**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-53 (CJN)** |
| | : | |
| | : | |
| **EDWARD JACOB LANG,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR**
**RELEASE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the Defendant's bond motion. The government contends that the Defendant, Edward Jacob Lang should continue to be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) [Crime of Violence]. There are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community, pursuant to 18 U.S.C. § 3142(e).

The government respectfully requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

**Procedural History**

On January 15, 2021, an arrest warrant was issued for the Defendant, who was then arrested in New York on January 16, 2021.

1

On January 19, 2021, at the Defendant's initial appearance in the arresting jurisdiction, the government orally moved for the Defendant's detention pending trial pursuant to § 3142(f)(1)(A) [Crime of Violence] of the federal bail statute. The defense consented to detention but indicated it might file a future bail application.

On January 29, 2021, the Defendant was indicted on eleven charges, including two counts of Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 111(a) and (b), one count of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a), three counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), one count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2, one count of Disorderly and Disruptive Conduct in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon, in violation of Title 18 U.S.C. § 1752(a)(2) and (b)(1)(A), one count of Engaging in Physical Violence in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon, in violation of Title 18 U.S.C. § 1752(a)(4) and (b)(1)(A), one count of Disorderly Conduct in a Capitol Building, in violation of Title 40 U.S.C. § 5104(e)(2)(D), and one count of Act of Physical Violence in the Capitol Grounds or Buildings, in violation of Title 40 U.S.C. § 5104(e)(2)(F).  The Defendant was transferred to D.C. and the Court set this matter for an initial appearance and detention hearing on Tuesday, February 9, 2021, at 1 p.m.

At the detention hearing, defense again conceded detention, while requesting the right to re-open the hearing at a later date.  On August 23, 2021, the Defendant filed a motion seeking the Defendant's release for a variety of reasons. Dkt 29.  In sum, the Defendant asks for release for the following general reasons: (1) Defendant claims detention is not necessary to ensure the

2

safety of the community in this case; (2) Defendant claims that the conditions at the jail require

his release because he claims he is being mistreated at the jail and claims he cannot participate in

his own defense or review discovery; and (3) the Defendant claims that discovery delays entitle

him to release.  Each of these arguments is without merit and his request for release should be

denied.

## **FACTUAL BACKGROUND**

### *The Attack on the United States Capitol on January 6, 2021*

On January 6, 2021, a joint session of the United States Congress convened at the United

States Capitol, located at First Street Southeast, Washington, District of Columbia. During the

joint session, elected members of the United States House of Representatives and Senate met in

the United States Capitol to certify the vote count of the Electoral College for the 2020

Presidential Election, which took place on November 3, 2020.

The United States Capitol is secured 24 hours a day by security barriers and United States

Capitol Police ("USCP") occupy various posts throughout the grounds. Restrictions around the

United States Capitol include permanent and temporary security barriers and posts manned by

USCP.  USCP officers wore uniforms with clearly marked police patches, insignia, badges, and

other law enforcement equipment. Only authorized people with appropriate identification are

allowed access inside the United States Capitol. On January 6, 2021, the exterior plaza of the

United States Capitol was also closed to members of the public.

The January 6, 2021 joint session began at approximately 1:00 p.m. Shortly thereafter, by

approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a

particular objection.  Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the United States Capitol building and USCP were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside. As the certification proceedings were underway, the exterior doors and windows of the Capitol were locked or otherwise secured.

At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and past officers of the USCP, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by the USCP or other authorized security officials.

A short time later, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. As such, all proceedings of the United States Congress, including the joint session, was effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the United States Capitol, including the danger posed by individuals who had entered the United States Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the United States Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm

4

after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

After the Capitol was breached, USCP requested assistance from the Metropolitan Police Department ("MPD") and other law enforcement agencies in the area to protect the Capitol, keep more people from entering the Capitol, and expel the crowd that was inside the Capitol.  Multiple MPD officers and other law enforcement officers came to assist.

By 2:30 p.m. on January 6, 2021, rioters had engulfed the west side of the Capitol and officers had begun retreating from the first landing of the Lower West Terrace, as shown in the still from USCP surveillance below.



Around the same time, rioters were climbing on the scaffolding in front of building as well as various features of the building.  Although the Capitol Building had already been breached and protesters had flooded in through several entrances, a group of MPD officers and members

of the USCP and other agencies called to assist gathered to protect the Capitol at the very

prominent entrance on the second landing of the Lower West Terrace.  (This is the exit through

which the President typically comes through during inauguration, as pictured below in a photo

from later that night.)  To enter the Capitol through the Lower West Terrace doors on January 6,

one had to walk, climb, or scale up to the second landing, go up a set of stairs, walk through an

arch and a short tunnel, and then walk through a series of glass doorways that the officers had

locked.  The tunnel and doorways are very narrow, with the entryway through the doors

measuring only around 10 feet across.



Around 2:40 PM, a group of law enforcement officers were maintaining a line at the

second set of glass doors inside the tunnel.  Officers reporting to the scene rushed to the tunnel

from within the building while rioters outside of the tunnel continued to summon more men to push their way through the tunnel.  A growing number of protesters made their way into the tunnel with a variety of tools and weapons and the tunnel became the point of one of the more intense and prolonged clashes between protesters and law enforcement at the Capitol on that day. Many of the protesters in the tunnel were recording video and many of the videos continue to circulate Internet channels, social media, and the news.  Much of the fighting over the next two and a half hours was also captured on surveillance footage from a camera above the Lower West Terrace doorway and Body Worn Camera ("BWC") footage.

### *Edward Jacob Lang's Criminal Conduct*

The Defendant is prominently featured in many of those videos and photos and can be seen on surveillance footage repeatedly fighting against the law enforcement officers guarding the Lower West Terrace doors from nearly the beginning of the fighting at 2:40 p.m. to nearly the end around 5 p.m., shortly before the rioters were finally expelled from the second landing of the Lower West Terrace.

Specifically, as shown in Exhibit A, which is a still from USCP surveillance footage, LANG first entered the tunnel around 2:41 p.m. with some of the very first rioters to enter the tunnel and approach the Lower West Terrace doors.

