# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **No. 21-CR-53 (CJN)** |
| **EDWARD JACOB LANG,** | |
| *Defendant.* | |

## DEFENDANT LANG'S MOTION TO DISMISS COUNT NINE: <u>OBSTRUCTION OF AN OFFICIAL PROCEEDING</u>

Defendant, Edward Jacob Lang ("Jake" or "Mr. Lang"), by and through his counsel, respectfully submits this motion to dismiss the indictment as to Count 9: obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2) because the Government has failed to state an essential element of the offense. Where an indictment is defective for failing to state an offense, a pretrial motion to dismiss the defective indictment is warranted and the Court must dismiss an indictment which fails to state all essential elements of the crime charged. FEDERAL RULES OF CRIM. PRO. 12 (b)(3)(B)(v). First, the allegations regarding Mr. Lang do not fit within the scope of the meaning of 18 U.S.C. § 1512(c)(2). Second, as a matter of law, the Electoral College certification in the Capitol building on January 6, 2021 was not an "official proceeding" under 18 U.S.C. § 1512(c)(2) or 18 U.S.C.S. § 1515(a)(1) and thus the charge must be dismissed. A memorandum in support is being simultaneously submitted.

Dated:  April 5, 2022

Respectfully Submitted,
/s/

_____

MARTIN H. TANKLEFF, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Lang*
99 Park Avenue, 6th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012


*/s/* **Steven A. Metcalf II, Esq.**

_____

STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Lang*
99 Park Avenue, 6th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012
metcalflawnyc@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that, on April 5, 2022, the forgoing document was filed via the Court's electronic filing system, which constitutes service upon all counsel of record.

Respectfully Submitted,

/s/
_____

MARTIN H. TANKLEFF, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Lang*
99 Park Avenue, 6th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012

/s/ **Steven A. Metcalf II, Esq.**
_____

STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Lang*
99 Park Avenue, 6th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012
metcalflawnyc@gmail.com

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

*v.*

**EDWARD JACOB LANG,**

        *Defendant.*

**No. 21-CR-53 (CJN)**

## MEMORANDUM IN SUPPORT OF DEFENDANT LANG'S MOTION TO DISMISS COUNT NINE OF THE SUPERSEDING INDICTMENT FOR FAILURE TO STATE AN OFFENSE

Defendant Edward Jacob Lang, by and through his counsel, hereby moves to dismiss Count Nine of the Superseding Indictment and, in support of the motion, sets forth the following facts and arguments.

## I.   INTRODUCTION

Count Nine of the Superseding Indictment charges Mr. Lang as follows:

> On or about January 6, 2021, within the District of Columbia and elsewhere, EDWARD JACOB LANG, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18

(*See* Superseding Indictment attached as **Exhibit A**).

An indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1), and "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution of the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.D.C. 2017) (*citing Russell v. United States*, 369 U.S. 749 (1962); *Stirone v. United States*, 361 U.S. 212 (1960)). A defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(3)(B). Rule 12 provides that a defendant may also move

to dismiss the indictment for "failure to state an offense" and "lack of specificity." FED. R. CRIM. P. 12(b)(3)(B)(iii), (v).

Section 1512(c) falls under Chapter 73 of Title 18, which clearly deals with "Obstruction of Justice." *See* 18 U.S.C. §§ 1501–1521. As the Ninth Circuit has emphasized – the plain language of the Section 1512(c) statute does not prohibit the obstruction of every governmental function. Actions that should be criminalized are only obstruction of proceedings such as a hearing that takes place before a tribunal. *See United States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013). Stated otherwise, various defense attorneys for January 6 Defendants have taken the position that Section 1512(c), by its plain language, does not criminalize the obstruction of legislative action by Congress.

Regardless of such position or argument, the main issue here is whether Mr. Lang's alleged actions fall within Section 1512(c) when he is not alleged to have destroyed documents used in any January 6th "proceeding".  His presence near the Capitol did not directly go after the vote counting, and do not fall within the confines or constitute "corruptly…obstruct[ing], influenc[ing], or imped[ing]" the "official proceeding".

A valid interpretation as to how Section 1512(c) should be applied is articulated in a June 8, 2018 memorandum Bill Barr wrote to Deputy Attorney General Rod Rosenstein and Assistant Attorney General Steve Engel. (*See* "the Muller Memo" attached as **Exhibit B**). In the memo, Barr explains the following:

> As things stand, obstruction laws do not criminalize just any act that can influence a "proceeding." Rather they are concerned with acts intended to have a particular kind of impact. A "proceeding" is a formalized process for finding the truth. In general, obstruction laws are meant to protect proceedings from actions designed subvert the integrity of their truth-finding function through compromising the honesty of decision-makers (e.g.,judge,jury) or impairing the integrity or availability of evidence-testimonial, documentary, or physical. Thus, obstruction laws prohibit a range of "bad acts" - such as tampering with a witness or juror; or destroying, altering, or falsifying evidence - all of which are inherently wrongful because, by their very nature, they are directed at depriving the proceeding of honest decision-makers or access to full and accurate evidence. In general, then, the actus reus of an obstruction offense is the inherently subversive "bad act" of impairing the integrity of a decision-maker or evidence. The requisite mens rea is simply intending the wrongful impairment that inexorably flows from the act.

(*See* Muller Memo at p. 1 attached as **Exhibit B**).

For the same reasons explained in the Muller memo, here the Government's indictment is defective with regard to 18 U.S.C. § 1512(c)(2) because it fails to state an essential element of the offense. 1512(c)(2) requires Mr. Lang to have "otherwise obstruct[ed], influence[ed], or impede[ed] any official proceeding." As this Court found in *Miller*, "§ 1512(c)(2) must be interpreted as limited by subsection (c)(1), and thus requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *US v. Miller*, 1:21-cr-00119 (CJN) at p. 28 (ECF Doc. 72).

## II.   <span>ARGUMENT</span>

### MR. LANG'S ALLEGED CONDUCT DOES NOT FIT THE 1512 CHARGE

Count nine of violating 18 U.S.C. 1512 (c)(2) simply does not apply to Lang's conduct.   Section 1512 is entitled "Tampering with a witness, victim, or an informant", which facially suggests that its subsections deal with judicial-type proceedings where a "witness, victim, or informant" is expected to testify. Under Section 1512, the full subsection (c) states as follows:

> (c) Whoever corruptly—
>
>   (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
>   (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

Here, Mr. Lang did not destroy documents used in the proceeding.  His presence in at the Capitol did not directed to go after the vote counting was temporarily suspended does not constitute "corruptly...obstruct[ing], influenc[ing], or imped[ing]" the "official proceeding".  As such, the government did not even allege that Lang intended to "influence" the vote counting inside.

Senator Schumer was not deemed to have been ". . . corruptly . . . influencing" an official proceeding for protesting outside of the U.S. Supreme Court building in

March 2020. The crowd gathered and threatened Associate Justices Gorsuch and Kavanaugh, while oral argument was taking place during an abortion case.[1] Protesting and remaining outside of a building is contrary to the actions Section 1512 was designed to cover, such as FBI attorney, Kevin Clinesmith, who was sentenced to probation, after being charged with altering a CIA email that was subsequentially used to improperly obtain a FISA warrant.[2]

More importly, here the Superseding Indictment of Mr. Lang alleges a violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2, with what the government entitles "Obstruction of an Official Proceeding and Aiding and Abetting". *Id.* at p. 5. The Indictment provides no other facts in support of this Count. Therefore, it is respectfully submitted that Count Nine be dismissed against Mr. Lang because § 1512(c)(2) must be read as a catchall to the narrowly focused subsection preceding it, § 1512(c)(1), which does not apply or fit the allegations in this matter.

Respectfully, § 1512(c)(2) must be limited to "conduct [that] undermined the official proceeding's truth-finding function through actions impairing the integrity and availability of evidence." *US v. Miller*, 1:21-cr-00119 (CJN) at p. 28 (ECF Doc. 72). Lang, however, is not alleged to have taken such actions, and cannot be said to have "undermined the official proceeding's truth-finding function". *Id.* The Superseding

---

[1] *See* https://nlpc.org/2020/03/06/ethics-bar-complaints-filed-against-sen-schumer-on-supreme-court-threats/.

[2] *See also* https://nlpc.org/2021/01/29/miscarriage-of-justice-as-clinesmith-gets-slap-on-the-wrist/.

