**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-53 (CJN)** |
| | : | |
| **EDWARD JACOB LANG,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT LANG'S
BRIEF REGARDING SELF-DEFENSE DEFENSE OF ANOTHER PERSON
<u>AND RELATED AFFIRMATIVE DEFENSES</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits that this Court should deny the relief requested in defendant Lang's brief, ECF 80, regarding self-defense and other affirmative defenses.[1] Lang has filed a brief instead, apparently, of a court-ordered proffer. His failure to comply with an order from this Court for a proffer supporting any claim of self-defense is reason enough to deny the relief Lang requests and provides grounds to preclude evidence of his affirmative defenses altogether. The relief that Lang requests is also premature. As explained below, a jury instruction for any affirmative defense like those referenced in his filing must be supported by a factual record addressing every element of each affirmative defense. Since Lang fails to provide this support, his application is without merit.

---

[1] Although styled as a brief, Lang's filing explains that it is meant to support an "application for the jury to be instructed on the affirmative defenses of self-defense, defense of others, necessity, justification, and duress at trial." ECF 80 at 1. "A party applying to the court for an order must do so by motion." Fed.R.Crim.P. 47(a). Accordingly, the United States construes the filing as a motion.

**Procedural History**

On January 15, 2021, United States Magistrate Judge G. Michael Harvey issued a sealed warrant for Lang's arrest for crimes he committed during the January 6, 2021, attack on the United States Capitol. ECF Nos. 1, 27.  Lang was arrested in Newburgh, New York, the next day. ECF No. 27.  On January 19, 2021, Lang made his initial appearance in the Southern District of New York, where United States Magistrate Judge Andrew E. Krause committed Lang to the custody of this Court and ordered that he be transported to the District of Columbia. *Id*. at 7. Lang made his first appearance in this jurisdiction on February 9, 2021. February 9, 2021 Minute Order.  At that hearing, with no objection from Lang, United States Magistrate Judge Zia Faruqui ordered Lang to remain detained pending trial. *Id*.

On August 23, 2021, Lang moved for release into the High Intensity Supervision Program with GPS monitoring. ECF No. 29. The first exhibit attached to that motion was a declaration from an individual named Phillip Anderson who claimed that Lang had pulled him from a pile of other fallen rioters.  ECF 29-1 at 2-5[2]. After receiving a response in opposition from the United States, ECF 39, this Court denied Lang's motion at a September 20, 2021, hearing, September 20, 2021 Minute Order, finding, among other things, "the particular circumstances" of Lang's crimes to be "even more troubling" than the statutes under which the crimes were charged: Lang "was at times at the very front of a large mob seeking to enter the Capitol. Mr. Lang appears to have been one of the leaders. . . and instigators of the violence."  Transcript of Arraignment/Status Conf./Motion Hearing, *United States v. Lang*, 21-cr-53-CJN (D.D.C. Sept. 20, 2021) ("Tr.") at 71.  The D.C. Circuit affirmed this Court's order denying Lang's motion for pretrial release.  *. See United States v. Lang*, No. 21-3066, 2022 WL 127437 (D.C. Cir. Jan. 12, 2022) (per curiam).

---

[2] Page numbers are those generated by CM/ECF.

Lang is now charged in a superseding indictment, ECF 36, for violating 18 U.S.C. § 111(a) and (b); 18 U.S.C. § 111(a); 18 U.S.C. § 231(a)(3); 18 U.S.C. § 1752(a)(2) and (b)(1)(A); 18 U.S.C. § 1752(a)(4) and (b)(1)(A); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(F).[3]

On February 23, 2022, this Court held a status conference.  In anticipation that Lang would raise a claim of self-defense, the prosecutor advised:

> The United States believes it would be appropriate, at a minimum, for the defense to present a proffer to the Court so that there can be some assurance that each element of such a defense can be proven so that it's not raised in an incomplete fashion during trial . . . I don't think [defense counsel] is opposed to that procedure.

