```
            IN  THE  UNITED  STATES  DISTRICT  COURT
             FOR  THE  DISTRICT  OF  COLUMBIA


UNITED STATES OF AMERICA,
                                    CR Action
             Plaintiff,             No. 1:21-053

      vs.                           Washington, DC
                                    September 20, 2021
EDWARD JACOB LANG,
                                    3:37 p.m.
             Defendant.
_____/


      TRANSCRIPT OF ARRAIGNMENT/STATUS CONF./MOTION HEARING
           BEFORE THE HONORABLE CARL J. NICHOLS
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:        MELISSA JOY JACKSON
                          U.S. ATTORNEY'S OFFICE FOR D.C.
                          555 4th Street, NW
                          Washington, DC 20530
                          202-252-7786


For the Defendant:        MARTIN HAROLD TANKLEFF
                          STEVEN ALAN METCALF, II
                           METCALF & METCALF
                           99 Park Avenue, Suite 2501
                           Manhattan, NY 10016
                           646-385-4403




Reported By:       LORRAINE T. HERMAN, RPR, CRC
                   Official Court Reporter
                   U.S. District & Bankruptcy Courts
                   333 Constitution Avenue, NW
                   Room 6720
                   Washington, DC 20001
                   202-354-3196
```

1          **P R O C E E D I N G S**

2               COURTROOM DEPUTY:  Your Honor, this is criminal

3     case year 2021-053, United States of America versus Edward

4     Jacob Lang.  Pretrial officer is Andre Sidbury, present by

5     telephone.

6               Counsel, please come forward to introduce

7     yourselves for the record, beginning with the government.

8               MS. JACKSON:  Good afternoon, Melissa Jackson on

9     behalf of the United States.

10              THE COURT:  Ms. Jackson.

11              Let me just say that whoever is at the podium

12    should feel free to take off his or her mask.  I find that

13    aids the court reporter, certainly aids me, aids opposing

14    counsel in understanding whoever is at the podium.

15              Then when you are seated, if you could put your

16    mask on.  So one person on that side of the podium with a

17    mask on at a time.  Thank you.

18              Ms. Jackson.

19              MR. METCALF:  On behalf of Edward Jacob Lang,

20    Steven Metcalf, M-e-t-c-a-l-f.  Good afternoon, again,

21    Counsel, and good afternoon, Your Honor.  Thank you.

22              THE COURT:  Good afternoon.

23              MR. TANKLEFF:  Martin Tankleff on behalf of

24    Mr. Lang.  Good afternoon, Your Honor.  Good afternoon,

25    Counsel.  I am also of Metcalf & Metcalf.

3

1          THE COURT:  Thank you, Counsel.

2          So we are here on the defendant's motion.  I've

3    reviewed all of the materials that have been filed, at least

4    the papers.  I've reviewed a number of the exhibits, both

5    photographic and other, including many of the videos.

6          I think the most efficient way to proceed this

7    afternoon is to hear first from defense counsel as to why I

8    should modify Mr. Lang's current conditions, in particular

9    why I should release him.  I will hear from the government

10   on the government's contrary view, and then I will let

11   defense have a brief rebuttal.

12         I think it would be helpful to focus not just on

13   the various factors under the Bail Reform Act but the

14   argument that you've made about Mr. Lang's current

15   conditions at the jail and his ability or lack thereof to

16   review discovery materials.

17         I don't know if that's you, Mr. Metcalf, or you,

18   Mr. Tankleff, but please approach.

19         Oh, yes.  Thank you.  Ms. Lesley reminds me that

20   we need to arraign the defendant.

21         Could you please do that, Ms. Lesley?

22         COURTROOM DEPUTY:  Mr. Metcalf or Mr. Tankleff,

23   please come forward.

24         May the record reflect that defendant, Edward

25   Jacob Lang, and counsel have received a copy of the

1    superseding indictment.  Do you wish to waive the formal

2    reading of the 13-count superseding indictment and enter a

3    plea?

4              MR. METCALF:  Yes.

5              COURTROOM DEPUTY:  In Criminal Case No. 21-053,

6    how do you wish to plead?

7              MR. METCALF:  Not guilty.

8              COURTROOM DEPUTY:  Thank you.

9              MR. METCALF:  Thank you.

10             Your Honor, while I'm up here, there is just one

11   minor housekeeping issue regarding our exhibit that we

12   produced with our reply.  Can I address that issue just real

13   quick?

14             THE COURT:  Yes.

15             MR. METCALF:  Okay.  So when we filed our reply

16   last Friday, we were not able to upload that video as an

17   actual exhibit.  It's referred to in the papers, and it is

18   also highly sensitive material.  So we submitted an email

19   today circulating that video, and we spoke with counsel

20   today.  And we do not mind -- we actually request that that

21   video be marked under seal, so Exhibit A, which is the only

22   exhibit to our reply, be marked under seal.

23             And for all intents and purposes of today, there

24   are three minutes of that video that we would like to

25   address and/or show to the Court.

1          THE COURT:  Thank you.

2          It sounds, Ms. Jackson, as if you've discussed

3  this question with defense counsel and you are okay sealing

4  the video at least for now?

5          MS. JACKSON:  Yes, Your Honor.

6          THE COURT:  I will grant the motion to seal the

7  video at least for present purposes.

8          MR. METCALF:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          So we have arraigned Mr. Lang on the superseding

11  indictment.  Who is going to take the lead for defense

12  counsel and defense on the motion to change the conditions

13  of pretrial detention?

14          MR. METCALF:  Mr. Tankleff is going to go first

15  and take the lead, and then I would ask just the ability to

16  address a couple issues before the Court.

17          THE COURT:  Sure.

18          MR. METCALF:  Thank you.

19          THE COURT:  Mr. Tankleff?

20          MR. TANKLEFF:  Thank you, Your Honor.

21          In 1988, I was charged with double homicide in the

22  state of New York.  I was granted a million dollars' bail.

23  There is no reason why my client, Jacob Lang, should be

24  incarcerated with no bail.

25          In this county, in this area, Michael Foy, Emanuel

1    Jackson, David Lee Judd, David Allen Blair, Robert Sanford

2    and Federico Klein have all been granted bail, that are all

3    violent cases, including many that contain assault cases.

4    Each one of those were granted bail as Mr. Lang should.

5            The conditions of Mr. Lang's confinement are

6    depriving him of his right to counsel, depriving him of

7    access to view evidence against him, depriving him of

8    personal hygiene items, religious services.  He's been

9    placed in the hole or segregation a number of times.  He's

10   denied truly privileged communications --

11           THE COURT:  What does that mean, "placed in the

12   hole"?

13           MR. TANKLEFF:  The hole is another word for

14   special housing or segregation.  You would be moved from

15   your normal housing unit to another area of the jail where

16   your accessibility is even more limited.

17           I know each jail throughout this country have

18   different classifications or criteria.  Many of them are

19   either called special housing units, administrative

20   segregation, administrative segregation [sic].  Sometimes

21   they even call it involuntary protective custody.

22           When you go from a normal housing unit to a

23   segregated unit or a special housing unit, you are even

24   restricted more so.  When myself and Mr. Metcalf went to

25   visit Mr. Lang, the attorney visits were, essentially, in a

1    cubical like this and completely exposed.  So every

2    conversation we had with Mr. Lang, everyone in the room

3    could hear.

4           Mr. Lang was held in a cage-like environment on

5    the other side of plexiglass, where we had to speak to him

6    by phone.  Every single word that he said, everyone could

7    hear.  When we left, we said, Well, what if Mr. Lang wanted

8    an in-person, private consultation?  We were told that he

9    would have to quarantine for 14 days after such a visit.

10           We recently learned that if Mr. Lang is not

11    vaccinated, we could not visit Mr. Lang back to back.  We

12    would actually have to wait 14 days.

13           It gets even worse when we --

14           THE COURT:  Why is Mr. Lang not vaccinated?

15           MR. METCALF:  Personal choice of his.  And I don't

16    think the jail is actually optioning whether it is the

17    Johnson & Johnson, Moderna or the Pfizer.

18           I know in various states throughout the country,

19    Johnson & Johnson has been the preferred choice of the jails

20    because it's a one-shot deal.  I don't know that D.C. Jail

21    offers other options.  I am involved in a case in Texas

22    where Johnson & Johnson was the initial offering; however,

23    if something is requested differently, it is offered.

24           But just to show you the problems of sending

25    discovery, we brought with us today an envelope of discovery

1          that we actually sent to Mr. Lang twice.  Twice it was

2          returned to us with a notation saying, "Return to shipper.

3          Reason for return:  Receiver refused delivery".

4                  Mr. Lang has never seen this, and we have never

5          been able to get an explanation of why us sending discovery

6          in a printed format with no other restrictions are being

7          returned to us.

8                  The system of discovery that's set up right now is

9          inadequate for Mr. Lang to actually have his rights

10         protected.  As the government has established, that we are

11         changing over to a Relativity system.  As the government has

12         stated, that this is going to be somewhat of a hurdle for

13         even attorneys to get used to.  The one thing I haven't seen

14         in any papers whatsoever is for those individuals who are

15         incarcerated, their ability to access Relativity.  We have

16         proposed --

17                 THE COURT:  Counsel, could you hold on one second?

18                 Ms. Lesley, is there anything we can do about the

19         reverb we are hearing, the feedback, or is that --

20                 MR. TANKLEFF:  Do you want me to step back?

21                 THE COURT:  I can hear you fine.

22                 MR. TANKLEFF:  I can step back.

23                 THE COURT:  I think that will be fine.

24                 MR. TANKLEFF:  One thing I learned in law school

25         was --

1          THE COURT:  Or maybe just push the microphone away

2     from you a little bit.

3          MR. TANKLEFF:  How's that?

4          THE COURT:  Thank you.

5          MR. TANKLEFF:  Sure.

6          As our moving papers established, there is a

7     number of computer programs throughout this country that for

8     individuals who are incarcerated, they get a significant

9     amount of time for discovery.

10          However, with the level of security -- I guess I

11     should say clearance issues or security status issues with

12     discovery in this case, I would be remiss to say that I

13     don't think the government would allow much of the discovery

14     to enter into the D.C. Jail if Mr. Lang remains

15     incarcerated.  That is why we have proposed that he be

16     released on bail, on bond, so he can have access to the

17     discovery, review it with his attorneys.

18          I mean, there are hundreds of hours of video.  I

19     think in one of the recent submissions they said there are

20     100 days' worth of video.

21          THE COURT:  Are you aware of a decision holding

22     that a defendant who should otherwise be detained should

23     nevertheless be released just in order to allow the

24     defendant to participate in pretrial discovery?

25          MR. TANKLEFF:  Am I aware of a decision?  No,

1    Your Honor.  But I am aware that the Sixth Amendment

2    guarantees a defendant the right to participate in his own

3    defense, the right to assist in his own defense.  Mr. Lang

4    is not able to assist in his own defense, which is a

5    deprivation of his Sixth Amendment rights.

6             THE COURT:  That's true, is it not, of essentially

7    everyone at the D.C. Jail right now because of the policies

8    and procedures that the D.C. Jail has set up; and whatever

9    rule I adopt for Mr. Lang, shouldn't it apply to everyone,

10   either his access or that he should be released to enable

11   him to participate in his defense?  Don't I have -- wouldn't

12   that, in effect, apply to everyone else?

13            MR. TANKLEFF:  It would, Your Honor.  Each case

14   has to be evaluated individually.  Not every case has the

15   level of discovery that each case has.  Not -- each case

16   doesn't have the level of security levels of discovery.

17            Mr. Lang has multiple levels.  I believe the

18   government said we are up to Disclosure 10.  You know, for

19   us to be able to work with Mr. Lang, if he was free on bond,

20   he could come to our office on a regular basis.  We could

21   speak to him on a regular basis.

22            The jail system set up a legal email system.  And

23   recently, we tried to send Mr. Lang something.  I think it

24   was 1,000 characters, which was rejected, where the email

25   system says that it can handle up to 30,000 characters.

1          The level of discovery in this case seems that it

2     is going to continue to be ongoing.  And each time the

3     discovery is disclosed to us, there would be a delay in

4     getting it to Mr. Lang for his ability to review it.  And as

5     I said before, with Relativity coming into place, we don't

6     know how relativity will be implemented within the jail.

7          If Mr. Lang is going to be given a fair

8     opportunity, he should be given bond to alleviate the

9     conditions of confinement and guarantee his Sixth Amendment

10    right to counsel and to participate in his own defense.

11         And Mr. Metcalf will take over from here.

12         THE COURT:  Thank you, Counsel.

13         MR. METCALF:  Your Honor, may I have just about

14    10 seconds real quick with Mr. Lang?

15         THE COURT:  Please.

16         MR. METCALF:  Thank you.

17         (Discussion off the record.)

18         MR. METCALF:  Thank you, very much, Your Honor.

19         A couple of things that I would like to address

20    with regards to this application were outlined and

21    highlighted in our reply papers.  And that was our ask.  And

22    our ask is to not focus on isolated instances in this

23    application, not to focus on a two- or three-minute time

24    span.  It's to, essentially, take into consideration the

25    totality of the circumstances that Mr. Lang was faced with

1    on that day and at the end of that, that this day or

2    circumstances anywhere substantially close to this are never

3    going to exist again.

4         So Mr. Lang, as alleged by the government, first

5    basically got to the tunnel at around 2:41.  After -- and

6    that lasted anywhere going back and forth until about 5:00.

