## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____   )

UNITED STATES OF AMERICA,   )

   )

      *v.*   )    No. 21-CR-53 (CJN)

   )

EDWARD JACOB LANG,   )

   )

      *Defendant*.   )

_____   )

## EDWARD LANG'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO TRANSFER VENUE, OR ALTERNATIVELY TO ALLOW FOR THE ADDITIONAL QUESTIONING OF THE JURORS

The United States Constitutional right to an impartial jury enshrined by the Fifth and Sixth Amendments is protected at all costs. Because of this great protection, this Court must transfer Mr. Lang's trial to a different venue, as the reasons below demonstrate that Mr. Lang suffers from such an outstanding and unique prejudice in Washington, D.C., that he cannot obtain a fair and impartial here.

## I.   INTRODUCTION

It cannot be refuted that Washington D.C. (hereafter referred to as "D.C") residents have been the most impacted region in the nation as a result of January 6, 2021[1]. Not only did individuals who live in D.C. know or care about another person, who either worked or lived near Capitol Hill; but, the entire city saw and have

---

[1] Hereafter also referred to as "J6" or "January 6th".

experienced the consequences and changes to the city since January 6th. For example, if one went near the Capitol throughout 2021 and 2022 there is a high likelihood, each saw the exceptionally high fences and Capitol police with machine guns surrounding the perimeter.

As such, the residence of D.C. daily lives has been tangentially effected as a result of January 6th, as each were the front row audience to fear mongering and safety concerns. In addition to safety concerns, residences were subject to a citywide 6:00 p.m. curfew[2] and to the national guard being called in and witnessed armed national guard outside the Capitol. (*See* **Exhibit K**: Article discussing curfew in D.C. & **Exhibit L**: Article discussing national guard outside the Capitol).

Consequently, D.C. residents have an internal and eternal bias due to their city being forever shifted and due to residents inconvenienced for years due to what transpired on January 6th. Just as a victim to the defendant on trial could not possibly been seen as an appropriate or impartial juror, no D.C. resident, can be seen as an appropriate or impartial juror to any January 6th Defendant.

These residents – by no means – should be the jury pool selected to heard the case *United States of America verses Edward Jacob Lang*.

---

[2] This curfew cannot be understated, as D.C. residents were substantially affected in ways that residents of other states were not subjected to. At this point in time, our country was suffering from COVID-19 for almost a year. Businesses such as restaurants and small shops where at a point of closing their doors permanently or going bankrupt.

## II.   FACTUAL BACKGROUND

Mr. Lang is charged in a thirteen-count superseding indictment[3] based on his alleged conduct outside of the United States Capitol on January 6, 2021. ECF No. 36. The charges against Mr. Lang include, but are not limited to, assaulting, resisting, or impeding certain officers or employees using a dangerous weapon in violation of 18 U.S.C. § 111(a) and (b). *Id.*

As has been extensively covered, it is alleged that on January 6, 2021, Mr. Lang along with the other J6 defendants were protesting the November 2020 presidential election, where Democrat Joe Biden was declared the winner over incumbent Republican Donald Trump. Many individuals, including Mr. Lang, are alleged to have breached the United States Capitol building in protest of the presidential election results.

As a result of the coverage of the January 6 events in Washington D.C., and the resulting tainting of the jury pool in D.C., Mr. Lang now requests a transfer of this action to the Southern, Eastern, Northern, or Western Districts of New York— where Mr. Lang resides and where the government claims he traveled from to commit his alleged crimes on January 6. Mr. Lang requires this transfer due to the fact that—for the reasons explained below—Mr. Lang suffers from such a great

---

[3] Mr. Lang was charged with thirteen counts in his superseding indictment (ECF No. 36), but Count Nine of the Superseding Indictment was dismissed by this Court via Minute Order on June 7, 2022. Thus, at this time Mr. Lang is charged with twelve counts.

prejudice in Washington, D.C., about which have evaluated to a level that he cannot *possibly even come close to* obtaining a fair and impartial trial here.

