IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) ) ) |
| v. | ) ) No. 21-CR-53 (CJN) |
| EDWARD JACOB LANG, | ) ) ) |
| *Defendant*. | ) ) ) |

**DEFENDANT LANG'S MOTION IN LIMINE TO PRECLUDE USE INSTAGRAM, TELEGRAM, AND TO USE CERTAIN LANGUAGE AND FOR A SELF-DEFENSE INSTRUCTION**

Defendant, Edward Jacob Lang, by and through his undersigned attorney, respectfully files this motion *in limine* in advance of the trial in this case. Although neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly contemplate motions *in limine*, the practice of allowing such motions has developed over time "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 fn. 4 (1984).

"Motions *in limine* are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Barnes v. D.C.*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (*quoting Graves v. District of Columbia*, 850 F.Supp.2d 6, 10 (D.D.C. 2011).

Edward Lang offers the authorities and analysis below to promote efficiency and reduce the need to argue objections mid-trial. For each motion herein, Lang asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

I. **LEGAL STANDARD**

Motions *in limine* are designed to narrow the evidentiary issues at trial. *Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010). Such motions are an important mechanism of insulating the jury from inadmissible evidence and of adhering to the goal of conducting proceedings "fairly . . . to the end of ascertaining the truth and securing a just determination." *United States v. Bikundi*, No. 14-CR-030 (BAH), 2015 WL 5915481, at *3 (D.D.C. Oct. 7, 2015) (*citing* FED. R. EVID. 102; *Banks v. Vilsack*, 958 F. Supp. 2d 78, 82 (D.D.C. 2013)).

Rulings on motions *in limine* in advance of the trial permit counsel to make the necessary strategic determinations. *See United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980); *Burns v. Levy*, Civ. No. 13-898, 2019 WL 6465142, at *3 (D.D.C. 2019).

Evidence is relevant only if "it has any tendency to make a fact more or less probable than it would without the evidence; and the fact is of consequence in determining the action." FED. R. EVID. 401. Evidence is therefore relevant only if it logically relates to matters that are at issue in the case. *United States v. O'Neal*, 844 F.3d 271, 278 (D.C. Cir. 2016); *see Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).

***Irrelevant evidence is not admissible***. FED. R. EVID. 402.

Furthermore, the Federal Rules of Evidence direct the court to exclude otherwise admissible evidence where its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FED. R. EVID. 403.

## II.     LAW AND ARGUMENT

### POINT ONE:

**LANG'S MOTION TO PRECLUDE THE USE OF THE 45-MINUTE INSTAGRAM CHAT, AND ALL TELEGRAM CHATS**

As highlighted above, irrelevant evidence is not admissible. FED. R. EVID. 402. Evidence is relevant only if "it has *any tendency* to make a fact more or less *probable* than it would without the evidence; and the fact is of consequence in determining the action"; and thus, must logically relate to matters that are at issue in the case. FED. R. EVID. 401; *O'Neal*, 844 F.3d at 278 (D.C. Cir. 2016).

In this case, these topics – an Instagram chat, and Telegram messages – have no relevance to any issue at controversy, or to any of the elements of the counts charged in this Superseding Indictment. Even if they did, *any* relevance is nominal, if non-existing, and is substantially outweighed by its unfair prejudice or even the danger of prejudicing Lang to a degree of no return. *See* FED. R. EVID. 403.

Prosecutors have an ethical duty to operate with fairness and honesty, as highlighted in *Berger* as follows:

> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused, when they should properly carry none.

*United States v. Berger*, 295 U.S. 78, 88 (1935).

"As a general rule, tangible evidence such as photographs must be properly identified or authenticated before being admitted into evidence at trial." *United States v. Blackwell*, 694 F.2d 1325, 1329 (D.C. Cir. 1982) (citations omitted). To satisfy this requirement, "the proponent must

produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). Rule 901(b) provides a non-exhaustive list of examples of methods for showing authenticity. Those include, as relevant here:

> (1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be.
>
> . . .
>
> (3) *Comparison by an Expert Witness or the Trier of Fact*. A comparison with an authenticated specimen by an expert witness or the trier of fact.
>
> (4) *Distinctive Characteristics and the Like*. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
>
> . . .
>
> (7) *Evidence About Public Records*. Evidence that: (A) a document was recorded or filed in a public office as authorized by law; or (B) a purported public record or statement is from the office where items of this kind are kept.
>
> . . .
>
> (9) *Evidence About a Process or System*. Evidence describing a process or system and showing that it produces an accurate result.

