**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-53 (CJN)** |
| **v.** | : | |
| | : | |
| **EDWARD JACOB LANG,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO TRANSFER VENUE**

Defendant Edward Jacob Lang, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to the Southern District of New York, ECF 101, or to the Eastern, Western, or Northern District of New York, ECF 101-1 at 3. Lang fails to establish that he "cannot obtain a fair and impartial trial" in the District of Columbia, Fed. R. Crim. P. 21(a), and this Court should deny his motion.[1]

---

[1] Judges on this Court have denied motions for change of venue in dozens of January 6 prosecutions, and no judge granted a change of venue in a January 6 case. *See, e.g., United States v. Ramey*, 22-cr-184, Minute Entry (D.D.C. Jan. 30, 2023) (DLF); *United States v. Eckerman, et al.*, No. 21-cr-623, Minute Order (D.D.C. Jan. 26, 2023) (CRC); *United States v. Pollock, et al.*, No. 21-cr-447, Minute Entry (D.D.C. Jan. 25, 2023) (CJN); *United States v. Gossjankowski*, No. 21-cr-12, ECF No. 114 (D.D.C. Jan. 25, 2023) (PLF); *United States v. Adams*, No. 21-cr-212, ECF No. 60 (D.D.C. Jan. 24, 2023) (ABJ); *United States v. Rhine*, No. 21-cr-687, ECF No. 78 (D.D.C. Jan. 24, 2023) (RC); *United States v. Oliveras*, No. 21-cr-738, ECF No. 52 (D.D.C. Jan. 17, 2023) (BAH); *United States v. Sheppard*, No. 21-cr-203, ECF No. 62 (D.D.C. Dec. 28, 2022) (JDB); *United States v. Samsel, et al.*, No. 21-cr-537, ECF No. 227 (D.D.C. Dec. 14, 2022) (JMC); *United States v. Gillespie*, No. 22-cr-60, ECF No. 41 (D.D.C. Nov. 29, 2022) (BAH); *United States v. Barnett*, No. 21-cr-38, ECF No. 90 (D.D.C. Nov. 23, 2022) (CRC); *United States v. Bender, et al.*, No. 21-cr-508, ECF No. 78 (D.D.C. Nov. 22, 2022) (BAH); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (D.D.C. Nov. 18, 2022) (TFH); *United States v. Vargas Santos*, No. 21-cr-47, Minute Entry (D.D.C. Nov. 16, 2022) (RDM); *United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022) (TJK); *United States v. Ballenger*, No. 21-719, ECF. No. 75 (D.D.C. Oct. 28, 2022) (JEB); *United States v. Eicher*, No. 22-cr-38, ECF No. 34 (D.D.C. Oct. 20, 2022) (CKK); *United States v. Schwartz, et al.*, No. 21-cr-178, ECF No. 142 (D.D.C. Oct. 11, 2022) (APM); *United States v. Nassif*, No. 21-cr-421, ECF No. 42 (D.D.C. Sep.

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

After attending the Save America rally on January 6, 2021, Lang along with others made his way to the U.S. Capitol, arriving at its West Plaza.  Once there, he climbed scaffolding to an upper level of the Capitol where he watched clashes between rioters and police struggling to prevent a breach of the Capitol's West Front.  By 2:30 p.m., the mob broke through the police line defending the West Front.  At approximately 2:41 p.m., Lang was among the earliest rioters who

---

12, 2022) (JDB); *United States v. Brock*, No. 21-cr-140, ECF No. 58 (D.D.C. Aug. 31, 2022) (JDB); *United States v. Jensen*, No. 21-cr-6, Minute Entry (D.D.C. Aug. 26, 2022) (TJK); *United States v. Seitz*, No. 21-cr-279, Minute Order (D.D.C. Aug. 17, 2022) (DLF); *United States v. Strand*, No. 21-cr-85, ECF No. 89 (D.D.C. Aug. 17, 2022) (CRC); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C. August 4, 2022) (BAH); *United States v. Garcia*, No. 21-cr-129, ECF No. 83 (D.D.C. July 22, 2022) (ABJ); *United States v. Rusyn, et al.*, No. 21-cr-303, Minute Entry (D.D.C. July 21, 2022) (ABJ); *United States v. Bledsoe*, No. 21-cr-204, Minute Order (D.D.C. July 15, 2022) (BAH); *United States v. Calhoun*, No. 21-cr-116, Minute Order (D.D.C. July 11, 2022) (DLF); *United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 176 (D.D.C. June 28, 2022) (APM); *United States v. Williams*, No. 21-cr-377, Minute Entry (D.D.C. June 10, 2022) (BAH); *United States v. McHugh*, No. 21-cr-453, Minute Entry (D.D.C. May 4, 2022) (JDB); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (D.D.C. Apr. 29, 2022) (TNM); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418, ECF No. 31 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158, Minute Order (D.D.C. Dec. 14, 2021) (RC); *United States v. Reffitt*, No. 21-cr-32, Minute Order (D.D.C. Oct. 15, 2021) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

entered the inaugural archway behind the stage on the Capitol's Lower West Terrace that was under construction for the inauguration. Over the next two and a half hours, Lang repeatedly pushed, punched, and kicked at police officers defending the Lower West Terrace entrance to the Capitol building. He also slammed a door against one officer's head and struck other officers first with a stolen riot shield and later with a metal baseball bat. *See United States v. Lang*, No. 21-3066, (D.C. Cir. January 12, 2022) (per curiam), ECF 52-1.

Based on his actions on January 6, 2021, Lang is now charged with assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. §§ 111(a)(1) and 2 (Counts One through Four); assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Counts Five and Six); assaulting, resisting, or impeding certain officers inflicting bodily injury and using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)1) and (b) (Count Seven); committing the offense of civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Eight); engaging in disorderly or disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Ten); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Eleven); engaging in disorderly or disruptive conduct within the United States Capitol grounds and in any of the Capitol buildings, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Twelve); and engaging in an act of physical violence within the United States Capitol grounds and in any of the Capitol buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Thirteen).