As captured by USCP surveillance footage, other videos recorded during this time period, and on a video that appears to be filmed by LANG and that was recovered from his phone (Exhibit B), LANG was with this group as they broke the glass of the locked doors separating the officers from the rioters, as shown in the still below from Exhibit B.

*Still from Exhibit B*



LANG then joined the group of rioters as they push forward towards the line of officers guarding the interior of the Capitol.   As captured in Exhibit B, which covers around 2:41 p.m. to

2:48 p.m., he remained at the forefront of that group as they try to get through the doors and can be heard yelling a variety of things at the officers, including: "This is our house" (Ex. B at 5 mins 46 seconds) and "You are enemies of the state" (Ex. B at 6 mins 40 secs).  (LANG later posted this video to his Instagram account, as shown in Exhibit B-1, a still from that post.)[1]

LANG remained at the forefront near the line of officers guarding the doors and filmed another video (Exhibit D covering around 2:51 to 2:57 p.m.).  In Exhibit D, LANG can be seen up against the line of officers and continuing to yell a variety of things, such as: "We are getting squished to death, the cops are squishing us to death." (Ex. D at 10 secs); "This is socialism, we are the last free country in the world." (Ex. D at 59 secs); "Back up, this is our house." (Ex. D at 3 mins 26 secs); "Lock your shields and push." (Ex. D at 4 mins 16 secs); "Get the women out of the way." (Ex. D at 5 mins 5 secs); "If you are not going to fight, move" (Ex. D at 5 mins 10 secs); and "Let us in. This is our house. We paid for this fucking building." (Ex. D. at 5 mins 46 secs); and "This is our country." (Ex. D. at 6 mins 10 secs).

Around 2:57 p.m., LANG and another rioter violently pushed a door against an officer's head and LANG simultaneously kicked at that officer.  Specifically, as captured in Exhibit E, which is a clip from YouTube Video 1, a publicly available video filmed by a photojournalist, that corresponds to around 2:57 p.m. with an added a white box around LANG, LANG and another rioter repeatedly shove the door against Sgt. J.M., who is in a bent forward position and

---

[1] At the beginning of this video, LANG appears to state, "We are in the motherfucking White House."  His posted something similar about being at the White House at least once more in a Facebook post and made a similar comment to his mother during a text exchange, as shown in Exhibit C. At the same time, in later posts and in that same text exchange, LANG also appeared to acknowledge that he was at the Capitol.  Indeed, as discussed in detail further on in this motion, in an extensive interview streamed on Instagram the following day, LANG explicitly stated that he and the other rioters were not a mob, but rather "patriots on a goal, on a mission to have the Capitol building. To stop this presidential election from being stolen so that we at least have one presidential veto left from all of these bullshit laws and restrictions."

has his head pressed up against the door.  (LANG can be seen with the red arrow above him and

Sgt. J.M.'s head can be seen below the yellow arrow in the still below from Exhibit E.)

*Still from Exhibit E*



As shown in Exhibit F, the BWC footage from Sgt. J.M. from the same time of around

2:57 p.m., LANG can be seen repeatedly kicking at the officer as he is stuck up against the door.

As Sgt. J.M. is bent forward trying to hold onto his shield at the time, his BWC faces downward.

The first kick is visible at 2:57.17; the second kick at 2:57.32; the third kick at 2:57.38; the

fourth kick at 2:57.40; and the fifth kick at 2:57.52.  (Although the top half of the person kicking

is not visible in the BWC footage, the pants and shoes match those worn by LANG, as shown in

Exhibit G, a photo of LANG on January 6 recovered from his phone (with an added red box

around LANG). Moreover, the position of the kicker corresponds with where LANG can be seen

standing, as shown in EXHIBIT B.)

Shortly thereafter, as shown in Exhibit H-1-4, stills from USCP footage, around 3:02 p.m., LANG left the tunnel, only to come back again around 3:03 p.m., scream and push his way to the front, and then exit once more.  This roughly corresponds with Exhibit I, a clip from YouTube Video 1, where LANG can be heard screaming "Come on, what the fuck are we doing? I can't even see."  Then leaving the tunnel, only to return shortly afterwards while making guttural screams.  (A red box has been added around LANG.)

Around 3:05 p.m., LANG appears to have filmed a "selfie" style video, as shown in Exhibit J which was recovered from his phone.  He can be seen outside the arch entrance to the tunnel yelling "we are the real men, we are the real men, get in there."  (LANG later posted a photo from this video to his Facebook account with the words "I was the leader of Liberty today. Arrest me. You are on the wrong side of history." Exhibit J-1.)

Around 3:08 p.m., LANG re-entered the tunnel and joined a group effort by the rioters trying to push past the officers guarding the doors.  Specifically, as shown in Exhibit K-1, USCP footage from 3:08 – 3:10 p.m. with an added red box around LANG, LANG walked toward the front of the tunnel bracing both arms on the back of the person directly in front of him and began pushing forward on the rioter directly in front of him. LANG then pushed with the crowd together as they pushed in unison attempting to break past the officers guarding the Lower West Terrace doors, who were located below the camera recording this footage.   LANG then stopped pushing and went to the side to wipe his eyes.  He then once again walked forward, braced both arms and joined the group effort to push past the officers guarding the doors, until he and others got pushed back out by the rioters leaving the tunnel. He then re-entered the tunnel and once

11

again joined the group pushing effort, as shown in Exhibit K-2, USCP footage from 3:12 – 3:13 p.m. with an added red box around LANG.

As captured in Exhibit L, a clip from YouTube Video 1 that corresponds to around 3:08 p.m. to 3:13 p.m., during this time frame as LANG and other rioters are violently pushing up against officers guarding the doors, the group of rioters all yelled "heave ho" as they pushed in unison.   As captured in Exhibit L, it was during this time that an MPD officer was being violently crushed against the first set of doors with a shield held by another rioter.