Indictment is devoid allegations that Mr. Lang also impaired "the integrity and availability of evidence." Instead, Count Nine of the Superseding Indictment alleges only that Lang "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18." (*See* Indictment at p. 5 attached as **Exhibit A**). 2–3.

Nothing in Count Nine, or the entire Indictment, alleges or can be said to imply that Lang "took some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote." *US v. Miller*, 1:21-cr-00119 (CJN) at p. 28 (ECF Doc. 72).

Overall, Lang's Indictment is devoid a single allegation that he took or attempted to take any action with respect to those records or documents. "Absent such an allegation, the Indictment fails to allege a violation of 18 § U.S.C. 1512(c)(2)." *US v Miller* at p. 28.

### III.   CONCLUSION

Under the statute's plain language and structure, the most natural and plausible reading of 1512(c)(2) is that it covers acts that have the *same kind of obstructive impact* as the listed forms of obstruction - *i.e.,* impairing the availability or integrity of evidence. Under such understanding, Mr. Lang's actions cannot be said to even allege conduct

that fits into such charge. Therefore, it is respectfully submitted that Count Nine of

the Superseding Indictment against Mr. Lang be dismissed.

Respectfully submitted,

*Steven Metcalf*

STEVEN A. METCALF II, ESQ.
MARTIN H. TANKLEFF, ESQ.
*Attorneys for Mr. Lang*
**Metcalf & Metcalf, P.C.**
99 Park Avenue, 6th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012
martytankleff@metcalflawnyc.com
*metcalflawnyc@gmail.com*



# Exhibit A

**Metcalf & Metcalf, P.C.**
99 Park Avenue, 6th Flr.
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on January 8, 2021

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  21-CR-53  (CJN) |
| | : | |
| v. | : | MAGISTRATE NO. 21-MJ-061 |
| | : | |
| EDWARD JACOB LANG, | : | VIOLATIONS: |
| | : | 18 U.S.C. § 111(a)(1) |
| Defendant. | : | (Assaulting, Resisting, or Impeding |
| | : | Certain Officers) |
| | : | 18 U.S.C. §§ 111(a)(1) and (b) |
| | : | (Assaulting, Resisting, or Impeding |
| | : | Certain Officers Using a Dangerous |
| | : | Weapon) |
| | : | 18 U.S.C. §§ 111(a)(1) and (b) |
| | : | (Assaulting, Resisting, or Impeding |
| | : | Certain Officers Using a Dangerous |
| | : | Weapon and Inflicting Bodily Injury on |
| | : | Certain Officers) |
| | : | 18 U.S.C. § 231(a)(3) |
| | : | (Civil Disorder) |
| | : | 18 U.S.C. § 1512(c)(2) |
| | : | (Obstruction of an Official Proceeding) |
| | : | 18 U.S.C § 2 |
| | : | (Aiding and Abetting) |
| | : | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) |
| | : | (Disorderly and Disruptive Conduct in a |
| | : | Restricted Building or Grounds with a |
| | : | Deadly or Dangerous Weapon) |
| | : | 18 U.S.C. § 1752(a)(4) and (b)(1)(A) |
| | : | (Engaging in Physical Violence in a |
| | : | Restricted Building or Grounds with a |
| | : | Deadly or Dangerous Weapon) |
| | : | 40 U.S.C. § 5104(e)(2)(D) |
| | : | (Disorderly Conduct in |
| | : | a Capitol Building) |
| | : | 40 U.S.C. § 5104(e)(2)(F) |
| | : | (Act of Physical Violence in the Capitol |
| | : | Grounds or Buildings) |

SUPERSEDING INDICTMENT

The Grand Jury charges that:

## COUNT ONE

On or about January 6, 2021, at or around 2:57 p.m., within the District of Columbia, **EDWARD JACOB LANG**, did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, that is, Sgt. J.M., an officer from the Metropolitan Police Department, while such person was engaged in and on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

**(Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 111(a)(1) and 2)

## COUNT TWO

On or about January 6, 2021, at or around 3:08 p.m. to 3:13 p.m., within the District of Columbia, **EDWARD JACOB LANG** did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, while such person was engaged in and on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

**(Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 111(a)(1) and 2)

## COUNT THREE

On or about January 6, 2021, at or around 4:01 p.m. to 4:02 p.m., within the District of

2

Columbia, **EDWARD JACOB LANG** did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, that is, Det. W.M. an officer from the Metropolitan Police Department, while such person was engaged in and on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

(**Assaulting, Resisting, or Impeding Certain Officers**, in violation of Title 18, United States Code, Section 111(a)(1))

## COUNT FOUR

On or about January 6, 2021, at or around 4:10 p.m. to 4:13 p.m., within the District of Columbia, **EDWARD JACOB LANG** did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, that is, Det. P.N., an officer from the Metropolitan Police Department, while such person was engaged in and on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

(**Assaulting, Resisting, or Impeding Certain Officers**, in violation of Title 18, United States Code, Section 111(a)(1))

## COUNT FIVE

On or about January 6, 2021, at or around 4:44 p.m. to 4:46 p.m., within the District of Columbia, **EDWARD JACOB LANG**, using a deadly and dangerous weapon, that is, a shield, did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee

3

of the United States, and of any branch of the United States Government (including any member

of the uniformed services), and any person assisting such an officer and employee, that is, Officer

T.C., an officer from the Metropolitan Police Department, while such officer or employee was

engaged in or on account of the performance of official duties, and where the acts in violation of

this section involve physical contact with the victim and the intent to commit another felony.

> (**Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon**, in violation of Title 18, United States Code, Sections 111(a)(1) and (b))

### COUNT SIX

On or about January 6, 2021, at or around 4:54 p.m. to 5:00 p.m., within the District of

Columbia, **EDWARD JACOB LANG**, using a deadly and dangerous weapon, that is, a bat, did

forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of

the United States, and of any branch of the United States Government (including any member of

the uniformed services), and any person assisting such an officer and employee, that is, Officer

I.F., an officer from the Metropolitan Police Department, while such officer or employee was

engaged in or on account of the performance of official duties, and where the acts in violation of

this section involve physical contact with the victim and the intent to commit another felony.

> (**Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon**, in violation of Title 18, United States Code, Sections 111(a)(1) and (b))

### COUNT SEVEN

On or about January 6, 2021, at or around 4:54 p.m. to 5:00 p.m., within the District of

Columbia, **EDWARD JACOB LANG**, using a deadly and dangerous weapon, that is, a bat, did

forcibly assault, resist, oppose, impede, intimidate, and interfere with, and inflict bodily injury on,

an officer and employee of the United States, and of any branch of the United States Government

(including any member of the uniformed services), and any person assisting such an officer and

4

employee, that is, Officer H.S., an officer from the Metropolitan Police Department, while such officer or employee was engaged in or on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

> (**Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury** in violation of Title 18, United States Code, Sections 111(a)(1) and (b))

## COUNT EIGHT

On or about January 6, 2021, within the District of Columbia, **EDWARD JACOB LANG** committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his/her official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

> (**Civil Disorder**, in violation of Title 18, United States Code, Section 231(a)(3))

## COUNT NINE

On or about January 6, 2021, within the District of Columbia and elsewhere, **EDWARD JACOB LANG** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

> (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

## COUNT TEN

On or about January 6, 2021, in the District of Columbia, **EDWARD JACOB LANG** did

knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions and, during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a bat and shield.

**(Disorderly and Disruptive Conduct in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon**, in violation of Title 18, United States Code, Section 1752(a)(2) and (b)(1)(A))

## COUNT ELEVEN

On or about January 6, 2021, in the District of Columbia, **EDWARD JACOB LANG** did knowingly, engage in any act of physical violence against any person and property in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting and, during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a bat and shield.

**(Engaging in Physical Violence in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon**, in violation of Title 18, United States Code, Section 1752(a)(4) and (b)(1)(A))

## COUNT TWELVE

On or about January 6, 2021, within the District of Columbia, **EDWARD JACOB LANG** willfully and knowingly engaged in disorderly and disruptive conduct within the United States Capitol Grounds and in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct

6

in that building of a hearing before or any deliberation of, a committee of Congress or either House

of Congress.

**(Disorderly Conduct in a Capitol Building**, in violation of Title 40, United States Code, Section 5104(e)(2)(D))

## COUNT THIRTEEN

On or about January 6, 2021, in the District of Columbia, **EDWARD JACOB LANG**

willfully and knowingly engaged in an act of physical violence within the United States Capitol

Grounds and any of the Capitol Buildings.