Transcript of Video Status Conference, February 23, 2022 (Tr.) at 9.  Defense counsel voiced no objection to filing a proffer in support of a self-defense claim.  Tr. at 10 ("I actually would want to address this issue head on, and I would defer to the Court as far as how we could schedule that . . .").

After counsel for the parties conferred, they jointly submitted a proposed scheduling order that, among other deadlines, required the defense to file a proffer supporting a claim of self-defense by June 24, 2022.  ECF 58, 58-1 at 1.  This Court issued the scheduling order which the parties had proposed, setting a trial date of January 9, 2023 and requiring the self-defense proffer from Lang by June 24, 2022.  ECF 60.

The defense did not meet the June 24, 2022 deadline.  Following several extensions,  Lang moved for jury instructions addressing self-defense and other affirmative defenses.

## Factual Background

### *The January 6, 2021 Attack on the Capitol*

---

[3] This Court dismissed a count charging a violation of 18 U.S.C. § 1512(c)(2).  June 7, 2022 Minute Order.  The United States is pursuing an appeal of the Court's dismissal of that count, ECF 65. That appeal is fully briefed, and the Court of Appeals has scheduled oral arguments for December 12, 2022.

On January 6, 2021, a riotous and violent mob overran barriers and assaulted police officers in an effort to breach the U.S. Capitol and prevent the certification of the 2020 presidential election. For an overview of the January 6, 2021 attack on the Capitol, the government refers to its previously filed general summary, *see* ECF 1:2-5; ECF 31:3-7; *see also Trump v. Thompson*, 20 F. 4th 10, 17-18 (D.C. Cir. 2021). Lang was a part of the mob that breached barriers and attacked officers.

*Defendant Lang's Role in the January 6, 2021 Attack on the Capitol*

Lang's conduct after he attended the Save America rally near the Ellipse and arrived at the Capitol has been presented to this Court in several earlier pleadings which the United States also references for a moment-by-moment account of Lang's assaults and the specific details of his participation in the attack on the Capitol.  *See* ECF 31 at 7-22; 75 at 3-20.

For this response, Lang's arrival at the Capitol's West Front remains relevant.  His cellular phone recordings demonstrate his early understanding that he had joined a crowd seeking to break through police lines and "take the Capitol building."  Lang passed through the crowd gathered at the West Front, recorded himself as he climbed scaffolding, and arrived in the area of the inaugural stage on the Capitol's Lower West Terrace.  From there, he observed and recorded police officers as they struggled to disperse the crowd, prevent further access to the Capitol and its grounds, and withstand assaults as the crowd continued to grow.

The first wave of rioters reached the West Plaza by approximately 1:00 p.m. and members of that crowd almost immediately began attempts to remove bicycle racks that officers were using as barriers.  For the next hour and a half, United States Capitol Police (USCP) and reinforcements from the Metropolitan Police Department (MPD) who arrived between 1:15 and 1:30 p.m. endured the rioters' attempts to dismantle the officers' defensive line with individual and group pushes against barriers, efforts to wrench riot shields from officers' hands, and other physical assaults.

4

These assaults included hand-to-hand confrontations, the use of bear spray and other unknown chemical irritants, and deployment of various makeshift projectiles that included poles, planks, metal objects, and materials and debris from ongoing construction to prepare for the inauguration.

Officers responded with nonlethal force that included pepper spray, pepper balls, concussion grenades, smoke bombs, rubber bullets, and at times even their own fists. Police responses, however, were not limited to force. For example, at approximately 2:03 p.m., MPD officers responding to the USCP's calls for assistance began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately. This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles. When officers did use force, they did so after warnings and with restraint.