7         Now, what we submitted to Your Honor as Exhibit A

8    in our reply is a video that took me -- I can't tell you how

9    many times to watch to actually see what was going on there

10   because I was constantly being told it.  And maybe for one

11   reason or another, I didn't want to believe it, and it was

12   right in front of my face the whole time.

13        The video -- I don't know if Your Honor has had a

14   chance to look at it.

15        THE COURT:  I have.

16        MR. METCALF:  It actually shows a story that there

17   was more to this situation than what first meets the eye,

18   than what's been portrayed in the media and how a single

19   snapshot could capture.

20        Two main instances that we want Your Honor to

21   focus on.  That one video in particular and the time frame

22   of that video, approximately, from my calculations, at about

23   3:05.  If you see the one bottle get thrown and ricochet off

24   of someone's head and, basically, hit the camera.  And then

25   some goop comes on the video.  It's a white substance that

1   comes on the video.

2          Around that exact same time -- I think we marked

3   it as two hours and five minutes into the video until about

4   two hours and eight minutes into the video -- if you focus

5   in the right-hand corner of that video, you see an elderly

6   woman with a red sweatshirt on who is completely helpless,

7   who is defenseless, and she is being beaten with batons.

8   She is being beaten by multiple officers.

9          There is, actually, one officer at one point

10  during that time frame -- I think it is about two hours and

11  seven minutes into that video, where one officer is not

12  wearing the typical gear.  He has a white shirt on and a

13  helmet.  And you see him beating this woman with a baton.

14         THE COURT:  What time is that, approximately?

15         MR. METCALF:  Based on my calculations, I believe

16  that to be approximately 3:07.

17         At the same time, there's an officer on a ledge

18  literally spraying that woman as the other officer is

19  beating her.  So you have multiple officers beating this

20  woman, and you have another officer engaging in the spray.

21         Now, the spray is something I want to focus on.

22  There are various different reasons why people showed up

23  that day.  Mr. Lang is a young 26-year-old who grew up with

24  a strict-regimen family, where he idolized his father.  His

25  father was a businessman, a strong businessman he wanted to

1    emulate and wanted to take after, and he actually created

2    skills in social media.

3             On January 6th, he had a website platform that was

4    about to take off.  He went there to promote himself, have

5    his voice heard.  And what these individuals were met

6    with -- now, this is Mr. Jacob Edward Lang [sic].  If we

7    talk about the 3142 factors in there, he's not involved in

8    any group, no anti-government group, no affiliations with

9    any Proud Boys, any members at all.  There is no showing

10   that he even went there to meet anybody.

11            He has a dress shirt on underneath his jacket.  He

12   was trying to find out business opportunities in D.C. the

13   day before, and he went there for his voice to be heard,

14   maybe so people would see him on Facebook.  What ended up

15   happening, though, is not anywhere close to what was

16   intended to have happen or what was intended to go on that

17   day.

18            You want to speak out about the government; that's

19   your First Amendment rights.  And what are you met with?

20   You are met with officers, tear gas, flash bangs, knee

21   bangers or -- I forget exactly what they are called at this

22   specific second -- and then what Phillip Anderson described

23   as orange gas that literally made you -- and when I say

24   "what we described", it's in our initial moving papers --

25   that literally made people almost pass out instantly.  Tear

1     gas, mace, flash banging.  And that video of this woman

2     captures this story.

3                 THE COURT:  Well, your client was there with a gas

4     mask.  Right?

5                 MR. METCALF:  At one point or another, yes, he did

6     have a gas mask on.

7                 THE COURT:  Was it his gas mask?

8                 MR. METCALF:  Say again?

9                 THE COURT:  Was it his?

10                 MR. METCALF:  I don't know about how he actually

11    came into possession of the gas mask, Your Honor.  I know

12    that the government alleges in their opposition that he

13    picked it up at one point, at approximately 3:01.  I was

14    trying to figure out that whole situation and I -- according

15    to my calculation, I saw different times throughout the

16    evidence that he had that gas mask beforehand.  So I don't

17    know when or how he actually did come into possession of

18    that gas mask, Your Honor.

19                 So the point being, when they got to that point

20    and when the officers formulated that line, there were

21    people stuck there.  There were people who had to react and

22    had to actually take action on behalf of other people.  And

23    there were people substantially being injured.  There were

24    numerous counts of excessive force happening right in front

25    of these people.  Not to justify the actions but to explain

1    what was going on that day.

2          And then if you fast-forward a little bit later,

3    it actually did happen.  There is a woman who physically

4    died right there on those stairs.  There is a woman who was

5    passed out unconscious, and videos have circulated about

6    officers beating her while she was down.  Unfortunately, I

7    don't have that video in our discovery where I could

8    pinpoint it to present it to Your Honor, but that is what is

9    circulating right now.

10         Mr. Lang, at one point or another, was trying to

11   stop this chaos.  He was trying to stop this mess.  He was

12   caught on video waving his arms, screaming.  "There are

13   people down there.  They need to get saved."

14         I actually pulled up the application of Mr. Foy,

15   another bond application that was done, and the video is

16   quoted in that application, and the words that are quoted

17   are Mr. Lang's words, trying to notify the police that

18   people are underneath a crowd of people and they are being

19   hurt and they are dying.

20         And there was no reaction other than the continued

21   threat of violence that just continued to ensue from these

22   officers.  So there were people who had to act in a certain

23   way.

24         Jake then picked up Phillip Anderson out of that

25   mess.  He tried to do what he could with regards to Rosanne,

1    and the government even acknowledges that in their papers at

2    Page 14.  And then he picked up another unconscious man.

3    This is not about race.  This is not about politics.  This

4    is not about anything other than him jumping into a chaotic

5    situation and trying to do what he can to save other people.

6            We ask Your Honor to take that into consideration.

7    We ask you to take that into consideration when you are

8    doing a distinction based on *Munchel*.  We understand that

9    *Munchel* does --

10           THE COURT:  So how does that jibe with Exhibit CC,

11   whereas, I understand it, your client wrote, "Can't wait for

12   the 20th.  I am getting a fucking arsenal together.  This

13   group is with zero fear of the Feds.  They know this is war.

14   This is war.  You obviously weren't at the Capitol this

15   week.  Let me show you what war is.  If anything goes down

16   where we need to mobilize and show up like the Minutemen,

17   the regional leader messages everyone and we come armed"?

18           MR. METCALF:  Your Honor, Exhibit CC of the

19   government's opposition having to do with the Telegram

20   messages?  Is that what you are referring to?

21           THE COURT:  Yes.

22           MR. METCALF:  Your Honor, those messages --

23           THE COURT:  That's after the event.

24           MR. METCALF:  Say again?

25           THE COURT:  Those messages were sent after

1    January 6th.  Correct?

2              MR. METCALF:  Yes, I'm not disputing that.

3              THE COURT:  So how are those consistent with your

4    argument, as I understand, all Mr. Lang was doing was trying

5    to protect innocent people from the violence of the officers

6    on the scene?

7              MR. METCALF:  It's not all that he was doing.  He

8    was also having his voice heard.  It was also his ability to

9    network or do things on social media that allowed him to

10   build a business.  Now, those beliefs could be misguided and

11   were definitely misguided at that point, but they were talk.

12   They actually never did anything.  They actually never led

13   to anything.  It was a situation that's nothing more than

14   hyperbole, Your Honor.

15             THE COURT:  You concede, do you not, that he's on

16   camera swinging a baseball bat at the officers?

17             MR. METCALF:  So time frame.

18             THE COURT:  Do you concede that?

19             MR. METCALF:  Yes, I do concede that, Your Honor.

20             THE COURT:  And do you also concede that at one

21   point he swung a riot shield or whatever you want to call it

22   that appears to have been taken from an officer, he swung it

23   at an officer or slammed it against an officer?  Do you

24   concede that?

25             MR. METCALF:  Okay.  So going back to the bat --

1          THE COURT:  Do you agree that there is evidence,

2     pretty clear video evidence that your client swung a riot

3     shield or shoved a riot shield or hit an officer with a riot

4     shield?

5          MR. METCALF:  What I saw with the riot shield was

6     the Facebook post pointing, This is me, and that the riot

7     shield got slammed on the floor.

8          THE COURT:  Have you viewed all of the videos the

9     government has introduced here?

10          MR. METCALF:  Introduced here?

11          THE COURT:  Yeah.

12          MR. METCALF:  Out of the 47 pieces of exhibits, I

13     would say potentially two or three may be the only ones I

14     did not see, and that is only because at that time I was not

15     able to open up my computer.  But I have gone through every

16     single one of those exhibits in as much detail as I possibly

17     can.

18          THE COURT:  So you contest that there's evidence

19     that the government has proffered showing Mr. Lang hitting

20     an officer, just to use a generic term, with a riot shield?

21          MR. METCALF:  No, I don't contest that.  What I

22     would say to Your Honor is this --

23          THE COURT:  Do you agree or concede that Mr. Lang

24     kicked an officer on the ground?

25          MR. METCALF:  The kicking charges --

1          THE COURT:  Answer the question.  Do you concede

2     that there is evidence that your client kicked an officer on

3     the ground?

4          MR. METCALF:  That we are still looking into, so I

5     cannot concede that at this point.

6          THE COURT:  Okay.

7          MR. METCALF:  But what I can say to Your Honor is

8     if you look at the two points that Your Honor's talking

9     about, with regards to the baseball bat, with regards to the

10    shield, the time frame here -- not excusable, but 4:26, 4:27

11    is approximately the time when Rosanne Boyland died right

12    there on those steps.

13          Mr. Lang tried to help her.  Was unable to.  Was

14    pulling other people out.  His actions at that time -- I

15    don't know if they were -- and this is why we are presenting

16    to Your Honor about looking into the defense of others, what

17    they were doing.  And what I could tell at that point and

18    what I submit to Your Honor is that the baseball bat was

19    used in a way where he was hitting the shields.

20          There is also -- if you look at them in its

21    totality, there is somewhat of a movement of trying to push

22    the police back and trying to push everybody else back.

23          There is not -- as the Klein Court put it, there

24    was no intention to actually harm.  Some of those shields

25    were not six feet.  Some of those shields were not covering

1      these officers' entire bodies at all.  So it was more of

2      warning signs.  It was more of trying to separate two

3      crowds.  It was more of adrenaline after picking up a woman

4      who just died, having to save another person, after seeing a

5      bunch of people hit.  There are so many different factors --

6           THE COURT:  Am I right that we are talking about a

7      period that is almost two hours after your client -- and we

8      talked about it before.  I think the time period you

9      mentioned was 2:41.  What we are talking about now are

10     events that happened roughly two hours later.

11          MR. METCALF:  Yes.

12          THE COURT:  So your client was there for two

13     hours.  Didn't step away.  Didn't walk away from the

14     Capitol.  Stayed there.  Was he, essentially, at the -- I

15     don't mean this to be specific, but at the general front of

16     the crowd at the tunnel?

17          MR. METCALF:  He was more towards the front of the

18     crowd, yes.

19          THE COURT:  That whole time?

20          MR. METCALF:  A little bit longer -- there are

21     certain points that are unaccounted for.

22          THE COURT:  So what was he doing that whole time?

23     Was he trying to save people that whole time?

24          MR. METCALF:  So there is a one ten-minute gap

25     between, I think, 3:30 and 3:40.  I think he was trying to

1   catch his breath.  I think he was actually having medical

2   attention given to him.  I think there was various different

3   things he was doing aside from the front.  There are

4   different times he did step back and come back; that is

5   correct, Your Honor.  It is longer than a two-hour period.

6           THE COURT:  I was just talking about the fact that

7   when we are talking about the shield and the -- whatever you

8   say happened with it, that's some two hours after Mr. Lang

9   is first observed at the beginning of the crowd in the

10  tunnel.  So it's a long period of time he was there.  And

11  I'm trying to understand whether your argument was that he

12  was trying to save people that whole time or protect people.

13          MR. METCALF:  Well, at first -- so they identify

14  him at 2:41.  At 2:41, there is a lot of people already in

15  front of him.  There is a lot of people in the tunnel at

16  that point in time.  He goes by the front gateway of the

17  tunnel and either snaps a photo or is recording.  Then he

18  goes somewhere else.  Not on camera for a couple of minutes.

19  Then when he comes back more towards 3:00 is when there is

20  that joint pushing movement that's described in the

21  government's papers.

22          So there was people pushing one way, officers

23  pushing the other way, people falling in the middle, then

24  more of the crowd coming behind.  So it was chaos in various

25  different ways and various different senses of the word.

1          THE COURT:  Who caused the chaos?

2          MR. METCALF:  Say again?

3          THE COURT:  Who caused the chaos?

4          MR. METCALF:  That's what I don't know,

5    Your Honor.  People being there.  Also, as I explained

6    before, when they came there, they were met with certain

7    types of violence and a certain level of violence from the

8    officers.  So I don't think it is just one person.  I don't

9    think it is one group of people.  I think that there are

10   various different factors at play here where there are

11   officers who actually may have escalated this scenario and

12   brought it to something that it wasn't.

13          And then what I am asking Your Honor to consider

14   is after the pushing movement got to a point where the

15   officers lined up at that entryway, there were people stuck

16   in that area; and that's where Mr. Lang's actions are

17   alleged to have substantially -- or to substantiate it at

18   that point in time.

19          And at that point in time is where I am saying

20   that they were looking to save people.  There's actually one

21   of the government's exhibits, I believe it is Exhibit E,

22   where you could hear him saying, There's women in there.