### III.   <u>STATEMENT OF LAW</u>

The United States Constitution establishes that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, and the Federal Rules of Criminal Procedure narrow the default venue to "a district where the offense was committed . . . ". FED. R. CRIM. P. 18. However, there is a crucial exception to this general rule to ensure that the constitutional right to an impartial jury enshrined by the Fifth and Sixth Amendments is protected. The exception to the general rule is that a court *must* transfer the defendant's trial to a different venue if a defendant requests a transfer and demonstrates that "so great a prejudice against the defendant exists in the [original] district that the defendant cannot obtain a fair and impartial trial there[.]" FED. R. CRIM. P. 21(a); *See Skilling v. United States*, 561 U.S. 358, 378 (2010) (highlighting "The Constitution's place-of-trial prescriptions … do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial . . . .").

## IV.  <u>LAW AND ARGUMENT</u>

In *Skilling*, the United States Supreme Court provided three factors for courts to consider in determining whether this local prejudice will prevent a fair trial: (1) "the size and characteristics of the community in which the crime occurred," (2) the presence of "blatantly prejudicial information" in news stories available to jurors, and (3) the time elapsed between the alleged crime and trial. *Id.* at 382. These three factors weigh in favor of transferring venue.

18 U.S.C. § 3237(a) states, in relevant part: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

Multiple courts have addressed this provision, including the United States Supreme Court where it was determined that the whole of a crime may be tried where any part can be proved to have been done. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281, 119 S. Ct. 1239, 1244 (1999).

In *Seward*, it was held that the nature of the crime for the purposes of venue is focused on the conduct that comprised the offense. *United States v. Seward*, 967 F.3d 57, 60 (1st Cir. 2020).

Further, in *Salinas*, it was reiterated that the so called "verb test" is rejected as the sole means of identifying the criminal conduct for the purposes of venue, but rather the elements of the crime as a whole. *United States v. Salinas*, 373 F.3d 161, 164 (1st Cir. 2004)

## A. MR. LANG'S CASE MEETS THE SKILLING FACTORS

### (1)   *The Size and Characteristics of the Community*.

Washington, D.C.'s size and characteristics weigh in favor of transfer. While it is true that the Supreme Court has recognized a "reduced likelihood of prejudice where [the] venire was drawn from a pool of over 600,000 individuals," this "reduced likelihood" becomes insignificant when considering the incredible uniqueness of D.C. (i.e., its characteristics) as it relates to the events of January 6. Indeed, D.C. is largely political[4] and democratic,[5] and the very events of January 6, 2021, could of course only have happened in D.C. given its unique nature and characteristic as the nation's capital. Unsurprisingly, there is substantial evidence

---

[4] *See* **Exhibit A**: JEFF CLABAUGH, WTOP NEWS: *Exactly how many Washingtonians work for the federal government?* (Published February 19, 2018) ("The federal government remains the largest single employer in the Washington metropolitan area") (*available at* https://wtop.com/business-finance/2018/02/exactly-many-washingtonians-work-federal-government/).

[5] *See* **Exhibit B**: PEW RESEARCH CENTER, *Party affiliation among adults in the Washington, DC metro area*, (highlighting approximately 56% of adults in the Washington, DC metro area identify as Democrats compared to only 28% who identify as Republican) (*available at* https://www.pewresearch.org/religion/religious-landscape-study/metro-area/washington-dc-metro-area/party-affiliation/).

that this unique characteristic directly prejudices Mr. Lang. *See* Survey results located at 1:21-cr-00129-ABJ, ECF No. 54-1[6] (explaining venue survey data of D.C. voters obtained during the month of January 2022 reveals, among other things, that 73% of respondents believed that anyone who merely entered the Capitol building on January 6 is guilty of insurrection, 95% of the respondents stated that they were familiar with the January 6, 2021 events at the capitol, 67% of those same respondents stated that they were very familiar with the events at the Capitol).

Consequently, Washington, D.C.'s characteristics, specifically its unique connection to the events at issue in this case, weigh in favor of transfer.

### (2)    *The Presence of "Blatantly Prejudicial Information" in News Stories Available to Jurors*.

Next, the type of information included in the media coverage was the "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Indeed, the coverage of January 6 has been sensationalized and called the "Capitol Hill riots" by many outlets,[7] and even after almost one and a half years, January 6 coverage and

---

[6] This Court may take judicial notice of public filings in other cases in this District. *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014) ("A court may take judicial notice of facts contained in public records of other proceedings[.]") (*citing Covad Communs. Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222, 366 U.S. App. D.C. 24 (2005)).