FED. R. EVID. 901(b)(1), (3), (4), (7), (9).

In making the showing necessary for admissibility, "the proponent's burden of proof" is "slight," and the "ultimate resolution of the evidence's authenticity is reserved for the jury." *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (*quoting McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 928 (3d Cir.1985); *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006)). To make the requisite *prima facie* showing, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981).

And such evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be . . .".  *Hassanshahi*, 195 F. Supp. 3d at 48 (*citing United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)).

Rather, the party offering the evidence needs to "demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated." *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (*quoting United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)). Only witnesses with knowledge of the events depicted in a photograph or video can authenticate the evidence, including but not limited to the person who took the photograph or video. *See* Fed. R. Evid. 901(b)(1). Any individual that observed the events depicted in the photograph or video can testify that the photograph or video appears to fairly and accurately show the events that took place. *Id.*; *see also United States v. Rembert*, 863 F.2d 1023, 1026 (D.C. Cir. 1988) (*citing Simms v. Dixon*, 291 A.2d 184 (D.C. 1972).

Here, the Instagram video should be precluded because its probative value is nominal, if non-existent, and is substantially outweighed by its unfair prejudice. Similarly, all of Lang's telegram chats serve zero probative value. All of these videos and chats do not address any of the elements of the crimes charged, and thus serve to inflame the passions and prejudices of the jury. In addition to the authentication issues, none of Lang's Instagram or Telegram chats should be admissible. In light of this objection, the government must authenticate the specific time or place of a chats and videos using metadata to make a *prima facie* showing that a photograph or video was made at the time or place reflected in the metadata. *United States v. Banks*, 43 F.4th 912, 918 (8th Cir. 2022) (highlighting "[w]hile the officers were not present when the images and videos were first captured, their testimony [about reviewing extraction reports] provided a rational basis

to believe that the exhibits had been created within the relevant time frame and stored on [the defendant's] cellular phones."); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 547-48 (D. Md. 2007) (explaining that "[b]ecause metadata shows the date, time and identity of the creator of an electronic record, as well as all changes made to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4)."); *United States v. Gilbreath*, No. 3:19-CR-127- TAV-HBG, 2020 WL 5441226, at *3 (E.D. Tenn. Sept. 10, 2020) (detailing that the "[m]etadata . . . showed that these images were created at defendant's home and on defendant's cell phone on September 12, 2015.").

In this case, first, the telegram chats contain hearsay on top of hearsay. And, as the government will most likely contend that the exceptions to the hearsay rule, such as – effect on the listener, context, motive and intent – all lack merit. For one, the government most likely will not identify who the listener is or what relevant act was undertaken in reliance on the out-of-court statement.

Second, as formatted, these videos and chats fail the basic test for the admission of demonstrative evidence, as each does not represent a fair and accurate depiction or representation of what they purportedly depict. In telegram, messages are sequential and show who read the message. If replied to, telegram would show the original message and the response. Here the government will most likely selectively, cherry pick, a bunch of messages, which may or may not have been read by Mr. Lang and may not reflect a response to an earlier message.

Third, the government will fail to identify the relevance of most, if not all of such chats, and how such will later apply to any fact at issue in the case. *United States v. Evans*, 216 F.3d

80, 85 (D.C. Cir. 2000) (internal citations omitted).

Fourth, if Rule 403 ever were to mean something positive, this is the circumstance in which such rule should apply. Again, and *ad nauseum*, under the 403 Rule, evidence is excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403.

Regardless of the government's reasons for introducing such evidence, it cannot be offered without the prejudice inquiry asking whether "the jury [was] likely to consider the statement for the truth of what was stated with significant resultant prejudice." *Id.* When that danger is weighed against the insignificant probative value of the testimony as background, the Rule 403 balance comes out clearly against admission. *Evans*, 216 F.3d at 87- 88. *See also United States v. Robinson,* No. CR 16-98 (CKK), 2017 WL 11496711, at *2 (D.D.C. June 21, 2017).

Furthermore, these videos and chats should also be precluded on first amendment grounds because the statements are protected by Mr. Lang's First Amendment. In light of such, the government must meet the standard articulated in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) to have such videos and chats admissible in this case. *Brandenburg* is applicable when the government seeks to punish a defendant's statements— when an utterance is the *actus reus* of the crime charged.