The defendant now moves for a change of venue. ECF 101, 101-1. Lang, who continues to conduct his own publicity campaign through online and mainstream media, a purported documentary available online, and a book, contends that prejudice should be presumed in this

district for several reasons: (1) the pretrial publicity surrounding the events of January 6, (2) the characteristics of the D.C. jury pool, (3) the results of a survey of potential jurors, and (4) the results of search engine totals of searches for certain terms.  Each of his arguments is without merit, and the motion should be denied.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary."  *Jones v. Gasch*, 404 F.2d 1231, 1238

(D.C. Cir. 1967).

**I.      The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

The defendant contends that a change of venue is warranted based on pretrial publicity. ECF 101-1 at 7-16. "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder."

*Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they

contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).  And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

### A.    Size and characteristics of the community

The defendant suggests (ECF 101-1 at 6-7) that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000.  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

**B.       Nature of the pretrial publicity**

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. As in *Skilling* and *Haldeman*, the news coverage of Lang is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* Indeed, although any media characterizations of Lang would be inadmissible, the photos and videos of Lang that have been disseminated would be both admissible and highly relevant at trial. *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial. Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

The defendant argues that prejudice should be presumed based on statements by the Attorney General of the United States.  ECF 101-1 at 11-12.  According to Lang, the statements equated the events of January 6, 2021 to the 1995 bombing of the Alfred P. Murragh Federal Building in Oklahoma City. Although his memorandum provides a citation to a Washington Examiner article which quotes the Attorney General's remarks, *id*. at 11, n. 16, the defendant has chosen not to include a copy of the article among the many exhibits to his motion, perhaps because neither the article nor the Attorney General mentioned Lang. Moreover, nothing in Attorney

General Garland's quoted remarks equated the criminal conduct in each event; instead, in an apparent effort to reassure the public, the remarks advised that procedures for the government's response to January 6 in place since the 1995 bombing were in use. Lang's characterization of the quoted remarks, ECF 101-1 at 11—that "the United States government has implicitly acknowledged that the events of January 6, 2021, are so unique that they warrant a transfer"— is inaccurate.[2]   But even if the quoted remarks had addressed Lang explicitly (which they did not) condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice.  In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382.  And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations."  *Haldeman*, 559 F.2d at 61.  The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."  *Id.*  The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about Lang.

---

[2] The quotation from the Washington Examiner article the defendant cites states, "'At the Justice Department, the deputy attorney general and I have already begun implementing a range of measures.  Among other things, we have begun to reinvigorate the Domestic Terrorism Executive Committee, and we will convene that interagency body in the coming days and months,' Garland stated on Tuesday.  "Attorney General Janet Reno originally created the executive committee in the aftermath of the 1995 Oklahoma City bombing.  The investigation of that bombing, which required an enormous commitment of resources from agencies across the federal and state governments, demonstrated the importance of such a coordination mechanism.'" https://www.washingtonexaminer.com/news/garland-oklahoma-city-bombing-capitol-riot.  These process-oriented comments are nothing like the inflammatory characterization offered by the defendant or even the article itself.

And, again, statements by Attorney General are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.[3]

The defendant also contends that the nationally televised hearings of the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee) support a change of venue. ECF 101-1 at 10-11. The defendant points out that approximately 20 million people watched the televised coverage of the first hearing on June 9, 2022. ECF 101-1 at 10. But this exposure was not limited to D.C. Instead, the hearings were carried on national networks across the country. In similar circumstances, the D.C. Circuit affirmed the denial of a change of venue where the defendants—who were high-ranking members of the Nixon administration—complained that they were prejudiced by news coverage of the Watergate-related hearings. *Haldeman*, 559 F.2d at 62-64 & nn.35, 43. The court of appeals observed that "a change of venue would have been of only doubtful value" where the "network news programs and legislative hearings" related to Watergate were "national in their reach." *Id.* at n.43.

Moreover, the 20 million viewers of the June 9, 2022 hearing represent only about 6% of the total U.S. population. The defendant attempts unconvincingly to argue that D.C. residents were more likely to have watched those hearings than citizens in other parts of the country. For example, Lang cites to a post on the WUSA web site about "watch parties" for D.C. residents to

---

[3] For example, similar language was quoted in the Missoula Current, https://missoulacurrent.com/biden-fight-extremists/ (dated June 16, 2021, last checked March 20, 2023); on CSPAN, https://archive.org/details/CSPAN3_20210622_233100_Attorney_General_Delivers_Remarks_o n_Domestic_Terrorism_Threats/start/180/end/240 (dated June 22, 2021, last checked March 20, 2023); and on MSNBC, https://archive.org/details/MSNBCW_20210615_150000_Craig_Melvin_Reports/start/840/end/9 00 (dated June 15, 2021, last checked March 20, 2023).

view the first of the Select Committee hearings.  ECF 101-1 at 11 and n.15; ECF 101-8.  This post

gives an anecdotal description identifying at most a few hundred residents (less than one-

thousandth of one percent of the District's population) attending such parties and offers no

information about whether similar events occurred elsewhere in the United States or in any federal

district in New York where the defendant seeks to transfer venue.  Lang also seeks to bolster his

argument about D.C. residents' viewing of the hearings by citing to a John Zogby Strategies poll

offered as an exhibit in an unrelated January 6 case. ECF 101-1 at 11 (referencing ECF 54-1 filed

in Case No. 1:21-00129-ABJ).  Whatever other failings detract from the Zogby poll (see below),

it does not mention the Select Committee hearings and offers no reason for concluding that local

residents watched the hearings at all or in greater numbers than residents in any federal district in

New York or elsewhere.   And even if D.C. residents tuned in at a higher rate, it is still likely that

a majority of D.C. residents did not watch the hearings.  Moreover, those hearings have focused

on the events of January 6 as a whole, not on the actions of the defendant.  There is no reason to

believe that coverage of the hearings will create in D.C. such a degree of bias against this particular

defendant that an impartial jury cannot be selected.  *See United States v. Chwiesiuk*, 21-536 (CKK)

2023 WL 2562517 @ *6 (D.D.C. Mar. 17, 2023) (coverage of the Select Committee might actually

be helpful to individual January 6 defendants by shifting focus from individual defendants to high-

level officials); *United States v. Oliveras*, No. 21-738 (BAH), 2023WL 196679 at *3 (D.D.C. Jan.