After being pushed out of the tunnel shortly after 3:13 p.m., LANG once again re-entered the tunnel around 3:15 p.m.  As shown in Exhibits M-1 through M-5, he pushed his way forward into the tunnel once again, grabbed an abandoned gas mask from the ground and put it on, and then rushed forward with other rioters towards the line of law enforcement guarding the doors. As captured in YouTube Video 1 and other videos, the rioters once again engaged in a joint heave-ho effort, pushing against the officers trying to guard the doors.  However, because LANG's position by the far wall and below the USCP camera obstructs view of him, it is unclear whether he participated in this additional joint-pushing effort.  As shown in Exhibits M-6 through M-7, from 3:18 p.m. to 3:19 p.m., LANG and all the remaining rioters in the tunnel are finally pushed out of the tunnel by law enforcement officers.

After law enforcement pushed rioters out of the tunnel around 3:20 p.m., and after those officers that had been violently dragged into the crowd and assaulted during this effort finally reached safety, the rioters near the arch entrance to the tunnel remained relatively calm and the violence subsided for a time.  During this time, LANG can be seen taking another selfie-style video near the edge of the second terrace.  Specifically, around 3:30 p.m., as captured in Exhibit

N, another video recovered from his phone that he appears to have filmed, LANG can be seen smiling widely and saying: "a little pepper spray in the morning!"  (LANG later posted this video to his Instagram account, as shown in Exhibit N-1, a still from that post.)

Around 3:50 p.m., rioters once again began to engage in violence, including another group pushing effort and more extreme violence.  LANG was one of the leaders in this effort and repeatedly escalated his violent attacks over the following hour.

Around 4:01 p.m., LANG can be seen crowd-surfing over the heads of rioters standing in front of the police line at the arch and then grabbing and hitting one of the officers repeatedly. Specifically, as captured in Exhibit O, a clip from YouTube Video 2, a video posted to YouTube by another Defendant, right before this happened, another rioter instructed the rioters to pull the police out.  Then rioters directly pressed up against the officers under the arch and those rioters on the steps behind them started to collectively heave against the officers to try to break past them once again.  At this point, LANG climbed on top of the heads and shoulders of the other rioters towards the line of law enforcement officers under the arch and attacked them. Essentially, he crowd-surfed to commit violence.  Once he reached the officers at the arch, as captured in USCP footage stills Exhibits P-1 through P-4, LANG hit an officer in the face.

Then, around 4:11 p.m., as captured in Exhibit Q (BWC footage from an officer on the side of the arch), after Detective P.N. fell to the ground, LANG repeatedly kicked the detective as he was down, as shown in Exhibit Q with a red box around LANG.

Around 4:20 p.m., LANG took a break from the violence to film another selfie-style video, as shown in Exhibit R, another video recovered from his phone. (LANG later posted this video to his Instagram account, as shown in Exhibit R-1, a still from that post.)

Around 4:26 p.m., as visible on USCP footage, LANG tried to get the attention of law enforcement to get assistance for a woman that was unconscious in the crowd of rioters being pushed out of the tunnel. He also appears to have helped drag another individual out from underneath other rioters that had been pushed out of the tunnel. (Unfortunately, as officers tried to help the woman and bring her inside the building to try to resuscitate her, other rioters, not including LANG, began violently attacking the officers with a variety of sticks and weapons.)

Around 4:37 p.m. LANG again took time to film another selfie-style video, this time filming himself up against the line of officers in the arch and pointing at them, as shown in Exhibit S, another video recovered from his phone. (LANG later posted this video to his Instagram account, as shown in Exhibit S-1, a still from that post.)

Around 4:43 p.m., a woman in the crowd appeared to try to get LANG and the others committing violence to stop, only to be shut down and ignored by LANG. Specifically, as shown in Exhibit T (BWC from Officer T.C., whom LANG then repeatedly hit with a stolen shield), around 4:43 p.m. a woman told LANG and other rioters: "you guys are better than that." LANG then appeared to state: "This is how our country was founded woman!" She replied by stating: "First of all I am a fucking veteran, let me talk to them." LANG responded by hitting Officer T.C. with the stolen shield, first at 4:43.36 p.m., then again at 4:43.29 p.m., then again at 4:43.51 p.m., then again at 4:43.53 p.m., and then again at 4:43.56 p.m. LANG then came at the officer with the shield at an angle at 4:44.31 p.m., then hitting him again at 4:44.33 p.m., then again at 4:44.51 p.m., and then again at 4:44.57 p.m. At 4:45.07 p.m., LANG told the officer: "You work for us," then hit him again at 4:45.42 p.m., and then hit the officer beside him at

4:46.37 p.m.  (Exhibit U, which is a clip of BWC from the same timeframe from an officer up on the ledge in the arch, captures much of the same, with an added red marking to show LANG.)

The rioters, and LANG in particular, then escalated things even further.  As shown in Exhibit V, an additional BWC clip from the officer on the ledge, around 4:48 p.m., another individual tried to get the violent rioters to stop, putting up both hands and screaming "we have to stop," only to be pulled to the side by another rioter.  After that individual was pulled aside, at 4:49.22 p.m., a rioter screamed "You are going to die tonight!" at the officers.  Then at 4:50 p.m., a series of violent assaults began by those standing near LANG, including a rioter attacking with a bat and a rioter attacking with a helmet.  (These assaults are captured from the perspective of the officers in Exhibit V and from the perspective of the crowd in Exhibit W, a video filmed by another individual in the crowd, but found on LANG's phone, that corresponds to approximately 4:50-4:56 p.m.)  These two attacks lasted around 30 seconds.

Around 4:50.42 p.m., after these attacks are done, LANG reached forward to take one of the fallen shields, which he passed back to rioters behind him.  At 4:50.57 p.m., LANG then reached forward to grab the MPD helmet that had just been used to bludgeon the officers by another rioter.  (This is captured more clearly on Exhibit X, another clip from BWC of an officer on the front line.)  LANG then placed the helmet on his head and waved his stolen shield triumphantly in the air, as captured in Exhibit W.  (LANG later posted a clip from what appears to be this same video with the words "this is me" and "Look at the patriots inspired by me chanting!!" above himself as he hoisted the shield up in the air triumphantly, as shown in the still from that posting in Exhibit W-1.)