**(Act of Physical Violence in the Capitol Grounds or Buildings**, in violation of Title 40, United States Code, Section 5104(e)(2)(F))

A TRUE BILL:


FOREPERSON.


*Channing D. Phillips /pk*

Attorney of the United States in
and for the District of Columbia.

7



# Exhibit B

**Metcalf & Metcalf, P.C.**
99 Park Avenue, 6th Flr.
New York, NY 10016
646.253.0514 (*Phone*)
646.219.2012 (*Fax*)

MEMORANDUM                                                    8 June 2018

To:      Deputy Attorney General Rod Rosenstein
         Assistant Attorney General Steve Engel

From:    Bill Barr

Re:      Mueller's "Obstruction" Theory

---

I am writing as a former official deeply concerned with the institutions of the Presidency and the Department of Justice. I realize that I am in the dark about many facts, but I hope my views may be useful.

It appears Mueller's team is investigating a possible case of "obstruction" by the President predicated substantially on his expression of hope that the Comey could eventually "let...go" of its investigation of Flynn and his action in firing Comey. In pursuit of this obstruction theory, it appears that Mueller's team is demanding that the President submit to interrogation about these incidents, using the threat of subpoenas to coerce his submission.

Mueller should not be permitted to demand that the President submit to interrogation about alleged obstruction. Apart from whether Mueller a strong enough factual basis for doing so, Mueller's obstruction theory is fatally misconceived. As I understand it, his theory is premised on a novel and legally insupportable reading of the law. Moreover, in my view, if credited by the Department, it would have grave consequences far beyond the immediate confines of this case and would do lasting damage to the Presidency and to the administration of law within the Executive branch.

As things stand, obstruction laws do not criminalize just any act that can influence a "proceeding." Rather they are concerned with acts intended to have a *particular kind* of impact. A "proceeding" is a formalized process for finding the truth. In general, obstruction laws are meant to protect proceedings from actions designed subvert the integrity of their truth-finding function through compromising the honesty of decision-makers (*e.g.*, judge, jury) or impairing the integrity or availability of evidence – testimonial, documentary, or physical. Thus, obstruction laws prohibit a range of "bad acts" – such as tampering with a witness or juror; or destroying, altering, or falsifying evidence – all of which are inherently wrongful because, by their very nature, they are directed at depriving the proceeding of honest decision-makers or access to full and accurate evidence. In general, then, the *actus reus* of an obstruction offense is the inherently subversive "bad act" of impairing the integrity of a decision-maker or evidence. The requisite *mens rea* is simply intending the wrongful impairment that inexorably flows from the act.

Obviously, the President and any other official can commit obstruction in this classic sense of sabotaging a proceeding's truth-finding function. Thus, for example, if a President knowingly destroys or alters evidence, suborns perjury, or induces a witness to change testimony, or commits

any act deliberately impairing the integrity or availability of evidence, then he, like anyone else, commits the crime of obstruction. Indeed, the acts of obstruction alleged against Presidents Nixon and Clinton in their respective impeachments were all such "bad acts" involving the impairment of evidence. Enforcing these laws against the President in no way infringes on the President's plenary power over law enforcement because exercising this discretion – such as his complete authority to start or stop a law enforcement proceeding -- does not involve commission of any of these inherently wrongful, subversive acts.

The President, as far as I know, is not being accused of engaging in any wrongful act of evidence impairment. Instead, Mueller is proposing an unprecedented expansion of obstruction laws so as to reach facially-lawful actions taken by the President in exercising the discretion vested in him by the Constitution. It appears Mueller is relying on 18 U.S.C. §1512, which generally prohibits acts undermining the integrity of evidence or preventing its production. Section 1512 is relevant here because, unlike other obstruction statutes, it does not require that a proceeding be actually "pending" at the time of an obstruction, but only that a defendant have in mind an anticipated proceeding. Because there were seemingly no relevant proceedings pending when the President allegedly engaged in the alleged obstruction, I believe that Mueller's team is considering the "residual clause" in Section 1512 – subsection (c)(2) – as the potential basis for an obstruction case. Subsection (c) reads:

> (c)   Whoever corruptly-- (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so [is guilty of the crime of obstruction]. [emphasis added].

As I understand the theory, Mueller proposes to give clause (c)(2), which previously has been *exclusively* confined to acts of evidence impairment, a new unbounded interpretation. First, by reading clause (c)(2) in isolation, and glossing over key terms, he construes the clause as a free-standing, all-encompassing provision prohibiting *any act* influencing a proceeding if done with an improper motive. Second, in a further unprecedented step, Mueller would apply this sweeping prohibition to facially-lawful acts taken by public officials exercising of their discretionary powers if those acts influence a proceeding. Thus, under this theory, simply by exercising his Constitutional discretion in a facially-lawful way – for example, by removing or appointing an official; using his prosecutorial discretion to give direction on a case; or using his pardoning power – a President can be accused of committing a crime based solely on his subjective state of mind. As a result, any discretionary act by a President that influences a proceeding can become the subject of a criminal grand jury investigation, probing whether the President acted with an improper motive.

If embraced by the Department, this theory would have potentially disastrous implications, not just for the Presidency, but for the Executive branch as a whole and for the Department in particular. While Mueller's focus is the President's discretionary actions, his theory would apply to *all exercises of prosecutorial discretion* by the President's subordinates, from the Attorney General down to the most junior line prosecutor. Simply by giving direction on a case, or class of

cases, an official opens himself to the charge that he has acted with an "improper" motive and thus becomes subject to a criminal investigation. Moreover, the challenge to Comey's removal shows that not just prosecutorial decisions are at issue. Any personnel or management decisions taken by an official charged with supervising and conducting litigation and enforcement matters in the Executive branch can become grist for the criminal mill based solely on the official's subjective state of mind.  All that is needed is a claim that a supervisor is acting with an improper purpose and any act arguably constraining a case – such as removing a U.S. Attorney -- could be cast as a crime of obstruction.

It is inconceivable to me that the Department could accept Mueller's interpretation of §1512(c)(2). It is untenable as a matter of law and cannot provide a legitimate basis for interrogating the President. I know you will agree that, if a DOJ investigation is going to take down a democratically-elected President, it is imperative to the health of our system and to our national cohesion that any claim of wrongdoing is solidly based on evidence of a *real* crime – not a debatable one. It is time to travel well-worn paths; not to veer into novel, unsettled or contested areas of the law; and not to indulge the fancies by overly-zealous prosecutors.

As elaborated on below, Mueller's theory should be rejected for the following reasons:

*First*, the sweeping interpretation being proposed for § 1512's residual clause is contrary to the statute's plain meaning and would directly contravene the Department's longstanding and consistent position that generally-worded statutes like § 1512 cannot be applied to the President's exercise of his constitutional powers in the absence of a "clear statement" in the statute that such an application was intended.

*Second*, Mueller's premise that, whenever an investigation touches on the President's own conduct, it is inherently "corrupt" under § 1512 for the President to influence that matter is insupportable. In granting plenary law enforcement powers to the President, the Constitution places no such limit on the President's supervisory authority. Moreover, such a limitation cannot be reconciled with the Department's longstanding position that the "conflict of interest" laws do not, and cannot, apply to the President, since to apply them would impermissibly "disempower" the President from supervising a class of cases that the Constitution grants him the authority to supervise.

*Third*, defining facially-lawful exercises of Executive discretion as potential crimes, based solely on subjective motive, would violate Article II of the Constitution by impermissibly burdening the exercise of core discretionary powers within the Executive branch.

*Fourth*, even if one were to indulge Mueller's obstruction theory, in the particular circumstances here, the President's motive in removing Comey and commenting on Flynn could not have been "corrupt" unless the President and his campaign were actually guilty of illegal collusion. Because the obstruction claim is entirely dependent on first finding collusion, Mueller should not be permitted to interrogate the President about obstruction until has enough evidence to establish collusion.

**I.  The Statute's Plain Meaning, and "the Clear Statement" Rule Long Adhered To By the Department, Preclude Its Application to Facially-Lawful Exercises of the President's Constitutional Discretion.**

The unbounded construction Mueller would give §1512's residual clause is contrary to the provision's text, structure, and legislative history. By its terms, §1512 focuses exclusively on actions that subvert the truth-finding function of a proceeding by impairing the availability or integrity of evidence – testimonial, documentary, or physical. Thus, §1512 proscribes a litany of specifically-defined acts of obstruction, including killing a witness, threatening a witness to prevent or alter testimony, destroying or altering documentary or physical evidence, and harassing a witness to hinder testimony. All of these enumerated acts are "obstructive" in precisely the same way – they interfere with a proceeding's ability to gather complete and reliable evidence.