For example, body-worn camera recordings show one officer repeatedly attempting to de-escalate conflict with rioters, warning them to back up, directing them not to touch barriers or throw projectiles at police, invoking mutual support for the Constitution, and stating, all before deploying chemical spray, that he did not want to hurt or "shoot" (i.e., spray) the rioters. On a different occasion, when officers decided circumstances called for the use of rubber bullets, body-worn camera also recorded the officers' intention to refrain from this measure if any of the rioters had children in the area. When circumstances permitted, officers assisted rioters who experienced health issues or injuries.

Dispersal orders, efforts to de-escalate, and the use of non-lethal force failed to deter the crowd. After judging the size and continued violence of the crowd, an MPD sergeant dispatched an officer to identify a location officers could use, if necessary, as a safe and defensible retreat.

That officer identified an area inside of the Capitol accessed through the Lower West Terrace's inaugural archway on the interior side of a double set of doors. [4]

Officers at the West Plaza had endured continuous assault from thousands of rioters in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. The attacks against officers continued as they moved to a safer position on the Lower West Terrace behind the double doors inside of the inaugural archway.

From his vantage on the Lower West Terrace, Lang witnessed, recorded, and cheered the assaults against officers occurring below him on the West Plaza. He shouted with enthusiasm and encouragement as rioters overwhelmed the police line. He directly observed and recorded officers filing into the archway.

Once inside the Capitol, officers who needed assistance went to an area for treatment of their injuries or a chance to recover from bear spray and similar chemical irritants. Others assumed a defensive position behind the double doors separating the archway entrance from the Capitol's interior. The officers braced for the arrival of the mob.

---

[4] The archway is the location typically used on inauguration day for the President's entrance onto the inaugural stage. The rounded arch is a feature constructed for the inauguration and fixed to a normal set of doors. To access the archway on January 6, at a minimum, rioters needed to walk, climb, or scale up to the Lower West Terrace landing and climb a set of stairs. The archway and doorway are narrow and no more than 10 feet across. The archway leads to a narrow hallway and a set of double doors.



After witnessing the violence against officers, and with knowledge that officers had retreated through the archway, at approximately 2:41 p.m., Lang joined the vanguard of rioters breaching the archway.  As he entered, rioters were already breaking glass panes in the first set of doors. An officer peering out from the second set of doors announced at 2:24:15 that a rioter had a weapon in his hands. Lang himself was prepared to engage in violence.  As rioters flowed into the archway, the hallway in front of the double doors grew overcrowded. Lang shouted "if you're not going to fight, get out of the way" and "get the women out of the way."  Although at this point police were defending their original position from the area shown in the photograph above and were unable to advance against the mob pressing against them, incongruously, Lang cried out that it was "the cops" who were "squishing us to death."  When consistent with the objective of forcing entry, rioters were able to and did direct members of the crowd to "back up" to allow space for rioters to manipulate poles to smash the doors.  Eventually, one rioter assumed a position at the

archway to act as a kind of traffic controller who kept rioters from entering when the archway grew too crowded and waved them in when space allowed or rioters called for reinforcements.

Officers who had already witnessed and suffered the mob's assault on the West Plaza resisted rioters' intrusion past the archway's interior doors with tear gas, batons, and the defensive use of riot shields. Even as members of the mob pushed against the police line, an officer calmly remarked to one individual, "Sir, stop. Please stop." At another time, an officer addressed rioters as "ladies and gentlemen" when asking them to "back up." An officer entreated, "Go out the door please" and explained "We have to do our job."

At times, officers showed greater concern for rioters than other members of the mob. In one case, when the crowd pressed forward towards the police line, crushing a rioter and causing her to cry out, it was an officer who admonished the crowd, "Stop-- you're hurting her; stop-- you're hurting her" without apparent success. In a different example, an officer entreated the crowd to back up when a rioter could not breathe and needed medical attention; however, the crowd did not respond.

From at least 2:51 until 3:18, Lang circulated in and out of the archway. When inside, he repeatedly kicked and punched officers, and used a door to hit one officer in the head. He engaged in group pushes against the police, who had not yet advanced beyond the boundary created by the double doors.