23   Get the women out.

24          Your Honor, throughout this time, there is a

25   different scenario going on based on what the officers are

1    doing.  So the entire time he was not trying to save people,

2    no.  But there are certain parts of that time where he

3    absolutely, unequivocally was.

4         And we ask Your Honor to take that into

5    consideration when applying *Munchel*, when looking at the

6    assault counts in this case, in looking at the severity of

7    those assault counts, and in weighing each one of these

8    factors.

9         The government puts him in his own category.

10    There can be a category for those with a defense of others

11    or those with an actual defense that explains their behavior

12    because absent that, you have people swinging bats and

13    throwing sticks at officers and if you don't look at the

14    entire scenario in these videos in its totality, you can't

15    make sense of it.

16         But when you go down to what was actually

17    happening at that time and people were getting sprayed in

18    their face with gases and there was tear gas coming in this

19    way and batons being hit over people's heads and people -- a

20    woman laying down unconscious, her being hit over the head

21    with a baton and then when people tried to save this woman,

22    them getting hit over the head with batons and completely

23    dropping like flies -- when you see this going on in front

24    of you, it explains certain scenarios and explains context

25    to what actually happened here this day and context to what

1      Mr. Lang is alleged to have done because without that

2      context, it doesn't make sense.

3                THE COURT:  So let's go back to one of the first

4      questions I asked you, and that is how at least some of this

5      argument is consistent with -- or maybe even answer a

6      different question, which is, isn't, for example, what he

7      said after the event relevant to the question in front of me

8      about the Bail Reform Act?

9                MR. METCALF:  Yes, it is.

10               THE COURT:  Yeah.  So you don't dispute that he

11     wrote what he wrote in the post period of January 6th.

12               MR. METCALF:  Absolutely --

13               THE COURT:  The government, I think, says that

14     that -- well, I don't know that they say this, but one could

15     argue that that puts him in a different category than people

16     who merely committed violence that day.

17               But he said, We are going to do this again if we

18     need to.  And so why isn't that highly relevant to whether

19     there is a significant risk of future dangerousness?

20               MR. METCALF:  Okay.  So, Your Honor, in going

21     through the factors, the nature and circumstances of the

22     offense, there's various different components that the

23     courts have analyzed.  So, yes, those statements,

24     100 percent, are relevant to your analysis.  We admit that

25     they may have been wholly misguided in one way, shape or

1    form.  They were put out there on the World Wide Web.

2              But when you take into consideration the various

3    different factors that are also looked at in weighing the

4    nature and circumstance, I ask Your Honor to take into

5    consideration that there's no evidence of prior planning.

6    There's no evidence of him going there that day with a

7    weapon.  That baseball bat was being passed around, and it

8    was, essentially, ripped away from someone who potentially

9    could have done ten times more harm with that bat.  As silly

10   as that sounds, when you see these other guys swinging the

11   bat, it is nowhere in comparison to the way Mr. Lang swung

12   the bat.

13             I will give you another example, Your Honor.

14   There is a video of his true nature.  I had to rewind this a

15   couple of times.  It's either Exhibit K2, where it's a

16   minute-long video.  You see Mr. Lang with a bunch of others,

17   and it seems as if they're approaching the officers and

18   everyone is kind of standing back and people are getting

19   aggressive.

20             An officer falls down, and Mr. Lang actually picks

21   him up.  When Mr. Lang picks him up, the people behind him

22   seem to get frustrated that he actually picks the officer

23   up, and then the video cuts off.  So I believe that that is

24   actually K2.

25             There are certain things that Mr. Lang did that

1   were not the intention of harming these officers.  It was

2   more of advancing the crowd, moving the crowd in one way or

3   the other and trying to get the officers to move in one way

4   or the other and if people were trapped behind them, being

5   able to have these people get out without being

6   substantially injured.

7          I just want to double-check, Your Honor, real

8   quick about that video.

9          THE COURT:  I'm reviewing K2 as you speak.  It's

10  not apparent to me that that's the one, but it may be.

11         MR. METCALF:  Your Honor, if I could just step

12  back to my phone.  I actually have it at the top of my

13  phone.  Is that okay?

14         THE COURT:  Yes.

15         MR. METCALF:  Thank you.

16         THE COURT:  Of course.

17         MR. METCALF:  It's actually Exhibit Q, Your Honor.

18         THE COURT:  Okay.  I am pulling that up.

19         MR. METCALF:  So, Your Honor, to clarify a couple

20  of things, K2 and Exhibit E are two videos that we were

21  looking at in comparing and contrasting the allegations

22  about kicking.  And the one main discrepancy that we have

23  here is that there is another individual wearing a very

24  similar jacket, who I keep mistaking for Mr. Lang.  In those

25  two exhibits, there seems to be more of, like, a collar with

1    this individual's jacket.  And that is precisely how

2    Mr. Lang is identified by officers in 302s, by officers in

3    general.

4            When I saw different exhibits of what his jacket

5    looked like and not having that actual collar and not being

6    able to flesh this out with Mr. Lang because we haven't been

7    able to send him his bond application or any other papers

8    for the last couple of weeks, that is why -- I didn't mean

9    to be offensive or defensive, but there are a couple of

10   things we still need to look into to see if Mr. Lang has

11   been mistaken because I've mistaken him in a whole bunch of

12   these videos on more than one occasion.

13           THE COURT:  So that means we don't know whether he

14   tried to help an officer up or not?

15           MR. METCALF:  No.  It means in K2 and E, we don't

16   know and cannot concede whether or not he is kicking at the

17   officer.

18           THE COURT:  What about in Q?

19           MR. METCALF:  Q, that appears to be Mr. Lang.

20           THE COURT:  Kicking the officer.

21           MR. METCALF:  This is what I am saying to

22   Your Honor.  He is kicking at what appears where the officer

23   is standing, just like with the bats a little bit later on.

24   But then it doesn't seem as if he hit this officer.  This

25   officer goes on the floor, and he picks him up.  The others

1    behind him seem to go after the officer as he is picking him

2    up.

3                    This is what I am saying to Your Honor is that

4    when you look at each one of these actions that he's alleged

5    to have done, he's not giving it his full intent to actually

6    harm these officers.  It's more of trying to create a space

7    between those in the crowd and the officers coming back and

8    at certain points to allow for the people stuck behind the

9    officers to get out without being substantially injured.

10   That's what we are proposing to Your Honor.

11                   When you review the evidence, the intent to harm,

12   you go through each one of the seven assault counts, these

13   officers -- there is one officer said that he had a

14   headache.  The injuries are not there because Mr. Lang did

15   not want them to be there.  His intention was not to harm

16   these officers.

17                   This is a man who reacted and actually sprung into

18   action when he saw people being beat right in front of him

19   and excessive force being done to women who were

20   defenseless.  That is what we are presenting to Your Honor.

21   Because the shields were not covering their whole bodies,

22   there are different portions in time where he could have

23   done it a completely different way if his intent was to

24   harm.  That video also captures that exact point.

25                   MR. TANKLEFF:  Your Honor, if I may.  If you look

1      on Q -- it's at 12 seconds -- you can actually see Mr. Lang

2      grabbing the officer's hand and picking him up.  It's

3      exactly at 12 seconds.

4                  THE COURT:  Grabs an officer's hand.

5                  MR. METCALF:  Your Honor, when we spoke about the

6      statements and those misguided statements and those

7      statements that could have been of rage on the day after and

8      how they are relevant, I ask Your Honor to consider his

9      planning.  There is no evidence of him planning.  I ask

10     Your Honor to consider that he is not part of any

11     anti-government group.  He's not affiliated with any of

12     these organizations, never was.  There's no planning of him

13     meeting up with any of these organizations on that day.

14                 Mr. Lang was essentially there by himself.  He

15     wasn't meeting up with people.  This was not a coordinated

16     scenario with regards to Mr. Lang.  There is no earpiece.

17     He's not talking to anybody as we've seen in these other

18     cases.  That is not the situation with regards to Mr. Lang.

19     I ask Your Honor to take that into consideration.  I ask

20     Your Honor to take into consideration what we are talking to

21     you about him picking up these officers.

22                 We are also asking you to take into consideration

23     his ability -- or what he did to actually try to save

24     people.  If you're going to take his words into account,

25     take his words into account about women being there.  Take

his words into account about trying to get the women out.
Take Phillip Anderson's words into account when he thought
that he was going to die.  But for Jake Lang pulling him out
of this crowd and these people off of him, he believed that
he was going to die.

There are people who had to react that day.  There
are certain reactions that were going to happen that day,
and there are people who sprung into action.  That's what we
are asking Your Honor to take into consideration.  There is
no leadership role here.  There is no de facto leadership
role here.  So there are various different aspects of the
nature and circumstances that can be broken down.

When you take all of these factors into play, you
can conclude that the nature and circumstances, although
serious, although involve these assaults, also involve a
defense of a defense of others, which brings context and an
explanation to these actions on this day, and weigh that in
favor of him not being detained anymore.

And, Your Honor, to circle back to something that
Mr. Tankleff mentioned to Your Honor, in the jail, Mr. Lang
is not treated the same.  Mr. Lang is singled out.  He is
punished different than other people.  He is used as a
scapegoat on various different occurrences.  Him going to
the hole at one point for two months at one time was for
sheer reason of people just potentially not liking him for

1   what the jail instills into the minds of everyone who is in

2   there.

3            There are various different factors there that

4   separate Mr. Lang apart.  When he was in the hole for two

5   months, he was filtering his water through his sock.  He was

6   not able to speak to us.  He still hasn't gotten a haircut

7   or a shave.  So regardless of medical reasons or religious

8   beliefs on getting vaccinated or not, Mr. Lang has been

9   placed in a whole other category for reasons I cannot

10   explain that literally have deprived this man of being able

11   to assist in his defense.  And that has been the situation

12   since his arrest.  We have not been able to adequately

13   communicate with Mr. Lang, no matter what lengths we go

14   through, no matter what policies we try to abide by.

15            There are various different times that we try to

16   email.  I will give Your Honor an example.  I went away for

17   the first time in about two years with my family about two

18   weeks ago.  I emailed the jail saying I wanted to have a

19   video visit with Mr. Lang.  I told them, specifically, On

20   this Monday, I am going to be traveling.  I am not going to

21   be in front of a computer.  They set up my visit with

22   Mr. Lang for that exact time I told them I was going to be

23   traveling.

24            There are various different instances and hurdles

25   that lead to this detention being wholly unconstitutional.

1          THE COURT:  I think I have it.  I would like to

2     hear from the government, and I will, of course, give you an

3     opportunity to do rebuttal.

4          MR. METCALF:  Thank you, Your Honor.

5          THE COURT:  Ms. Jackson.

6          MS. JACKSON:  Good afternoon, Your Honor.

7          Timing matters in this case and the timeline

8     matters, specifically as it relates to the factors that

9     Your Honor needs to take into consideration in evaluating

10    the detention decision, in particular both the nature and

11    circumstances of the event, of the charges itself, the risk

12    that Mr. Lang poses to the community and his characteristics

13    and history.

14         To start off, it actually doesn't start at 2:41.

15    One of the reasons we have such a firm grasp on the timeline

16    for Mr. Lang is he filmed himself almost continuously

17    throughout the day.  We have recovered those videos from his

18    phone.  He also posted many of them on Instagram, Facebook

19    and social media, where he had thousands of followers.

20         You can see him when you go through all of the

21    evidence starting first at the rally and then going down to

22    the Capitol, climbing the scaffolding and hanging from the

23    side from around 2:30 on and then climbing to the top of the

24    scaffolding, which is how he gets to the second level of the

25    lower west terrace and approaches the tunnel or the archway,

1   the entrance through which the president typically walks out

2   on Inauguration Day, which is where the bulk of this

3   occurred.

4          Then around 2:41 he enters.  It's a bit chaotic

5   from 2:41 until approximately 2:57, as captured in his own

6   videos that he, again, filmed himself and posted to social

7   media.  What he said and did in the order in which he said

8   and did matter.  As you can hear from that video, yes, he

9   said, Get the women out of the way, when he first gets

10   there.  But before he said that, he said, Lock your shields

11   and push back up.  This is our house.  And afterwards he

12   said, If you are not going to fight, move.  Let us in.  This

13   is our house.  We paid for this F-ing building.  This is our

14   country.

15          The government has now charged Mr. Lang in a

16   superseding indictment with charges beginning for his

17   behavior around 2:57 p.m., where the government alleges you

18   can see Mr. Lang kicking at and slamming a door against the

19   head of a sergeant, who is in a prone position as he tries

20   to hold on to a shield at the front of those doors.

21          This is captured in Exhibit E and Exhibit F that

22   the government provided to the government -- I mean to the

23   defense and the Court.  I believe we might have confused

24   defense counsel by putting the white box around Mr. Lang and

25   Sergeant J.M. around that time because there is another

gentleman who wears a leather jacket.  However, as included

in the still, in our motion, Mr. Lang is clearly visible

wearing that blue Trump hat and swim goggles, which he

appeared to have brought with him to a rally for some

reason, which is the same outfit he is seen wearing in the

many previous videos he filmed of himself earlier that day,

including while hanging off the scaffolding as he climbed

up.