[7] *See* **Exhibit C**: TROY CLOSSON, THE NEW YORK TIMES: *Social Media Posts Lead to Arrest of N.Y. Man for Role in Capitol Riot* (Updated February 14, 2023) (*available at* https://www.nytimes.com/2021/01/17/nyregion/ny-man-arrested-Capitol-riots.html).

news is so prevalent and difficult "to shut from sight" that there were outside "viewing parties" of the congressional hearings on the January 6 events in Washington, D.C. *See* JOHN KOBLIN, NEW YORK TIMES: *At Least 20 Million Watched Jan. 6 Hearing*, New York Times (June 10, 2022).[8]

It is undeniable that the citizens of D.C. have been deeply impacted as a result of the January 6 events and the resulting news coverage. *See* **Exhibit D**: LIZ VINSON, SOUTHERN POVERTY LAW CENTER, *January 6: State of D.C. One year later* (Published            January            6,            2022) (*available            at* https://www.splcenter.org/news/2022/01/06/january-6-state-dc-one-year-later)[9]; *See also* **Exhibit E**: PHILIP ELLIOTT, TIME MAGAZINE: *The Jan. 6 Hearing Laid Bare How D.C. is Still Recovering From That Awful Day*) (Published June 10, 2022) (*available    at*    https://time.com/6186499/jan-6-hearings-first-day-washington-consequences/.)[10]

Further, unlike in other cases where this factor did not weigh in favor of transfer, Mr. Lang can identify plenty of "pretrial publicity that mentions him." *See*

---

[8] Available at https://www.nytimes.com/2022/06/10/business/media/jan-6-hearing-ratings.html.

[9] *See* **Exhibit D**: LIZ VINSON, SOUTHERN POVERTY LAW CENTER, *January 6: State of D.C. One year later* (Photographer Pete Kiehart documents the events in Washington, D.C., on the one-year anniversary of the January 6 events, including a candlelight vigil on the steps of the U.S. Capitol).

[10] *See* **Exhibit E**: PHILIP ELLIOTT, TIME MAGAZINE: *The Jan. 6 Hearing Laid Bare How D.C. is Still Recovering From That Awful Day*) (highlighting ("The siege lasted just a few hours, but Washington has been living with the consequences ever since.").

*United States v. Brock*, No. 21-140 (JDB), 2022 U.S. Dist. LEXIS 156672, at *22 (D.D.C. Aug. 31, 2022). As what will be provided below in more detail, Mr. Lang has been discussed in D.C. news outlets such as the Washington Post[11] and Washington Times.[12] *See* Section B, *infra* (explaining that for these reasons, the type of information included in the media coverage was clearly the "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.").

Consequently, this second factor also weighs in favor of transfer.

### (3) *The Time Elapsed Between the Alleged Crime and Trial.*

This third and final factor also weighs in favor of transfer. While the actual events of January 6 will be over two years once Mr. Lang's trial occurs, this passage of time has, crucially, not allowed the "decibel level of publicity about the crimes themselves to drop and community passions to diminish." *In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015). The community passions have not been able to diminish because, despite the passage of time, the events of January 6 remain a topic of coverage on a daily basis. Specifically, and especially, as recently as December 22,

---

[11] *See* **Exhibit J**: *See* ANNIE GOWEN, THE WASHINGTON POST, *Supporters Raise Millions to Rebrand Jan. 6 Rioters as 'Patriots,'* The Washington Post (January 6, 2023) (*available at* https://www.washingtonpost.com/nation/2023/01/06/jan-6-prisoners-supporters/).

[12] *See* **Exhibit F**: JOSEPH CLARK, THE WASHINGTON TIMES: *Jan. 6 defendant accuses DOJ of denying news interviews, threats of discipline for press calls* (June 28, 2022) (https://www.washingtontimes.com/news/2022/jun/28/edward-jacob-lang-jan-6-prisoner-accuses-doj-denyi/).