If these videos and chats are from Defendant Lang, such statements neither shed light on the elements of the offenses, nor his motive or intent; and thus, should not be admitted in this case, as such statements – even if proven to be made by Lang may otherwise constitute speech protected by the First Amendment. Therefore, Lang's Instagram videos and Telegram chats should be precluded because not only is their probative value substantially outweighed by its prejudicial effect, but there are also authentication issues.

## POINT TWO:

### L<small>ANG'S</small> M<small>OTION TO</small> P<small>RECLUDE THE</small> G<small>OVERNMENT'S</small> U<small>SE OF</small> C<small>ERTAIN</small> T<small>ERMS</small>

Mr. Lang requests to preclude the Government's use of, or elicitation through its witnesses and visual evidence, of falsehoods, crimes not charged[1], and other inflammatory terms and allegations that are not inherent in the crimes charged, and are instead highly prejudicial, inflammatory, and with no probative value while only creating jury confusion. Mr. Lang requests that the Court order exclusion of "terrorism," "terrorist," "insurrection," "insurrectionist," "mob," "rioter," "treason," "traitor," "attack on the Capitol," "attack on democracy," "attack on Congress", and "stormed the Capitol."

There is no possible dispute that the legacy media and social media are inundated with references to all January 6th defendants as "insurrectionists," "terrorists," a "mob," "rioters," "traitors," and people who "stormed" the U.S. Capitol to "execute a coup" and "end democracy," or that any of Lang's actions on January 6, 2021 constituted an "attack on the U.S. Capitol".

It should be undisputed, although maybe not, that since January 6, 2021, the media has won the fight in labeling and identifying Defendants such as Lang all the aforementioned terms. In following and being a part of the January 6th trials, which have concluded in the D.C. District of Columbia, it has been become abundantly clear that the DOJ will stop at nothing, and will regularly use inflammatory terms in court against any January 6th Defendant. Even if such terms are not spoken aloud, most of the prospective jurors already know such terms, and will unquestionably associate such terms with any Defendant charged with a January 6th crime.

---

[1] It must be noted here that there is not a single Defendant associated with January 6th, who has been charged with "Insurrection", and such a term serves no purpose in the trial of *USA v. Edward Jacob Lang*.

Further, most of these terms carry a legal definition, which jurors or potential jurors do not know the definition to, but will still apply to any defendant standing charged of a January 6th crime, regardless if such defendant has not been charged with, and his actions do not rise to the level of such a term.

For example, Mr. Lang is not charged with insurrection, seditious conspiracy, terrorism (where there is no U.S. statute for domestic terrorism as a crime), or inciting a riot. He is not a member of any recognized group such as the "Proud Boys", the "Oathkeepers", the "Three Percenters" or any other militia. He is not a white supremacist or member of any revolutionary group, such as Black Lives Matter and Antifa, which espoused the overthrow of the U.S. Government with no repercussions.[2]

On January 6th, Lang did not enter the capitol building, which means that he also did not enter the rotunda, any chamber, or officials office. None of this imagery and propaganda portrayed in the media for the last two years should apply to Lang in a court of law.  As the D.C. Circuit in *Monaghan* has held:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

---

[2] Such groups did in fact commit actions rising to the level of a real claim of domestic terrorism. The reason for such statement is in the year 2020 alone, such groups designed approximately 547 riots, in approximately a ten week period, damaged billions of dollars in property damage, including damage to federal buildings, private businesses, and police stations, which were taken over for days. This is not to mention such groups committed arson, wide spread looting, where over a dozen police officers were killed, and thousands of individuals were injured and over 30 citizens killed. Respectfully, one must point out the difference in mainstream news coverage, and more importantly, the two tier justice system and difference in DOJ prosecution and FBI interest with respect to all of these events.

*United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984); *see also United States v. Hawkins*, 595 F.2d 751, 754 (D.C. Cir. 1978).

The words, terms and their spoken or visual representations that this motion *in limine* seeks to have excluded may reduce additional pile-on to the unfair prejudice Mr. Lang is already subject to by the media and the January 6th Committee, on a daily basis. It is necessary to remove any suggestion that Mr. Lang's conduct and intent aligns with the widely used descriptions of people he was not with, and for crimes he is not accused of.