17, 2023) (same).

Additionally, a careful voir dire—rather than a change of venue—is the appropriate way

to address potential prejudice from the Select Committee hearings.  "[*V*]oir dire has long been

recognized as an effective method of rooting out [publicity-based] bias, especially when conducted

in a careful and thoroughgoing manner."  *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C.

Cir. 1981).  After a careful voir dire, this Court can select a jury from those residents who either did not watch the hearings or who, despite having watched the hearing, give adequate assurances of their impartiality.  *See Haldeman*, 559 F.3d at 62 n.35 (rejecting claim of prejudice even though "several jurors" had "seen portions of the televised Senate hearings" related to Watergate).

The defendant asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6.  ECF 101-1 at 7-8.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And, especially when Lang's own media contacts are excluded, a comparatively small percentage of the news coverage of January 6 has focused on Lang himself.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 900 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held.") (internal quotation marks omitted).  Indeed, many of the news

stories that Lang cites were published by media or other organizations with wide national circulation, not purely local outlets.  ECF 101-4 (Defense Exhibit C, a January 17, 2021 New York Times Article reporting Lang's arrest); ECF 101-5 (Defense Exhibit D, Southern Poverty Law Center web site report on the anniversary of January 6 making no reference to Lang); ECF 101-6 (Defense Exhibit  E, June 10, 2022 Time Magazine article without reference to Lang); ECF 101-9 (Defense Exhibit H, January 5, 2022 article from the Daily Beast web site); ECF 101-12 (Defense Exhibit K, January 6, 2021 article on NPR web site making no reference to Lang); ECF 101-13 (Defense Exhibit L, January 13, 2021 article on CNBC web site making no reference to Lang).  Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### C.    Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial."  *Skilling*, 561 U.S. at 383.  In this case, 26 months have already elapsed since the events of January 6, and four additional months will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories (excluding those in which Lang *chose* to be interviewed) have mentioned Lang himself, and much of the reporting has been national in scope, rather than limited to Washington, D.C.

Significantly, much of the coverage that mentions Lang by name comes primarily from sources in the Southern District of New York, where he seeks to transfer his trial.  *E.g.*, ECF 101-4; "Social Media Posts Lead to Arrest of N.Y. Man for Role in Capitol Riot," https://www.nytimes.com/2021/01/17/nyregion/ny-man-arrested-Capitol-riots.html (last checked

March 20, 2023); "Newburgh man charged with beating cops with bat at Capitol on Jan. 6 shuns plea deal," https://www.recordonline.com/story/news/local/2021/12/09/capitol-riot-suspect-edward-lang-newburgh-rejects-plea-deal-trial/6415704001/ (last checked March 20, 2023); "Hudson Valley Man Arrested in Connection With Capitol Riot: FBI," https://www.nbcnewyork.com/news/local/crime-and-courts/hudson-valley-man-arrested-in-connection-with-capitol-riot-sources/2834919/ (last checked March 20, 2023); "FBI arrests Orange County man seen in riot pictures he posted online," https://abc7ny.com/9725861/ (last checked March 22, 2023); "NY man busted for alleged role in Capitol riot—after outing himself online," https://nypost.com/2021/01/17/ny-man-busted-for-alleged-role-in-capitol-riot-after-outing-self/ (last checked March 22, 2023); "US Capitol rioter who posted 'I was the leader of Liberty today, arrest me,' detained after court appearance" https://www.nydailynews.com/new-york/ny-jake-lang-capitol-rioter-detained-20210119-3x53xgnsmfdjxiclht7gevfyqm-story.html (last checked March 22, 2023); "Capitol riot suspect from Newburgh allegedly beat cops with fists, feet, bat and shield" https://www.recordonline.com/story/news/local/2021/09/09/feds-detail-capitol-riot-suspect-edward-langs-alleged-assaults/5780030001/

https://www.recordonline.com/story/news/local/2021/09/09/feds-detail-capitol-riot-suspect-edward-langs-alleged-assaults/5780030001/ (last checked March 20, 2023); "Capitol riot defendant from Newburgh denied appeal for his release," https://www.timesunion.com/hudsonvalley/news/article/Capital-riot-defendant-denied-appeal-for-release-16773226.php (last checked March 20, 2023); "Trial for Edward Jacob Lang set for January 9, 2023 in DC," https://www.sullivantimes.com/post/trial-for-edward-jacob-lang-set-for-january-9-2023-in-dc (last checked March 20, 2023).

Finally, Lang cannot persuasively complain about the prevalence of January 6 coverage

when he has persistently generated such coverage through interviews with online broadcasters and podcasters, through his own web site, through promotion of a January 6 documentary, and through publication of a book about his conduct at the Capitol on January 6, 2021.  *See* "Supporters raise millions to rebrand Jan. 6 rioters as 'patriots,'" ECF 101-11 at 2 (Lang "has his own personal assistant to manage his interview requests and podcast schedule—from jail"), published at https://www.washingtonpost.com/nation/2023/01/06/jan-6-prisoners-supporters/.  As recently as February 17, Lang provided an audio interview to a host from @LindellTV, *see* https://gettr.com/user/jakelang (embedding excerpt from the interview); on February 11, 2023, Lang called into another podcast to discuss January 6. https://www.ksgf.com/episode/claryfication-podcast-02-11-23-jan-6-political-prisoner-jake-lang-interview/ (last checked March 23, 2023) (includes links to Lang's website, documentary, and pre-order form for his book)  *See also* ECF 71 at 24 n. 11, 25 n.12, 27; ECF 92 at 8-9, 21 n.10, 23 (providing some samples of Lang's other broadcasts).  The complaints about publicity from someone who consistently attempts to keep January 6 in the public eye ring hollow and convey little more than hypocrisy.  They do not support a change of venue.

### D.     The jury verdict

Because Lang has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer

of venue without even conducting voir dire.