At 4:51.31 p.m., as seen on Exhibit V, LANG taunted the officers (or perhaps simply tried to rile up the crowd) by slamming the stolen shield down in front of the officers.  Shortly thereafter, at 4:52 p.m., someone close to the same area where LANG was standing (unclear whom) yelled "Are you motherfuckers ready to die? Are you motherfuckers ready to die?" at the officers.  At the same time, rioters threw a variety of objects – poles, plastic cones, desk drawers, and sticks at the officers.  Around the same time, the crowd yelled "traitors" at the officers.  At 4:53 p.m., a different rioter came forward with the same bat used previously and attacked the officers for a few seconds.  At 4:54 p.m., LANG once again taunted the officers (and/or riled up the crowd) by slamming the stolen shield down in front of the officers repeatedly.  He then waived other rioters forward (although none joined him) and once again slammed the shield on the ground.

As captured best on Exhibit W, around 4:55 p.m., another rioter handed LANG the bat that had been used by other rioters at least twice before to attack the officers.

Over the next five minutes, from 4:55 p.m. to 5 p.m., LANG repeatedly, and strategically, attacked the officers guarding the Capitol with that bat.  Specifically, he can be seen striking the officers with the bat at the following times: 4:54.58 p.m.; 4:56.30 p.m.; 4:56.44 p.m.; 4:57.13 p.m.; 4:57.15 p.m.; 4:57.21 p.m.; 4:57.26 p.m.; 4:57.32 p.m.; 4:58.06 p.m.; 4:58.29 p.m.; 4:59.10 p.m.; 4:59.32 p.m.; 4:59.49 p.m.; 4:59.51 p.m.; 4:59.54 p.m.; and 4:59.58 p.m.  These are captured on Exhibit V and Exhibit Y (BWC footage from one of the officers repeatedly hit with the bat).  LANG only stopped after he was shot with a rubber bullet that hit him in the foot.

His attack with the bat is also captured by videos and photos taken by news media in the area on January 6, 2021, including for example the two photos below showing him attacking law

16

enforcement with the black and red bat (a red arrow has been added above the Defendant's head in each photo).





While attacking the officers with the bat, LANG was strategic about his approach, switching from simple swings to a more complex approach where he varied between low swings, overhead swings, and thrusts.  (These low swings towards the officers' legs can best be seen in Exhibit Z, a clip from the BWC of an officer behind the frontline officers.)  As one of his

victims, Officer H.S., noted when interviewed, these varying strikes were more effective.
Indeed, Officer H.S. was injured by LANG's hits to his leg and had trouble standing after he
finally got off the front line that night.  Officer H.S. limped for days after and the swelling took a
month to subside.

### *Defendant's Additional Postings and Interviews on Social Media After January 6*

In addition to the social media posts described above, the Defendant participated in a nearly
45-minute-long public live video interview posted on Instagram on January 7, 2021, where he
described his actions on January 6, 2021, noting, among other things:

- "It was war. This was no protest.";

- After describing how he was shot in the foot with a rubber bullet, stating that this
  "was after already three hours face to face with them.  We gave them not an inch.
  We tried getting in through the front, but we couldn't. Other people got access
  through a couple of windows, stuff like that and slowly funneled in but we were
  trying to get through the main gates.";

- "You know I had a gas mask on for the first two, three hours. I was fighting them
  face to face but eventually they started using the stuff that goes right through the
  gas mask.";

- "Six, seven times at least I got hit. Kept getting whatever the eyewash spray out,
  waiting 5 or 10 minutes, get back in there. You know and I even had a gas mask
  on.  I got a gas mask with me, it is full of blood from the top, my head just leaked
  down into it."; and

- "A lot of people were thinking it was a game, for like their snapchat or to be a part
  of history, then they started getting hit with batons, and people started coming out
  with blood and people were getting trampled.  And I am like straight up get the
  women and children out of this little corridor right here. We are talking war. We
  need men up there, men who are going to pull cops down and out of there. Men
  who are going to take a bullet if need be, you know.  This was tyrants versus
  freedom fighters. At the end of the day painting us as insurrectionists, a mob. This
  was no mob. A mob is a bunch of people like attacking each other.  This was an
  organized unit of patriots trying to take on tyrants.  You know what I mean. A mob

has no goal.  A mob is just, uh, just screaming and shit. This was patriots on a goal, on a mission to have the Capitol building. To stop this presidential election from being stolen so that we at least have one presidential veto left from all of these bullshit laws and restrictions."

LANG made many of the same type of statements – particularly statements bragging about his violent actions on January 6, 2021, during texts with his mother, as shown in Exhibit C. After his mother extorted him to take his Facebook posts down because "they are arresting people for breaching the capital."  LANG refused, explaining that he would "gladly" get arrested and would "take the consequences of [his] actions."  LANG went on to say, "you should have seen me momma…You would be so proud," followed by details of his "three hours" of wrestling, dragging, and taking "metal" to the heads of law enforcement officers.

On January 7, 2021, LANG posted: "The tree of liberty is thirsty for the blood of tyrants. God give us strength in the battle ahead." On January 13, 2021, he posted: "Redcoats this will be the last thing you see before your maker."

In addition, an open-source search of social media depictions from January 6, 2021, also uncovered additional videos and photographs of the Defendant discussing his thoughts about what would follow the attack on the Capitol.  In a video posted by a Twitter account holder, the Defendant had a conversation with an unidentified female ("UF"), which was streamed on Instagram. The following was an excerpt of the conversation posted online:

- UF: "So what do you think happens next?"
- The Defendant: "Guns…That's it. One word. The First Amendment didn't work, we pull out the Second. We're all civilized people and we love going to work and praying to God on Sundays and having nice family barbeques…and that was every single person there. No one wants to take this and and die for our rights, but dying for our rights is the only option that any person with a logical brain sees right now. This is it."

January 14, 2021, just two days before he was arrested, the defendant posted a story to his Instagram.  Among other things, he stated: "I want to use this time to say thank you for all the people that have been reaching out, calling me a patriot… Been really amazing to have this impact on the community, going to keep on fighting for you guys, we got some big things planned.  We are not going to let them take our Constitutional Liberties.  Our God-given rights are safe within the hearts of the patriots.  So we won't give up.  You guys should not give up. Contact me if you want to be a part of the patriot movement."