The question here is whether the phrase – "or corruptly otherwise obstructs" – in clause (c)(2) is divorced from the litany of the specific prohibitions in § 1512, and is thus a free-standing, all-encompassing prohibition reaching *any* act that influences a proceeding, or whether the clause's prohibition against "otherwise" obstructing is somehow tied to, and limited by, the character of all the other forms of obstruction listed in the statute. I think it is clear that use of the word "otherwise" in the residual clause expressly links the clause to the forms of obstruction specifically defined elsewhere in the provision. Unless it serves that purpose, the word "otherwise" does no work at all and is mere surplusage. Mueller's interpretation of the residual clause as covering *any and all acts* that influence a proceeding reads the word "otherwise" out of the statute altogether. But any proper interpretation of the clause must give effect to the word "otherwise;" it must do some work.

As the Supreme Court has suggested, *Begay v. United States,* 553 U.S. 137, 142-143 (2008), when Congress enumerates various specific acts constituting a crime and then follows that enumeration with a residual clause, introduced with the words "or otherwise," then the more general action referred to immediately after the word "otherwise" is most naturally understood to cover acts that cause a *similar kind* of result as the preceding listed examples, but cause those results in a *different manner*. In other words, the specific examples enumerated prior to the residual clause are typically read as refining or limiting in some way the broader catch-all term used in the residual clause. *See also Yates v. United States*, 135 S.Ct. 1074, 1085-87 (2015). As the *Begay* Court observed, if Congress meant the residual clause to be so all-encompassing that it subsumes all the preceding enumerated examples, "it is hard to see why it would have needed to include the examples at all." 553 U.S. at 142; *see McDonnell v. United States*, 136 S.Ct. 2355, 2369 (2016). An example suffices to make the point: If a statute prohibits "slapping, punching, kicking, biting, gouging eyes, or otherwise hurting" another person, the word "hurting" in the residual clause would naturally be understood as referring to the same *kind* of physical injury inflicted by the enumerated acts, but inflicted in a different way – *i.e.,* pulling hair. It normally would not be understood as referring to any kind of "hurting," such as hurting another's feelings, or hurting another's economic interests.

Consequently, under the statute's plain language and structure, the most natural and plausible reading of 1512(c)(2) is that it covers acts that have the *same kind of obstructive impact* as the listed forms of obstruction – *i.e.,* impairing the availability or integrity of evidence – but cause this impairment in a different way than the enumerated actions do. Under this construction,

then, the "catch all" language in clause (c)(2) encompasses any conduct, even if not specifically described in 1512, that is directed at undermining a proceeding's truth-finding function through actions impairing the integrity and availability of evidence. Indeed, this is how the residual clause has been applied. From a quick review of the cases, it appears all the cases have involved attempts to interfere with, or render false, the evidence that would become available to a proceeding. Even the more esoteric applications of clause (c)(2) have been directed against attempts to prevent the flow of evidence to a proceeding. *E.g., United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014)(soliciting tips from corrupt cops to evade surveillance); *United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009)(disclosing identity of undercover agent to subject of grand jury drug investigation). As far as I can tell, no case has ever treated as an "obstruction" an official's exercise of prosecutorial discretion or an official's management or personnel actions collaterally affecting a proceeding.

Further, reading the residual clause as an all-encompassing proscription cannot be reconciled either with the other subsections of § 1512, or with the other obstruction provisions in Title 18 that must be read *in pari passu* with those in § 1512. Given Mueller's sweeping interpretation, clause (c)(2) would render all the specific terms in clause (c)(1) surplusage; moreover, it would swallow up all the specific prohibitions in the remainder of § 1512 -- subsections (a), (b), and (d). More than that, it would subsume virtually all other obstruction provisions in Title 18. For example, it would supervene the omnibus clause in § 1503, applicable to pending judicial proceedings, as well as the omnibus clause in § 1505, applicable to pending proceedings before agencies and Congress. Construing the residual clause in § 1512(c)(2) as supplanting these provisions would eliminate the restrictions Congress built into those provisions -- *i.e.*, the requirement that a proceeding be "pending" -- and would supplant the lower penalties in those provisions with the substantially higher penalties in § 1512(c). It is not too much of an exaggeration to say that, if § 1512(c)(2) can be read as broadly as being proposed, then virtually all Federal obstruction law could be reduced to this single clause.

Needless to say, it is highly implausible that such a revolution in obstruction law was intended, or would have gone uncommented upon, when (c)(2) was enacted. On the contrary, the legislative history makes plain that Congress had a more focused purpose when it enacted (c)(2). That subsection was enacted in 2002 as part of the Sarbanes-Oxley Act. That statute was prompted by Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen, had systematically destroyed potentially incriminating documents. Subsection (c) was added to Section 1512 explicitly as a "loophole" closer meant to address the fact that the existing section 1512(b) covers document destruction only where a defendant has induced another person to do it and does not address document destruction carried out by a defendant directly.

As reported to the Senate, the Corporate Fraud Accountability Act was expressly designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14-15. Section 1512(c) did not exist as part of the original proposal. See S. 2010, 107th Cong. (2002). Instead, it was later introduced as an amendment by Senator Trent Lott in July 2002. 148 Cong. Rec. S6542 (daily ed. July 10, 2002). Senator Lott explained that, by adding new § 1512(c), his proposed amendment:

would enact stronger laws against *document shredding*. Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered .... [T]his section would allow the Government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year.

Id. at S6545 (statement of Sen. Lott) (emphasis supplied). Senator Orrin Hatch, in support of Senator Lott's amendment, explained that it would "close [] [the] loophole" created by the available obstruction statutes and hold criminally liable a person who, acting alone, destroys documents. Id. at S6550 (statement of Sen. Hatch). The legislative history thus confirms that § 1512(c) was not intended as a sweeping provision supplanting wide swathes of obstruction law, but rather as a targeted gap-filler designed to strengthen prohibitions on the impairment of evidence.

Not only is an all-encompassing reading of § 1512(c)(2) contrary to the language and manifest purpose of the statute, but it is precluded by a fundamental canon of statutory construction applicable to statutes of this sort. Statutes must be construed with reference to the constitutional framework within which they operate. *E.g., Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Reading § 1512(c)(2) broadly to criminalize the President's facially-lawful exercises of his removal authority and his prosecutorial discretion, based on probing his subjective state of mind for evidence of an "improper" motive, would obviously intrude deeply into core areas of the President's constitutional powers. It is well-settled that statutes that do not *expressly* apply to the President must be construed as not applying to the President if such application would involve a possible conflict with the President's constitutional prerogatives. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). OLC has long rigorously enforced this "clear statement" rule to limit the reach of broadly worded statutes so as to prevent undue intrusion into the President's exercise of his Constitutional discretion.

As OLC has explained, the "clear statement" rule has two sources. First, it arises from the long-recognized "cardinal principle" of statutory interpretation that statutes be construed to avoid raising serious constitutional questions. Second, the rule exists to protect the "usual constitutional balance" between the branches contemplated by the Framers by "requir[ing] an express statement by Congress before assuming it intended" to impinge upon Presidential authority. *Franklin*, 505 U.S. at 801; *see, e.g., Application of 28 U.S.C. §458 to Presidential Appointments of Federal Judges,* 19 Op. O.L.C. 350 (1995).

This clear statement rule has been applied frequently by the Supreme Court as well as the Executive branch with respect to statutes that might otherwise, if one were to ignore the constitutional context, be susceptible of an application that would affect the President's constitutional prerogatives. For instance, in *Franklin* the Court was called upon to determine whether the Administrative Procedure Act ("APA"), 5 U.S.C §§ 701-706, authorized "abuse of discretion" review of final actions by the President. Even though the statute defined reviewable action in a way that facially could include the President, and did not list the President among the express exceptions to the APA, Justice O'Connor wrote for the Court:

> [t]he President is not [expressly] excluded from the APA's purview, but he is
> not explicitly included, either. Out of respect for the separation of powers and
> the unique constitutional position of the President, we find that textual silence
> is not enough to subject the President to the provisions of the APA. We would
> require an express statement by Congress before assuming it intended the
> President's performance of his statutory duties to be reviewed for abuse of
> discretion.

505 U.S. at 800-01. To amplify, she continued, "[a]s the APA does not expressly allow review of
the President's actions, we must presume that his actions are not subject to its requirements." *Id.* at
801.