By 3:18, officers began to move as a group from their interior position towards the archway, forcing rioters out. The officers maintained a new defensive line directly under the archway and facing the crowd. At this time, certain members of the mob pulled MPD officer Michael Fanone from his front-line position under the archway, dragged him and another officer into the crowd, beat him, and assaulted him with a Taser. Fanone sustained severe injuries requiring hospitalization. Other members of the mob helped the other officer away from his

assailants and escorted that officer to a safer location.  Nevertheless, even after these assaults, officers refrained from confronting other rioters standing face-to-face with police at the archway while those other rioters remained nonviolent and even attempted to negotiate with them.  At approximately 3:28 p.m., seven minutes after the mob's attack against Fanone had concluded, one such negotiator announced through a bullhorn:

> Patriots! Everybody listen up! We've made it this far. We've spoken to them. These are the guards right now. We've spoken to them. We are holding the line. Listen, they say they will not mace us, tase us, or beat us. We are holding the line. We are not moving until we get our way. This is a peaceful protest now. This is a peaceful protest now and always has been. Remember this is our Capitol; this is our house, these are our steps. If we have to sit here all night, we will. Do not bum rush us, we are trying to work with them.

*See*  https://www.youtube.com/watch?v=iISN53RNVlA (last checked on October 17, 2022).

Any pause in the violence at the archway was only temporary.  Around 3:50 p.m., rioters just outside of the archway once again began to engage in violence, including another group pushing effort and more extreme attacks.  Lang was one of the leaders in this effort and repeatedly escalated his violent attacks over the following hour.

Between 4:01 and 4:20, Lang crowd-surfed over other rioters to punch an officer, and he repeatedly kicked a detective who had fallen to the ground.  As they were attacked during this time, officers maintained their position under the archway. Surveillance footage from this period does not show officers advancing against the crowd.  Instead, it shows an increasingly violent and chaotic attack against officers, where, at times, the mob outside of the archway inadvertently jostled and forced some of its own members, including Lang, to the ground.  Lang regained his footing, and at approximately 4:20, he left the archway to take pictures of himself.

Meanwhile, at approximately 4:13, Roseanne Boyland, one of the individuals referenced in Lang's motion, was climbing steps towards the archway.  At approximately 4:15, rioters began a group effort to push their way back inside the archway.  Phillip Anderson, who provided Lang

with an affidavit, ECF 29-1 at 1, was one of the rioters pushing against the police as the crowd began to infiltrate the archway.  At 4:16, Anderson appears on surveillance footage waving to others behind him to join those pushing against police officers.  At 4:17:53, Anderson and those pushing with him passed under the archway as police officers were forced back towards the double doors.  By 4:19 p.m., rioters once again filled the archway. At approximately 4:20, police began to push rioters back out of the archway.  By 4:24, police officers regained their position under the archway as rioters at the entrance continued to assault them.  At roughly this time, Phillip Anderson had fallen outside of the archway.

At 4:26 p.m., Lang appears on surveillance footage below the archway.  His face was covered by a gas mask, and in the footage he waves his hands and gestures at officers.  According to Lang, he was attempting to seek assistance from officers for Roseanne Boyland, who had collapsed outside of the archway.  Open source video shows Lang dragging Anderson's body away from the arch moments before showing rioters who appear to trample over Boyland's prone body as they charged at, and then as captured on body-worn camera, attacked officers.

Unfortunately, as officers tried to help Boyland and bring her inside the building to try to resuscitate her, other rioters, not including Lang, began violently attacking the officers with a variety of sticks and weapons.  At approximately 4:30, however, rioters dragged Boyland's body towards officers who were able to take her inside the Capitol in an effort to resuscitate her.  As soon as officers took Boyland's body through the archway, rioters resumed their attack, striking and hurling objects at the officers.

At 4:38, Lang posed in front of the archway with his finger pointed at officers to record himself for his Instagram account.