In that video, when you take them in conjunction,

not just the body-worn camera of Sergeant J.M., who is prone

forward, bent over, holding on to a shield as he is kicked

at and has a door hit into him, but also Exhibit E, the clip

from the YouTube video, which corresponds to the same time

frame.  You can see Mr. Lang and other rioters slam the door

into the sergeant's head.  It happens quickly, which is why

we included a still so you could actually see the sergeant's

badge number on his helmet as he is prone forward.

You will also see repeated kicks.  Yes, you can't

see his face.  He is bent forward.  However, it is the same

pointy black boots and gray pants that Mr. Lang was wearing

that day that were recovered from his home later on.  And

he's standing in the same -- or rather, the kicker is

standing in the exact same position as Mr. Lang is in

Exhibit E at the same time frame, leading to the reasonable

conclusion that, in fact, he is the one kicking.

1          From that point, it goes forward.  He enters and

2   exits screaming, making weird guttural screams and yelling,

3   What are we doing, as his eyes are -- he appears to have

4   been pepper-sprayed repeatedly but keeps coming back.

5   Although he is not charged for that, it does indicate his

6   state of mind and what he was choosing to do over and over

7   again.

8          From 3:08 to 3:13 -- this has led to another

9   charge, a 111 -- he repeatedly joins the group heave-hoe

10   pushing effort as this group of rioters in this small

11   tunnel -- I've been there -- the doorway is about 10 feet

12   wide -- the tunnel itself is a little bit wider -- are

13   pushing with all of their might against the guards blocking

14   the door.

15          In the process, as captured in Exhibit -- in the

16   YouTube clip -- I believe it is Exhibit L -- one of the

17   officers gets smashed between a shield and the doorjamb as

18   the whole group heaves and hoes, including Mr. Lang.  You

19   can see him first come in at that first clip in K1, stop to

20   wash his eyes out, join the pushing again.  There is a

21   break.  Comes back, joins the pushing again.

22          You can just see him run forward in K2 and get the

23   behind the people in front of him.  He is a bit shorter, so

24   it becomes harder to see him, and then you kind of have to

25   watch his hat to see where he is going.

1          Altogether, you see him joining the heave-hoe and

2     hurting people.  That is what happened is people were hurt.

3     Just as you can see that officer screaming in pain to get

4     free, as captured in Exhibit L, which is -- corresponds to

5     approximately 3:12 to 3:13, at the end of it, people were

6     hurt.  That's not the only officer that was hurt.  Others

7     officers suffered internal bleeding who were stuck inside of

8     that group and pushed and shoved.

9          One of the tragedies of January 6th is there are

10    so many assaults and so many people assaulting the officers

11    that we cannot correspond exact injuries to particular

12    assaults by each defendant on every case because -- for

13    instance, the officer who was dazed and had headaches

14    afterwards that the defense counsel referenced, that is

15    Officer I.F.  He was hit by multiple people around the exact

16    same time frame with a baton-like object or stick-like

17    object.  So can we say for sure that it was Mr. Lang versus

18    one of the other defendants attacking the officers at the

19    same time that caused that injury?  No.  But, yes, people

20    were hurt.

21         From there it continues forward.  Around 3:18 to

22    3:20, he is pushed out of the crowd.  There is a large pause

23    in the violence from approximately 3:20 to 3:50 p.m.  During

24    that time frame, just as he had previously, Mr. Lang stops

25    to take a selfie and a video that he posts on Instagram.  He

1   had stopped earlier, around 3:05, I believe, to go outside

2   and say, We are the real men, screaming and yelling, Get in

3   there!  Get in there!  He then stops at 3:30.  You can see

4   him in a blue paisley shirt on the edge saying, A little

5   pepper spray in the morning, while he smiles real big,

6   taking a break.  Then he goes back.  He goes back with

7   exuberance.  It keeps growing from that point forward.

8           At 4:01 p.m., he doesn't just attack an officer.

9   You can see him crowd-surf over other rioters to get to the

10  front and then punch an officer in the head repeatedly.

11          Then around 4:05 to 4:10, that is when defense

12  counsel's cited example of the woman in red, who is in not

13  in her 50s or 60s -- she is a defendant.  She has been

14  arrested.  She was in her 40s.  That occurred in the tunnel

15  around 4:05 to 4:10.  The way you can tell is that the

16  exhibit is labeled 1400 hours, meaning it starts at 2:00, so

17  meaning two hours and five minutes in is around 4:05 to

18  4:10.  So that's after he assaulted multiple officers.

19          That occurs on, if you are looking at the tunnel,

20  essentially the left-hand side of the tunnel.  He, on the

21  far right side of the tunnel, proceeds to kick and punch at

22  Detective P.N., who is wearing a bright neon vest and had

23  fallen to the ground.

24          I fought with myself repeatedly about whether I

25  was overloading the Court with exhibits on this issue.  We

did so for a reason, because we wanted to be precise in how we were describing what occurred.  I actually regret not including two more exhibits about this exact offense.  All of these -- this behavior, his actions that day, these are not everything.  These are just a few for each incident.

That particular incident is also captured on the body-worn camera from Sergeant J.M., who is standing directly behind that detective as he is kicked and punched, where you can see Lang hit and kick at the detective as he is on the ground.

It's also captured in Exhibit A that defense counsel provided to Your Honor, the USCP footage.  If you go to approximately 4:11 p.m., which would be two hours and 11 minutes in, you will be able to see, fairly violently, Mr. Lang punch and kick at someone who appears to be on the ground.  When you combine that with the body-worn camera capturing the detective who had fallen on the ground, it becomes very clear who he is kicking and punching at.

I did include on purpose the additional portion where he is grabbing the detective's arm.  Frankly, I watched it many, many times.  I can't tell if he is trying to help him or pull him into the crowd.  It's not clear.  But it is after already punching and kicking the detective who had been on the ground.  Maybe he had some regret and felt bad or maybe he was trying to pull him out.  I don't

1    know.

2            Then after 4:11, that takes us to 4:26.  That's

3    when the rioter who passed away, who is referenced by

4    defense counsel, is blue.  Mr. Lang, to his credit, waves

5    like this.  You can see him on the USCP footage, Exhibit A

6    that defense counsel provided, at two hours and 26 minutes

7    in or so trying to get the attention of officers.

8    Unfortunately, other people start hitting them violently

9    with sticks and batons as they are trying to give her help,

10   but they are able to pull her out.

11           She did, unfortunately, pass away.  As has been

12   publicized in the press, the findings and conclusions, it

13   appeared to be a drug overdose as opposed to for another

14   reason.  But I'm sure at the time, it certainly seemed like

15   she had been crushed to the persons there regardless of the

16   reasons why after the fact.

17           So you go from 4:26, a couple more selfies in

18   there.  And then at 4:44, 4:43, that's when Mr. Lang, at

19   this point, has a shield and is repeatedly hitting.

20           It is hard to watch those ten minutes even just of

21   the shield.  You'd think it wouldn't be so scary because

22   it's a shield attacking an officer, but at least he has a

23   shield to protect him, but it is still frightening because

24   those are pretty violent hits.  They are not just shoves.

25   And there is nobody being protected.  There is no defendants

1    or rioters or other folks that that particular officer is

2    doing anything against.  He is just standing there trying to

3    guard the archway, along with his fellow officers.

4         And what's the most frightening was the time that

5    you can see him kind of come at an angle with the shield and

6    slice downward.  Why does that matter?  Because as defense

7    counsel pointed out, the shields don't cover the whole body.

8    So if you slice downward, you are going to hit him in the

9    legs.

10        Why does it matter?  Because the context and

11   timing matters here because it indicates his state of mind

12   that day.  What is he trying to do?  Well, he's not just

13   doing one quick check with the shield and walking away.

14   He's not just standing there to stop the opposition from

15   going forward.  He is repeatedly hitting, violently,

16   aggressively, strongly, and trying to do it in a way that

17   will hurt them.

18        THE COURT:  So in light of all of this conduct,

19   does a presumption of detention trigger?

20        MS. JACKSON:  Statutorily?

21        THE COURT:  Yes.

22        MS. JACKSON:  No, Your Honor, there is no --

23        THE COURT:  Statutory.  Even though this is a

24   crime of -- as you argue, a crime of violence?

25        MS. JACKSON:  Because it's a crime of violence, we

1      are allowed to seek detention based upon that reason, and

2      111(b)s are categorically a crime of violence, and therefore

3      the analysis ends there.  Can we at that point seek

4      detention?  Yes.  And we are seeking detention because --

5                  THE COURT:  Right.  The question is whether a

6      presumption arises from the statute.

7                  MS. JACKSON:  No, Your Honor.  Ironically, had he

8      committed destruction of property, there would be a

9      presumption.  But for some reason, attacking officers with a

10     weapon is not enough to create a presumption.

11                 THE COURT:  I think I have the timeline.  I have

12     the facts of the day.

13                 Obviously, he makes an argument about all of the

14     stuff you've talked about.  He did some things that are

15     favorable or paint him in a better light, including, as you

16     conceded, raising his hand when the woman was in obvious

17     duress.

18                 My main question is, under D.C. Circuit opinion

19     and *Munchel* and more generally, there has to be a specific

20     articulable risk that his pretrial release would enhance.

21     What is, in the government's view, that specific,

22     articulable risk?

23                 MS. JACKSON:  I believe in *Munchel*, the Court

24     stated that those who actually committed violence were in a

25     separate category and therefore the exact analysis and

1    issue --

2             THE COURT:  They did, although they didn't have

3    occasion to identify what the specific articulable risk

4    therefore was.

5             MS. JACKSON:  Correct, Your Honor.  But they have

6    since, for instance, in Hale-Cusanelli, stated it's really

7    just an individualized assessment, no different than any

8    other case.

9             Counsel had cited a number of, very quickly, off

10   the cuff, various defendants who have been released.  They

11   are different than the ones I prepared for because they are

12   not the ones listed in his reply.  But I would note that all

13   of those cited, as far as I am aware, don't come close to

14   Mr. Lang, both in terms of his threat forward and his

15   actions that day.

16            So to answer the first question, his actions that

17   day supply an independent basis in and of itself to provide

18   a reasonable risk of dangerousness, a clear and convincing

19   conclusion that he is a danger to all law enforcement that

20   stands in his way.  Why?  Because he made a decision not

21   once, not simply in a reactionary posture, but over and over

22   again over a period of hours.

23            THE COURT:  So would you say the government, if

24   forced to articulate it with specificity, is that the risk

25   that in any future engagement with law enforcement, he would

1      engage in violence?  Is that the way you would put it?

2             MS. JACKSON:  I would specify it as such that the

3      defendant continues to pose a danger to the community if

4      released given his risk of committing or advocating violence

5      in support of his political beliefs, which I think I pulled

6      that language specifically from Hale-Cusanelli, but I am not

7      positive.

8             I think a more applicable or comparable case would

9      be U.S. versus Christopher Quaglin, which is a case I do

10     handle, so I know the facts much better.  But we argued for

11     his detention.  Mr. Quaglin, like Mr. Lang, engaged in

12     violence over a prolonged period of time.  In his case, it

13     was from 1:00 to approximately 3:20 p.m.  He used a weapon

14     against officers as one of the multiple assaults that he

15     committed.

16            He was wearing a gas mask.  He appears to have

17     brought the gas mask in advance, unlike Mr. Lang.  I will be

18     very clear.  I am not aware of any preplanning by Mr. Lang

19     to engage in violence.  I don't believe he brought that gas

20     mask with him because it can be seen falling from the face

21     of another rioter in the tunnel earlier that day and he can

22     be seen picking it up off the ground and putting it on, nor

23     have I seen any evidence of receipts or financial purchases

24     indicating he bought something in preparation.

25            The only thing he bought in preparation, it

1    appears to me, are the goggles, which are designed to keep

2    gas from getting in your face, I would assume or that's the

3    intention.  It's not like he was going swimming at the

4    Capitol that day or in D.C.  Other than that, there is no

5    preplanning.

6          What there is -- the government contends that his

7    actions on January 6th alone -- let's say he was quiet

8    afterwards and did nothing else.  That alone should be

9    sufficient to reach a conclusion by clear and convincing

10   evidence that he poses a danger to any and all law

11   enforcement and our society if it contradicts his ideologic

12   beliefs.

13         He was willing to engage in that behavior despite

14   a large number of law enforcement officers near him.  He was

15   willing to do it in front of a crowd.  He was willing to do

16   it repeatedly.  He was willing to do it despite the fact

17   that he knew that the news was there and media was there.

18   Not only was he willing to do it, he boasted about it that

19   day and posted about it on his social media, basically

20   telling the world what he had done.

21         If you add that to his after-the-fact actions --

22   and this is where he comes more in line to Quaglin -- unlike

23   somebody who said, Oh, my God, I can't believe I just did

24   that, or showed some remorse or some shock and appall at

25   what they had committed, he went full-fledged the other

1    direction.

2          While he did not plan in advance, he certainly

3    started to use the social media skills that the defense

4    counsel flagged that he had been developing, including his

5    own website.  Liberty Centric, I believe, is what it was

6    called.  He started to use those skills to further plan and

7    advocate violence against the government and specifically to

8    stop president Joe Biden from taking office.

9          He did that not only by boasting, generally,

10   hunting down a video of him committing some of the crimes,

11   the shield, waving it up at his head, and finding that so he

12   could post on his own Instagram with a "This is me" above it

13   and saying, "Look at all of the crowd cheering for me," or

14   something along that line, but then he went to an extreme,

15   new level.