2022, the House Select Committee to Investigate the January 6th Attack on the United States Capitol released their final report after holding hearings over the previous three months.[13] Of course, unsurprisingly, the hearings were watched by a massive audience, "in the ballpark of big television events like a[n] '[NFL] Sunday Night Football' game." *See* JOHN KOBLIN, THE NEW YORK TIMES: *At Least 20 Million Watched Jan. 6 Hearing* (Updated October 13, 2022).[14]

Indeed, other Courts have acknowledged that "these hearings make the passage of time somewhat less significant," *Brock*, 2022 U.S. Dist. LEXIS 156672 at 24, and that "media coverage has been heavy due to the ongoing public hearings of the Select Committee." *See Rhodes*, 2022 U.S. Dist. LEXIS 114264, 2022 WL 2315554, at *22. While these Courts ultimately denied a request for a change of venue, it does not change the fact that as a result of the ongoing media coverage, this third factor evaluating time weighs in favor of transfer.

Further, while one Court concluded that "the Select Committee hearings were broadcast nationally, and [the defendant] has offered no evidence demonstrating that Washington, D.C. residents were a disproportionate percentage of the viewership," there is indeed evidence that Washington, D.C. residents are disproportionately

---

[13]  *See* Select January 6th Committee Final Report and Supporting Materials Collection (https://www.govinfo.gov/collection/january-6th-committee-final-report?path=/GPO/January%206th%20Committee%20Final%20Report%20and%20Supporting%20Materials%20Collection).

[14] Available at https://www.nytimes.com/2022/06/10/business/media/jan-6-hearing-ratings.html.

impacted by these hearings. *See* 1:21-cr-00129-ABJ, ECF No. 54-1 at 3 ("Greater than 9 in 10 respondents (95%) [in D.C.] said they have overall familiarity (very and somewhat combined) with the January 6, 2021 events at the Capitol; and more than two-thirds (67%) of whom stated they are very familiar with these events."); *See* JOHN KOBLIN, *At Least 20 Million Watched Jan. 6 Hearing*, NEW YORK TIMES (Published June 10, 2022) (holding outside "viewing parties" of the hearings in Washington, D.C).[15]

Overall, the *Skilling* factors weigh in favor of transfer. Indeed, the United States government has implicitly acknowledged that the events of January 6, 2021, are so unique that they warrant a transfer. *See* JERRY DUNLEAVY, *Merrick Garland ties Oklahoma City bombing to Capitol riot*, THE WASHINGTON EXAMINER (June 15, 2021) (describing that when United States Attorney General Merrick Garland compared the Oklahoma City Bombing in 1995 to the January 6 events, stating that the government's "current effort comes on the heels of another large and heinous attack [like the Oklahoma City Bombing], this time the Jan. 6 assault on our nation's capital.").[16]

---

[15] *See also* **Exhibit G**: JOHN HENRY, *Locals view January 6 hearings at several DC watch parties*, WUSA9 News (explaining "People viewed the first night of the January 6 Committee hearings at several watch parties in D.C.") (Updated June 10, 2022)(*available at* https://www.wusa9.com/article/news/national/capitol-riots/january-6-hearings-dc-watch-parties/65-22c97ebf-e689-4e2f-90a2-de0ab4d69854).

[16] Available at https://www.washingtonexaminer.com/news/garland-oklahoma-city-bombing-capitol-riot.

Of course, a federal court agreed that the events in Oklahoma City after the bombing in 1995 were "so profound and pervasive that no detailed discussion of the evidence [to transfer] is [even] necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1474 (W.D. Okla. 1996) (granting motion for change of venue). Such logic equally applies to Mr. Lang's case.

## B.  MR. LANG'S CASE IS REMARKABLY SIMILAR TO *RIDEAU*

Not only do the *Skilling* factors weigh in favor of transfer, but the Supreme Court's decision to transfer venue in *Rideau* is directly applicable to this case. *See Rideau v. Louisiana*, 373 U.S. 723 (1963)

In *Rideau* the Supreme Court held that the defendant was entitled to a change of venue when the defendant's taped confession was broadcast to the community—even though the broadcast did not reach as much as two thirds of the venire. *Id.*; *see Brock*, 2022 U.S. Dist. LEXIS 156672, at 15–16 ("the defendant's taped confession was broadcast to [approximately] a third of the venire"). The Court reasoned that a trial in the community that witnessed the evidence on broadcast would be tantamount to a "kangaroo court," as the taped and broadcast evidence was "in a very real sense [the defendant's] trial—at which he pleaded guilty." *Id.* at 726.