Simply put, the jury should not be swayed to find him guilty based on false descriptors and its perception of political or social problems. Moreover, given the distinction of these words from the crimes charged, such use would clearly confuse the issues, mislead, and inflame the jury - who suffered victimhood through months of National Guard occupation after January 6th. *See United States v. Johnson,* 231 F.3d 43, 47 (D.C. Cir. 2000) ("A prosecutor may not make comments designed to inflame the passions or prejudices of the jury. And a prosecutor may not ask jurors to find a defendant guilty as a means of promoting community values, maintaining order, or discouraging future crime.").[3]

Whether used once or, used every day before a jury, and regardless of how many times this Court has used these terms in its own courtroom – each of the words and terms mentioned above serve no meaning in Lang's case other than to prejudice him of a point of no return. Therefore, these words cannot be unheard, and Lang's position is that we will not wait until such words are spoken and then we are in the position of having to request this Court for such word to be stricken**.**

---

[3] See also *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (highlighting that unfair prejudice relates to "an undue tendency to suggest decision on an improper basis") (*quoting* FED. R. EVID. 403, advisory committee's note).

## POINT THREE:

### EDWARD JACOB LANG'S MOTION FOR A SELF-DEFENSE AND <u>DEFENSE OF OTHERS JURY INSTRUCTION</u>

The right to defend a third person, or what is recognized under the law as "defense of another" is analogous to the right of self-defense, and like just as self-defense, can provide a complete defense to criminal charges, the same applies to the "defense of another." *Cf. Lee v. United States*, 61 A.3d 655 (District of Columbia, Court of Appeals, 2013). Stated otherwise, the "right to defend a third person is analogous to the right of self-defense, and like self-defense, can provide a complete defense to criminal charges." *Id.*

The standard jury instructions should read along these lines: "Every person has the right to use a reasonable amount of force in defense of another person if (1) s/he actually believes that the other person is in imminent danger of bodily harm and if (2) s/he has reasonable grounds for that belief." *Id.* at 658 (*quoting* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA ("Redbook"), No. 9.510, *Defense of a Third Person* (5th ed. rev.2010)).

As with self-defense, a person *may use deadly force* in defense of *another* person if he actually and reasonably "believes at the time of the incident that that person is in imminent danger of death or serious bodily harm from which s/he can save that person only by using deadly force against the assailant . . . ". *Id.* The Redbook instruction goes on to explain that the reasonableness of the defendant's belief in the need to use force in defense of another must be assessed "under the circumstances as they appeared to him/her at the time of the incident." *Id.*[4]

---

[4] *See Lee*, 61 A.3d at 658 (District of Columbia, Court of Appeals, 2013)(highlighting that once there is evidence of defense of a third person, the government must prove beyond a reasonable doubt that the defendant "did not act in defense of another person." REDBOOK NO. 9.510; *Cf. Comber v. United States,* 584 A.2d 26, 41 fn. 17, 43 n. 19 (D.C.1990) (en banc)).

Throughout the time Mr. Lang is alleged to have committed assaults, 2:57 pm to 5:00 pm, various Metropolitan Police Department Officers (hereafter referred to as "MPD") and United States Capitol Police (hereafter referred to as "USCP") continuously used excessive force. Some of this force was invoked against, unarmed, helpless, women. Upon information and belief, excessive force utilized by the Capitol Police began as early as 1:15pm, where after the first barrier breach, protestors, even though they should not have been in such a location – remained peacefully for a period of time. Such a demonstration took place on the West side of the Capitol, the same location Lang entered at least an hour-and-a-half later. Then out-of-nowhere, US Capitol Police positioned themselves in a perimeter much higher than where the protestors were gathered, in the peace circle. And in being positioned in such a upper location, US Capitol police began to fire rubber bullets and flash bangs at the peaceful crowd. The rubber bullets were not below the belt, and the overwhelming majority of such shots – were face shots. Protestors were hit in the face numerous times, where one individual was hit in his cheek, and his teeth and jaw line were clearly visible. The point of this is the police and USCP incited the crowd and inflamed the crowd's actions.

Then enters Edward Jacob Lang. After various police misconduct, Lang enters a protest that is already out-of-control. Lang then finds himself in a area on the West Side of the Capitol, now known as "the Tunnel". The police misconduct, only continued from there, but now was staring Lang in the eye. Officer's were then using various different instruments to beat the protestors, including woman being beaten over the head. One of Lang's first bond application included a Reply, which explained how he viewed a woman being beaten with a baton and at times with closed fists. At the time that woman's identify was unknown, but now we have identified her as Victoria White.