## II.     The Characteristics of the District of Columbia's Jury Pool Do Not Support a Change of Venue.

The defendant also contends that a D.C. jury cannot be impartial because of various characteristics of the District's jury pool: the political makeup of the District's electorate, the impact of January 6 on D.C. residents, and the prevalence of federal employees in the District. ECF 101-1 at 6 and n.4 and n.5, 8, 9.  None of these claims has merit.

### A.     The District of Columbia's political makeup does not support a change of venue.

The defendant contends that he cannot obtain a fair trial in the District of Columbia because more than half of adults "in the Washington, DC metro area" identify as Democrats.[4]  ECF 101-1 at 6, n.5.  The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."  *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily

---

[4] Jurors will not be selected from the Washington, D.C. "metropolitan area," which includes portions of the District of Maryland and the Eastern District of Virginia; instead, the jury pool will consist of residents from the District of Columbia.

black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here.  To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with a defendant's political aims.  But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire.  This Court should not presume that every member of a particular political party is biased simply because this case has a political connection.  Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895).  The same is true here.  The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial."  *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.  High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, Roger Stone, and Steve Bannon have all been tried in the District.  *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020); *United States v. Bannon*, No. 210-cr-670 (CJN).  Indeed, the Court in

17

*Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone." 2020 WL 1892360, at *30-31. Similarly here, the fact that most residents of the "DC metro area," identify as Democrats does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

**B.      The impact of January 6 on Washington D.C. does not support a change of venue.**

The defendant contends that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the Mayor's imposition of a curfew, and unspecified safety concerns. ECF 101-1 at 1-2, 8. But January 6 is now more than two years in the past. Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed. There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon). In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and

inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.* In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors. There is no reason to presume prejudice.

**C.    The number of federal employees who reside in the District of Columbia does not support a change of venue.**

The defendant argues that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family members. ECF 101-1 at 6, n.4. But the defendant does not explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror. Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly impacted. Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture of many federal agencies at the time. And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote. There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case. *See United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government. According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C. in 2017. OPM, Federal Civilian Employment,

available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/. But many federal employees who work in the District live outside the District and would not be part of the jury pool. And the District has nearly 700,000 residents. Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

III.    **The Poll And Search Data Cited by the Defendant Do Not Support a Change of Venue.**

Lang relies on the John Zogby Strategies poll of D.C. residents conducted at the request of a defendant in another case, *see United States v. Garcia*, 1:21-cr-00129-ABJ (ECF 54-1 at 2). ECF 101-1 at 7, 11, 13. The poll does not support a change of venue. Even in *Garcia*, Judge Jackson found the Zogby poll to be flawed and unpersuasive and denied the motion to change venue filed in that case. *Id.*, 2022 WL 2904352 at * 10-12, (D.D.C. July 22, 2022).

A.    **Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.**

The defendant argues that this Court should find a presumption of prejudice based on a poll of prospective jurors. But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias." *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005). As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of

a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that

99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather than public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and

render a verdict based on the evidence presented in court." *Id.* at 723.  But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And the defendant has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice.  But, as explained below, the poll cited by the defendant does not support a presumption of prejudice in any event.

### B.    The Zogby poll does not demonstrate pervasive prejudice in the District of Columbia.

The poll conducted by John Zogby Strategies at the request of another January 6 defendant, Gabriel Garcia, does not support a presumption of prejudice.  In fact, there are particularly strong reasons to doubt poll's reliability.  For one thing, the poll does not provide the Court with all the information needed to assess its accuracy.  The American Society of Trial Consultants' Professional Standards for Venue Surveys state the following:

> The trial consultant's presentation of survey results to a court shall include [t]he questionnaire that was used in the survey, identification of the primary persons who performed the work (including their qualifications), and descriptions of how each of the following standard steps for conducting a survey was completed:
> - Design of the survey instrument.
> - Determination of eligibility and sampling measures.
> - Training of interviewers and supervisors to conduct the interviewing.
> - Interviewing procedures.
> - Dates of data collection

      - Calculation of sample completion rate.

      - Tabulation of survey data.

American Society of Trial Consultants (ASTC), Professional Standards for Venue Surveys at 7, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf.

The Zogby poll fails to provide critical information, such as how the 400 survey participants were selected for the vaguely described "online survey" and whether they self-selected. *Garcia*, ECF No. 54-1 at 2; *see also* 2022 WL 2904352 at \*3 (criticizing this omission); *United States v. Thomley*, No. 2:18-CR-18-KS-MTP, 2018 WL 5986754, at \*2 (S.D. Miss. Nov. 14, 2018) ("The Court is . . . troubled by [the polling firm's] failure to explain *how* they selected their sample. Did they obtain responses online or via social media? Did respondents self-select?"). Additionally, the explanation that is provided indicates that the poll was underinclusive, in that it was only of "Washington DC registered voters," *Garcia*, ECF No. 54-1 at 2, whereas this Court's jury pool is generated based on voter registration, Department of Motor Vehicles records, and D.C. income tax forms.  Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors at 1, available at https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf.  *See also* 2022 WL 2904352 at \*10 (finding "significant omission" from the polling sample, which did not represent the D.C. jury pool).

Moreover, the Zogby poll uses a number of compound, non-neutral, and leading questions. *See Campa*, 459 F.3d at 1131-32, 1146 (affirming district court's decision to reject venue survey that used "ambiguous" and "non-neutral" questions).  For example, Question 8 asked respondents which description of January 6 "comes closer to your opinion," giving options only for (A) "a dire threat to the fabric of our nation and . . . the worst assault on US democracy since 9/11, Pearl Harbor, or even the Civil War" or (B) "unwise and caused senseless damage to the Capitol building

and people's lives, some of which were lost, but the events were not insurrectionist and did not pose a threat to US democracy."  *Garcia*, ECF No. 54-1  at 21, 40.  These answers, in addition to being compound, forced respondents into a binary choice between extreme options.  For example, there was no choice for someone who believed the events *did* pose a threat to U.S. democracy but did not approach the level of 9/11, Pearl Harbor, or the Civil War.  Nor was there a choice for someone who believed the events did *not* pose a threat to U.S. democracy but was also unwilling to describe them as "unwise" or "senseless."