### *Defendant's Efforts to Organize State Militias Online and Stop President Biden's Inauguration*

A search of LANG's phone revealed that after January 6, LANG became enthralled with the idea of fighting the government and what he saw as defending his freedoms. LANG organized group chats and invited like-minded members to join conversations where participants expressed interest in forming militias and pursuing further violence in Washington D.C. and elsewhere, including efforts to impede the inauguration of President Biden on January 20, 2021.  LANG used Instagram and the application Telegram to conduct these group discussions. As captured on his phone, LANG then attempted to use the Telegram group chats to organize a militia with factions or "regiments" in different parts of the country.  LANG assigned regional leaders, instructed participants on ways to anonymize their identities in the application, and encouraged them to recruit family and friends to join, as shown in Exhibit AA, an example of a common message LANG sent out to the Telegram militia group chats he created.

As shown in Exhibit BB, a sample chat exchange from some of the militia group chat members, some of these new Telegram group members then used the conversation threads to discuss whether and how to disrupt the government.

As shown in the examples included below, which are all included in Exhibit CC, in various chats both with the larger Telegram group chats of those interested in the militias and in discussions one on one with others via Telegram, LANG also repeatedly indicated that he was planning further efforts to disrupt the government, particularly either on January 17th or on the date of the inauguration on January 20, 2021.

- *EXHIBIT CC.1 - January 8, 2021 chat with Another Person about January 20th* - LANG notes he would have "died" with the person "on Capitol Hill" and later says "Can't wait for the 20th. I'm getting a fucking arsenal together."

- *EXHIBIT CC.2 January 9, 2021 post to group chat by LANG* – LANG notes that "This group is with ZERO fear of the feds…. They know this is war.  This is war. You obviously weren't at the capitol this week.  Let me show you what war is."

- *EXHIBIT CC.3 January 9, 2021 post to group chat by LANG*- LANG explains the regional regiments per state that he places everyone in and notes "if anything goes down where we need to mobilize and show up like the minute men the Regional Leader messages everyone and we come armed…"  Then after one of the Telegram group members warns him that the group is not vetted, LANG replies: "respectfully my name and face is all over national news and I'm not scared about these alphabet boys…" He later adds: "They know what I'm up to. I'm bringing the patriots together and theirs nothing they can do but kill me."

21

- *EXHIBIT CC.4 January 14, 2021 post to group chat by LANG* – LANG notes that "We will March armed on state capitols, and DC."

- *EXHIBIT CC.5 January 14, 2021 post to group chat by LANG* – LANG asks people to message him privately regarding "suggestions on what we should do on the 17th and 20th" and notes "I'm having discussions privately and posting what I believe this Militia should do nationally."

- *EXHIBIT CC.6 January 14, 2021 post to group by LANG* – LANG notes "Caution is out the window.  When Joe Biden gets into office he will label us domestic terrorists… I say making a stand on the 17th and 20th is our DUTY as Americans!..."

- *EXHIBIT CC.7 January 14, 2021 post to group by LANG* – LANG notes: "Our best and honestly easiest option right now is to make sure Joe Biden never gets in that office."

LANG further used videos of his violence on January 6, 2021 to inspire and convince others in this Telegram militia group chat.  For example, as shown in Exhibit DD (a portion of one of the group chat threads), on January 9, 2021, LANG asked for others to help him "scout" for additional members, to which another member responded that he had a bunch of people and "tons of ammo to load."  LANG then stated: "Can't wait to take back our country with you patriots. It's their turn to hide and run. Wednesday was the Shot heard around the world - The Second American Revolution and now the redcoats get to hide and wonder if they are safe at night."  LANG then shared some more "savage" videos of his actions on January 6, 2021 to the group to inspire them, including the video of him hoisting the stolen shield up in front of the

crowd shortly before he beat officers with a bat.  LANG explained "got the redcoats full gear, gas mask, shield, helmet" and added: "The patriots loved it listen to them. My people!!!!!!!! The Tree of Liberty is Thirsty for the Blood of Tyrants."

## ARGUMENT

**I.**     **There Is Clear and Convincing Evidence That No Conditions or Combinations Can Effectively Ensure the Safety of Any Other Person and the Community.**

There are four factors under § 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. §3142(g).  In consideration of these factors, the government respectfully submits that there are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community.

### *Nature and Circumstances of the Offenses Charged*

During the course of the violent siege of the Capitol on January 6, 2021, over 100 law enforcement officers reported being assaulted or injured by the violent mob while attempting to protect the U.S. Capitol and the individuals inside of the building. These assaults occurred both inside of the Capitol, as well as on the steps outside of the Capitol and the grounds of the Capitol, where the enormous mob included numerous individuals with weapons, bulletproof vests, and pepper spray who were targeting the officers protecting the Capitol.  Additionally, the violent crowd encouraged others in the crowd to work together to overwhelm law enforcement and gain unlawful entry into the U.S. Capitol.

23

What is extremely troubling about the Defendant's role in this attack is the severity of his actions, the length of time he was engaged in fighting law enforcement, the de facto leadership role he took, and the escalation of his violent assaults.  As noted above, around 2:40 p.m., on January 6, 2021, the Defendant joined a large mob that substantially outnumbered law enforcement guarding the Lower West Terrace doors to the Capitol. The Defendant was part of a group that pushed forward inside of a small tunnel to reach the Lower West Terrace doors and attacked law enforcement in an effort to gain entry. The law enforcement officers were all in full uniform with the word "police" clearly visible.  Over the next two and a half hours, the rioters continued to fight with law enforcement guarding these doors.  The Defendant played a leading role in that effort, continually re-engaging with law enforcement on the front lines from 2:40 p.m. to around 5 p.m., when according to his own account, he was shot in the foot with a rubber bullet.