Similarly, in *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989), the
Court held that the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. § 2, does not apply
to the judicial recommendation panels of the American Bar Association because interpreting the
statute as applying to them would raise serious constitutional questions relating to the President's
constitutional appointment power. By its terms, FACA applied to any advisory committee used by
an agency "in the interest of obtaining advice or recommendations for the President." 5 U.S.C.
app. § 3(2(c). While acknowledging that a "straightforward reading" of the statute's language
would seem to require its application to the ABA committee, *Public Citizen*, 491 U.S. at 453, the
Court held that such a reading was precluded by the "cardinal principle" that a statute be interpreted
to avoid serious constitutional question." *Id.* at 465-67. Notably, the majority stated, "[o]ur
reluctance to decide constitutional issues is especially great where, as here, they concern the
relative powers of coordinate branches of government," and "[t]hat construing FACA to apply to
the Justice Department's consultations with the ABA Committee would present formidable
constitutional difficulties is undeniable." *Id.* at 466.

> The Office of Legal Counsel has consistently "adhered to a plain statement rule: statutes
> that do not expressly apply to the President must be construed as not applying to the
> President, where applying the statute to the President would pose a significant question
> regarding the President's constitutional prerogatives." *E.g, The Constitutional Separation
> of Powers Between the President and Congress*, __ Op. O.L.C. 124, 178 (1996);
> *Application of 28 U.S.C. §458 to Presidential Appointments of Federal Judges,* 19 Op.
> O.L.C. 350 (1995).

The Department has applied this principle to broadly-worded criminal statutes, like the one
at issue here. Thus, in a closely analogous context, the Department has long held that the conflict-
of-interest statute, 18 U.S.C § 208, does not apply to the President. That statute prohibits any
"officer or employee of the executive branch" from "participat[ing] personally and substantially"
in any particular matter in which he or she has a personal financial interest. *Id.* In the leading
opinion on the matter, then-Deputy Attorney General Laurence Silberman determined that the
legislative history disclosed no intention to cover the President and doing so would raise "serious
questions as to the constitutionality" of the statute, because the effect of applying the statute to the
President would "disempower" the President from performing his constitutionally-prescribed
functions as to certain matters . See *Memorandum for Richard T. Burress, Office of the President,*

*from Laurence H. Silberman, Deputy Attorney General, Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* at 2, 5 (Aug. 28, 1974).

Similarly, OLC opined that the Anti-Lobbying Act, 18 U.S.C. § 1913, does not apply fully against the President. *See Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 304-06 (1989). The Anti-Lobbying Act prohibits any appropriated funds from being "used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress." 18 U.S.C. § 1913. The statute provided an exception for communications by executive branch officers and employees if the communication was made pursuant to a request by a member of Congress or was a request to Congress for legislation or appropriations. OLC concluded that applying the Act as broadly as its terms would otherwise allow would raise serious constitutional questions as an infringement of the President's Recommendations Clause power.

In addition to the "clear statement" rule, other canons of statutory construction preclude giving the residual clause in §1512(c)(2) the unbounded scope proposed by Mueller's obstruction theory. As elaborated on in the ensuing section, to read the residual clause as extending beyond evidence impairment, and to apply it to any that "corruptly" affects a proceeding, would raise serious Due Process issues.  Once divorced from the concrete standard of evidence impairment, the residual clause defines neither the crime's *actus reus* (what conduct amounts to obstruction) nor its *mens rea* (what state of mind is "corrupt") "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." *See e.g. McDonnell v. United States*, 136 S.Ct. at 2373.  This vagueness defect becomes even more pronounced when the statute is applied to a wide range of public officials whose normal duties involve the exercise of prosecutorial discretion and the conduct and management of official proceedings. The "cardinal rule" that a statute be interpreted to avoid serious constitutional questions mandates rejection of the sweeping interpretation of the residual clause proposed by Mueller.

Even if the statute's plain meaning, fortified by the "clear statement" rule, were not dispositive, the fact that § 1512 is a criminal statute dictates a narrower reading than Mueller's all-encompassing interpretation.  Even if the scope of § 1512(c)(2) were ambiguous, under the "rule of lenity," that ambiguity must be resolved against the Government's broader reading. *See, e.g., United States v. Granderson*, 511 U.S. 39, 54 (1994) ("In these circumstances -- where text, structure, and history fail to establish that the Government's position is unambiguously correct -- we apply the rule of lenity and resolve the ambiguity in [the defendant's] favor.")

In sum, the sweeping construction of § 1512(c)'s residual clause posited by Mueller's obstruction theory is novel and extravagant. It is contrary to the statute's plain language, structure, and legislative history. Such a broad reading would contravene the "clear statement" rule of statutory construction, which the Department has rigorously adhered to in interpreting statutes, like this one, that would otherwise intrude on Executive authority. By it terms, § 1512 is intended to protect the truth-finding function of a proceeding by prohibiting acts that would impair the availability or integrity of evidence. The cases applying the "residual clause" have fallen within this scope. The clause has never before been applied to facially-lawful discretionary acts of

Executive branch official. Mueller's overly-aggressive use of the obstruction laws should not be embraced by the Department and cannot support interrogation of the President to evaluate his subjective state of mind.

## II. Applying §1512(c)(2) to Review Facially-Lawful Exercises of the President's Removal Authority and Prosecutorial Discretion Would Impermissibly Infringe on the President's Constitutional Authority and the Functioning of the Executive Branch.

This case implicates at least two broad discretionary powers vested by the Constitution exclusively in the President. First, in removing Comey as director of the FBI there is no question that the President was exercising one of his core authorities under the Constitution. Because the President has Constitutional responsibility for seeing that the laws are faithfully executed, it is settled that he has "illimitable" discretion to remove principal officers carrying out his Executive functions. *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S.Ct. 3138, 3152 (2010); *Myers v. United States*, 272 U.S. 52 (1926). Similarly, in commenting to Comey about Flynn's situation – to the extent it is taken as the President having placed his thumb on the scale in favor of lenity – the President was plainly within his plenary discretion over the prosecution function. The Constitution vests *all Federal law enforcement power*, and hence prosecutorial discretion, in the President. The President's discretion in these areas has long been considered "absolute," and his decisions exercising this discretion are presumed to be regular and are generally deemed non-reviewable. *See, e.g., United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see generally* S. Prakash, The Chief Prosecutor, 73 Geo. Wash. L. Rev. 521 (2005)

The central problem with Mueller's interpretation of §1512(c)(2) is that, instead of applying the statute to inherently wrongful acts of evidence impairment, he would now define the *actus reus* of obstruction as *any act,* including facially lawful acts, that influence a proceeding. However, the Constitution vests plenary authority over law enforcement proceedings in the President, and therefore one of the President's core constitutional authorities is precisely to make decisions "influencing" proceedings. In addition, the Constitution vests other discretionary powers in the President that can have a collateral influence on proceedings – including the power of appointment, removal, and pardon. The crux of Mueller's position is that, whenever the President exercises any of these discretionary powers and thereby "influences" a proceeding, he has completed the *actus reus* of the crime of obstruction. To establish guilt, all that remains is evaluation of the President's state of mind to divine whether he acted with a "corrupt" motive.

Construed in this manner, §1512(c)(2) would violate Article II of the Constitution in at least two respects:

*First,* Mueller's premise appears to be that, when a proceeding is looking into the President's own conduct, it would be "corrupt" within the meaning of §1512(c)(2) for the President to attempt to influence that proceeding. In other words, Mueller seems to be claiming that the obstruction statute effectively walls off the President from exercising Constitutional powers over cases in which his own conduct is being scrutinized. This premise is clearly wrong constitutionally. Nor can it be

reconciled with the Department's longstanding position that the "conflict of interest" laws do not, and cannot, apply to the President, since to apply them would impermissibly "disempower" the President from supervising a class of cases that the Constitution grants him the authority to supervise. Under the Constitution, the President's authority over law enforcement matters is necessarily all-encompassing, and Congress may not exscind certain matters from the scope of his responsibilities. The Framers' plan contemplates that the President's law enforcement powers extend to all matters, including those in which he had a personal stake, and that the proper mechanism for policing the President's faithful exercise of that discretion is the political process – that is, the People, acting either directly, or through their elected representatives in Congress.