At 4:43, Lang shouted down a female veteran trying to persuade the rioters not to engage in violence.  Lang, along with others, escalated his attacks on police officers even further.  He

repeatedly and forcefully hit an officer with a stolen shield at least 12 separate times.   He again disregarded cries from another rioter for the assaults to stop.  He placed a helmet stolen from an officer on his own head and repeatedly slammed a stolen shield onto the ground in front of the police line.  He took a baseball bat used by another rioter as a weapon and used it himself to repeatedly strike at officers, aiming more strategically as his assaults continued for less protected areas such as officers' legs. He deployed the bat against officers at least 16 times, stopping only when a rubber bullet hit his foot.

In the aftermath of the attack on the Capitol, Lang described January 6, 2021 as a "war" and not a protest.  He acknowledged fighting with police and told his mother that she would have been proud of his assaults.  In Lang's post-attack statements, he described the next step after January 6 as "guns."  Before his arrest, Lang involved himself with the creation of and recruitment for his own armed militia.

He now seeks to defend the assaults he has been charged with by claiming self-defense, defense of others, justification, necessity, and duress. Lang demands a jury instruction for these affirmative defenses.  His demand is premature and unfounded.

## Legal Analysis

"To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means."  F.R.E. 103(d).  Thus, in criminal cases, a judge "may, and generally should, block the introduction of evidence supporting a proposed defense unless all of its elements can be established."  *E.g.*, *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002).  To screen inadmissible evidence of incomplete affirmative defenses from a jury, trial judges can require defendants to provide a factual proffer sufficient to show evidence of every element of an affirmative defense.  *See United States v. Bailey*, 444 U.S. 394, 412 n. 9, 415 (1980); *United States v. Montgomery,* 772 F.2d 733, 736 (11th Cir. 1985) ("In order to have the

11

defense submitted to a jury, a defendant must first produce or proffer evidence sufficient to prove the essential elements of the defense") (*citing Bailey*)); *United States v. Cramer*, 532 Fed. Appx. 789, 791 (9th Cir. 2013) (explaining in case where defendant sought to invoke self-defense that "If a defendant cannot proffer legally sufficient evidence of each element of an affirmative defense, then he is not entitled to present evidence in support of that defense at trial").

This Court has ordered Lang to provide, at the very least, a factual proffer in support of his self-defense claim.  Lang has failed to provide such a proffer.  Instead, he has moved for the Court to issue a jury instruction in a filing that fails to address or proffer supporting facts for the necessary elements of any of the affirmative defenses he lists, including any claim of self-defense.  Lang's failure to provide the information this Court has ordered is grounds for precluding admission of the information Lang has withheld.  *E.g., United States v. Johnson*, 970 F.2d 907, 911 (D.C. Cir. 1992) (non-disclosure of notice of alibi); *Taylor v. Illinois*, 484 U.S. 400, 415-16 (1988) (non-disclosure of witness list);  *Michigan v. Lucas*, 500 U.S. 145, 150 (1991) ("a criminal trial is not 'a poker game in which players enjoy an absolute right always to conceal their cards until played'") (internal citation omitted); *see also United States v. Combs*, 267 F.3d 1167, 1179 (10th Cir. 2001) (defendant who failed to seek relief from court's disclosure instructions tacitly assented to those instructions and was subject to exclusion of evidence for failure to comply).[5]

Lang's demand for a jury instruction is also premature.  First, he has not provided a proffer or evidence to this Court establishing a *prima facie* case for any of the affirmative defenses he

---

[5] Lang's filing asserts that a pretrial proffer will require more time because defense counsel needs to review an unspecified amount of videos and then have Lang review them as well. ECF 80 at 2. *But see* ECF 71 at 27 (noting Lang's public statement that he "and his team" had reviewed thousands of hours of video footage for a documentary film he created about January 6, 2021). Elsewhere, the filing suggests that statements about self-defense from Lang's witnesses require further verification and fact-checking, ECF 80 at 13, n.4, but then adds that "the basis of the claims has already been verified" but needs further review from Lang. *Id*.