16         He sought out -- basically, it is like mailing or

17   something like spamming people who thought he might have

18   similar ideologic beliefs to try to get them to join this

19   Telegram chat to create a state militia system that he

20   organized by region, where he would assign leaders to the

21   different regions and ask them to plan and prepare so they

22   could meet and vet people.

23         He taught them how to take out their personal

24   information so that they would be anonymous but made clear

25   that he didn't have to be anonymous because, A, he wasn't

1      afraid of the Feds or the government and we couldn't do

2      anything besides kill him to make him stop.

3              He then made it very clear when people disagreed

4      with him that he believed violent action was necessary to

5      stop -- and this is where timeline matters again.  He didn't

6      stop on January 6th.  He was shot in the foot; that's why he

7      stopped.  That's why he stopped with the bat.  He didn't

8      stop with the planning to interrupt the inauguration until

9      he was arrested.

10             He was arrested on January, I believe, 16th.  If

11     you look at the texts that are included in Exhibit CC or

12     DD -- I am not sure which one -- he mentions planning for

13     January 17th and January 20th and how it's the duty as

14     Americans.  And the 17th was the next day.  So we don't know

15     what could have happened, what was planned or what might

16     have occurred because he was arrested.

17             That is why he was stopped.  That is the only

18     reason he stopped sending out those missives to these groups

19     of anonymous people with similar beliefs about what and how

20     they should tackle stopping president Biden from taking

21     office.

22             THE COURT:  Let's assume for all intents and

23     purposes that the government has established that he needs

24     to be continued to be detained.  It does seem that the

25     current situation in the jail is such that it's become, has

1    been, continues to be quite difficult for all sorts of

2    communications or activities that would typically be done to

3    mount a defense.

4            MS. JACKSON:  I will concede --

5            THE COURT:  What is the government doing about

6    that?

7            MS. JACKSON:  Yes, Your Honor.  Some of the

8    problems with the jail and access to discovery are

9    structural problems with the jail itself.

10           As we noted in our most recent status update,

11   which was filed, I believe, the 23rd -- it's just in the

12   second-to-last paragraph where we explain the government is

13   in communications with FPD and the jail to try to increase

14   access for defense counsel.

15           But I would note that defense counsel failed to

16   mention some of the things that do exist, right, or that

17   were mentioned really quickly or obliquely in some of the

18   filings.

19           First, I think as defense counsel has said to me

20   previously, they speak regularly on the phone, almost on a

21   daily basis, with the defendant, or at least that was a

22   comment in one offhand conversation I had with defense

23   counsel.  But my understanding is that there is phone

24   communication that is available.

25           Second, as described in the policy from -- I

1    believe it is March of 2021, which the government provided

2    to defense in April in an email, there is an option for

3    providing electronic evidence with a laptop for the

4    defendant to review voluminous electronic discovery.  Is it

5    perfect?  No.  Is there a wait list?  Possibly.

6            But what we haven't heard from the defense is how

7    many times have they tried to do that, come to the jail?

8    Yes, it is harder because they live in New York and he is

9    charged here in D.C.  If they were local counsel, some of

10   this would be much easier.  It just would.

11           But how many times have they come here with a hard

12   drive of the 10 different productions of discovery we have

13   provided or the key exhibits, like the video that they filed

14   and the body-worn camera or the exhibits from this, and

15   provided it through the jail to the defendant to be able to

16   review?  Because he has that ability.

17           I would note also that the fact that he has to

18   quarantine after a private, in-person meeting with defense

19   counsel does appear to be his choice; that is one of the

20   things he must analyze when trying to decide whether he

21   wants to be vaccinated or not.  He is not being forced to be

22   vaccinated, but that means the jail reasonably has to

23   protect other people in the jail and keep them from getting

24   sick.  So it seems to be --

25           THE COURT:  And, indeed, some of the jail's rules

1    about COVID are at least a reaction to or required by

2    litigation involving the jail in front of Judge

3    Kollar-Kotelly.

4         MS. JACKSON:  Yes, Your Honor.

5         THE COURT:  I am not suggesting at all that she

6    has required any particular rules, but she certainly has

7    litigation in front of her that involves the jail, at large,

8    and the rules, policies and procedures that the jail has to

9    follow to, on the other hand, ensure there isn't a massive

10   outbreak, and on the other, to ensure that people have

11   access to information and the like.  I am pretty loathe, I

12   must say, to insert myself into that case.

13        MS. JACKSON:  Your Honor, that highlights one

14   major concern that the government has with some of the

15   arguments the defense has made regarding why he should be

16   released, specifically their allegations regarding

17   mistreatment at the jail and/or access or policies and

18   procedures which they believe inhibit communication.

19        There is a reason that that should be addressed in

20   civil discovery.  I don't have access.  The government

21   doesn't have access to the lots of jail surveillance in

22   video that exist, the interviews of the officers that might

23   have had to led to a reason why somebody was put in the hole

24   or isolation, the reports or hearings that were held after

25   each of those.  I don't have access to any of that.

1          THE COURT:  But you agree that the question of

2     whether the defendant is presently having access to

3     information he needs in his own defense is relevant here.

4          MS. JACKSON:  Absolutely, Your Honor.

5          THE COURT:  There may be other ancillary issues

6     about the hole or treatment or whatever that may or may not

7     be relevant here.  But the core question, which is can he

8     mount the constitutionally required minimal defense in light

9     of the present detention, is live in his criminal case.

10          MS. JACKSON:  Yes, Your Honor.

11          I guess -- taken to its fullest extreme, the

12     defense counsel's argument would mean not a single human

13     being who was arrested on January 6th could be held ever

14     because there is too much discovery and then therefore they

15     wouldn't be able to access it.

16          So that means no matter how egregious, no matter

17     how much evidence of future planning and inciting additional

18     violence, as is the case with Mr. Lang, we would be unable

19     to hold them because there is just too much evidence.  That

20     doesn't make sense.  There have to be additional solutions.

21          In fact, the government is working towards those

22     solutions right now, which is why in the latest status

23     update, we provided the update that there are ongoing

24     discussions about increasing options.  For instance, there

25     have been other developments, such as the laptop policy that

1   was instituted in March of 2021, that allow review of

2   voluminous electronic evidence.

3           THE COURT:  Can you say a little bit more about

4   that?  Do I have it right that the laptop policy permits, if

5   attempted, defense counsel to bring to the jail a laptop

6   that presumably --

7           MS. JACKSON:  Hard drive, basically.

8           THE COURT:  A hard drive that doesn't have

9   internet access but on which maybe the jail would review it,

10  maybe not, but the defendant could review whatever discovery

11  defense counsel loads onto the hard drive.

12          MS. JACKSON:  Essentially, yes.  They are placed

13  in a separate area so they can review it for up to two weeks

14  at a time.  Now, does that mean you are going to have to

15  take some breaks between, yes, reviewing the evidence.  But

16  it does offer an option, an option that was developed, I

17  believe, as a result of the litigation before Judge

18  Kollar-Kotelly.

19          I would note that there is a Relativity platform.

20  And right now there is not internet access to the relativity

21  platform or the Evidence.com platform.  But in this case,

22  for instance, Your Honor, we provided over 200-plus videos

23  of body-worn camera to defense counsel, not to mention many,

24  many, many videos, both USCP surveillance, the three hours

25  you have in before you, in addition to the many videos the

1    defendant filmed of himself committing these various

2    incidents to defense.  That's been provided months ago, many

3    months ago.  Nothing I included in my motion is new.  It was

4    all in prior discovery to defense counsel for months.

5         So to the extent -- I know it's hard to sort

6    through a lot of the evidence, and I have offered defense

7    counsel assistance to the extent they want to identify

8    particular videos or have me point them in a particular

9    direction to help make sense of it.  But it is possible to,

10   for instance, download the 10-key body-worn cameras that

11   actually matter from that tunnel, the five -- four key

12   videos that really matter and the USCP video on one hard

13   drive and provide it to defendant to review per the policy

14   instituted in March of this year.

15        Is that everything?  No.  But I'm not aware of the

16   need to review absolutely anything that exists in provided

17   discovery, even if it actually is not material or relevant

18   to the defendant's case.

19        We are taking an extremely wide view of discovery

20   in this case because if this were a bank robbery, everybody

21   would be charged as a codefendant but it is too many people

22   and we can't.  So instead they are charged separately, for

23   the most part, but essentially are still codefendants, and

24   therefore they receive each other's discovery.

25        Much of the stuff that will be in Relativity, as I

1    tried to explain to counsel earlier, is not going to be

2    relevant or interesting at all to defendant in this case.

3    They don't need to know every single 302 of how we

4    identified Joe Schmo who went in the Senate gallery, but

5    they are being provided that anyway.

6           There is going to be a lot, but as it relates to

7    him in particular, it's not going to be as much and it's

8    conceivable to identify it and provide it to him via the

9    policies that currently exist, not to mention any that might

10   be developed through these discussions that defense, FPD,

11   the government and the jail are working on at the time.

12          THE COURT:  I think I have it, Ms. Jackson.  I'd

13   like to hear from defense counsel unless there is something

14   you think is absolutely critical.

15          MS. JACKSON:  Give me just -- no, just one second.

16   I have scribbles, and I wanted to make sure I didn't ignore

17   my own stars, but I think I got them all.

18          No, Your Honor.  I don't have anything further.

19          THE COURT:  Thank you, Counsel.

20          MR. TANKLEFF:  With the Court's permission,

21   Mr. Lang would like to make a statement to the Court before

22   I close out.

23          THE COURT:  If defense counsel thinks that's

24   advisable.

25          You may approach, Mr. Lang, and you may take off

1        your mask.

2                THE DEFENDANT:  Thank you, Your Honor.

3                Your Honor, I know this case is a national media

4        sensation.  It's easier to forget that we are dealing with

5        individuals here, people not characterized by misleading and

6        dehumanizing statements like terrorists, white supremacists.

7        These things have been blaring on the media 24/7.  It's hard

8        to understand that we are dealing with individuals

9        sometimes.

10               I am a 26-year-old young man.  I am an

11       entrepreneur.  I grew up with a very disciplined family.  My

12       dad is military.  His dad is military, a Vietnam War

13       veteran.  Dad is Coast Guard.

14               I wrestled four years varsity in high school,

15       waking up two hours early before school, working out with

16       the team three hours after school.  My team was very

17       successful in Pennsylvania, top-five team in the state of

18       PA.

19               I was also part of the Scholastic Bowl team, the

20       mathematics team that would travel around Pennsylvania and

21       do Scholastic Bowl.  I won the geography bee.  I was even

22       part of rigorous curriculum called Gifted and Talented

23       Education, GATE programming.  It's for the top one percent

24       of the kids tested in the school.

25               So I had a very structured -- and I know about

1    following rules and what's to be expected of somebody with

2    that much responsibility, such as any responsibilities that

3    the Court were to give me for being released.

4         I went on to wrestle in Hunter College in

5    Manhattan.  I was varsity also there my freshman year.  I

6    decided to follow in my father's footsteps.  After wrestling

7    for one year varsity and figuring out that college wasn't

8    exactly for me, I wanted to be an entrepreneur, just like my

9    father and his father before him.

10        I started building websites for other small

11   businesses, helping to stimulate the economy, being a --

12   basically a business helper, whatever they needed, graphic

13   design, websites and things like that nature.

14        You know, my family and I, we are lovers of

15   America.  We love our constitutional rights.  We love the

16   police.  My father is an ardent supporter of all kinds of

17   police-backed groups.  We grew up with the police being our

18   best friends in my neighborhood.  It wasn't anything to be

19   scared of.

20        At my local church, I volunteer two times a week

21   at the soup kitchen handing out food.  If the government has

22   my phone, they've seen my more recent actions of being very

23   religiously minded and very disciplined as far as a

24   volunteer type of man.  I love to volunteer.  These are

25   things, moving forward, that I can say about in my past.

1          About that day, you know, I can tell you that the
2    most basic human right, in my opinion, is to be able to tell
3    your side of the story.  For eight months and four days,
4    244 days, I have been locked up in solitary confinement.
5    The first three months I was in D.C. Jail, it was 23 and 1;
6    23 hours in your cell, one hour out.  You got about
7    15 minutes to shower, 45 minutes to call your family and
8    whatnot.
9          After that, we were on medical.  Two hours out off
10   your cell, 22 hours in your cell.  This was more.  After
11   that I got thrown in the hole for singing the national
12   anthem and for asking for Bible study, because we have been
13   denied all of our religious rights in the jail.  So I
14   started asking the guards, Hey, can we get out of our cell
15   separate for Bible study and to be able to worship God?  And
16   they threw me in the hole for asking questions, basically.
17   I was in the hole with no disciplinary charges -- it was
18   called pending investigation -- for over three months.
19         Just two days ago during the rally that they had
20   here in D.C., they woke us up in the early morning hours,
21   like classic psychological warfare.  Didn't tell us where we
22   were going.  Told us to grab our mattresses.  Didn't tell us
23   what was going on.  Marched us through the jail.  Stuck us
24   in the basement of the jail and kept us there in cells with
25   no bathroom, no sink, no way to grab water and didn't tell

1   why we were there, how long we were staying, what was going

2   on.

3          As I was singing the national anthem with my

4   fellow men in the jail, I got punched in the ribs by one of

5   the guards.  This is just the type of torture and mental --

6   psychological warfare that were going on on a daily basis.

7          And about last week, they cut my rations on my

8   Kosher food in half.  I am getting half of the food I am

9   supposed to be getting.  The other inmates, January sixers,

10  in this jail, they get a laptop and the videos are cut off.