The defendant in *Rideau* is remarkably similar to Mr. Lang. First, like *Rideau*, but unlike many January 6 defendants who are unrecognizable to the general public, Mr. Lang has been broadcast in D.C. as a major figure in the events that are the

subject of his charges. Indeed, Mr. Lang has been covered in news outlets such as the Daily Beast,[17] National Public Radio ("NPR"),[18] the Washington Post,[19] and the New York Times.[20]

Second, Mr. Lang's actions and the events of January 6 were not only broadcast to approximately one third of the community like the defendant in *Rideau*, but a substantially larger percentage. Indeed, there is evidence that the events of January 6 were broadcast to nearly 100% of the Washington, D.C. jury pool. *See* 1:21-cr-00129-ABJ, ECF No. 54-1 at 3 (highlighting that "Greater than 9 in 10 respondents (95%) said they have overall familiarity (very and somewhat combined) with the January 6, 2021 events at the Capitol; and more than two-thirds (67%) of whom stated they are very familiar with these events.").

---

[17] *See* **Exhibit H**: ZACHARY PETRIZZO, *Accused Capitol Rioter Edward Jacob Lang Blasts Trump and Begs For His Help in Jailhouse Call*, THE DAILY BEAST (January 5, 2022) (https://www.thedailybeast.com/capitol-rioter-who-beat-cop-with-bat-begs-for-trumps-aid-from-jail-on-eve-of-jan-6).

[18] *See* **Exhibit I**: TOM DREISBACH, *In a D.C. jail, Jan. 6 defendants awaiting trial are forming bitter factions*, NPR (April 14, 2022) (https://www.npr.org/2022/04/14/1092580753/capitol-riot-january-6-insurrection-defendants).

[19] *See* **Exhibit J**: ANNIE GOWEN, THE WASHINGTON POST: *Supporters Raise Millions to Rebrand Jan. 6 Rioters as 'Patriots,'* The Washington Post (January 6, 2023) (https://www.washingtonpost.com/nation/2023/01/06/jan-6-prisoners-supporters/).

[20] *See* TROY CLOSSON, *Social Media Posts Lead to Arrest of N.Y. Man for Role in Capitol Riot*, THE NEW YORK TIMES (Updated February 14, 2023) (https://www.nytimes.com/2021/01/17/nyregion/ny-man-arrested-Capitol-riots.html).

Third, google trends are useful in monitoring search interest over a specific timeline for a topic or key word. This data enables us to see which region took the greatest interest in the date by relevancy to each of the other regions.  As shown in **Exhibit C** and **Exhibit D**, Washington D.C.'s results when searching "Jake Lang January 6th Capitol Riots" are far more unfavorable or distasteful than other state's search results that also searched the same. (*See* **Exhibit M**: Jake Lang Jan 6 Capitol Riots Search; *See also* **Exhibit N**: Jake Lang Accusatory v Informational Questions).

For example, instead of an informational question posed such as "What was the Lang indictment" or "What did the FBI say about Lang" posed by Pennsylvania, the questions were much more accusatory in Washington D.C. such as "What did Lang point out in his post", which gave the answer "Lang's most damning post featured him pointing himself out in a photo of rioters fighting with law enforcement guarding a door to the Capitol" and "what bat did Lang use to hit officers". Further, the D.C. is the highest ranked location of users searching the damning terminology "White Supremacist", "Capitol Terrorist" and " Domestic Terrorist" associated with January 6th Defendants. (*See* **Exhibit O**:  Capitol Terrorist & Domestic Terrorist Search).