Additionally, it can be stated that even the government did not oppose the notion that Lang was yelling, "please stop" and "people are being killed", and that such statements were made towards officers at the exact time another woman, known as Roseanne Boyland, laid unconscious on the floor, and was nonetheless continued to be beaten with a baton. Boyland ultimately died that day, as a result of the violence that took place at "the Tunnel" that day.

In response to the display of excessive force and calls for help, Mr. Lang did what he could to distract officers, and to ultimately help those protestors in need, those being extremely beaten by the Officers. Under these circumstances, Lang reasonably believed that the women in his presence (whether it be Victoria White or Roseanne Boyland) faced a present threat of death or serious injury. Consequently, Lang moved swiftly and "acted lawfully in response to the threat". Such swift actions of Lang does not even encompass his actions in saving Phillip Anderson, and Thomas Tatum, two men who were also stuck in "the Tunnel" and found themselves in a position where each reasonably feared being stampeded to a point where they believed they could have died in a similar way as Roseanne Boyland.

Anderson and Tatum are both grown men, over six feet tall, and well over 250 pounds. And both men account Lang's actions to "saving their lives".

Here, as set forth above, Mr. Lang will be able to put forth evidence that he had a reasonable belief that his actions were necessary to defend himself and others against the immediate use of unlawful force. As such proffered evidence, this Court should allow for self-defense and defense of others given as a jury instruction and to make such arguments to the jury, during a jury address and on cross-examination.

Thus, it is reasonable for this Court to hold in abeyance whether it will instruct the jury with an instruction along these lines: if (1) Lang actually believes that the other person is in imminent

danger of bodily harm, and if (2) Lang has reasonable grounds for that belief." *Lee v. United States*, 61 A.3d 655 (District of Columbia, Court of Appeals, 2013); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA ("Redbook"), No. 9.510, *Defense of a Third Person* (5th ed. rev.2010).

Further, Lang proposes language similar to the following to be instructed to the jury:

> Every person has the right to use a reasonable amount of force in self-defense if (1) he actually believes he [or another] is in imminent danger of bodily harm and if (2) he has reasonable grounds for that belief. The question is not whether looking back on the incident you believe that the use of force was necessary. The question is whether Edward Jacob Lang, under the circumstances as they appeared to him at the time of the incident, actually believed he [or another] was in imminent danger of bodily harm, and could reasonably hold that belief.

### III.   CONCLUSION

There is no legitimate reason for the Government itself or through its witnesses and visual evidence to use inflammatory words and highly prejudicial descriptions that are not part of the crimes charged or locations where Mr. Lang was present. Any use of visuals or inflammatory words to create an association between Mr. Lang and the acts of others is disingenuous. Use of the words listed for exclusion can only confuse, mislead, and cause prejudice in the jury. They can only unfairly malign Mr. Lang. They can only be part of an attempt to create scienter where none existed. The Government needs to prove its case by proving every element of the crimes charged - and not through insertion of words and visuals with no foundation or evidentiary relevance to the charges. The Government should not be allowed to achieve a conviction through the deliberate provocation of bias in the jury. Moreover, the use of any Telegram Chats is irrelevant and unfairly prejudicial, raises authenticity issues and first amendment violations. Lastly, this Court should allow the reading of self-defense and defense of others as a jury instruction.

**WHEREFORE**, Mr. Lang requests that the Court order exclusion of "terrorism," "terrorist," "insurrection," "insurrectionist," "mob," "rioter," "treason," "traitor," "sedition," "conspiracy," "attack on the Capitol," "attack on democracy," "attack on Congress", and "stormed the Capitol." Mr. Lang further requests the preclusion of all Instagram and Telegram chats on relevance FRE 401 and 403 grounds; First Amendment grounds; and Authenticity issues. Furthermore, Lang requests the reading of self-defense and defense of others as a jury instruction.

Dated: March 16, 2023

        Respectfully Submitted,

        */s/ Steven Alan Metcalf II*

        STEVEN A. METCALF II, ESQ.
        Metcalf & Metcalf, P.C.
        99 Park Avenue, 6th Flr.
        New York, NY 10016
        (*Office*) 646.253.0514
        (*Fax*) 646.219.2012

## CERTIFICATE OF SERVICE

I hereby certify on the 17th day of March 2023, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Steven A. Metcalf, Esq

Steven A. Metcalf, Esq.