The survey's next question asked whether respondents believed that "any individual who was inside the US Capitol on January 6, 2021 should be convicted of insurrection."  *Garcia*, ECF No. 54-1 at 22, 40, cited by the defendant in the instant case at ECF 101-1 at 7.  This question is poorly worded, considering that hundreds of "individual[s] who w[ere] inside the US Capitol on January 6" had every right to be there, including the Vice President, the members of Congress, and the U.S. Capitol Police and U.S. Secret Service.  Moreover, the question provided no background on potential criminal offenses involved in the events of January 6 other than "insurrection"—which the question does not define or describe, *see* 18 U.S.C. § 2383, and with which no defendant has been charged in connection with the events of January 6.  And the setup for this question naturally prompted respondents to condemn the actions of January 6 rather than to consider whether they actually believed everyone who entered the Capitol without permission was an insurrectionist.  In short, these questions have the earmarks of an inappropriate "push poll" that is "primarily designed to influence survey respondents' opinions in a particular direction by presenting systematically biased information."  ASTC Professional Standards for Venue Surveys at 7; *see id.* at 8 ("Efforts should be made to avoid context, wording or other influences that raise the likelihood of responses due to social desirability or other response bias."); *Campa*, 459 F.3d at 1146 (observing that "the

survey was riddled with non-neutral questions"). Not surprisingly, Judge Jackson concluded the Zogby poll's questions were flawed. 2022 WL 2904352 at *11-12.

In addition, the Zogby poll is particularly unhelpful in determining whether transfer is warranted because it fails to provide a comparison with any of the defendant's preferred venues in the Southern, Eastern, Western, or Northern District of New York, or any other district. According to the poll, 54% of respondents indicated their views about January 6 were shaped more by national media sources, compared to only 39% that were shaped by more local media sources. *Garcia,* ECF No. 54-1 at 5. Thus, the Zogby poll fails to establish that the views of D.C. voters are substantially different than potential jurors in other jurisdictions. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest). Indeed, the defendant may be *less* well known in Washington, D.C. than, for example, in the Southern District of New York, where there has been significant local coverage of the defendant.

Even if the Zogby poll's results are taken at face value, the poll does not support a presumption of prejudice in this district. The defendant contends that the Zogby poll shows that "73% of respondents believed that anyone who merely entered the Capitol building on January 6, 2021 is guilty of insurrection." ECF 101-1 at 7. In fact, the Zogby poll showed that 73% of respondents who were "Very familiar" or "Somewhat familiar" with January 6 held this belief. *Garcia*, ECF No. 54-1 at 22 (277 of 380 respondents). When respondents who were "Not familiar/Not sure" are taken into account, the percentage falls to 69%. *Id.* at 19, 22 (277 of 401 respondents). And this does not raise a presumption of prejudice. In *Patton v. Yount*, nearly 99% of prospective jurors had heard of the case, and 77% indicated on voir dire that "they would carry an opinion into the jury box," yet the Supreme Court rejected a claim of presumed prejudice.

*Patton*, 467 U.S. 1025, 1029 (1984).  Thus, the number of poll respondents who had formed a general opinion about January 6 defendants was lower than in *Patton*, even though the Zogby poll did not ask respondents whether they could set aside their opinions and determine guilt based solely on the evidence if called as jurors.  *Compare Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part) (61% of survey respondents held the opinion that defendants were "guilty" in connection with Watergate even when provided a survey option for "Not Guilty Until Proven").  At most, these responses indicate the Court might have to call a somewhat larger venire in order to find 12 impartial jurors; they do not demonstrate that it is impossible to pick an unbiased jury.

The defendant discusses a variety of other findings from the Zobgy poll, many of them variations on the findings just discussed.  *See* ECF 101-1 at 10-11.  But all these findings suffer from the same flaw—they fail to show a level of bias against the defendant so high that this Court can presume prejudice, forgo voir dire, and transfer venue to another jurisdiction.  In fact, the Zogby poll fails to provide *any* information about prospective jurors' familiarity with and prejudice toward the defendant in this case.

### C.   Search Engine Materials Do Not Show Pervasive Prejudice in the District of Columbia

Perhaps to support a flawed an unpersuasive poll, Lang also offers screenshots from online search engines intended to show the frequency or the volume of queries for certain terms.  ECF 101-14, 101-15, 101-16, 101-17, and 101-18.  The screenshots are inconclusive and largely irrelevant, and the conclusions that Lang proffers from these exhibits are largely speculative.

For example, ECF 101-14 at 1-3 appears to compare Google searches for the defendant under his nickname, "Jake Lang" in Washington, D.C. with searches including "Jake Lang" conducted other states, only one of which is New York State. (The exhibit offers no information

supporting the reliability of any location data, and the defense proffers none.)  The comparison does not provide data for any one of the four federal districts located within New York State.  The precise search term is not evident from the exhibit, and neither is the precise date range.  From the exhibit, there is no way to confirm that the same search term or date range was used for each and every location.  No data concerning any search is provided that links an interest in the defendant to any bias against the defendant.  Lang was indicted under the name "Edward Jacob Lang;" however, in the numerous interviews he has granted, the defendant is identified and identifies himself as "Jake Lang."  Thus, any interest in Lang reflected in this search data may result from the positive or even self-serving coverage Lang himself has generated, reflecting a favorable rather than a negative interest behind these searches.  The exhibit itself does not address the motive behind any search.  It provides no basis to conclude that the level of interest reflected in any search leads to a conclusion that bias exists.  The remaining pages of the exhibit, ECF 101-14 at 4-7, appear to reflect searches for the Capitol riot without the defendant's name (with jurisdictions not included in the first half of the exhibit) but fails to show why searches for the Capitol riot show bias against Lang in particular.

Although subject to the same flaws as the Google search, Exhibit N, ECF 101-15, purports to document a similar search through Bing; the results depicted for Washington, D.C., however, consist primarily of content favorable to Lang involving his own interviews or material Lang has disseminated.  This exhibit undermines the request to transfer venue.

Exhibit O, ECF 101-16 at 1, appears to address trends for searches of the term "white supremacist."  Lang, however, is not charged with white supremacy, or any hate crime, and the Superseding Indictment contains no allegations regarding race.  No support of any kind links the contents of the exhibit to any credible allegation that a D.C. jury pool will be improperly biased

against Lang.