The Defendant has now been indicted for three of his violent acts during that nearly two and a half hours of fighting with law enforcement and the government intends to supersede with additional charges in the near future to encompass his many additional violent acts against law enforcement officers -- which the Defendant himself described as a "war."  His actions clearly represent violent criminal behavior that involved a further dangerous escalation aimed at allowing other violent rioters to unlawfully enter the Capitol.  He directly injured at least one officer and additional officers could have easily been seriously injured, if not killed, by his attacks first with his body, then with a shield, and finally with repeated blows with a baseball bat over a five-minute period.  (To be sure, many other officers, including officers whom the Defendant victimized were also injured that day.  However, unfortunately, due to the number of violent rioters on January 6, 2021 and the fact that officers were assaulted many times by many

people over multiple hours, it is often difficult to attribute specific injuries to the actions of one specific rioter.)   Throughout the day, but particularly towards the end when the violence was at its worst, the Defendant took on a *de facto* leadership role – encouraging and exhorting others to commit violence.   For example, early on as rioters were first trying to get past the officers guarding the Lower West Terrace doors, he told others "if you are not going to fight, move" and encouraged the group to push.   Later, after the violence had subsided and things had been peaceful for some time, he is one of those who ratcheted up the violence -- literally crowd surfing so he could attack officers by climbing on top of the rioters standing closer to the officers.   As others in the crowd tried to repeatedly stop the violence – he and those around him shut them down and got them out of the way.   Then, as the violence continued to escalate, he took a role right at the front using the officer's own tools (a helmet and shield) to both taunt them and encourage the crowd behind him.   Indeed, he himself determined that he had "inspired" those around him, as he noted in an Instagram story about the topic.

The D.C. Circuit has instructed that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   Here, the Defendant "actually assaulted" *multiple* police officers in *multiple* ways for *hours*.   As a result, LANG certainly falls within the "different category" of January 6 defendants identified in *Munchel*.   If anything, his extreme and repeated violence that day puts him in a category all his own – as very few (if any) other defendants

committed as much violence against law enforcement officers on January 6, 2021 as the
Defendant did.

Moreover, he repeatedly demonstrated both on January 6 and the days after that he was ready
and willing to go it alone in his violent attacks on law enforcement.  Indeed, he was most violent
on January 6 when he mostly stood in front of the officers by himself and without assistance --
attacking them with a bat for nearly five minutes.  This is not a case in which "the presence of
the group was critical to [his] ability to obstruct the vote and to cause danger to the community."
*Id.*  The Defendant had no issue leading the violence all on his own.  The Defendant
demonstrated that he remains a danger to the community (and any law enforcement officers
standing in the way of his ideological beliefs) by his repeated choice on January 6 to engage in
violence.

As a result, the nature and circumstances of these offenses overwhelmingly weigh in favor of
detention.

### *Weight of the Evidence Against the Defendant*

The second factor to be considered, the weight of the evidence, also heavily weighs in
favor of detention.  The evidence against the Defendant is also quite strong and compelling.  As
noted above, the Defendant was observed on USCP surveillance cameras, social media videos
and photos (much posted by himself), BWC videos, and media footage attacking law
enforcement officers and attempting to unlawfully enter the Capitol.  A witness that has known
him since childhood identified him in some of those photos and videos.  Additionally, a social
media video captures the Defendant admitting that he wore a gas mask and fought law
enforcement for hours on January 6, 2021 and he made similar admissions many times in chats,

26

texts, and online forums.  Lastly, law enforcement recovered some of the distinct clothing he wore that day, including a blue and white floral shirt and a black jacket with numerous zippers, from the apartment where he was arrested.  The evidence against this Defendant is overwhelmingly and exceptionally strong, and accordingly, the weight of the evidence weighs heavily in favor of detention.

### *Defendant's History and Characteristics*

The government recognizes that the Defendant has only one prior conviction for a misdemeanor possession of a controlled substance.  However, as noted in the Defendant's pleading, he apparently has two additional open matters pending in two different states.

The Defendant's glee and pride in his violent actions should also weigh in favor of detention. The Defendant did not just make one boastful claim that he later disavowed, rather he stopped repeatedly throughout the day to film his exploits for social media.  He then repeatedly discussed both what he had done and what he planned to do in multiple digital forums – going so far as to state that the only way he could be stopped was to be killed.  He even informed his mother what he had done, telling her she would be "proud" of him for his extreme violence against law enforcement.  In addition, he then leveraged a unique set of skills in social media to attempt to organize online groups of state militias and encourage them to stop the inauguration. Accordingly, the Defendant's history and characteristics also weigh in favor of detention.

### *Danger to the Community and Flight Risk*

The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of the Defendant's detention. The charged offenses involve violent assaultive conduct, and the assaults became more violent and more

dangerous as the day progressed.  He armed himself and assaulted law enforcement with the intent to unlawfully enter the Capitol and stop the functioning of our government as it met to certify election results. The Defendant repeatedly made it clear both on January 6 and the days that followed that he poses a danger to the functioning of our government and any law enforcement officers that stand in the way of his ideological beliefs.

His public comments about further escalation – like his noting that what happens next is "guns" and indicating that "we have got some big things planned" -- just add to the danger to the community already made clear by his decision to attack law enforcement officers guarding the Capitol on January 6, 2021 violently and repeatedly.

In particular, the fact that he appears to have been galvanized by his own violent actions on January 6 are particularly concerning.  In the weeks afterwards, the Defendant repeatedly threatened and attempted to plan future violence to stop President Biden from taking office – both in his public posts online and in the state militia Telegram chat groups he created.  He stated that he was "bringing the patriots together" and there was "nothing they can do but kill me."  As late as the day before a warrant was issued for his arrest, he stated "Our best and honestly easiest option right now is to make sure Joe Biden never gets in that office."  The Defendant has repeatedly made it clear to all who were willing to listen that he is a threat and a danger that cannot and will not deterred or stopped.  Accordingly, this factor also weighs heavily in favor of detention.

Given the above assessment of all four relevant factors, no conditions or combinations of conditions can effectively ensure the safety of any other person and the community.