*Second*, quite apart from this misbegotten effort to "disempower" the President from acting on matters in which he has an interest, defining facially-lawful exercises of Executive discretion as potential crimes, based solely on the President's subjective motive, would violate Article II of the Constitution by impermissibly burdening the exercise of core discretionary powers within the Executive branch. The prospect of criminal liability based solely on the official's state of mind, coupled with the indefinite standards of "improper motive" and "obstruction," would cast a pall over a wide range of Executive decision-making, chill the exercise of discretion, and expose to intrusive and free-ranging examination of the President's (and his subordinate's) subjective state of mind in exercising that discretion.

### A. Section 1512(c)(2) May Not "Disempower" the President from Exercising His Law Enforcement Authority Over a Particular Class of Matters.

As discussed further below, a fatal flaw in Mueller's interpretation of §1512(c)(2) is that, while defining obstruction solely as acting "corruptly," Mueller offers no definition of what "corruptly" means. It appears, however, that Mueller has in mind particular circumstances that he feels may give rise to possible "corruptness" in the current matter. His tacit premise appears to be that, when an investigation is looking into the President's own conduct, it would be "corrupt" for the President to attempt to influence that investigation.

On a superficial level, this outlook is unsurprising: at first blush it accords with the old Roman maxim that a man should not be the judge in his own case and, because "conflict-of-interest" laws apply to all the President's subordinates, DOJ prosecutors are steeped in the notion that it is illegal for an official to touch a case in which he has a personal stake. But constitutionally, as applied to the President, this mindset is entirely misconceived: there is no *legal* prohibition – as opposed a political constraint -- against the President's acting on a matter in which he has a personal stake.

The Constitution itself places no limit on the President's authority to act on matters which concern him or his own conduct. On the contrary, the Constitution's grant of law enforcement power to the President is plenary. Constitutionally, it is wrong to conceive of the President as simply the highest officer within the Executive branch hierarchy. He alone *is* the Executive branch. As such, he is the sole repository of *all Executive powers* conferred by the Constitution. Thus, the full measure of law enforcement authority is placed in the President's hands, and no limit is placed on the kinds of cases subject to his control and supervision. While the President has subordinates --the Attorney General and DOJ lawyers -- who exercise prosecutorial discretion on

his behalf, they are merely "his hand," *Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922) – the discretion they exercise is the President's discretion, and their decisions are legitimate precisely because they remain under his supervision, and he is still responsible and politically accountable for them.

Nor does any statute purport to restrict the President's authority over matters in which he has an interest. On the contrary, in 1974, the Department concluded that the conflict-of-interest-laws cannot be construed as applying to the President, expressing "serious doubt as to the constitutionality" of a statute that sought "to disempower" the President from acting over particular matters. *Letter to Honorable Howard W. Cannon from Acting Attorney General Laurence H. Silberman*, dated September 20, 1974; and *Memorandum for Richard T. Burress, Office of the President, from Laurence H. Silberman, Deputy Attorney General, Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* at 2, 5 (Aug. 28, 1974). As far as I am aware, this is the only instance in which it has previously been suggested that a statute places a class of law enforcement cases "off limits" to the President's supervision based on his personal interest in the matters. The Department rejected that suggestion on the ground that Congress could not "disempower" the President from exercising his supervisory authority over such matters. For all the same reasons, Congress could not make it a crime for the President to exercise supervisory authority over cases in which his own conduct might be at issue.

The illimitable nature of the President's law enforcement discretion stems not just from the Constitution's plenary grant of those powers to the President, but also from the "unitary" character of the Executive branch itself. Because the President alone constitutes the Executive branch, the President cannot "recuse" himself. Just as Congress could not *en masse* recuse itself, leaving no source of the Legislative power, the President cannot take a holiday from his responsibilities. It is in the very nature of discretionary power that ultimate authority for making the choice must be vested in some final decision-maker. At the end of the day, there truly must be a desk at which "the buck stops." In the Executive, final responsibility must rest with the President. Thus, the President, "though able to delegate duties to others, cannot delegate ultimate responsibility or *the active obligation to supervise that goes with it.*" *Free Enterprise Fund v. Public Co. Acctg. Oversight Bd.*, 130 S. Ct. 3138, 3154 (2010) (*quoting Clinton v. Jones,* 520 U.S. 681, 712-713 (1997) (Breyer, J., concurring in judgment)) (emphasis added).

In framing a Constitution that entrusts broad discretion to the President, the Framers chose the means they thought best to police the exercise of that discretion. The Framers' idea was that, by placing all discretionary law enforcement authority in the hands of a single "Chief Magistrate" elected by all the People, and by making him politically accountable for all exercises of that discretion by himself or his agents, they were providing the best way of ensuring the "faithful exercise" of these powers. Every four years the people as a whole make a solemn national decision as to the person whom they trust to make these prudential judgments. In the interim, the people's representatives stand watch and have the tools to oversee, discipline, and, if they deem appropriate, remove the President from office. Thus, under the Framers' plan, the determination whether the President is making decisions based on "improper" motives or whether he is "faithfully" discharging his responsibilities is left to the People, through the election process, and the Congress, through the Impeachment process.

The Framers' idea of political accountability has proven remarkably successful, far more so than the disastrous experimentation with an "independent" counsel statute, which both parties agreed to purge from our system. By and large, fear of political retribution has ensured that, when confronted with serious allegations of misconduct within an Administration, Presidents have felt it necessary to take practical steps to assure the people that matters will be pursued with integrity. But the measures that Presidents have adopted are voluntary, dictated by political prudence, and adapted to the situation; they are not legally compelled. Moreover, Congress has usually been quick to respond to allegations of wrongdoing in the Executive and has shown itself more than willing to conduct investigations into such allegations. The fact that President is answerable for any abuses of discretion and is ultimately subject to the judgment of Congress through the impeachment process means that the President is *not* the judge in his own cause. *See Nixon v. Harlow*, 457 U.S. 731, 757-58 n.41 (1982)(" The remedy of impeachment demonstrates that the President remains accountable under law for his misdeeds in office.")

Mueller's core premise -- that the President acts "corruptly" if he attempts to influence a proceeding in which his own conduct is being scrutinized – is untenable. Because the Constitution, and the Department's own rulings, envision that the President may exercise his supervisory authority over cases dealing with his own interests, the President transgresses no legal limitation when he does so. For that reason, the President's exercise of supervisory authority over such a case does not amount to "corruption." It may be in some cases politically unwise; but it is not a crime. Moreover, it cannot be presumed that any decision the President reaches in a case in which he is interested is "improperly" affected by that personal interest. Implicit in the Constitution's grant of authority over such cases, and in the Department's position that the President cannot be "disempowered" from acting in such cases, is the recognition that Presidents have the capacity to decide such matters based on the public's long-term interest.

In today's world, Presidents are frequently accused of wrongdoing. Let us say that an outgoing administration – say, an incumbent U.S. Attorney -- launches a "investigation" of an incoming President. The new President knows it is bogus, is being conducted by political opponents, and is damaging his ability to establish his new Administration and to address urgent matters on behalf of the Nation. It would neither be "corrupt" nor a crime for the new President to terminate the matter and leave any further investigation to Congress. There is no legal principle that would insulate the matter from the President's supervisory authority and mandate that he passively submit while a bogus investigation runs its course.

At the end of the day, I believe Mueller's team would have to concede that a President does not act "corruptly" simply by acting on – even terminating – a matter that relates to his own conduct. But I suspect they would take the only logical fallback position from that – namely, that it would be "corrupt" if the President had actually engaged in unlawful conduct and then blocked an investigation to "cover up" the wrongdoing. In other words, the notion would be that, if an investigation was bogus, the President ultimately had legitimate grounds for exercising his supervisory powers to stop the matter. Conversely, if the President had really engaged in wrongdoing, a decision to stop the case would have been a corrupt cover up. But, in the latter case, the predicate for finding any corruption would be first finding that the President had engaged in the wrongdoing he was allegedly trying to cover up. Under the particular circumstances here, the

issue of obstruction only becomes ripe after the alleged collusion by the President or his campaign is established first. While the distinct crime of obstruction can frequently be committed even if the underlying crime under investigation is never established, that is true only where the obstruction is an act that is wrongful in itself -- such as threatening a witness, or destroying evidence. But here, the only basis for ascribing "wrongfulness" (*i.e.,* an improper motive) to the President's actions is the claim that he was attempting to block the uncovering of wrongdoing by himself or his campaign. Until Mueller can show that there was unlawful collusion, he cannot show that the President had an improper "cover up" motive.