lists.  Thus, Lang may not be able to present evidence of any of those defenses.  Additionally, whether or not a jury instruction is appropriate will depend on the evidence that is actually admitted during Lang's trial.  *See, e.g., United States v. Al-Rekabi*, 454 F.3d 1113, 1122–23 (10th Cir. 2006) ("To qualify for an instruction on an affirmative defense such as necessity a defendant must produce evidence of each element sufficient to warrant its consideration by the jury.").

His application is premature, because by failing to submit a factual proffer, Lang has not established the basis for admitting evidence of any affirmative defense, let alone grounds for a jury instruction.  Moreover, a defendant is entitled to have the jury instructed on any recognized defense where sufficient evidence has been admitted to allow a reasonable jury to find in his favor.  *Mathews v. United States*, 485 U.S. 58, 63 (1988).  Since Lang's trial has not occurred, the nature of the evidence is unknown.  Assuming Lang convinces this Court to allow evidence of any of his affirmative defenses, any jury instruction will depend on the evidence that is actually presented.

To establish a *prima facie* claim of self-defense, a defendant must prove two elements: (1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances.  *United States v. Biggs*, 441 F.3d 1069, 1071 (9th Cir. 2006).

Moreover, "[a] defendant cannot claim self-defense if he was the aggressor or if he provoked the conflict upon himself."  *Waters v. Lockett*, 896 F.3d 559, 569 (D.C. Cir. 2018) (internal quotation marks and citation omitted).  That principle applies fully to Section 111 prosecutions.  *See, e.g.*, *United States v. Mumuni Saleh*, 946 F.3d 97, 110 (2d Cir. 2019) ("Mumuni was the initial aggressor in the altercation with Agent Coughlin; as such, he could not, as a matter of law, have been acting in self-defense"); *United States v. Acosta-Sierra*, 690 F.3d 1111, 1126 (9th Cir. 2012) ("[A]n individual who is the attacker cannot make out a claim of self-defense as a justification for an assault."); *see also Harris v. United States*, 364 F.2d 701, 702 (D.C. Cir. 1966)

("One who is attacked may repel the attack with whatever force he reasonably believes is necessary under the circumstances, but only if he has not provoked the fight").

A theory based upon the defense of others in the context of prosecution under Section 111 justifies the use of a reasonable amount of force against an adversary when a person reasonably believes that he [or another] is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger*." United States v. Middleton,* 690 F.2d 820, 826 (11th Cir. 1982) (emphasis added).

In *United States v. Slatten*, 395 F. Supp. 3d 45, 112-113 (D.D.C. 2018), a federal murder case, District Court Judge Royce C. Lamberth instructed the jury on defense-of-others as follows:

> Self-defense or defense-of-others is a complete defense to murder where Mr. Slatten actually believed that he or another person was in danger of serious bodily injury, and actually believed that the use of deadly force was necessary to defend against that danger and both of these beliefs were reasonable. Every person has the right to use a reasonable amount of self-defense or defense-of-others if: One, he actually believes he or another person is in imminent danger of bodily harm; and if, two, he has reasonable grounds for that belief. The question is not whether looking back on the incident you believe that the use of force was necessary. The question is whether Mr. Slatten, under the circumstances as they appeared to him at the time of incident, actually believed he or another person was in imminent danger of bodily harm, and could reasonably hold that belief. A person may use a reasonable amount of force in self-defense, including, in some circumstances, deadly force.

*Id.* (emphasis added); *see also id.* (citing Barbra Bergman, *Criminal Jury Instructions for the District of Columbia* §§ 9.500, 9.501(B)-(C), 9.503 (5th ed. 2018)).