11  You can see edits in the videos because the government is

12  hiding some police brutality, a lot of police brutality.

13         So what they are saying is not relevant to me, it

14  may not be exactly relevant to me, but guess what?  It is

15  relevant to the case and to the entire structure of what

16  happened in that tunnel.

17         That tunnel was brutal, brutal in many ways.  The

18  first ten minutes I was in that tunnel, I had my camera up

19  and hands down, just filming, being peaceful.  Then I

20  started witnessing disgusting police brutality, and things

21  moved on from there.

22         THE COURT:  Counsel, I would strongly advise you

23  to --

24         MR. METCALF:  Yes.

25         THE DEFENDANT:  That is all I have to say about

1    that.  I was there to film.  That is all I am going to say.

2         THE COURT:  I have serious problems with you

3    letting your client get into the facts of that day in open

4    court with a live case against him.

5         MR. METCALF:  Absolutely, Your Honor.  That is

6    exactly what we spoke to him about not doing, and that is

7    where his statement -- he's not going any further from

8    there.

9         THE COURT:  Okay.

10        THE DEFENDANT:  I just was referring to the fact

11   that some of the video evidence that they are claiming on

12   the laptops that is not relevant to us is because in that

13   tunnel there was things that happened that the government

14   doesn't want exposed as far as the police actions.  I was

15   there to witness those personally.  So that's why I was

16   referencing just the beginning of what I saw in the tunnel

17   just being a filmer there.

18        I have a religious exemption to the vaccine.

19   There's aborted fetus cells that are in the vaccine.  Me

20   being a Jewish Christian man, I cannot take the vaccine.  I

21   can't.  So when my counsel comes to visit me, quarantine for

22   14 days, that means you are, again, reset.  One hour out of

23   your -- one hour in your cell, 23 hours locked in.

24        Right now currently I am looked in my cell 18 and

25   a half hours a day.  It's still sensory deprivation.  No

1   religious services.  No hygienic services.  I can't get a

2   nail clipper.  I can't shave my face.  I can't get a

3   haircut.  There are so many things that that jail has been

4   subjecting us to that makes it impossible for me to be of a

5   right mind to even assist in my counsel if I were to have

6   these videos.

7          And these videos are being cut off.  Some of the

8   other people have laptops in there, and you can see the

9   videos are literally sliced between things that the

10  government doesn't want the people to see.  So what's not

11  relevant to them is very relevant to us.

12         I don't see a way where I can assist in my own

13  defense.  I mean, just that video that I just saw right

14  there was the first minute I have seen of myself in 244 days

15  of anything, the video of me pulling up the officer.  I

16  haven't seen anything.  I don't know what we are talking

17  about here.  I have no frame of reference.  It's horrifying

18  to me because I want to tell my side of the story and I also

19  want to have the videos to back it up and to me be able to

20  see this stuff.

21         Talking about my future actions and whatnot, there

22  are certain conditions of my release that can mitigate, 100

23  percent, any kind of Telegram or social media services and

24  stuff.  So I can just be home to assist in my counsel, watch

25  the videos, be able to talk to Steve and Marty with a laptop

1    in front of me and say, Go to this second of the video.

2    What do you see here?  Go to this second of the video.

3         Because for three-quarters of a year, I haven't

4    even been able to say, Can you go to this second of the

5    video?  Can you go to that second of the video?

6         And I believe with the right amount of provisions

7    by the Court over me, I can be at home, be peaceful, be

8    watching the evidence against me and actually mount a

9    defense that is guaranteed to me by the constitution.

10             THE COURT:  Thank you.

11             THE DEFENDANT:  That's all I have to say, Your

12   Honor.

13             THE COURT:  Thank you, Mr. Lang.

14             MR. TANKLEFF:  Your Honor, I just want to touch on

15   a few issues.  First, I would like to acknowledge that

16   Jake's mother and father are in this courtroom today.  They

17   are here today to support Jake because if Jake were granted

18   bond, Jake would be living with his father.  Jake's father

19   has a position where he is willing to put up property and

20   money.  Jake's mother has offered to cosign the bond

21   application.

22             One of the issues we have to be concerned with, or

23   really not even concerned with, is that Jake poses no risk

24   to the community.

25             In *U.S. versus Munchel*, the Court addressed that

1    the circumstances of January 6th would not present

2    themselves ever again.  If Jake were granted bond, this

3    Court could enable or enact a number of conditions.  He

4    would be required to live with his father.  He would be on

5    home detention, electronic monitoring except for certain

6    conditions where he could go to church, he could go to his

7    attorney's offices.  He would be under the supervision of

8    pretrial services.  They could require installation of a

9    landline.  If he has a passport, they could have him

10   surrender a passport.  He could be required to be regularly

11   drug tested.

12          But when the government says that there is no

13   articulable threat, it is pure speculation.  It is purely

14   speculative that Jake would pose a threat to his community.

15          THE COURT:  Isn't that always true?  I mean, isn't

16   it always the case that we are making a predictive judgment?

17          MR. TANKLEFF:  Not all of the times.

18          THE COURT:  Really?

19          MR. TANKLEFF:  Sometimes prior conduct --

20          THE COURT:  You have to make a predictive judgment

21   about future conduct based on past conduct.  You don't know

22   if it's going to happen or not.

23          MR. TANKLEFF:  Correct.  But when you look at

24   Jake's totality, in this case, Phillip Anderson says, If not

25   for Jake, I would be dead.  That's who Jake is.  Jake has

1     done so much good in his life.  There was a situation where

2     there was a mother in the Bronx who didn't have gifts for

3     Christmastime.  He went out and bought gifts and brought it

4     to her.

5              Really what the Court should be concerned with and

6     focus on is the ability to grant bond, focus on the

7     conditions that can be imposed upon Jake that would enable

8     him to live at home with his father, possibly work with his

9     father, because his father has offered him the ability to

10    work, and participate in his own defense.

11             As Mr. Lang just said, the risk to his safety lies

12    remaining in the jail.  The abuses that he has suffered in

13    that jail would not exist if he were free and being able to

14    defend himself and participate in his own defense.

15             THE COURT:  Have you attempted to get Mr. Lang

16    hard drives pursuant to the jail's current laptop policy?

17             MR. TANKLEFF:  We have not.

18             THE COURT:  Hard drives containing videos or the

19    like?

20             MR. TANKLEFF:  Correct.  But I don't think with

21    the government's position that all of the videos have been

22    able to be brought into the jail because of the security

23    issues.

24             THE COURT:  Have you tried?

25             MR. TANKLEFF:  We have not tried yet.

1          THE COURT:  You haven't tried?

2          MR. TANKLEFF:  No.

3          THE COURT:  So how am I supposed to --

4          MR. TANKLEFF:  What the government said, which was

5      very interesting --

6          THE COURT:  Hold on a second.

7          MR. TANKLEFF:  Sure.

8          THE COURT:  How am I to conclude that the current

9      policy is unworkable for him if you haven't attempted to

10     work under the current policy?

11         MR. TANKLEFF:  One of the issues that we can

12     prove, Your Honor, if we can't simply mail Mr. Lang mail, it

13     is being returned to us, we are supposed to rely that the

14     system they have in place will function.

15         The government just said that they are only

16     allowed to review discovery two weeks at a time.  In one of

17     the government's submissions, they said there is 100 days of

18     video.  So what is Mr. Lang supposed to do?  How long would

19     it take Mr. Lang in jail to review the discovery?

20         THE COURT:  Are you going to review all of that

21     discovery?  It seems to me that the problem here -- and I'm

22     not suggesting this is the solution -- we have a massive

23     amount of information and evidence on video.  That's true

24     for every single defendant whether the defendant is in the

25     jail or not.  It's true for every single defense counsel.

1          In part, your argument seems to be Mr. Lang needs

2     to be in a position to review every single hour of every

3     single video.  And it's not clear to me that that's a

4     reasonable position because your job as lawyers is to sift

5     through some of that and to provide him with, right, the

6     most relevant stuff.

7          Not suggesting he doesn't have a right to do that.

8     I am just saying, in practical terms, he very likely does

9     not need to review every single minute of every video.  He

10    needs to review the most salient parts, as do you.

11         From what I am hearing is the information that is

12    at least most salient to his case, the stuff that the

13    government is presently relying on to justify in its view,

14    your client's continued pretrial detention, he has not seen

15    but you have not attempted to show him under the current

16    jail policy.

17         MR. TANKLEFF:  We submit that under the current

18    jail policy, he wouldn't even be able to review just the tip

19    of the iceberg because he would only be limited -- there is

20    a waiting list for access to the computers.  Then there is a

21    limited period of time they can have access to those

22    computers.

23         So, if you think about it, there is a waiting

24    period to get access to the computers.  Then you are only

25    allowed up to two weeks to review the discovery.  To me,

1      that is a deprivation.  If he was free, there wouldn't be a

2      waiting period.  There wouldn't be a limitation on reviewing

3      the discovery.  There wouldn't be --

4              THE COURT:  The government's argument is that's

5      true for every detainee at the jail or at least every

6      January 6th detainee.

7              MR. TANKLEFF:  But not every detainee has this

8      amount of discovery in his case.  Every case has to be

9      evaluated differently.

10             THE COURT:  Every detainee could say, I want to

11     review all of the information that's out there, generally.

12     And how do you know whether other detainees have as much

13     video evidence about them?

14             MR. TANKLEFF:  I don't.  But we are not here to

15     discuss --

16             THE COURT:  You just said, other detainees don't

17     have as much.  You just made a representation that other

18     detainees don't have as much video evidence to review.

19     There maybe some with more.

20             MR. TANKLEFF:  Some of the detainees don't have as

21     many counts.  So, obviously, the indictment has to be

22     supported by evidentiary evidence, which could be videos or

23     documents.  Some of the other defendants don't have as many

24     counts as Mr. Lang does.  Mr. Lang was just issued a

25     superseding indictment.  So there is going to be more

1      discovery coming forward.

2              THE COURT:  The problem is you are complaining

3      about a policy, which may or may not be the best policy in

4      the world -- it may actually not get the balance right.  I

5      am not sitting here opining on the policy.  The problem is

6      you have a policy that you haven't actually -- at least as

7      it relates to videos, you haven't attempted to work under.

8      And that is one of your major arguments for why he should be

9      released.

10             MR. TANKLEFF:  One of the other major arguments is

11     the deprivation of counsel.  When we go to visit Mr. Lang,

12     there is nothing privileged.  If we want a private room, we

13     are limited to one period of time and then he gets

14     quarantined for 14 days.  That's a serious issue.

15             I mean, if I can't sit with my client and have a

16     conversation where no one else is listening -- on a day we

17     went to see Mr. Lang, there was an attorney sitting two

18     cubicles down.  We heard everything she said to her client

19     because it's a completely exposed area.  How is somebody

20     supposed to be confident that they can communicate with

21     their attorney if there is no privacy, there is no

22     privilege?  And then you are saying, If you want that

23     privacy and you want that privilege, we are going to

24     penalize you by quarantining you for 14 days afterwards.

25             So it seems for somebody to exercise their Sixth

1    Amendment right to counsel, you suffer by doing that.

2            THE COURT:  Because he won't get vaccinated.  I

3    understand he says he has a firmly held religious belief not

4    allowing him to get vaccinated, but that's a choice.

5            MR. TANKLEFF:  But if his attorneys are

6    vaccinated, the likelihood of us exposing him to COVID is

7    very slim, based on all the medical science.

8            THE COURT:  But you can't be possibly asking me to

9    revisit the jail's current COVID policies here.

10           MR. TANKLEFF:  I am not suggesting that, Your

11   Honor.  All I am suggesting is that their policy is not

12   based on what I would say is science or logic because the

13   attorneys are actually vaccinated.  And in many

14   jurisdictions, if you are vaccinated, you can go to a

15   restaurant.  You don't have to wear a mask.  What would be

16   the difference with us going to visit our client in jail?

17   There really is none.  So the policy that's in place is just

18   ineffective.

19           THE COURT:  I am not even disagreeing with that.

20   I am just not prepared to take a position.  I mean, there's

21   an entire case going on in this courthouse in front of a

22   different judge involving the entire D.C. Jail and the rules

23   that have been adopted about COVID.  I am not prepared to

24   second-guess my colleague on her oversight of her injunction

25   or otherwise the generally applicable rules.  The rules are

1      the rules.

2             I get that they have an effect on your client, and

3      I have to assess that in light of his request to get out,

4      but it seems to me that, again, that would mean that every

5      single client who's unwillingly to get vaccinated would have

6      an argument there is a 14-day quarantining requirement post

7      meeting with counsel and so therefore they should be

8      released.

9             MR. TANKLEFF:  I don't think every individual can

10     make that argument because not every attorney has sought to

11     see their client in person, not every one of those

12     individuals has the same level of discovery, not every one

13     of those individuals have the same desire to be as actively

14     involved in their own defense.  If a defendant wants to be

15     involved, he should have that right because that is his

16     right.  Mr. Lang has asserted that he wants to be as

17     involved in his defense, which is his right.  He has the

18     right to review the evidence.

19            If he can't even review printed discovery and

20     printed motions that we send to him because the jail's

21     rejecting them saying, Reason for return:  Receiver did not

22     want -- how can Mr. Lang refuse these documents if he never

23     saw them?  This just goes to show you that the policies that

24     are in place in the D.C. Jail are ineffective because they

25     are depriving our clients, Mr. Lang, access to legal

1   materials that we are sending to him.