Moreover, these search trends show that Wikipedia, a website that can be edited by people, was Washington D.C.'s number one web page that popped up whenever Washington D.C. searched about January 6th. This is concerning because

this shows that D.C. can be influenced and manipulated by misinformation or one-sided information. Moreover, information can be controlled which effects how people digest news information, corruptly influencing and tainting the same pools of people that would go on to sit the juries in D.C. In addition to the above, the search trends show that Washington D.C., by drastic contrast, was the leading state to search terms such as "Select Committee" (*Compare* **Exhibit P**: "Insurrection"; *Compare with* **Exhibit Q:** and "Capitol Riots" (highlighting anywhere jurors are exponentially pre-exposed to relevant information, it is likely unbiased jury pool will even be available as data will prove that based on location data, the D.C. jury pool is abnormally and willfully tainted.)).

Data Spikes were undeniably affected by the "Select Committee" release dates. This shows that potential jurors exposed themselves to biased reports absent any meaningful discussion or cross examination of January 6th witnesses or defendants, and weeks of hearings that exclusively benefitted DOJ prosecutors. Affected areas of an event are understandably going to have a high search rate. For example, the affected area being D.C. and the event being January 6th. In contrast, a generic topic such as ice cream, will not show one particular area with a high search rate. (*See* **Exhibit R**: Nationwide "Ice Cream" Search). This is problematic here because the D.C. jury pool is going to have extreme event bias towards the January 6th, evidenced by search trends nationwide. Therefore, jurors that come from D.C.

are substantially more likely to be prejudiced by channeled information and the narrative that January 6th was a violent riot, that they have been hyper exposed to.

Fourth, and finally, a trial in the District of Columbia would amount to a "kangaroo court" just as the trial in *Rideau* for the same reasons: the broadcasted actions of Mr. Lang would "in a very real sense [be his] trial." *Id.* at 726. Specifically, there has been a notorious photograph associated with Mr. Lang's case that the media has portrayed as a confession of wrongdoing: a photograph Mr. Lang allegedly posted on social media stating "this is me," with an arrow pointed at an individual in the crowd. *See* AARON FEIS, *NY man busted for alleged role in Capitol riot — after outing himself online*, THE NEW YORK POST (January 17, 2021) (*available at* https://nypost.com/2021/01/17/ny-man-busted-for-alleged-role-in-capitol-riot-after-outing-self/) (last visited March 10, 2023).

Thus, just like the defendant in *Rideau*, a trial in the D.C. community that witnessed the evidence on broadcast would be tantamount to a "kangaroo court," as the broadcasted evidence would be "in a very real sense [Mr. Lang's] trial."

## C.   MR. LANG MEETS THE 18 U.S.C. § 3237(A) STANDARD

It is also a well-known fact that the Presidential Election of 2020 was highly controversial and divisive across the nation as a whole. Mr. Lang was deeply invested in the outcome of that election, as evidenced by his participation in the January 6 protest. The plan to travel to D.C. to participate in the protest was not a

spur of the moment consideration or a spontaneous action on the part of Mr. Lang. Asserted and inferred in the Statement of Facts and Superseding Indictment is the allegation that Mr. Lang committed civil disorder by committing or attempting to commit an act that obstructed, impeded or interfered with law enforcement. Therefore, if the Statement of Facts is to be taken at face value, the alleged charges contained in the Superseding Indictment began weeks before January 6, 2021, in New York City as for at least Counts Eight and Nine of the Superseding Indictment there is a requisite element of *mens rea*.

This alleged conduct establishes that for each of the alleged crimes charged, but for the planning, preparation, and purpose in traveling from New York to Washington D.C., the proceeding allegations would not have been made, nor would an Indictment have been filed. Thus, where the intent is a necessary and distinct element of the charged offense, the location wherein the intent was formulated and initiated is proper venue under 18 U.S.C. § 3237(a). The Government will no doubt argue that the Sixth Amendment of the United States Constitution is abundantly clear as to the issue of venue. However, the Sixth Amendment is equally supportive of Mr. Lang's motion as it states, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law…" US CONST. AMEND. 6, Part 1 of 17 (emphasis

added). Clearly the broad issue of venue was left by our Founding Fathers to be a question of law for the Court under the unique circumstances of the individual cases that may arise.