Absent  context that is lacking from raw search data, Lang's exhibits are meaningless.  For example, defendant's Exhibit M, ECF 101-17, purports to offer data about searches for the term "Insurrection" including peak dates for the search, related topics (although what makes the topics related is unexplained), and the top five queries.  Searching for the term "insurrection" might, in some unknown number of cases, reflect a negative view of what happened on January 6.  Alternatively, such a search might reflect an interest in conspiracy theories about utilization of the Insurrection Act tied to a favorable view of events at the Capitol on January 6, 2021.  Yet another alternative is that neutral searches of the word "insurrection" occurred by people seeking its definition.  There is no way to tell, and no reason for this Court to conclude that any search is connected to bias generally or to bias against the defendant that warrants a change of venue.  The same uncertainty applies to searches for terms like "Capitol terrorist," "domestic terrorist," *see* ECF 101-16 at 2-3, or "Capitol riot," *see* ECF 101-18, since those searches might originate with those opposed to the mob at the Capitol, or those seeking validation of conspiracy or other theories justifying the presence of the crowd.  The defendant has failed to establish the relevance or reliability of the exhibits concerning online searches, and this Court should decline to view the exhibits as grounds for any transfer of venue.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases.  But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses.  As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of

venue is required.  *Haldeman*, 559 F.2d at 62.

**V.     The January 6-Related Jury Trials That Have Already Occurred Have Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.**

At this point, more than a dozen January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort.  *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  Instead, the judges presiding over nearly all of those trials were able to select a jury in one or two days.  *See United States v. Reffitt*, No. 21-cr-32, Minute Entries (Feb. 28 & Mar. 1, 2022); *United States v. Robertson*, No. 21-cr-34, Minute Entry (Apr. 5, 2022); *United States v. Thompson*, No. 21-cr-161, Minute Entry (Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (Apr. 25, 2022); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (May 23, 2022); *United States v. Anthony Williams*, No. 21-cr-377, Minute Entry (June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022); *United States v. Herrera*, No. 21-cr-619, Minute Entry (D.D.C. August 15, 2022); *United States v. Jensen*, No. 21-cr-6, Minute Entries (Sep. 19 & 20, 2022); *United States v. Strand*, No. 21-85, Minute Entry (D.D.C. Sep. 20, 2022); *United States v. Alford*, No. 21-cr-263, Minute Entry (Sep. 29, 2022); *United States v. Riley Williams*, No. 21-cr-618, Minute Entries (D.D.C. Nov. 7 & 8, 2022); *United States v. Schwartz*, No. 21-cr-178, Minute Entries (D.D.C. Nov. 22 & 29, 2022); *United States v. Gillespie* No. 22-cr-60, Minute Entry (D.D.C. Dec. 19, 2022); *United States v. Barnett*, 21-cr-38, Minute Entries (D.D.C. Jan. 9 & 10, 2023); *United States v. Sheppard*, No. 21-cr-203, Minute Entries (D.D.C. Jan. 20 & 23, 2023); *United States v. Eckerman*, No. 21-CR-623, Minute Entry (D.D.C. Jan. 23, 2023). The only exceptions have trials

involving seditious conspiracy charges.  *See United States v. Rhodes, et al.*, No. 22-cr-15, Minute Entries (Sept. 27, 28, 29; Dec. 6, 7, 8, 9, 2022).  And, using the first five jury trials as exemplars, the voir dire that took place undermines the defendant's claim that prejudice should be presumed.

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined).  *See Reffitt*, No. 21-cr-32, ECF No. 136 at 121.  The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror.  *Reffitt*, No. 21-cr-32, ECF No. 133 at 23, 30. The Court then followed up during individual voir dire.  Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[5]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%).  *See Thompson*, No. 21-cr-161, ECF No. 106 at 170, 172, 181, 190, 193.  The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire.  *Id.* at 4-5, 35.  Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[6]

---

[5] For those struck based on a professed inability to be impartial, see *Reffitt*, No. 21-cr-32, ECF No. 133 at 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046); ECF No. 134 at 41-42 (Juror 443), 43-47 (Juror 45), 71-78 (Juror 1747), 93-104 (Juror 432), 132-43 (Juror 514); ECF No. 135 at 80-91 (Juror 1484).  For those struck for other reasons, see *Reffitt*, No. 21-cr-32, ECF No. 134 at 35-41 (Juror 313, worked at Library of Congress); ECF No. 134 at 78-93 and ECF No. 135 at 3 (Juror 728, moved out of D.C.); ECF No. 135 at 6-8 (Juror 1650, over 70 and declined to serve), 62-73 (Juror 548, unavailability), 100-104 (Juror 715, anxiety and views on guns), 120 (Juror 548, medical appointments); ECF No. 136 at 41-43 (Juror 1240, health hardship), 53-65 (Juror 464, worked at Library of Congress), 65-86 (Juror 1054, prior knowledge of facts).

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson*, No. 21-cr-34, ECF No. 106 at 73. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Robertson*, No. 21-cr-34, ECF No. 104 at 14. It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15. The Court followed up on affirmative answers to those questions during individual voir dire. Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[7]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%), *Webster*, No. 21-cr-208, ECF No. 115 at 6, though it later excused one of those 35 based on hardship, *Webster*, No. 21-cr-208, ECF No. 114 at 217-18. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that

---

[6] For the three stricken for bias, see *Thompson*, No. 21-cr-161, ECF No. 106 at 51-53 (Juror 1242), 85-86 (Juror 328), 158-59 (Juror 999). For the six stricken for hardship or inability to focus, see *Thompson*, No. 21-cr-161, ECF No. 106 at 44 (Juror 1513), 45 (Juror 1267), 49-50 (Juror 503), 50-51 (Juror 1290), 86-93 (Juror 229), 109-10 (Juror 1266).