## II.     The Defendant Has Not Demonstrated that the Conditions at the Jail Justify His Release.

### A.  The Defendant's Complaints about Access to Discovery and Counsel at the Jail Are Not a Basis for Release.

The Defendant's claims regarding access to discovery and counsel do not establish that he is entitled to the relief he seeks.  The Defendant claims that the conditions at the jail make confidential discussions with attorneys difficult, *see* Dkt 29. at 13-15, and keep him from being able to access to the voluminous discovery provided by the government in this case to date.  *See id.* at 16.  For these reasons, among others, the Defendant asserts that he should be released.  To be sure, the Defendant is entitled to reasonable access to discovery and the opportunity to meaningfully confer with counsel.  But the Defendant cites no authority suggesting that his complaints justify a different analysis at a detention hearing and ordering his release.  Indeed, the concerns raised by the Defendant are entirely independent of the factors this Court must analyze in making a detention decision under the Bail Reform Act.[2]

The Defendant also requests access to a laptop in his motion as an alternative to release.  However, the Defendant's access to a laptop is immaterial to the question of whether he would pose a danger if released.  He has also not proffered to the Court whether he attempted to take advantage of the program at the jail that allows for inmates to review voluminous discovery on a computer provided by the jail and, if so, why he claims it is not sufficient to allow him to review discovery.

On March 30, 2020, a civil complaint was filed in the United States District Court for the District of Columbia, on behalf of defendants detained at the Central Detention Facility and Central

---

[2] Defendant complains that a "contact" visit from his attorney results in a 14-day quarantine. Dkt. at 14.  The government notes that the current policy only requires such quarantines for defendants who have elected not to be vaccinated.  *See*  https://doc.dc.gov/page/coronavirus-prevention  and  https://www.cdc.gov/coronavirus/2019-ncov/community/quarantine-duration-correctional-facilities.html (both websites last visited August 6, 2021).

Treatment Facility (CTF), alleging that by the D.C. Department of Corrections (DOC) was failing to take reasonable precautions to prevent the spread and severity of a COVID-19 outbreak.  That case, *Banks v. Booth* (20-cv-849), was assigned to Judge Kollar-Kotelly, who on April 19, 2020 issued a temporary restraining order (ECF No. 48), and on June 18, 2020, issued a preliminary injunction (ECF No. 100) that addressed, in part inmates' access to confidential legal calls in light of enhanced restrictions in place to address the pandemic, and ordered DOC to ensure that all inmates have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters, and to "swiftly implement to use of such technology" necessary to accomplish this (ECF No. 100 at 39).

On December 12, 2020, *amici* filed a report to provide information to the Court regarding DOC's compliance with the Court's June 18, 2020, preliminary injunction (ECF No. 138).  That report noted that the DOC had purchased significant amounts of new technology to facilitate attorney client communications, including through the use of cell phones from within their cells; and that the DOC facilitated more than 1500 such calls each month.  The report also noted that DOC had purchased a number of tablets that inmates were permitted to use review discovery and to communicate with their attorneys using secure messaging (ECF No. 139 at 42).  Finally, the report noted that the DOC facilitated 1,209 videoconferences between attorneys and their clients between May and October 2020 (*Id.* at 40-41).[3]

On March 15, 2021, DOC issued a new procedure for voluminous electronic discovery, which the undersigned provided to the defense via email on April 7, 2021.  The policy is similar to, but more flexible than, the policy appended to the Defendant's motion, and it would allow him to

---

[3]     On July 6, 2021, the D.C Circuit Court of Appeals found that the preliminary injunction had expired.

review electronic materials in his cell on a laptop provided by DOC.  The government's position is that this procedure satisfies the requirements of the Protective Order regarding discovery in this case, so it would not limit the Defendant's access to sensitive materials.

The Defendant makes no attempt to explain why the program already in place at the jail is inadequate to allow him to review discovery and engage in privileged discussions.[4]  The Defendant also claims—without any explanation or citation—that the waiver required by the jail "on its face has the potential to invade attorney-client privilege." Dkt. 29 at 18.  It is unclear what, specifically, the Defendant contends is potentially violative of attorney-client privilege, but if there is a problem with the waiver, the Defendant should take the issue up with DOC, with involvement of the government and Court only if necessary.  Any allegedly offensive language in a waiver regarding discovery is not material to the Court's detention determination.[5]

### B.  The Defendant's Complaints about Mistreatment at the Jail Are Not a Basis for Release.

The Defendant similarly cites no authority—and the government is not aware of any—standing for the proposition that restrictive housing or any of the other conditions at the jail raised by the

---

[4]    The defendant also requests that if he is provided a laptop, he has the ability to email his attorneys and to take notes. Dkt. 29 at 19.  The defendant cites no authority in support of this demand, and in any event, it is irrelevant to his dangerousness.  He also requests a guarantee that "no one shall access the laptop in an effort to gain access to attorney client privileged materials."  He has not proffered that anyone is currently trying to access any privileged materials he may possess, and the government is aware of no such attempts.

[5]    The defendant also claims that the conditions of attorney-client visits at the jail require release because they are tantamount to an intrusion of the Attorney-Client privilege.  *See* Dkt. 29 at 14-15.  We note that the cases cited by the defendant are inapposite, even to his proffered facts.  The defendant has made no allegation that any of the information stated in any meetings with his attorneys has made its way to the U.S. Attorney's Office or the FBI, much less that government counsel or agents obtained information on privileged communications.  *See* Dkt. 29 at 15, citing *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995).  Neither the information proffered by the Defendant with respect to his communications with counsel at the jail, nor his hypotheticals about government intrusion into those interactions, are material to whether the defendant would pose a danger if released.

Defendant entitle him to release under the Bail Reform Act, which is the relief he seeks in this motion.