For reasons discussed below, I do not subscribe to this notion. But here it is largely an academic question. Either the President and his campaign engaged in illegal collusion or they did not. If they did, then the issue of "obstruction" is a sideshow. However, if they did not, then the cover up theory is untenable. And, at a practical level, in the absence of some wrongful act of evidence destruction, the Department would have no business pursuing the President where it cannot show any collusion. Mueller should get on with the task at hand and reach a conclusion on collusion. In the meantime, pursuing a novel obstruction theory against the President is not only premature but – because it forces resolution of numerous constitutional issues – grossly irresponsible.

### B.  Using Obstruction Laws to Review the President's Motives for Making Facially-Lawful Discretionary Decisions Impermissibly Infringes on the President's Constitutional Powers.

The crux of Mueller's claim here is that, when the President performs a facially-lawful discretionary action that influences a proceeding, he may be criminally investigated to determine whether he acted with an improper motive. It is hard to imagine a more invasive encroachment on Executive authority.

*1.  The Constitution Vests Discretion in the President To Decide Whether To Prosecute Cases or To Remove Principal Executive Officers, and Those Decisions are Not Reviewable.*

The authority to decide whether or not to bring prosecutions, as well as the authority to appoint and remove principal Executive officers, and to grant pardons, are quintessentially Executive in character and among the discretionary powers vested exclusively in the President by the Constitution. When the President exercises these discretionary powers, it is presumed he does so lawfully, and his decisions are generally non-reviewable.

The principle of non-reviewability inheres in the very reason for vesting these powers in the President in the first place. In governing any society certain choices must be made that cannot be determined by tidy legal standards but require prudential judgment. The imperative is that there must be some ultimate decision-maker who has the final, authoritative say -- at whose desk the "buck" truly does stop. Any system whereby other officials, not empowered to make the decision themselves, are permitted to review the "final" decision for "improper motives" is antithetical both to the exercise of discretion and its finality. And, even if review can censor a particular choice, it leaves unaddressed the fact that a choice still remains to be made, and the reviewers have no power to make it. The prospect of review itself undermines discretion. *Wayte v. United States,* 470 U. S.

598, 607- 608 (1985); *cf. Franklin v. Massachusetts*, 505 U.S. at 801. But any regime that proposes to review and *punish* decision-makers for "improper motives" ends up doing more harm than good by chilling the exercise of discretion, "dampen[ing] the ardor of all but the most resolute ...in the unflinching discharge of their duties." *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (2d Cir. 1949)(Learned Hand). In the end, the prospect of punishment chills the exercise of discretion over a far broader range of decisions than the supposedly improper decision being remedied. *McDonnell*, 136 S.Ct. at 2373.

    For these reasons, the law has erected an array of protections designed to prevent, or strictly limit, review of the exercise of the Executive discretionary powers. *See, e.g., Nixon v. Fitzgerald*, 457 US 731,749 (1982) (the President's unique discretionary powers require that he have absolute immunity from civil suit for his official acts). An especially strong set of rules has been put in place to insulate those who exercise prosecutorial discretion from second-guessing and the possibility of punishment. *See. e.g., Imbler v. Pachtman*, 424 U. S. 409 (1976); *Yaselli v. Goff*, 275 U. S. 503 (1927), *aff'g* 12 F. 2d 396 (2d Cir. 1926). Thus, "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *See, e.g., ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 283 (1987); *United States v. Cox*, 342 F.2d 167, 171-72 (5th Cir. 1965) (The U.S. Attorney's decision not to prosecute even where there is probable cause is "a matter of executive discretion which cannot be coerced or reviewed by the courts."); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

    Even when there is a prosecutorial decision to proceed with a case, the law generally precludes review or, in the narrow circumstances where review is permitted, limits the extent to which the decision-makers' subjective motivations may be examined. Thus, a prosecutor's decision to bring a case is generally protected from civil liability by absolute immunity, even if the prosecutor had a malicious motive. *Yaselli v. Goff*, 275 U. S. 503 (1927), *aff'g* 12 F. 2d 396 (2d Cir. 1926). Even where some review is permitted, absent a claim of selective prosecution based on an impermissible classification, a court ordinarily will not look into the prosecutor's real motivations for bringing the case as long as probable cause existed to support prosecution. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Further, even when there is a claim of selective prosecution based on an impermissible classification, courts do not permit the probing of the prosecutor's subjective state of mind until the plaintiff has first produced objective evidence that the policy under which he has been prosecuted had a discriminatory effect. *United States v. Armstrong*, 517 U.S. 456 (1996). The same considerations undergird the Department's current position in *Hawaii v. Trump*, where the Solicitor General is arguing that, in reviewing the President's travel ban, a court may not look into the President's subjective motivations when the government has stated a facially legitimate basis for the decision. (*SG's Merits Brief* at 61).

In short, the President's exercise of its Constitutional discretion is not subject to review for "improper motivations" by lesser officials or by the courts. The judiciary has no authority "to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made" in the courts. *Marbury v. Madison, 1 Cranch (5 U.S.) 137, 170 (1803)*.

*2. Threatening criminal liability for facially-lawful exercises of discretion, based solely on the subjective motive, would impermissibly burden the exercise of core Constitutional powers within the Executive branch..*

Mueller is effectively proposing to use the criminal obstruction law as a means of reviewing discretionary acts taken by the President when those acts influence a proceeding. Mueller gets to this point in three steps. First, instead of confining §1512(c)(2) to inherently wrongful acts of evidence impairment, he would now define the *actus reus* of obstruction as *any act* that influences a proceeding. Second, he would include within that category the official discretionary actions taken by the President or other public officials carrying out their Constitutional duties, including their authority to control all law enforcement matters.  The net effect of this is that, once the President or any subordinate takes any action that influences a proceeding, he has completed the *actus reus* of the crime of obstruction. To establish guilt, all that remains is evaluation of the President's or official's subjective state of mind to divine whether he acted with an improper motive.

Wielding §1512(c)(2) in this way preempts the Framers' plan of political accountability and violate Article II of the Constitution by impermissibly burdening the exercise of the core discretionary powers within the Executive branch. The prospect of criminal prosecution based solely on the President's state of mind, coupled with the indefinite standards of "improper motive" and "obstruction," would cast a pall over a wide range of Executive decision-making, chill the exercise of discretion, and expose to intrusive and free-ranging examination the President's (or his subordinate's) subjective state of mind in exercising that discretion

Any system that threatens to punish discretionary actions based on subjective motivation naturally has a substantial chilling effect on the exercise of discretion. But Mueller's proposed regime would mount an especially onerous and unprecedented intrusion on Executive authority. The sanction that is being threatened for improperly-motivated actions is the most severe possible – personal criminal liability.  Inevitably, the prospect of being accused of criminal conduct, and possibly being investigated for such, would cause officials "to shrink" from making potentially controversial decisions and sap the vigor with which they perform their duties.  *McDonnell v. United States*, 136 S.Ct. at 2372-73.

Further, the chilling effect is especially powerful where, as here, liability turns solely on the official's subjective state of mind. Because charges of official misconduct based on improper motive are "easy to allege and hard to disprove," *Hartman v. Moore*, 547 U.S. 250, 257-58 (2006), Mueller's regime substantially increases the likelihood of meritless claims, accompanied by the all risks of defending against them. Moreover, the review contemplated here would be far more intrusive since it does not turn on an objective standard – such as the presence in the record of a reasonable basis for the decision – but rather requires probing to determine the President's actual subjective state of mind in reaching a decision. As the Supreme Court has observed, *Harlow v. Fitzgerald*, 457 U.S. 800, 816-17 (1982), even when faced only with civil liability, such an inquiry is especially disruptive:

> [I]t now is clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of

> subjecting officials to the risks of trial — distraction of officials from their
> governmental duties, inhibition of discretionary action, and deterrence of able
> people from public service. There are special costs to "subjective" inquiries
> of this kind. ...[T]he judgments surrounding discretionary action almost
> inevitably are influenced by the decisionmaker's experiences, values, and
> emotions. These variables ...frame a background in which there often is no
> clear end to the relevant evidence. Judicial inquiry into subjective motivation
> therefore may entail broad-ranging discovery .... Inquiries of this kind can
> be peculiarly disruptive of effective government.

Moreover, the encroachment on the Executive function is especially broad due to the wide range of actors and actions potentially covered. Because Mueller defines the *actus reus* of obstruction as any act that influences a proceeding, he is including not just exercises of prosecutorial discretion directly deciding whether a case will proceed or not, but also exercises of any other Presidential power that might collaterally affect a proceeding, such as a removal, appointment, or grant of pardon. And, while Mueller's immediate target is the President's exercise of his discretionary powers, his obstruction theory reaches all exercises of prosecutorial discretion by the President's subordinates, from the Attorney General, down the most junior line prosecutor. It also necessarily applies to all personnel, management, and operational decision by those who are responsible for supervising and conducting litigation and enforcement matters -- civil, criminal or administrative -- on the President's behalf.