A defendant must satisfy five elements for a defense-of-others claim: (1) the defendant actually believed that another person was in danger of injury; (2) that belief was reasonable; (3) the defendant actually believed that the use of force was necessary to defend the person against the danger; (4) that belief was reasonable as well; and (5) the defendant used a reasonable amount of force in response. *See Slatten*, 395 F. Supp. 3d at 112-113 (emphasis added); *accord* Pattern Criminal Jury Instructions of the Seventh Circuit, 6.01 (2012 ed.) ("A person may use force when

14

he reasonably believes that force is necessary to defend [himself/another person] against the imminent use of unlawful force."); Wayne R. LaFave, *Substantive Criminal Law* § 10.5, Defense-of-others (Dec. 2021) ("[O]ne is justified in using reasonable force in defense-of-others person, even a stranger, when he reasonably believes that the other is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger.").

The defense of others has important limitations. First, Congress enacted Section 111 "to protect both federal officers and federal functions." *United States v. Feola*, 420 U.S. 671, 679 (1975). As a result, "[a]n individual is not justified in using force for the purpose of resisting arrest or other performance of duty by a law enforcement officer within the scope of his official duties." *United States v. Drapeau*, 644 F.3d 646, 653 (8th Cir. 2011); *see also United States v. Branch*, 91 F.3d 699, 714 (5th Cir. 1996) ("[Self-defense] principles must accommodate a citizen's duty to accede to lawful government power and the special protection due federal officials discharging official duties."). Second, even in circumstances where an individual might be justified in using some force to resist a federal officer, that resistance must be reasonable under those circumstances. *See Abrams v. United States*, 237 F.2d 42, 43 (D.C. Cir. 1956) (observing that "the use of 'reasonable force' only would have been open to defendants"); *see also United States v. Wallace*, 368 F.2d 537, 538 (4th Cir. 1966) (explaining that Section 111 permits "reasonable force employed in a justifiable belief that it is exerted in self-defense"); *United States v. Perkins*, 488 F.2d 652, 655 (1st Cir. 1973) (defendant may be convicted under Section 111 where "he used more force than was necessary to protect the person or property of himself or others").

Before a defense of justification or necessity can be presented to a jury, a defendant must first produce or proffer evidence that (1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal

alternatives to violating the law. *Bailey,* 444 U.S. at 409-10. This defense is difficult to establish, as a defendant "must, among other things, show that there was 'no reasonable alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm.'" *United States v. Greenpeace, Inc.*, 314 F. Supp. 2d 1252, 1265 (S.D. Fla. 2004) (quoting *United States v. Montgomery*, 772 F.2d 733, 736 (11th Cir. 1985)).

In fact, "federal courts have uniformly rejected justification [defenses] in civil disobedience cases where the defendants contend that their illegal activity is justified because the normal political processes are ineffective." *Id.* (citing *United States v. Ayala*, 289 F.3d 16, 26 (1st Cir. 2002) (protesters of bombing exercises on Vieques who illegally entered naval installation); *Montgomery*, 772 F.2d at 736 (anti-nuclear protesters who entered government defense plant, hammered and poured blood on conventional and nuclear missile launchers, hung banners, and distributed pictures); and *United States v. Quilty*, 741 F.2d 1031, 1033–34 (7th Cir. 1984) (anti-nuclear demonstrators who entered military property without permission after issuance of bar order)). Necessity is not a defense to taking actions against a politician who is unresponsive or who disagrees with a constituent's demands. *United States v. Gosar*, No. 19-306, 2020 WL 468902, at *1 (W.D. Wash. Jan. 29, 2020).

A duress defense requires proof that the defendant acted under an unlawful threat of imminent death or serious bodily injury and there was no reasonable, legal alternative to committing the crime. *United States v. Nwoye*, 824 F.3d 1129, 1135 (D.C. Cir. 2016).