2            THE COURT:  Thank you, Counsel.

3            MR. TANKLEFF:  Thank you, Your Honor.

4            THE COURT:  Here is how I am go going to proceed.

5   I am going to take a brief recess.  I know it's late.  But I

6   would like to just attempt to resolve the motion today on

7   the record, but I need somewhere between five and 10 minutes

8   to gather my thoughts.

9            So let's go to a recess, a brief one.  I will come

10  back and I will either issue my decision from the bench or

11  basically tell you that I need to take it under advisement

12  and we will be writing something or have another hearing or

13  whatever.

14           Let me do that now.  Thank you.

15           (Break.)

16           COURTROOM DEPUTY:  We are now back on the record.

17           THE COURT:  So as I indicated before we took the

18  recess, I've considered this matter and I am prepared to

19  decide, at least in part, defendant's motion for release.

20           In particular, after considering the parties'

21  arguments in the filings, their representations at this

22  hearing, including the statement by Mr. Lang, the entire

23  record before me, including the various videos and exhibits

24  I've reviewed, I find the following regarding the

25  Section 3142(g) factors, which I must consider in this bond

1    review hearing:

2          The first factor is the nature and circumstances

3    of the charged offense.  As for this first factor, the

4    nature and circumstances of the charged offense is Mr. Lang

5    originally faced 11, now faces 13 charges, including some

6    very serious felonies.  These include crimes of violence,

7    assaults against officers and assaults with deadly weapons

8    and at least one assault that resulted in injury.

9          The statutory offenses are themselves very

10   serious, but the particular circumstances here make them

11   even more troubling.  The government alleges that Mr. Lang

12   was at times at the very front of a large mob seeking to

13   enter the Capitol.  Mr. Lang appears to have been one of the

14   leaders, and by "leader," I don't mean preplanning leader

15   but just physically the leader and instigators of the

16   violence, as reflected in the video.

17         The government has presented a large amount of

18   video and photo evidence, including some from Mr. Lang's

19   social media accounts of Mr. Lang in front of the crowd,

20   verbally encouraging violence, hitting Capitol Police with

21   at times a metal baseball bat, another time a riot shield

22   and also kicking a police officer.  These actions were in

23   full view of officers of the law, the cameras, and he was

24   even filming himself at the scene, which certainly suggests

25   a lack of respect for the rule of law.

1    The defense contests the government's allegations

2    and asserts that any of Mr. Lang's violent actions were in

3    response to violence on the part of law enforcement

4    personnel or in response to seeing someone trampled and

5    killed at a protest, that defendant had planned to be a

6    peaceful First Amendment activity, thus so says the

7    defendant, the circumstances of the charged offenses are

8    peculiar and unlikely to happen again and so Mr. Lang is not

9    a threat of future or further violence.

10    I do not find this argument particularly

11    persuasive.  The conduct here spanned more than two hours

12    and was not in a momentary heat of passion but was conduct

13    that, as I said, continued over the course of several hours.

14    And it appears there was very little remorse about those

15    actions.  Over the next few days, Mr. Lang appeared proud of

16    his actions and publicly boasted about what he did.  And I

17    will discuss some of that evidence in a minute.

18    The time and place of the charged offenses raise

19    their severity and suggest that Mr. Lang does pose a threat

20    of future violence.  All of this occurred while a joint

21    session of Congress was meeting to certify the results of

22    the presidential election.  While the transition of power is

23    obviously now complete, these circumstances suggest that

24    Mr. Lang views the current United States government as

25    illegitimate and it is at least possible he may not comply

1    with future legal orders or respect the rule of law.

2         Altogether, the nature and circumstances of the

3    charged offenses weigh heavily in favor of continued

4    detention.  In particular, the brazenness of Mr. Lang's

5    actions in full view of officers and cameras, again, suggest

6    that he may view the present government as illegitimate and

7    that no amount of monitoring or surveillance or other

8    conditions of release would sufficiently deter him from

9    future unlawful conduct.

10         The second factor is the weight of evidence.  The

11    evidence against Mr. Lang is very strong.  His social media

12    accounts and subsequent public comments place him at the

13    scene of the charged conduct.  Even the evidence Mr. Lang

14    himself submitted to the Court, both an affidavit from

15    someone apparently unlawfully inside of the Capitol building

16    and the video included with his reply, place him at the

17    scene of the offenses.

18         The government has also proffered substantial

19    evidence, as I noted, from Mr. Lang's social media accounts,

20    surveillance footage and police-worn body cameras showing

21    him repeatedly attacking Capitol Police, as I mentioned

22    before, with a metal bat, a riot shield and quite likely

23    with his feet by kicking them.

24         To be sure, some of the videos are blurry.  And to

25    be sure, it is difficult to understand in all of them what

1    is happening in context.  But in other videos, it is quite

2    clear.  And by cross-referencing the timestamps in the

3    video, as the government was doing to some extent during

4    this hearing, before I said that I had it all, and the

5    evidence against Mr. Lang appears quite strong.

6            Mr. Lang is, of course, entitled to a presumption

7    of innocence regarding his guilt, and he may have various

8    defenses that he will present at trial.  But as I've noted,

9    the weight of the evidence, at least right now, is against

10   him.  And given that, this factor weighs also in favor of

11   continued detention.

12           As to the third factor, the history and

13   characteristics of Mr. Lang, this factor tends to suggest

14   that it's possible that some condition of release could

15   assure his peacefulness and presence at future proceedings,

16   although some of the other evidence may not.  I will discuss

17   that in a minute.

18           Mr. Lang has a relatively clean record.  He has

19   only one prior conviction, a misdemeanor possession of a

20   controlled substance, though I note there are some

21   additional pending matters.

22           As the defense has noted, at least at times during

23   January 6th, he was looking out for the lives of others.

24   According to an affidavit from Mr. Anderson, when Lang

25   learned that Anderson wasn't able to breathe and was being

crushed by the crowds, Mr. Lang alerted officers in the
crowd and enabled Anderson to get out.  Mr. Anderson credits
Mr. Lang with saving his life that day.

The defense also asserts that Mr. Lang has ties to
his community, including local law enforcement, local
businesses, friends and family.  That may be true, although
Mr. Lang has not presented substantial evidence about that,
but Mr. Lang's parents are here.  They have proposed putting
up bond for him, which are important and suggest he has ties
that would tend to assure both his appearance and his
non-dangerousness.

On the other hand, the government, I think quite
rightly, points the Court to defendant's apparent pride in
his violent actions on and around January 6th and his
efforts to organize others through Telegram and social
media.

As I indicated earlier, after the events after
January 6th, in Telegram and as reflected in various
exhibits but I think importantly in Exhibit CC submitted by
the government -- that is C as in Charlie, C as in
Charlie -- Mr. Lang wrote, among other things -- this is
before the inauguration, "Can't wait for the 20th.  I'm
getting a fucking arsenal together."  That is one line.
Another is, "This group is with zero fear of the Feds.  They
know this is war.  This is war.  You obviously weren't at

1    the Capitol this week.  Let me show you what war is."

2            And then on another line, "If anything goes down

3    where we need to mobilize and show up like the Minutemen,

4    the regional leader messages everyone and we come armed."

5            I think these messages, which, again, happened

6    after January 6th, they were not in the heat of the moment

7    and they reflect at least a risk that in the future Mr. Lang

8    would, as the government put it, be at risk of committing or

9    advocating violence in favor of his political beliefs.

10            Again, Mr. Lang wasn't just caught up in a

11    15-minute or 30-minute heat-of-the-moment action.  His

12    actions on January 6th spanned over two hours.  And then he

13    did a number of things after the event to reaffirm the

14    appropriateness of what he had done.

15            Based on that evidence and the evidence otherwise

16    submitted to the Court, Mr. Lang's history and

17    characteristics, perhaps we could suggest that some

18    conditions of release might be possible without further

19    violence or risk of flight, although some of that evidence

20    is quite to the contrary.

21            Finally, the fourth factor, which is the danger to

22    the community posed by defendant's release, overlaps in many

23    ways with what I have already discussed.  On the whole, in

24    my view, this factor weighs in favor of continued detention.

25    As I mentioned, Mr. Lang directly attacked law enforcement

personnel in full view of thousands of people on camera over
the course of several hours.

Evidence suggests he was under the belief that the
United States' current government is illegitimate.  He led
and encouraged others in the day of the January 6th attack
and through his internet-based messages, appears interested
in the possibility of continuing to attack the United States
government.

I won't repeat, again, what is contained in
Exhibit CC and some of the other January 6th messages, but I
do think they are very important here because unlike various
other cases, including cases I have, we have a defendant who
both engaged in substantial violence on the day of
January 6th and then thereafter in his own messages both did
not reflect any remorse about those events and indeed said
very concerning things about the inauguration.

And as the government argued today, the reason we
don't have to test the proposition of whether Mr. Lang might
have done something on January 6th is because he got
arrested.

So in light of Mr. Lang's disregard for the rule
of law, his beliefs that I've discussed, his willingness to
use violence on the day of January 6th, in my view, there
are not conditions of release that would prevent him from
being a danger to the community, either because of his own

1    direct action or incitement of others to action against law

2    enforcement personnel, the United States government or

3    others.  For that reason, I am not going to modify his

4    pretrial detention and I'm denying his motion to the extent

5    that it seeks release from jail.

6            We have, however, also discussed a number of

7    issues relating to the current conditions of confinement at

8    the jail.  It seems to me that the most important issues

9    that have been raised are, one, whether and to what extent

10   Mr. Lang is able to review, as he would like and as he has a

11   right to do, the evidence that has been produced and will be

12   produced by the government relating to this case.  Much of

13   that, of course, is video evidence.  It's quite voluminous.

14   That's one concern.  And the other concern is the concern

15   about the manner -- both the confidentiality of, the amount

16   of and the way in which Mr. Lang can communicate with

17   counsel.

18           As to Mr. Lang's review of the evidence, either

19   that already provided in discovery or that will be provided

20   by the government, the D.C. Jail has various policies in

21   place to permit, at least to some extent, the review of that

22   information by defendants.  And it has become apparent to me

23   in this hearing today that the defense has not attempted to

24   use those procedures to allow Mr. Lang to review the video

25   and other record evidence.

1          I, therefore, don't believe it is appropriate for

2     me to order any change on Mr. Lang's behalf or otherwise as

3     it relates to the so-called laptop policy.  If defendant and

4     defense counsel attempt to use that policy and it turns out

5     that it is wholly unworkable, either under its present form

6     or, as I understand it, some modifications that might be

7     made in the future, I am here to entertain additional

8     motions to relieve Mr. Lang, as appropriate, of whatever

9     restrictions are then applicable, whether that means

10    providing him with a laptop for all time or something else.

11    But it seems to me that right now we have, essentially, an

12    unripe dispute because defense counsel has not attempted to

13    work under the currently operating policy.

14         As to communications with counsel, I think that is

15    more ripe because I don't think there is any present dispute

16    that if Mr. Lang wishes to meet with his counsel in person,

17    he would have to quarantine for 14 days because of his

18    current unvaccinated status.

19         I think -- although it's not clear -- but I

20    believe I understand this correctly that that would be if he

21    were to meet with counsel in a confidential, small-room

22    setting, if he were to choose that option, i.e., to have

23    confidential attorney-client communications, then he would

24    have to quarantine for 14 days thereafter.  Alternatively,

25    if he didn't doesn't want to quarantine for 14 days

1    thereafter, he has to meet with counsel in a setting that
2    counsel says does not sufficiently protect his confidential
3    communications.

4         I think that this is not unproblematic.  I am
5    certainly concerned about ensuring that Mr. Lang has the
6    ability to talk with counsel.  It also appears, however,
7    that Mr. Lang is presently able to speak with counsel by
8    phone.  So what we are really talking about are those times
9    that his New York counsel would like to meet with him in
10   person.

11        It seems to me this issue presents questions
12   beyond just this case because whether and to what extent the
13   D.C. Jail has adopted adequate COVID protocols and policies
14   to protect the rights of criminal defendants are the very
15   issues that are pending in front of Judge Kollar-Kotelly.

16        I, again, am not prepared to order any specific
17   relief for Mr. Lang as it relates to this issue except to
18   say that it does seem that there should be a way to ensure
19   that Mr. Lang can have confidential communications with his
20   lawyers relativity often.

21        As far as I know, Mr. Lang has a closely held and
22   legitimate religious objection to taking the vaccine.  There
23   isn't any evidence to the contrary here.  And in light of
24   that, it's not exactly as if it is just his choice, at least
25   not in the traditional sense, about getting vaccinated

1    versus having to quarantine after having met with his

2    counsel.

3            Having said all of that, I basically view this

4    issue in the same way as I do with respect to the access to

5    videos; and that is, I am not prepared to intervene at this

6    time into how these communications are occurring.  But I am

7    willing to entertain a future motion in the event that it

8    continues to be the case that Mr. Lang's defense is

9    seriously impeded by his inability to have confidential

10   communications with counsel.

11           The last thing I will say on this topic is that

12   this issue or these issues about client communications with

13   counsel, client communications with the Court for defendants

14   who are detained at the D.C. Jail are very much top of mind

15   for the bench.  There are communications weekly between a

16   group of judges and the D.C. Jail about the current

17   policies.  There's obviously Judge Kollar-Kotelly's case.

18   So the Court is aware of them.  And I am here in the event

19   that Mr. Lang would like to file a renewed motion

20   specifically about this issue or, as I said, about the

21   physical evidence.

22           But for present purposes, I think the ruling is --

23   well, I know the ruling, but in a technical sense the ruling

24   is Mr. Lang's motion to be released pretrial is denied.  His

25   motion to -- what I will consider it as to modify the

1    conditions of his confinement at the jail, either with

2    respect to physical evidence review and to be able to

3    communicate with his lawyers, is denied without prejudice to

4    his renewing that motion next week, two weeks from now,

5    whenever in the event that circumstances arise such that

6    either the physical review has been attempted under the

7    current policy and as to the client communications that more

8    evidence and more work has occurred to try to make these

9    communications be effective.

10          I will just say one last thing.  The continued

11    detention of all defendants at the D.C. Jail -- I think the

12    government well knows this -- where there is complicated

13    discovery and where the COVID protocols are slowing down or

14    otherwise making it very difficult for client communications

15    or mounting of a defense to occur, there is a lot of tension

16    there.  And I think the system is starting to show some of

17    this tension.  And it can't be the case that defendants are

18    largely unable to participate in their defense while they're

19    detained.

20          In this case, I do not believe that the

21    appropriate course is to release Mr. Lang pretrial or to

22    modify the conditions of his detention.  But, again, that is

23    why I am denying that portion of the motion without

24    prejudice because it may be that in two or three weeks, that

25    there is sufficient additional evidence about his inability

1    to mount the defense.  Then I will reconsider that portion

2    of the decision.

3              With that, thank you, Counsel.

4              You have a question, Counsel?

5              MS. JACKSON:  Yes, Your Honor.  Your Honor didn't

6    say -- defense counsel, on Page 9 of their motion, made a

7    general argument regarding human rights violations at the

8    jail and that being a basis for relief.

9              I didn't hear Your Honor address that particular

10   argument specifically.

11             THE COURT:  Yeah.  Thank you.  That portion of the

12   motion is also denied without prejudice.  I'm not privy to

13   enough evidence, certainly, to grant that motion.  In the

14   event that the defense either mounts more evidence or

15   certainly wants to file some sort of civil complaint, I or

16   someone else will take it up.

17             MR. TANKLEFF:  Thank you, Your Honor.

18             MR. METCALF:  Thank you, Your Honor.

19             THE COURT:  I guess housekeeping.  Next hearing

20   date.

21             MS. JACKSON:  There are two outstanding issues

22   left beyond the detention hearing.  The first is we extended

23   a preliminary plea offer to defense counsel for Mr. Lang

24   back in June of this year.  My understanding is particularly

25   given the current superseding indictment, they do not want

1   to put that on the record today and would like to instead do

2   it at the next hearing after they have time to advise him,

3   of course, of the new charges.

4          THE COURT:  Do you object to that approach?

5          MS. JACKSON:  I do not object to that approach.  I

6   think that's the right approach.  The plea offer remains

7   open, and we did not say it expired today.

8          The second issue is just what we are doing from

9   here on forward.  I've discussed with defense counsel a

10  45-day continuance, tolling in the interest of justice,

11  given the voluminous amount of discovery, which apparently

12  the defendant has not been able to look at at all, and the

13  complexity of this particular case, including the new

14  superseding indictment with additional charges that the

15  defense counsel is facing.  My understanding is that defense

16  counsel is not objecting to tolling on that basis.

17         THE COURT:  Counsel, do you agree with that?  Let

18  me just say that for the reasons I just discussed, I would

19  not be inclined to grant a 45-day continuance here.  I would

20  like to do shorter, precisely because Mr. Lang remains

21  detained.  If he were not detained, I would be willing to

22  entertain 45 days or longer.  This tension still exists, and

23  I am thinking it is more appropriate to be back together in

24  30 days, whether by phone or otherwise.

25         I am happy to hear from counsel.

1          MR. METCALF:  Your Honor, counsel has actually --

2     do you mind if I get my calendar real quick?

3          THE COURT:  No.

4          MR. METCALF:  Thank you.

5          THE COURT:  Please.

6          MR. METCALF:  The government has been actually

7     pleasant to work with at times, even though she told

8     Your Honor something that I thought was off the record.

9          So at this point, in light of Your Honor's

10    decision today, in light of us having to reassess how we are

11    going to be able to get Mr. Lang more discovery and how this

12    flash drive scenario is going to play out and in speaking

13    with him, I think in the interest of justice, I don't

14    disagree with 45 days, but I'll ultimately refer to

15    Your Honor if you want to go -- or if you want to reschedule

16    the next appearance for 30 days.

17         THE COURT:  Why don't we do this.  I've said it

18    three times now, but I am concerned about Mr. Lang as a

19    detained defendant and other detained defendants not having

20    their cases just linger because the case is voluminous or

21    otherwise.  I don't want this case to just wallow because

22    we've set it out for 45 days.  So I would like to set it for

23    30 days.  I want to do a status conference on October 20th

24    at 2:00 p.m.  It can be by phone.

25              I'm also perfectly amenable, if it turns out as we

1    approach that date, that the parties for good cause say,

2    We'd like another two weeks or whatever.  But I think it's

3    better to try to do a 30-day status conference rather than

4    extend the time for the reasons I've discussed.

5              Are the parties available at 2:00 p.m. on

6    October 20th?

7              MS. JACKSON:  Yes, Your Honor.

8              MR. METCALF:  Yes, Your Honor.

9              THE COURT:  Okay.  So we will do another status on

10   2:00 p.m., October 20th.  I find the ends of justice are

11   best served and outweigh the interest of the public and

12   Mr. Lang in a speedy trial, and the time between today's

13   date and the next status conference shall be excluded in

14   computing time within which the trial must commence in this

15   case under the Speedy Trial Act.

16             Again, if it turns out that for whatever reason

17   the parties think that it would be substantially more

18   productive to push that status off by two weeks or a month,

19   that's fine.  I just don't want on the front end to assume

20   that 45 days is an appropriate amount of time for someone

21   who is in the detained camp.  Okay?

22             MR. METCALF:  Your Honor, I have a request, if I

23   may.

24             CAPTIONER:  Sir, can you take your mask down,

25   please?

1          THE COURT:  You may approach the podium.  That

2    might be easier.

3          MR. METCALF:  Thank you, Your Honor.

4          In light of your decision today, we are

5    respectfully requesting an order for the D.C. Jail, if we

6    send over a flash drive, to allow the flash drive to contain

7    highly confidential material and have that highly

8    confidential material be accessible to Mr. Lang.

9          There's one issue that was discussed is there are

10   different levels of the sensitivity of the material and if

11   we send him certain things that are marked highly

12   confidential, they are not going to actually provide that

13   information to Mr. Lang.

14         So in light of that, would Your Honor be willing

15   to issue an order indicating that the jail is allowed to

16   provide Mr. Lang with highly sensitive material if provided

17   by counsel?

18         THE COURT:  Does the government have a view on

19   this?

20         MS. JACKSON:  I think we've stated from the

21   beginning that the current policy allows him to review

22   highly sensitive material as provided to the jail under the

23   current voluminous --

24         THE COURT:  That's the problem I have is that you

25   haven't attempted to do this, as far as I can tell, and you

1    haven't been refused it.  You are asking me to order

2    something that may be fully permissible under the policy or

3    not.  I haven't been presented with a situation in which

4    this has been rejected.

5              MR. METCALF:  Your Honor, you are talking about

6    literally policy where we would have to physically go to the

7    D.C. Jail and give it to employees, where every single

8    action we've ever taken has been shut down, from phone calls

9    to -- he calls us.  That's perfectly fine.  But when we try

10   to set up a phone call, when we try to set up a legal visit,

11   when we go there and giving him a piece of paper, when we

12   mail him things, every single thing that we have done has

13   been completely shut down.

14             It was our understanding --

15             THE COURT:  Is it your understanding that the D.C.

16   Jail policy allows confidential information to be given to

17   detained defendants?

18             MR. METCALF:  Yes.  But I don't want highly

19   confidential material to become a problem, so I was just

20   trying to get ahead of it because my understanding was if

21   there is something that is highly confidential, it could not

22   get shown to Mr. Lang.  That's why I was simply making that

23   request.

24             And I've read the policy.  I've spoken to as many

25   people as I can.  I've called up the D.C. Jail on 80

1    different occasions trying to figure this stuff out, and it

2    never works.  There is a hurdle every single time I try to

3    do something.

4           So that's why I was just asking for a court order

5    to make it nice and easy, but if it is part of the policy,

6    then that's fine.  I will go back.  If there's an issue with

7    it, then --

8           THE COURT:  I just don't know what I am supposed

9    to be ordering.  D.C. Jail, comply with your policy?  Or

10   D.C. jail, notwithstanding your policy, you still have to

11   give Mr. Lang highly confidential information?

12          MR. METCALF:  Or it's ordered that Mr. Lang is to

13   be able to obtain a flash drive from his attorneys that

14   contain discovery on it so it doesn't get shipped back in

15   the mail.  Or if we go there, we don't get shut down.

16          Just something additional to allow us to be able

17   to do something, Your Honor.  That's all I'm asking for.

18          THE COURT:  Ms. Jackson?

19          MS. JACKSON:  Your Honor, the government's concern

20   is the following:  I don't know why the jail doesn't allow

21   mail to go through from defense counsel to defendant.  I

22   know that there are concerns regarding -- I don't know the

23   reason or the basis for that policy, and so I don't feel

24   comfortable representing on their behalf why it should be

25   changed or not.

1          Perhaps we could, at the next hearing if this

2     remains an issue, ask that somebody like the general counsel

3     for the jail or someone else be available to articulate the

4     bases for that position so that you can make an informed

5     decision about what needs to be changed, if at all.

6          THE COURT:  Here is my view.  The D.C. Jail needs

7     to comply with its policies as to Mr. Lang.  It needs to

8     permit him to see information that otherwise would be

9     permissible for any defendant to see.  Right?

10          And I will enter an order in addition to the

11     general order about this hearing saying that the D.C. Jail

12     must comply with its laptop policy with respect to Mr. Lang.

13          MR. TANKLEFF:  Your Honor, may I approach for one

14     second?

15          THE COURT:  Sure.

16          MR. TANKLEFF:  I think I could maybe, possibly

17     narrow this down.  What we are really asking the Court is to

18     modify the protective order to allow Mr. Lang to be part of

19     the protective order and gain access to everything that

20     counsel had to actually execute the protective order, to

21     gain access to those materials.  I think that's kind of --

22     we can narrow it down that way.  By modifying the protective

23     order, that would give him access.

24          THE COURT:  That is not a D.C. Jail issue.  That

25     would be true whether he is detained or not.  And on that, I

1   want you to meet and confer with the government and make a

2   proposal.  Modifying the protective order is true for every

3   defendant.  It's not a D.C. Jail issue.  Right?  So if you

4   want a modification of the protective order, that is

5   independent of D.C. Jail's policy.

6          MR. TANKLEFF:  The protective order identifies

7   certain highly classified, highly sensitive material that we

8   really can't send Mr. Lang because --

9          THE COURT:  Again, that is not a D.C. Jail

10  problem.  It is a protective order problem.  I haven't heard

11  one minute about the protective order today until just now.

12  That's exactly the kind of thing you need to confer with the

13  government about before coming to me.  Ask the government if

14  they are prepared to loosen the protective order protections

15  as to highly confidential information.  You would have to

16  ask them that whether he was detained or not.  So that's one

17  thing.

18          Whatever happens there, you then have a separate

19  question about the D.C. Jail.  To date, I have no

20  information in front of me that the D.C. Jail is failing to

21  comply with a policy as to laptop or hard-drive information,

22  because you guys haven't tried.  I am fine entering an order

23  saying the D.C. Jail shall comply with all policies as to

24  Mr. Lang.  I don't know what I am supposed to do beyond

25  that.

1          MR. TANKLEFF:  Okay.  Thank you, Your Honor.

2          THE COURT:  I will entertain a motion to modify

3     the protective order.

4          MS. JACKSON:  Your Honor, the government -- I

5     guess I did not make this as clear as it should have been.

6     On the top of Page 31 in our motion, the current policy

7     enables the defendant to review electronic evidence marked

8     as highly sensitive in his cell.  It is not prohibited by

9     the protective order under the government's interpretation

10    of what the protective order means, meaning that should

11    defense counsel bring a hard drive to the jail and then they

12    arrange for him to view it, it can include USCP

13    surveillance, such as the footage provided in Exhibit A,

14    which is the only thing that has been marked highly

15    sensitive in this case.

16         THE COURT:  That may very well be the case.  I

17    would encourage the parties to have a discussion about what

18    defense counsel thinks they can't show Mr. Lang under the

19    protective order.  It may be that the government's view is

20    nothing; you can share everything you want with him, and the

21    D.C. Jail should permit it to go to him.

22          If that's the case and I need to enter an order to

23    that effect, I will, of course, do that.  That's the way it

24    is supposed to work.

25          If on the other hand there is some information

1   that would not be permissibly shown to Mr. Lang under the

2   protective order for whatever reason, that's a protective

3   order issue, not a jail issue.  And I can't force the jail

4   to give him something that he can't see under the protective

5   order.  Okay?

6           Thank you, Counsel.

7           MR. METCALF:  Thank you, Your Honor.

8           MR. TANKLEFF:  Thank you.

9           (Proceedings concluded at 5:57 p.m.)

1                    **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8

9

10   **September 21, 2021              ___/s/_____**
            **DATE**                     **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25