The Government will also no doubt argue such cases as *Miller* and *Wright*, where the Courts found that "The determination of criminal venue is informed by where physical conduct occurred, and not where criminal intent was formed." *United States v. Miller*, 808 F.3d 607, 615 (2d Cir. 2015) and *United States v. Wright*, No. 2:16-cr-46, 2016 U.S. Dist. LEXIS 139076, at *5 (D. Vt. Oct. 6, 2016)

However, as has been demonstrated, on the basis of the allegations contained in the Government's own Statement of Facts and Superseding Indictment, New York is not merely where intent was formed, but also where the alleged acts were planned, initiated, and concluded.

## V.  ALTERNATIVELY, IT IS RESPECTFULLY REQUESTED THAT THIS COURT SHOULD EXPAND ITS EXAMINATION OF PROSPECTIVE JURORS AND TAKE ANY OTHER POTENTIAL STEPS TO LESSEN PREJUDICE TO MR. LANG.

Alternatively, if this Court denies the instant motion, this Court should allow defense counsel to prepare and distribute a questionnaire to prospective jurors, to (1) allow the parties to be present for any pre-screening questioning of prospective jurors before the beginning of formal *voir dire*, and (2) allow the parties to question jurors individually during *voir dire*.

Moreover, when a likelihood exists that an impartial jury will be difficult to attain, a trial court may take a number of steps, including enlarging the venire of potential jurors, in order to ensure that jurors who are free from prejudice are selected. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554-55 (1976); *Sheppard v. Maxwell*, 384 U.S. 333, 361-62 (1966). In *United States v. Rodriguez*, for example, the Eighth Circuit upheld a district court's effort to ensure a defendant's constitutional right to a fair trial when it denied a motion for change of venue, but reduced the risk of prejudice resulting from pre-trial publicity by "assembl[ing] a 590–person jury pool … and requiring jurors to answer a 121–question form." 581 F.3d 775, 785 (8th Cir. 2009) (defendant also received ten additional peremptory strikes).

A cursory review of the juror questionnaire responses in other J6 case, in which your affirmant has been an attorney to demonstrates a presumed prejudice from the venire that permeates throughout all facets of the Washington, D.C. population. Equally troubling is the lack of representation as is required by the Sixth Amendment and the Jury Selection and Service Act (JSSA). First, the Sixth Amendment requires that the jury venire from which a jury is selected represent a "fair cross-section" of the community. *United States v. Odeneal,* 517 F. 3d 406, 411-12 (6th Cir. 2008).

Under the JSSA, "is the policy of the United States that all litigants in Federal court entitled to trial by jury shall have the right to … petit juries selected at random from a far cross section of the community in the district or division wherein the court convenes." 25 U.S.C. § 1861. Further, § 1862 prohibits exclusion of any citizen "from 4 service as a … petit juror … on account of race [or] color [.]" "Typically, challenges brought under the JSSA are reviewed under the same standard as a Sixth Amendment claim of denial of a jury representing a fair cross section of the community which requires a showing of underrepresentation of a distinct group." *Ovalle*, 136 F.3d at 1099, see also *Allen*, 160 F. 3d at 1102 (calling the JSSA test "essentially identical" to the Sixth Amendment test and again laying put elements); *United States v. Wesley*, No. 15-cr20718, 2017 WL 2590487, at * 6 (E.D. Mich. June 15, 2017)(holding that the same "standard applies regardless of whether the claim is brought under the Sixth Amendment or the Jury Service and Selection Act").

## VI.   <u>CONCLUSION</u>

For the reasons explained above, Mr. Lang requests a transfer of this action to the Southern District of New York—where Mr. Lang resides and where the government claims he traveled from to commit his alleged crimes on January 6.

Dated:  March 10, 2023

Respectfully Submitted,

*/s/ Steven Alan Metcalf II*

_____
STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Mr. Lang*
99 Park Avenue, 6th Flr.
New York, NY 10016
(*Office*) 646.253.0514
(*Fax*) 646.219.2012

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been served upon counsel for all parties to this proceeding as identified below through the court's electronic filing system as follows:

/s/

_____

STEVEN A. METCALF II
*Attorney for Edward Jacob Lang*

Dated: March 10, 2023