[7] For those struck based on a professed inability to be impartial, see *Robertson*, No. 21-cr-34, ECF No. 104 at 26-34 (Juror 1431), 97-100 (Juror 1567); ECF No. 105 at 20-29 (Juror 936), 35-41 (Juror 799), 59-70 (Juror 696), 88-92 (Juror 429); ECF No. 106 at 27-36 (Juror 1010), 36-39 (Juror 585), 58-63 (Juror 1160). For those struck for other reasons, see *Robertson*, No. 21-cr-34, ECF No. 104 at 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.); ECF No. 105 at 55-59 (Juror 1122, language concerns), 92-94 (Juror 505, work hardship); ECF No. 106 at 16-21 (Juror 474, work trip); 50-53 (Juror 846, preplanned trip).

would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster*, No. 21-cr-208, ECF No. 113 at 19.  During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly.  *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66.  Only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[8]  The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case.  *Webster*, No. 21-cr-208, ECF No. 115 at 7.

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%).  *Hale-Cusanelli*, No. 21-cr-37, ECF No. 91 at 106, 111.  The Court asked prospective jurors questions similar to those asked in the other trials.  *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 72-74 (Questions 16, 20).  Of the 15 prospective jurors struck for cause, 11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[9]

In these first five jury trials, the percentage of prospective jurors stricken for cause based

---

[8] Nine of the 19 stricken jurors were excused based on hardship or a religious belief.  *See Webster*, No. 21-cr-208, ECF No. 113 at 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster*, No. 21-cr-208, ECF No. 114 at 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262).  Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office.  *See Webster*, No. 21-cr-208, ECF No. 113 at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster*, No. 21-cr-208, ECF No. 114 at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

[9] *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 61-62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 91-94 (Juror 653); ECF No. 91 at 2-5 (Juror 1129), 32 (Juror 182), 36 (Juror 176), 61-62 (Juror 890), 75-78 (Juror 870), 94-97 (Juror 1111), 97-104 (Juror 1412).  For the four jurors excused for hardship, see *Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 77-79 (Juror 1524), 99 (Juror 1094); ECF No. 91 at 12 (Juror 1014), 31 (Juror 899).

on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728.   In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727.   The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803.   *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.*   As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.   The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

## VI.    Lang's Arguments That Venue Is Also Proper Elsewhere Fail To Justify A Transfer

Lang contends that statutory language addressing venue for offenses that occur in more than one jurisdiction supports his demand to transfer venue.   ECF 101-1 at 16-22.   He relies on the provisions of 18 U.S.C. § 3237(a), which provide:

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or

> committed in more than one district, may be inquired of and prosecuted in any
> district in which such offense was begun, continued, or completed.

18 U.S.C.A. § 3237 (a). According to Lang, before leaving the Southern District of New York for

Washington, D.C., he formed the intent to commit the offenses charged in Counts Eight and Nine

of the Superseding Indictment, which charge him with civil disorder, in violation of 18 U.S.C. §

231(a)(3), as to Count Eight, and obstruction of justice in violation of 18 U.S.C. §§ 1512(c)(2) and

2, as to Count Nine. ECF 101-1 at 17. From this factually unsupported assertion, Lang contends

that commission of "at least" these two offenses began in the Southern District of New York and

thus, venue lies in that district. *Id*. Because Lang proposes an alternative venue, he concludes

without explanation that this Court should transfer venue. The argument Lang has constructed,

however, suffers from insurmountable defects that include the absence of any basis in fact or logic,

a premise that contradicts positions Lang has taken before this Court, and a lack of supporting

legal authority.

   As an initial matter, Lang apparently fails to consider this Court's dismissal of Count Nine.

He offers no legal authority to support any claim that a dismissed count can establish venue, even

where, as here, an appeal from that dismissal is pending. The United States is aware of no such

authority.

   Otherwise, and apparently with respect to Count Eight and its charge of civil disorder, Lang

relies heavily on the Affidavit in support of his criminal complaint, ECF 1-1, for assertions that

"the alleged charges contained in the superseding indictment began weeks before January 6, 2021,

in New York City" and but for "the planning, preparation and purpose in traveling from New York

to Washington, D.C.," an indictment would not have been filed. ECF 101-1 at 17. Additionally,

"on the basis of the allegations contained in the Government's own Statement of Facts and

Superseding Indictment, New York is not merely where intent was formed, but also where the alleged acts were planned, initiated, and concluded."  ECT 101-1 at 18.

The difficulty for Lang is that what was docketed and labeled as an Affidavit in Support of Criminal Complaint and Arrest Warrant (not, as is sometimes the case, as a Statement of Facts), never mentions any acts planned, initiated, or concluded in New York.  Neither does the Superseding Indictment, which only alleges for each count that the offense charged occurred in the District of Columbia.  The Affidavit never addresses where or precisely when Lang formed the intent to commit any offense.  The Affidavit makes only one reference to New York (without specifying whether that reference is to New York City or the State of New York) as the place where Lang resides. ECF 1-1 at 6.  The Affidavit does state that on or about January 6, 2021, Lang traveled to Washington, D.C., but it never states from where.  *See* ECF 1-1 at 1.  In sum, neither the complaint, nor its supporting affidavit, nor the Superseding Indictment provide factual support for Lang's claim that some portion of any charged offense occurred in any federal district in New York.  He fails to show a basis for venue in New York.

Another problem with Lang's argument for an alternate venue is that it contradicts arguments Lang makes elsewhere.  For example, in a recent motion *in limine*, rather than claiming Lang engaged in weeks of preparation for any offense or that he initiated any offense before arriving in D.C., Lang maintains that he attacked officers because he "reacted as a response" to their supposed use of excessive force, and "in the heat of the moment" Lang believed he was responding with justifiable force.  ECF 103 at 7.  According to Lang, his actions at the Capitol were in "response to the display of excessive force and calls for help," ECF 103 at 8, and Lang was "caught up in [a] mob mentality," *id*. at 7 (cleaned up); *see also* ECF 102 at 13 (Lang was reacting to the display of excessive force and calls for help).  Lang's assertions that he was acting

36

in defense of others cannot be reconciled with claims that weeks prior to January 6, 2021, he prepared and formed the intent to obstruct, impede, or interfere with officers during a civil disorder. The assertions Lang has made to support claims of an alternate venue conflict with his claims of self-defense or any defense based on conditions during the riot, stripping all of his arguments of credibility.[10]

To his credit, counsel for Lang acknowledges decisions that hold the "determination of criminal venue is informed by where 'physical *conduct*' occurred, and not where criminal intent was formed." *E.g., United States v. Miller*, 808 F.3d 607, 615 (2d Cir. 2015) (original emphasis, internal citation omitted). Additionally, however, Lang's alternative venue argument fails because it addresses the wrong question. Even if New York were in fact a legitimately alternative venue for Lang's trial, that fails to explain why this Court should transfer venue in the first place. *See United States v. McHugh*, No. 21-453 (JDB), 2023 WL 2384444 at *7 (D.D.C. Mar. 6 2023) (reasoning that even if venue were proper in California, that would not mandate a transfer because venue is proper in the District of Columbia). In *McHugh*, another case involving the January 6, 2021 attack on the Capitol, Judge Bates determined that there was no "serious argument" that the conduct constituting the offense took place entirely outside of D.C. such that venue was improper

---

[10] Some of Lang's public statements also appear to contradict claims that he was planning to engage in the offense of civil disorder while in New York. *See* Hearts of Oak Podcast, "Jake Lang—Jan 6th Political Prisoner: No Trial, No Visitors, No Justice," available at https://tunein.com/podcasts/Education-Podcasts/Hearts-of-Oak-Podcast-p1430791/?topicId=173766215 (last checked March 22, 2023). At 4 minutes, 6 seconds into the recording, Lang stated that "we were there [Washington, D.C.] patriotically and peacefully protesting"; at 4 minutes 12 seconds, he describes the crowd "meeting up, shaking hands, sharing stories," and at 4 minutes 14 seconds, Lang stated, "you know, I showed up after a business meeting in New York, I was in slacks, and dress boots and uh a dress shirt, and um so I showed up there to just be part of history and to support my country."

here and denied McHugh's motion for a transfer of venue. Lang's motion should be similarly denied.

## VII.   A Jury Questionnaire Is Not Necessary in This Case.

The defendant also contends that this Court should use a jury questionnaire in selecting a jury. ECF 101-1 at 18. He is incorrect. Although this Court has discretion to use a written questionnaire, it need not do so because it can select an impartial jury using only in-person voir dire.[11] Issues of pre-trial publicity and potential prejudice are more meaningfully explored by in-person examination than by use of a jury questionnaire. "[W]ritten answers [do] not give counsel or the court any exposure to the demeanor of the juror in answering the . . . questions." *Mu'Min*, 500 U.S. at 425. A prospective juror's tone of voice and demeanor are important. *See Rosales-Lopez*, 451 U.S. at 188 (observing that the court "must reach conclusions" based on its "own evaluation[] of demeanor evidence and of response to questions"). Indeed, "[h]ow a person says something can be as telling as what a person says." *United States v. Jackson*, 863 F. Supp. 1449, 1459 (D. Kan. 1994); *see also Mu'Min*, 500 U.S. at 433 (O'Connor, J., concurring) ("A particular juror's tone of voice or demeanor might have suggested to the trial judge that the juror had formed an opinion about the case and should therefore be excused."). And even where a questionnaire is used, in-person follow-up questioning is important to give the court the "face-to-face opportunity

---

[11] Some judges in this District have used written questionnaires to aid in screening potential jurors in particular cases. *See, e.g., United States v. Stone*, --- F. Supp. 3d ---, 2020 WL 1892360, at *2-3 (D.D.C. Apr. 16, 2020); *United States v. Lorenzana-Cordon*, No. 03-CR-331, 2016 WL 11664054, at *1 (D.D.C. Feb. 22, 2016). One judge used a questionnaire in a January 6 trial. *United States v. Alford*, 21-cr-263, ECF Nos. 46 at 15, 50 (D.D.C. Apr. 18, 2022) (TSC). And in *United States v. Samsel*, 21-cr-537 (Dec. 15, 2022) (Minute Order) (JMC), the court has indicated that it plans to use a juror questionnaire in advance of trial. But the practice is not common in this District. And judges in many January 6 cases have achieved the efficiency often served by questionnaires by using a hybrid voir dire in which the court initially asks questions of the entire venire, with prospective jurors noting their answers on notecards, followed by individual questioning.

to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. A jury questionnaire would not materially assist jury selection in this case, since there is no suggestion that this particular defendant has received significant, unfavorable pretrial publicity, and any potential prejudice due to general media coverage of the events of January 6, 2021 can be adequately probed through in-person voir dire examination.[12]

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ Karen Rochlin

---

[12] While proposing alternative relief, Lang also references the Jury Selection and Service Act, 28 U.S.C. §§ 1861-67. ECF 101-1 at 19-20. Although he mentions certain requirements of the Act, such as random selection of jurors from a fair cross-section of the community, Lang does not appear to be raising a claim under the Act itself and does not explain how the Act has any bearing on his argument concerning the use of written questionnaires. Lang does not refer to this Court's Jury Selection Plan, *see* Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors, United States District Court: District of Columbia, 1 (2016), https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf, and identifies no objection to the plan. Because Lang fails to develop or explain any argument under the Act, its description in his motion and unexplained citation to cases concerning the Act does not merit any relief. "The court need not consider conclusory arguments with no explanation or support." *Avila v. Dailey*, 246 F. Supp. 3d 347, 361 (D.D.C. 2017), *on reconsideration in part*, No. 15-CV-2135 (TSC), 2017 WL 9496067 (D.D.C. Aug. 1, 2017) (citing *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 499 (D.C. Cir. 2015), *cert. denied*, 578 U.S. 965, 136 S.Ct. 1839, 194 L.Ed.2d 839 (2016); *see also United States v. Rodriguez*, 2022 WL 3910580 at *14 n.6 (Aug. 31, 2022) (Jackson, J.) ("Defendant Rodriguez makes passing reference to his First Amendment right to petition the government for a redress of grievances, but makes no argument under the First Amendment requiring the Court's consideration.").

Karen Rochlin
Assistant U.S. Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov


Craig Estes
Assistant U.S. Attorney Detailee
John Joseph Moakley Federal Courthouse
1 Courthouse Way
Boston, MA 02210
(617) 748-3100
Email: craig.estes@usdoj.gov