The government is committed to ensuring the safety all of inmates, regardless of their detention status.  But it is also critical, from the government's perspective, to allow the issues to be properly litigated in their proper course.  Civil litigation is the proper venue to address complaints of mistreatment by the jail.  *See United States v. Brooks*, 2020 U.S. Dist. LEXIS 230323, at *10 (D.D.C. Dec. 7, 2020) ("As the government correctly rejoins, any such constitutional claim must be raised via a separate civil suit and cannot be part of a compassionate-release motion in the underlying criminal case. Courts all over the country have concurred."); *United States v. Smith*, 2020 U.S. Dist. LEXIS 213050, 2020 WL 6702173, at *6 n.8 (S.D. Ohio Nov. 13, 2020) (collecting cases); *see also, e.g.*, *United States v. Banks*, 422 F. App'x 137, 138 n.1 (3d Cir. 2011) (per curiam) ("We agree with the District Court that a motion filed in his criminal case was not the proper vehicle for raising the claims about prison conditions contained in that motion."); *United States v. Garcia*, 470 F.3d 1001, 1003 (10th Cir. 2006) (noting that, because the defendants' "challenge[s] to the conditions of confinement . . . were raised in motions filed in their respective criminal cases . . . they were properly denied by the district court"). The proper way to raise such a claim is to file a civil suit against the DOC or its warden. *See, e.g.*, *United States v. Folse*, Nos. CR 15-2485 JB, CR 15-3883 JB, 2016 WL 3996386, at *15 (D.N.M. June 15, 2016) ("The general rule is that a defendant must file a separate civil action to address his conditions of confinement."); *United States v. Luong*, No. Cr. 99-433 WBS GGH, 2009 WL 2852111, at *1 (E.D. Cal. Sept. 2, 2009) ("As several courts have recognized, the proper procedure to redress a defendant's grievances regarding treatment within

a jail or prison is to file a civil suit against the relevant parties . . . rather than a motion in his criminal case."); *United States v. Wells*, Cr. No. 3:02CR-20-H, 2007 WL 3025082, at *2 (W.D. Ky. Oct. 15, 2007) ("[T]o the extent Wells is challenging his condition of confinement by claiming that his life is in danger, the appropriate course would be to file a civil action against the alleged wrongdoers, not a Rule 60(b) motion in his criminal action."); *Campbell v. McGruder*, 416 F. Supp. 100, 101 (D.D.C. 1975) (addressing "class action brought by unconvicted pre-trial detainees incarcerated at the District of Columbia jail").

The Defendant relies on a U.S. District Court case holding that courts have the power to grant some form of relief to pretrial detainees who complain of violations of their Constitutional rights while in pretrial detention as the basis for his request for release. *See United States v. Medina*, 628 F. Supp. 2d 52, 55 (D.D.C. 2009) (Lamberth, J.). *Medina* involved procedures surrounding access to counsel and discovery, as well as the security designation of the defendants, and Judge Lamberth held that he possessed the power to grant the relief requested. *Id.* Notably, this defendant largely does not ask this Court to grant the type of relief Judge Lamberth concluded that he had the authority to provide in *Medina*.[6] He also does not ask the Court to order the jail to grant relief from alleged human rights violations. He instead seeks his outright release, and the information he proffers does not meet the standard set out in the Bail Reform Act to support a decision to release the Defendant on the merits. Here, as discussed above, the Bail Reform factors weigh heavily in favor of detention.

### III.    Detention Should Be Analyzed Based on the Bail Reform Act, Not the Volume of Discovery in this Case.

---

[6]    The Defendant does request access to a laptop as an alternative to release. The government addresses that request *supra*.

The United States is aware of and takes seriously its obligations pursuant to Federal Rule of Criminal Procedure 16 and Local Criminal Rule 5.1(a), the provisions of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), and the Jencks Act, 18 U.S.C. § 3500.  Accordingly, as set forth in detail in the United States' Memorandum Regarding Status of Discovery as of August 23, 2021 (ECF No. 30), the United States has exercised and continues to exercise due diligence: (1) to obtain potentially discoverable materials from multiple sources; (2) to review those materials for discoverability; (3) to process discoverable materials into loadable, searchable formats that are accessible and useable for  the defense and consistent with industry-wide standards; (4) to organize productions in a manner that will be meaningful to the defense; and (5) to ensure that any materials produced are subject to adequate protections and/or redactions.  The United States is managing the ingestion, review, processing, and production of an unprecedented volume of materials generated by an extraordinary crime.  These materials come from a wide range of sources and vary in format.  The steps the government is undertaking are designed to ensure the defense can receive such evidence in loadable, searchable formats that are consistent with industry-wide standards.  Processing takes time but the government is taking all appropriate measures to expedite this process.  Ultimately this process will significantly benefit the defense in terms of its ability to review the information produced.  Any other production method would make defense review of the materials incredibly burdensome and time-consuming, given the nature and volume of the materials involved.

It is important to note that the government is taking a very expansive view of what may be exculpatory and thus discoverable in these Capitol Breach matters.  It is the government's commitment to ensuring that all arguably exculpatory materials are produced in a comprehensive,

accessible, and useable format that, in the main, underlies the government's need for time to provide discovery.  The government's approach to discovery is designed to ensure that the Defendant's rights are observed, including ensuring he has meaningful access to voluminous information that may contain exculpatory material, and that we do not overproduce or produce in a disorganized manner.  *Brady v. Maryland*, 373 U.S. 83 (1963), imposes a constitutional obligation on the government to disclose information favorable to the Defendant where it is material to either guilt or punishment.  *Id.* at 87.

The government's overarching discovery plan is designed to provide the Defendant with all data that may contain such information in a manner that will facilitate the search, retrieval, sorting, and management of that information.  Given the nature and volume of material – a large portion of which was generated on January 6 when thousands of individuals, including the defendant, collectively participated in an attack at a heavily surveilled location, chose to record their actions on their own digital devices, and subsequently posted evidence of their criminal conduct on social media – our plan will take time.

The government is acting diligently, but this case creates very complex discovery issues, not of the government's making, that we need reasonable time to address. In view of the government's ongoing exercise of due diligence, our need for reasonable time to address discovery obligations is not something the court should take into account when considering whether detention is warranted in this case.  As explained above, the facts in this case warrant a conclusion by clear and convincing evidence that no condition or combination of conditions of release can assure the safety of the community.

**CONCLUSION**

35

WHEREFORE, the United States respectfully requests that the Court grant the government's motion to detain the Defendant pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By:

**MELISSA JACKSON**
Assistant United States Attorney
D.C Bar Number 996787
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 815-8585
Email: Melissa.Jackson@USDOJ.GOV