A fatal flaw with Mueller's regime – and one that greatly exacerbates its chilling effect -- is that, while Mueller would criminalize any act "corruptly" influencing a proceeding, Mueller can offer no definition of "corruptly." What is the circumstance that would make an attempt by the President to influence a proceeding "corrupt?" Mueller would construe "corruptly" as referring to one's purpose in seeking to influence a proceeding. But Mueller provides no standard for determining what motives are legal and what motives are illegal. Is an attempt to influence a proceeding based on political motivations "corrupt?" Is an attempt based on self-interest? Based on personal career considerations? Based on partisan considerations? On friendship or personal affinity? Due process requires that the elements of a crime be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." *See McDonnell*, 136 S.Ct. at 2373. This, Mueller's construction of §1512(c)(2) utterly fails to do.

It is worth pausing on the word "corruptly," because courts have evinced a lot of confusion over it. It is an adverb, modifying the verbs "influence," "impede," etc. But few courts have deigned to analyze its precise adverbial mission. Does it refer to "how" the influence is accomplished – *i.e.,* the means used to influence? Or does it refer to the ultimate purpose behind the attempt to influence? As an original matter, I think it was clearly used to described the means used to influence. As the D.C. Circuit persuasively suggested, the word was likely used in its 19th century transitive sense, connoting the turning (or corrupting) of something from good and fit for its purpose into something bad and unfit for its purpose – hence, "corrupting" a magistrate; or "corrupting" evidence. *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir.1991). Understood this way, the ideas behind the obstruction laws come more clearly into focus. The thing that is

corrupt is the means being used to influence the proceeding. They are inherently wrong because they involve the corruption of decision-makers or evidence. The culpable intent does not relate to the actor's ultimate motive for using the corrupt means. The culpable state of mind is merely the intent that the corrupt means bring about their immediate purpose, which is to sabotage the proceeding's truth-finding function. The actor's ultimate purpose is irrelevant because the means, and their immediate purpose, are dishonest and malign. Further, if the actor uses lawful means of influencing a proceeding – such as asserting an evidentiary privilege, or bringing public opinion pressure to bear on the prosecutors – then his ultimate motives are likewise irrelevant. *See Arthur Anderson*, 544 U.S. at 703-707. Even if the actor is guilty of a crime and his only reason for acting is to escape justice, his use of lawful means to impede or influence a proceeding are perfectly legitimate.

Courts have gotten themselves into a box whenever they have suggested that "corruptly" is not confined to the use of wrongful means, but can also refer to someone's ultimate motive for using lawful means to influence a proceeding. The problem, however, is that, as the courts have consistently recognized, there is nothing inherently wrong with attempting to influence or impede a proceeding. Both the guilty and innocent have the right to use lawful means to do that. What is the motive that would make the use of lawful means to influence a proceeding "corrupt?" Courts have been thrown back on listing "synonyms" like "depraved, wicked, or bad." But that begs the question. What is depraved – the means or the motive? If the latter, what makes the motive depraved if the means are within one's legal rights? Fortunately for the courts, the cases invariably involve evidence impairment, and so, after stumbling around, they get to a workable conclusion. Congress has also taken this route. *Poindexter* struck down the omnibus clause of §1505 on the grounds that, as the sole definition of obstruction, the word "corruptly" was unconstitutionally vague. 951 F.2d at 377-86.  Tellingly, when Congress sought to "clarify" the meaning of "corruptly" in the wake of *Poindexter*, it settled on even more vague language – "acting with an improper motive" – and then proceeded to qualify this definition further by adding, "including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. §1515(b). The fact that Congress could not define "corruptly" except through a laundry list of acts of evidence impairment strongly confirms that, in the obstruction context, the word has no intrinsic meaning apart from its transitive sense of compromising the honesty of a decision-maker or impairing evidence.

At the end of the day then, as long as §1512 is read as it was intended to be read – *i.e.,* as prohibiting actions designed to sabotage a proceeding's access to complete and accurate evidence -- the term "corruptly" derives meaning from that context. But once the word "corruptly" is deracinated from that context, it becomes essentially meaningless as a standard. While Mueller's failure to define "corruptly" would be a Due Process violation in itself, his application of that "shapeless" prohibition on public officials engaged in the discharge of their duties impermissibly encroach on the Executive function by "cast[ing] the pall of potential prosecution" over a broad range of lawful exercises of Executive discretion. *McDonnell*, 136 S.Ct. at 2373-74.

The chilling effect is magnified still further because Mueller's approach fails to define the kind of impact an action must have to be considered an "obstruction." As long as the concept of obstruction is tied to evidence impairment, the nature of the actions being prohibited is discernable. But once taken out of this context, how does one differentiate between an unobjectionable

"influence" and an illegal "obstruction?" The actions being alleged as obstructions in this case illustrate the point. Assuming arguendo that the President had motives such that, under Mueller's theory, any direct order by him to terminate the investigation would be considered an obstruction, what action short of that would be impermissible? The removal of Comey is presumably being investigated as "obstructive" due to some *collateral* impact it could have on a proceeding. But removing an agency head does not have the natural and foreseeable consequence of obstructing any proceeding being handled by that agency. How does one gauge whether the collateral effects of one's actions could impermissibly affect a proceeding?

The same problem exists regarding the President's comments about Flynn. Even if the President's motives were such that, under Mueller's theory, he could not have ordered termination of an investigation, to what extent do comments short of that constitute obstruction? On their face, the President's comments to Comey about Flynn seem unobjectionable. He made the accurate observation that Flynn's call with the Russian Ambassador was perfectly proper and made the point that Flynn, who had now suffered public humiliation from losing his job, was a good man. Based on this, he expressed the "hope" that Comey could "see his way clear" to let the matter go. The formulation that Comey "see his way clear," explicitly leaves the decision with Comey. Most normal subordinates would not have found these comments obstructive. Would a superior's questioning the legal merit of a case be obstructive? Would pointing out some consequences of the subordinate's position be obstructive? Is something really an "obstruction" if it merely is pressure acting upon a prosecutor's psyche? Is the obstructiveness of pressure gauged objectively or by how a subordinate subjectively apprehends it?

The practical implications of Mueller's approach, especially in light of its "shapeless" concept of obstruction, are astounding. DOJ lawyers are always making decisions that invite the allegation that they are improperly concluding or constraining an investigation. And these allegations are frequently accompanied by a claim that the official is acting based on some nefarious motive. Under the theory now being advanced, any claim that an exercise of prosecutorial discretion was improperly motived could legitimately be presented as a potential criminal obstruction. The claim would be made that, unless the subjective motivations of the decision maker are thoroughly explored through a grand jury investigation, the putative "improper motive" could not be ruled out.

In an increasingly partisan environment, these concerns are by no means trivial. For decades, the Department has been routinely attacked both for its failure to pursue certain matters and for its decisions to move forward on others. Especially when a house of Congress is held by an opposing party, the Department is almost constantly being accused of deliberately scuttling enforcement in a particular class of cases, usually involving the environmental laws. There are claims that cases are not being brought, or are being brought, to appease an Administration's political constituency, or that the Department is failing to investigate a matter in order to cover up its own wrongdoing, or to protect the Administration. Department is bombarded with requests to name a special counsel to pursue this or that matter, and it is frequently claimed that his reluctance to do so is based on an improper motive. When a supervisor intervenes in a case, directing a course of action different from the one preferred by the subordinate, not infrequently there is a tendency for the subordinate to ascribe some nefarious motive. And when personnel changes are made – as

for example, removing a U.S. Attorney – there are sometimes claims that the move was intended to truncate some investigation.

While these controversies have heretofore been waged largely on the field of political combat, Mueller's sweeping obstruction theory would now open the way for the "criminalization" of these disputes. Predictably, challenges to the Department's decisions will be accompanied by claims that the Attorney General, or other supervisory officials, are "obstructing" justice because their directions are improperly motivated.  Whenever the slightest colorable claim of a possible "improper motive" is advanced, there will be calls for a criminal investigation into possible "obstruction."  The prospect of being accused of criminal conduct, and possibly being investigated for such, would inevitably cause officials "to shrink" from making potentially controversial decisions.