Lang's filing falls far short of addressing each and every element of the affirmative defenses he seeks to raise. His self-defense claim cannot succeed if only because Lang was the aggressor. He provoked a confrontation with police by going with others where he was not supposed to go. Within minutes of his entry through the archway, he called for violence. He does

not explain how any force used by police was unreasonable in the context of a continuing and violent riot, or how his own use of force was reasonable against officers was reasonable.

Lang also fails to acknowledge that any force officers used occurred during a violent and destructive riot.  The rioters who entered the archway immediately began to break glass in the double-doors shielding officers from the mob.  An officer saw and reported a rioter in possession of an unspecified weapon.  Other rioters used flag poles, fists, and equipment taken from officers as weapons.  Lang himself used one a door to hit an officer in the head.

Instead of addressing the violence which the mob and Lang brought to officers waiting behind close doors, Lang misconstrues language from an opinion in a civil suit.  *See* ECF 80 at 5 (*citing Armbruster v. Frost*, 962 F.Supp. 2d 105, 117 (D.D.C. 2013)).  Lang misreads *Armbruster* and appears to cite it for the unsupported proposition that an officer needs to be engaged in an arrest to use force.  *Armbruster* addressed facts involving an arrest where an officer allegedly threw the arrestee's interfering friend to the ground, applied his knee against her torso, and placed her on the hood of a car.  The opinion observed that officers have authority to use some degree of physical coercion when making an arrest; however, it did not, as Lang seems to suggest, restrict that authority only to arrests.  *Id*. at 112.  The section of the opinion Lang cites, applying District of Columbia rather than federal law under this Court's supplemental jurisdiction, *id*. at 117, invoked even broader language stating that "[A] police officer is privileged to use force so long as the 'means employed are not in excess of those which [he] reasonably believes [are] necessary.' " Lang's meritless contention that officers defending themselves and others against a violent mob could not lawfully use force is unsupported by any authority is and provides no support for his unsubstantiated claim of self defense.

His other legal arguments are even less persuasive.  For example, he cites a non-federal case, *District of Columbia v. Coleman*, 667 A.2d 811, 820 (D.C. Ct. App. 1995), as part of a

frivolous attempt to suggest that officers in the archway were not acting in an official capacity and thus not empowered to use force.  *Coleman*, however, concerned a shooting by District of Columbia officers in Maryland acting outside of their jurisdiction.  The opinion has no relevance to any affirmative defense raised here.

Lang's references to Roseanne Boyland and Phillip Anderson also fail to establish a basis for any affirmative defense. Lang was assaulting police long before Roseanne Boyland collapsed or Phillip Anderson[6] intruded past the archway and was forced back out.  Lang fails to explain how it was reasonable to assault officers who had nothing to do with either of those individuals. He does not explain what force officers used against these individiuals, why any such force was unreasonable, or how his assaults against random officers were a reasonable response or served to defend anyone.

With respect to his alleged justification or necessity defense, Lang does not even attempt to proffer any facts which would suggest what evils he was faced with and that his conduct represented the lesser of those evils.  Nor does Lang attempt to explain how his kicking and punching of officers were done to prevent imminent harm or that there were no other legal alternatives to his aggressive and violent conduct.  With respect to his alleged duress defense, Lang does not offer any facts to suggest that he was facing death or serious bodily injury when he was attacking the officers.  Lang's generalized and conclusory claims that officers used excessive force are too broad to support a claim of self-defense or any other affirmative defense.

---

[6]In his filing, Lang identifies a third potential witness named Tommy Tatum. Counsel for Lang has publicly referred to an affidavit Tatum signed during a recording that was posted on the Internet; it has not been filed or otherwise made available.

Since Lang has failed to proffer a *prima facie* case for any affirmative defense, evidence of any of his affirmative defenses should not be admitted, and the jury instructions he seeks cannot be justified.

### CONCLUSION

For all of the reasons above, this Court should deny Lang's application for jury instructions he has failed to support.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/Karen Rochlin
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov