# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Action |
| | ) No. 21-MJ-236 |
| vs. | ) |
| | ) |
| LUKE RUSSELL COFFEE, | ) April 9, 2021 |
| | ) 2:03 p.m. |
| Defendant. | ) Washington, D.C. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**


**APPEARANCES:**

FOR THE UNITED STATES:     PETER C. LALLAS
                           U.S. Attorney's Office
                           for the District of Columbia
                           555 Fourth Street, NW
                           Washington, DC 20530
                           (202) 252-6879
                           Email: peter.lallas@usdoj.gov

FOR THE DEFENDANT:         JIM BURNHAM, PRO HAC VICE
                           6116 N. Central Expressway
                           Dallas, TX 75206
                           (214) 750-6616
                           Email: jim@jburnhamlaw.com

                           CHRISTOPHER D. MAN
                           1901 L Street NW
                           Washington, DC 20036
                           (202) 282-5000
                           Email: cman@winston.com

ALSO PRESENT:              ANDRE SIDBURY, Pretrial Services

Court Reporter:            Elizabeth Saint-Loth, RPR, FCRR
                           Official Court Reporter


*This hearing was held via videoconference and*
*telephonically and is therefore subject to the limitations*
*associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

```
1                    P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Matter before the Court,
3    Magistrate Case No. 21-236, United States of America versus
4    Luke Russell Coffee.
5              Your Honor, for the record, Pretrial Agent Andre
6    Sidbury is joining us via telephone.
7              Counsel, please state your names for the record,
8    starting with the government.
9              MR. LALLAS:  Good afternoon, Your Honor.
10   Peter Lallas for the United States.
11             THE COURT:  Good afternoon, Mr. Lallas.
12             MR. BURNHAM:  Your Honor, my name is Jim Burnham;
13   I am from Dallas, Texas, and I represent Luke Coffee.
14             THE COURT:  Good afternoon, Mr. Burnham.
15             And good afternoon, Mr. Coffee.
16             THE DEFENDANT:  Good afternoon, Your Honor.
17             THE COURT:  Mr. Coffee, after consultation with
18   your counsel, do you agree to participate in this hearing
19   remotely using video-teleconference technology rather than
20   being physically present in the courtroom here with me?
21             THE DEFENDANT:  Yes, Your Honor.  Yes, Your Honor.
22             THE COURT:  All right.
23             All right.  So pending before the Court is the
24   government's motion for review of the magistrate judge's
25   release order.
```

1    In connection with the hearing, I have reviewed

2    the criminal complaint in this case, the government's

3    emergency motion for a stay and for review of the release

4    order, the defendant's opposition to the government's

5    emergency motion that was submitted to the Court via email

6    on March 10th and asking for 30 days to prepare a more

7    fulsome response.  And I think that, on behalf of the

8    defense, my courtroom deputy docketed that --

9           THE COURTROOM DEPUTY:  They docketed it.

10          THE COURT:  They did docket it.  Okay.  But it

11   wasn't on the docket until recently though, right?

12          THE COURTROOM DEPUTY:  Yes, Your Honor.

13          THE COURT:  But at that request I postponed the

14   hearing, review hearing, that was originally scheduled for

15   March 12th until today to give defense counsel the

16   opportunity he requested to file a response.

17          I have also reviewed some of the Rule 5 documents

18   filed in the Northern District of Texas; the government's

19   memo in support of pretrial detention, docketed at ECF 10;

20   the defendant's memo in opposition to the government's

21   motion, docketed at ECF 13; the government's response to the

22   Court's April 5th order directing the government to address

23   the D.C. Circuit's recent decision in *Munchel,* and that

24   response was docketed at ECF 14; the defendant's subsequent

25   memo that was docketed at ECF 15.  And I have also reviewed

1    the pretrial services report that was prepared in Texas in

2    connection with the original detention hearing.

3            So I go through this because I want to make sure

4    that it's clear -- the things that I have not reviewed in

5    connection with this review request by the government.

6            No one -- no party has provided me with the

7    transcript from the March 8th, 2021, hearing before the

8    Northern District of Texas magistrate judge, although

9    defense counsel has helpfully provided me with excerpts from

10   that transcript.

11           I also have reviewed no video evidence in

12   connection with this hearing, although I appreciate that the

13   parties did cite multiple videos in their papers, including

14   some YouTube videos.  They cite to some body-worn camera

15   footage.  They cite to some YouTuber's video titled

16   Conspiracy Castle -- amounting to hours, I guess, of that.

17   And apparently there was video played at the magistrate

18   judge detention hearing; but, again, I haven't received any

19   videos.

20           Is the government planning on showing a video at

21   this hearing?

22           MR. LALLAS:  I wasn't, Your Honor.

23           THE COURT:  Okay.  Well, that's fine; you

24   certainly don't have to.

25           But I just want to make it clear that I am not --

1    I think -- I am not getting as much of a record here as even

2    the magistrate judge in the Northern District of Texas; I

3    want that to be clear at the outset.

4         Typically, the government does provide me with a

5    transcript of a hearing that they're seeking review on, but

6    that hasn't been done here.  The government also sometimes

7    provides me not just with the videotape -- video clips which

8    were shown at the original hearing but they supplement with

9    even additional video evidence, but that hasn't been done

10   here.  So I just wanted to make that all clear as the

11   setting, as we proceed.

12        So, Mr. Lallas, let me just proceed to you.  This

13   is your motion, so I usually start with the moving party

14   first.

15        So the defendant -- I want to start first with the

16   charges in this case because the charges are, of course, an

17   excellent starting point in a detention hearing, in terms of

18   evaluating the seriousness of the offense, and so on; all

19   pertinent to the nature and circumstances of the offense

20   conduct.

21        And here the defendant is charged with, among

22   other things, a violation of 18 U.S.C. Section 111(a) and

23   (b); along with the enhanced penalty for use of a deadly or

24   dangerous weapon.

25        111 doesn't provide a definition for deadly or

1     dangerous weapon; but I just want to confirm that it's the

2     government's view that the defendant's use of the crutch on

3     January 6th is what the government is claiming and resting

4     its enhancement on here.  Is that correct?

5               MR. LALLAS:  Yes.  That's correct, Your Honor.

6               THE COURT:  And the government is not otherwise

7     contending that the enhancement under 111 is appropriate

8     because of the infliction of bodily injury.  Is that

9     correct?

10              MR. LALLAS:  That's correct, Your Honor.

11              THE COURT:  All right.  Now, the complaint that

12    started this whole case cites that one of the charges is 40

13    U.S.C. 5104(e)(1); and that's also repeated in various other

14    papers in connection with the case.

15              It goes on to describe 40 U.S.C. 5104(e)(1) as

16    being disorderly conduct on Capitol grounds.  But isn't the

17    disorderly conduct on Capitol grounds charge at 5104(e)(2),

18    not (e)(1)?

19              MR. LALLAS:  Your Honor, if I could just have a

20    moment, I will look that up.  I am sure Your Honor is

21    correct, but I will take a look at the statute right now.

22              THE COURT:  Well, I just want to be clear whether

23    I am dealing with a felony or a misdemeanor; and (e)(2) is a

24    misdemeanor.

25              MR. LALLAS:  Yes, Your Honor.  You are right.

1          The way it is in the complaint it's charged as a

2     misdemeanor.  Whether there is an indictment -- I am not

3     going to speak for the grand jury, as it hasn't happened

4     yet; but we may ask the grand jury to charge it differently.

5          THE COURT:  Okay.  Well -- so you mean you are

6     charging him as an (e)(1) rather than as an (e)(2)?

7          MR. LALLAS:  Well, I am certainly not changing

8     anything that is in the complaint, and that -- or even a

9     finding of probable cause on -- but Mr. Coffee was wielding

10    a dangerous weapon while he was acting disorderly on Capitol

11    grounds.

12         THE COURT:  Yes.  Well, (e)(1) usually charges

13    conduct based on use of firearms, dangerous weapons,

14    explosives or incendiary devices on the Capitol grounds.

15    And so it's -- you know, it's pretty important to know

16    whether we're dealing with an (e)(1) violation, which can be

17    a felony, or an (e)(2) violation, which, as I said, is

18    disorderly conduct, basically, and is a misdemeanor.

19         So -- okay.  With that cleared up, under (e)(2)

20    there are seven possible charges under (e)(2) in paragraphs

21    (A) through (G).  And do you know whether it's -- which one,

22    (A), (B), (C), (D), (E), (F), (G) -- which one is being

23    charged?

24         MR. LALLAS:  Yes, Your Honor, I don't think we

25    specified that in the complaint.

1          THE COURT:  You did not, and that's why I am

2     asking.

3          MR. LALLAS:  Yes.  Yes.  I appreciate that, Your

4     Honor.

5          (F) would certainly apply, as he engaged in an act

6     of physical violence on the grounds of the Capitol.

7     Subsection (D) seems also to apply.  So at least those two.

8          THE COURT:  Okay.  So we have got these charges

9     clarified now to be (e)(2)(D) and (F).

10         All right.  Okay.  Well, that's a start.

11         The defendant's also charged under 18 U.S.C.

12    Section 1752(a)(1) and (2), which can either be misdemeanors

13    or felonies; it's not clear to me which one is being

14    charged.

15         It can be a felony if the person is charged with

16    using or carrying a deadly or dangerous weapon or firearm

17    during or in relation to the offense.  And given that you

18    are charging the 111(b) enhancement for use of a dangerous

19    weapon, are we to presume that you are also charging that in

20    connection with 1752(a)(1) and (2)?  The complaint is

21    totally not clear on that.

22         What are you doing here --

23         MR. LALLAS:  Your Honor --

24         THE COURT:  -- misdemeanor or felony?

25         MR. LALLAS:  I think we've charged it as a

1   misdemeanor in the complaint --

2          THE COURT:  And that's what you are going to stick

3   with?

4          MR. LALLAS:  And I agree that the complaint is

5   unclear.

6          THE COURT:  Okay.  So we have a felony at 111(b);

7   we have a felony at 231(a)(3); we have a felony at

8   1512(c)(2).

9          But for the next two charges, 1752(a)(1) and (2)

10  and 5104 -- which says "(e)(1)" but it should be (e)(2) --

11  we have got two misdemeanors.

12         Do I have that right?

13         MR. LALLAS:  Yes, Your Honor.

14         THE COURT:  Okay.  So that's important

15  clarification as to precisely what charges I am dealing with

16  here.

17         Okay.  So then -- let me just take a moment to

18  talk about the standard of review here.  I mean, I have laid

19  out my reasoning in *Chrestman* fairly clearly that the

20  district court's review of a magistrate judge's release

21  decision should be *de novo* in these cases.

22         But in *Munchel* -- most recently decided -- the

23  D.C. Circuit made it clear that that is an open question in

24  this Circuit, and they declined to resolve it in *Munchel*.

25         What they did in *Munchel* is say:  We don't have to

1    decide it here because in *Munchel* -- that was pending before

2    Judge Lamberth -- the government submitted substantial

3    additional evidence that had not been presented to the

4    magistrate judge in that case which meant, according to the

5    Circuit, that the hearing on review to Judge Lamberth was --

6    and I quote -- more akin to a new hearing rather than an

7    instance that could require deference to the magistrate

8    judge's finding.

9             Here I have, in fact, less evidence than was

10   presented to the magistrate judge in Texas.

11            So my question is, what does -- what does *Munchel*

12   mean for the standard of review here, Mr. Lallas?  And do I

13   owe deference to the findings of the magistrate judge in

14   Texas?

15            MR. LALLAS:  Well, Your Honor, I know just the

16   language in *Munchel* that Your Honor is referring to, so I

17   know exactly what you are getting at.

18            I don't think that this Court -- I don't think

19   this Court owes any deference to the magistrate judge's

20   finding, particularly here.  We have -- I don't want to say

21   "unique," but a less common factual circumstance where there

22   seems to be very little, if any, dispute as to the key facts

23   here.

24            The defense does not dispute that Mr. Coffee was

25   at the Capitol.  They don't dispute that he picked up a

1    crutch.  They don't dispute that he used the crutch to, in

2    their words, press against the line of police officers.

3           Now, they don't get to -- don't spend a lot of

4    time on what happened after that, which is the officers

5    repel Mr. Coffee and he regains himself and then attacks yet

6    again.  There seems to be no factual dispute that he was the

7    person that was there.  He grabbed and crutch and he

8    attacked law enforcement --

9           THE COURT:  So what you are saying, Mr. Lallas, is

10   the standard of review, whether it's deferential or not, is

11   not particularly relevant here because I can give deference

12   to the findings -- the factual findings of the magistrate

13   judge; but whatever legal conclusions he drew from those

14   factual findings I don't have to give deference to at all.

15          Is that essentially what you are arguing.

16          MR. LALLAS:  Yes.  Or nearly -- I should be clear,

17   Your Honor.  We think the standard of review here should be

18   *de novo*; and that has been the practice in this District --

19   in this Circuit.  And although, of course, Your Honor is

20   correct that *Munchel*, in a line or two, did allude to the

21   possibility of that being an incorrect standard of review,

22   *Munchel* did not say that *de novo* is not a standard of

23   review; the Circuit did not say that -- did not say there

24   should be deference.  The Circuit had the opportunity to do

25   so, and did not.  So --

1    THE COURT:  For a reason that doesn't apply here.

2    MR. LALLAS:  Yes.

3    THE COURT:  So I just wanted to get the

4    government's perspective on that.

5    Okay.  So the government argues that one basis for

6    pretrial detention here is under 3142(f)(1)(E) because the

7    defendant is charged with felonies that are not otherwise

8    crimes of violence that involve the possession of -- use of

9    a dangerous weapon.  So for this basis I have to conclude

10   the crutch is a dangerous weapon, right?

11   MR. LALLAS:  Yes, Your Honor.

12   THE COURT:  And the government doesn't really

13   provide a definition for the Court for a dangerous weapon,

14   and there is no definition for dangerous weapon under

15   Section 111.  So how should I ascertain that?

16   MR. LALLAS:  Well, Your Honor, I'm sorry I didn't

17   provide any case law in any supplemental briefing; I'd be

18   happy to do so.  I do have cases.

19   I mean, just last month Judge Lamberth addressed

20   this in the *Chansley* case.

21   THE COURT:  Oh, yes.  I have read his case.  And I

22   appreciate that he adopted a definition of deadly or

23   dangerous weapon that multiple circuits have used; that it's

24   an object either inherently dangerous or used in a way that

25   is likely to endanger life or inflict great bodily harm.

1      So is that the definition the government would

2  urge this Court to adopt?

3      MR. LALLAS:  Yes, Your Honor.

4      As Your Honor knows, some circuits have taken an

5  even more slightly expansive view.  I am skimming some of it

6  now.  But, you know, the sentencing guidelines of course do

7  also address, as Your Honor knows far better than I do, the

8  dangerous weapon definition.

9      And here the crutch was used as a dangerous

10  weapon; using the crutch to strike at law enforcement in the

11  middle of an incredibly violent melee that resulted in not

12  only Mr. Coffee's attack, but, more broadly, it was an

13  incredibly violent scene.

14      THE COURT:  Well, Mr. Lallas, let's be precise.

15  Of course, I haven't seen any video but I have seen the

16  photographs, and I have seen the description of what

17  occurred.  And this was not the use of the crutch to -- you

18  know, as, I mean, in other cases where people have used

19  objects like flagpoles and things like that.  He wasn't

20  using the crutch like a spear; he wasn't, like, throwing it

21  like a spear.  Is that right?

22      MR. LALLAS:  Yes.

23      THE COURT:  And he wasn't using it like a

24  battering ram, was he, like to bash police officers on the

25  heads or the shoulders, was he?

1          MR. LALLAS:  Yes.  I think that's -- Your Honor is
2     correct on that.
3          THE COURT:  And so from the descriptions that I
4     have seen and the pictures I have seen, he was really using
5     this crutch to help push.  It was held -- it was pretty
6     close to his body, and he was pushing it against the police
7     line.  Is that right?
8          MR. LALLAS:  Well, yes; that's the first attack.
9          He is then repelled by the police; falls onto his
10    knees, regains himself, and then attacks again.  And in that
11    second attack -- as the defense notes, the attack happens
12    incredibly fast; and it's difficult to discern exactly where
13    the crutch is directed.
14          But it is in that second attack not used
15    horizontally in a pushing motion but directed a little
16    more -- the end of it appears to be directed as a blunt
17    object a little more towards an officer.
18          THE COURT:  All right.  So let's refine that a
19    little bit.  So you are saying that the crutch was not used
20    as a dangerous weapon initially when he was just using it to
21    help push.  But he was using it as a dangerous weapon the
22    second instance after he apparently had fallen to the ground
23    and was then getting up again in that second contact with
24    law enforcement.  Do I have that right?
25          MR. LALLAS:  Well, I am not sure I am ready to

1    concede that the first -- what the defense calls a "push,"

2    which the defendant himself called a "charge" -- I am not

3    sure I am ready to concede that that was not likely to

4    result in bodily injury.  But certainly the second attack,

5    the second thrust, the second charge he was using as a

6    dangerous weapon at that point, if not before.

7              THE COURT:  All right.  So show me -- point me to

8    the actual figures either in the complaint or the

9    government's motion or memorandum -- I guess I would do the

10   motion for emergency stay -- no, I would just do the

11   government's memorandum in support of pretrial detention.

12             What are the photographs, the numbered

13   photographs, where you would say that second instance of

14   where he was using it, let's say, more as a dangerous

15   weapon?

16             MR. LALLAS:  I think figure 8 captures that.

17             THE COURT:  And that's figure 8 on page 8 of the

18   government's memo at ECF 10?

19             MR. LALLAS:  Yes, Your Honor.  That's right.

20             THE COURT:  In that figure it appears that he's

21   using --

22             MR. BURNHAM:  In that figure --

23             THE COURT:  He's using -- I'm sorry.  Are you

24   talking over me?

25             MR. BURNHAM:  No, sir.

```
1              No, Your Honor.  I apologize.

2              THE COURT:  Okay.  Good.

3              MR. BURNHAM:  I was just saying --

4              THE COURT:  Don't talk over me, Mr. Burnham,

5    because the court reporter will only take down what I say

6    and not what you say.

7              All right.  So in figure 8 it appears that the

8    defendant is holding the crutch at chest level parallel to

9    his body, perhaps against the shield -- it's not

10   particularly clear from the photograph.

11             Is that what you are referring to, Mr. Lallas?

12             MR. LALLAS:  Yes, Your Honor.  And I think

13   figure 7 -- excuse me, figure 7 on page 7 which, you know,

14   captures the, I don't know, millisecond before that.  And

15   Your Honor can see that -- again, I apologize for not

16   submitting video.  But in the sequence from figure 7 to

17   figure 8, you can see Mr. Coffee -- where the position of

18   the crutch changes between those two images.

19             THE COURT:  And this is the instance where

20   Mr. Coffee says he had been pepper sprayed, put on the

21   ground, was disoriented and was getting up and, actually,

22   figure 6 looks, like, maybe --

23             MR. LALLAS:  Yes.

24             THE COURT:  -- between figure 5 and figure 6 it

25   does look like he was on the ground and then getting up.
```

1   And, then, to the extent that his crutch looks a little bit

2   more pointed towards the law enforcement officers, he was

3   disoriented.

4          Is that, do you think, a farfetched explanation

5   for the position of the crutch?  Or is that somewhat -- is

6   that a legitimate explanation for it?

7          MR. LALLAS:  I think it's a little farfetched.

8   That might explain him kneeling or crouching in figure 6,

9   but when he gets up, depicted in figures 7 and 8, and

10  attacks the line of law enforcement again -- people don't

11  attack law enforcement in this kind of context because they

12  are disoriented; he knew exactly what he was doing.

13         You know, in his post -- post January 6th litany

14  of media and YouTube interviews, he doesn't say, "I didn't

15  mean to do it," he was disoriented.  He actually speaks of

16  it proudly.  He was privileged to be able to --

17         THE COURT:  All right.  Well, let me go back to

18  this danger issue in that the government is not seeking

19  detention under 3142(f)(1)(A) as a case involving a crime of

20  violence even though he is charged with violating 111 --

21  assaulting, resisting, impeding, intimidating, interfering

22  with a law enforcement officer; and the government is

23  applying the enhancement under 11(b) [sic] and expressly

24  states that:  He poses an inherent risk of danger to the

25  community as a crime of violence; that's what the

1    government's memo, at page 12, ECF 10 says.

2            But, nonetheless, the government is not relying on

3    (f)(1)(A); is that right?

4            MR. LALLAS:  Yes, Your Honor.

5            THE COURT:  And what is puzzling to me about that

6    is that in the case of *U.S. v Lopatic*, which is a case in

7    front of Judge Sullivan, the government submitted a brief

8    clarifying its position that Section 111(a)(1) alone does

9    not constitute a crime of violence, but that Section 111(a)

10   and (b) together -- which is what is charged here -- do

11   constitute a crime of violence.  And this same position was

12   expressed by the government in its motion for detention

13   under (f)(1)(A) in *Fitzsimons*, which is a case pending

14   before Judge Ketanji Jackson.

15           So I am trying to make sense of why, in those two

16   cases, *Lopatic* and *Fitzsimons*, the government is arguing for

17   detention where there are charges under 111(a) and (b) where

18   it's a crime of violence warranting detention and not here.

19   Is it because the government does see some difference

20   between the defendant's use of a crutch in this case versus

21   whatever dangerous weapon is used in both *Lopatic* and

22   *Fitzsimons*?

23           MR. LALLAS:  I am sure Your Honor can understand

24   but nonetheless be totally unsatisfied with my answer which

25   is I am not familiar with either of those cases, and I am

1    not suggesting that that should be satisfactory to Your

2    Honor; but I don't know the facts and circumstances there.

3              THE COURT:  All right.  Well, I am just looking at

4    charges.  I am not very familiar with the facts either.  I

5    am just looking at what are the charges, and what are the

6    bases for detention being offered and why crime of violence

7    there, not crime of violence here.  And even though the

8    Circuit in *Munchel* didn't address comparisons between cases

9    because it hadn't been properly raised below, they certainly

10   made a point that that was something that needed to be

11   looked at.

12             Okay.  Well, I understand that.

13             All right.  The government also states that the

14   defendant's gravely serious conduct constituted an act of

15   domestic terrorism under 18 U.S.C. Section 2331(5).  The

16   government said that at 12, docketed at ECF 10.

17             The government is not contending that this is a

18   case that triggers the rebuttable presumption, though; is

19   that right?

20             MR. LALLAS:  That is absolutely correct.  No.

21             THE COURT:  Okay.  I just wanted to make sure I

22   wasn't missing something there.

23             Okay.  So the defendant has pointed out a number

24   of things here, and I just want to be clear.  I set out a

25   number of factors that I look at in these

1   January 6th-related cases in evaluating detention, which is

2   now supplemented by the *Munchel* factors; and I just want to

3   make sure that I am understanding the government's analysis

4   of these factors.

5          To the extent that the defendant made statements

6   on some live stream on January 5, 2021, stating that all

7   hell is going to break loose tomorrow; he expected to see

8   people hang themselves literally.  Is that what -- that was

9   a self-produced video, do I understand that correctly, what

10  the source of that is?

11         MR. LALLAS:  As best I can tell, yes.

12         THE COURT:  But the defendant is not associated

13  with the Proud Boys, the Oath Keepers, Three Percenters --

14  any of these other gangs; is that right?

15         MR. LALLAS:  Not that I am aware of.

16         THE COURT:  All right.  So he -- and he brought no

17  weapons with him to D.C. that the government has been able

18  to proffer; is that right?

19         MR. LALLAS:  That's right, Your Honor.

20         THE COURT:  And he also didn't even bring the

21  crutch with him to the Capitol; he picked that up when he

22  was there, is that right?

23         MR. LALLAS:  That's right, Your Honor.

24         THE COURT:  So was there any preplanning that this

25  defendant engaged in before he ended up marching with the

1    mob to assault the Capitol?

2              MR. LALLAS:  It appears not, other than that video

3    clip to which Your Honor just referred which is -- while

4    driving to D.C. for purposes of participating in the

5    January 6th events, he makes a comment about -- quoting

6    Steve Bannon about how all hell is going to break loose

7    tomorrow; and that suggests at least the possibility of

8    foreseeing something more than a rally.

9              THE COURT:  Yes.  But it's not the same as buying

10   radios with encrypted channels and buying tactical vests --

11             MR. LALLAS:  That's correct.

12             THE COURT:  -- and arming yourself with a taser or

13   bear spray, pepper gel, and various other items to inflict

14   injury; is that right?

15             MR. LALLAS:  I completely agree.

16             THE COURT:  So -- okay.  So does it appear that

17   he -- so there was no preplanning.

18             Does he coordinate with others in attending the

19   Capitol grounds that you have been able to discern?

20             MR. LALLAS:  No, Your Honor.

21             THE COURT:  And did he take any kind of leadership

22   or de facto leadership role at the site of the mob?

23             MR. LALLAS:  I would say probably not as Your

24   Honor --

25             THE COURT:  I mean, the photos do show him at the

1     front of the mob; and he had to have pushed his way up there

2     somehow to get up to the front of the mob.

3           But the defense says that the defendant initially

4     and repeatedly yelled -- turned to the mob, back to the

5     Capitol building, to tell them to stop and pray.  And the

6     defense says that there are multiple pictures of the

7     defendant with his hands up in the air begging the rioters

8     to stop.  Apparently, at the magistrate judge hearing in

9     Texas, an FBI special agent confirmed that that is in fact

10    what occurred.

11          Does the government now dispute that?

12          MR. LALLAS:  No.  No.  That's right before he

13    commits the assault and -- I can't get into the defendant's

14    head to know what changed.  But, yes, for a moment or longer

15    than a moment he was not being violent.  And then something

16    changed, and he charged at the police officers with a

17    crutch; he was repelled, and he charged again.

18          In the defendant's own words, during that moment

19    there were pieces of paper falling down from the sky with

20    scripture on those pieces, and those words from scripture

21    were compelling him to move forward.  So that's --

22          THE COURT:  I'm sorry.  What are you talking

23    about, in terms of pieces of paper falling from the sky?

24    Are those in your papers?  I haven't read about that.

25          MR. LALLAS:  Yes.

```
 1                    THE COURT:  Are those in your papers, Mr. Lallas?
 2                    MR. LALLAS:  Yes, Your Honor.  I'm sorry.  I am
 3        trying to look it up right now to give you a citation.
 4                    THE COURT:  Okay.  If you come across it.  But,
 5        really, I don't have anymore time to --
 6                    MR. LALLAS:  I'm sorry.  I don't have it right off
 7        my hands.
 8                    THE COURT:  I don't remember hearing about pieces
 9        of paper coming down from the sky; that might have stuck in
10        my mind.  Maybe I missed it --
11                    MR. LALLAS:  Actually, Your Honor, I just found it.
12                    I'm sorry.  Your Honor, it's on page 9 of my
13        detention memo.  He's speaking --
14                    THE COURT:  And you are talking about ECF 10?
15                    MR. LALLAS:  Yes, Your Honor.  Yes.
16                    He says during the Conspiracy Castle interview,
17        quote, When I was walking up there, bro', it's, like, the
18        heavens opened up and there were these strips of pieces of
19        paper with verses on it --
20                    THE COURT:  I see.
21                    MR. LALLAS:  -- which were encouraging me to walk
22        on forward.
23                    THE COURT:  And then he goes on to say, I am not a
24        crazy person.  It was like the spirit of 1776; we were going
25        to bust in there.  Okay.
```

 1                    MR. LALLAS:  Yes.

 2                    THE COURT:  And this was -- this was after -- this

 3          was the videotape made on January 15th, after January 6th.

 4                    MR. LALLAS:  Exactly, Your Honor.

 5                    THE COURT:  All right.  So, I mean, these

 6          post-January 6th statements, even if they sound crazy,

 7          they -- it's hard to characterize them.  And I think what

 8          the government says is they show no remorse; I think that's

 9          the government's conclusion.  Is that right?

10                    MR. LALLAS:  Well, that is one of the things, Your

11          Honor.  It shows a complete lack of remorse; in fact, the

12          opposite.  He is bragging about it, he is proud about it.

13                    THE COURT:  Right.

14                    MR. LALLAS:  And of concern to the government that

15          is relevant to this hearing is that also evidenced some

16          level of future dangerousness.

17                    THE COURT:  And, of course, *Munchel* is all about

18          future dangerousness.

19                    And I have to say when I looked at some of these

20          comments, it seemed to me as comments describing how he was

21          feeling on January 6th; describing what he was thinking on

22          January 6th, including perhaps what he was seeing, I guess,

23          if you want to talk about those strips of paper with verses

24          on them dropping from the heavens, but he is not crazy.  And

25          he is talking about his feelings that day where he says he

1    was -- I was ready to die.  These were not regular cops.  He

2    said, I had to charge them, just push them back.

3              These are all comments that could be described as

4    him recollecting what he was feeling, seeing, and doing on

5    January 6th.  I am not sure they pass muster as saying --

6    because I don't see anywhere in these excerpts:  I want to

7    do this again as soon as I can get another mob together;

8    that would be cause for concern.  If you are a member of a

9    gang with an intent to disrupt the democratic process on an

10   ongoing basis that, too, would be of concern.

11             But I just wonder whether -- and it's certainly --

12   you're right, no remorse is indicated here; but the lack of

13   remorse is not the end-all and be-all of whether someone

14   gets detained pretrial since they're presumed innocent.  But

15   it's -- there is perhaps a fine line but a definite line, in

16   my mind, between somebody recalling feelings, observations,

17   actions on January 6th versus what could qualify as a

18   suggestion, an indication, of future dangerousness by future

19   plans, intents, desires, and motivations; and I don't see

20   the latter in these comments.

21             But I missed the strips of paper falling from the

22   heavens so, Mr. Lallas, is there anything that I have missed

23   that falls into the latter category?

24             MR. LALLAS:  First of all, I agree with everything

25   Your Honor just said.

1      I think in addition to the post-January 6th

2   comments, there were a few other indicia of dangerousness;

3   one is the -- this allusion in electronic messages with a

4   close family member to at least having contemplated

5   obtaining a shotgun or an armed confrontation with law

6   enforcement if they had come to get him.  Of course, he did

7   not, in the end, obtain a firearm to the best of the

8   government's knowledge, and his arrest and self-surrender

9   was perfectly peaceful; but that is a concerning

10  communication in that he at least thought about it.

11      It's also, I think -- tying all of these together,

12  Your Honor -- the fact that he was willing to die to advance

13  his political beliefs and he was willing to attack federal

14  law enforcement, local law enforcement, out of whatever --

15  misguided -- or what his view was that a presidential

16  election had been stolen, his view that perhaps as a QAnon

17  conspiracy adherent, perhaps -- I think he said he believed

18  that there might be child trafficking, human trafficking, he

19  was coming to D.C. to try to stop.  But if you believe

20  that --

21      THE COURT:  But, Mr. Lallas, let me stop you right

22  there because didn't *Munchel* foreclose basing a finding of

23  dangerousness on just what you said?

24      And I am reading from *Munchel,* The district court

25  based its dangerousness determination on a finding that

1    Munchel's alleged conduct -- and this is a guy, by the way,

2    who, with his mother, took a taser and zip ties not only

3    into the Capitol building but onto the floor of the Senate

4    chamber -- okay, but back to *Munchel*, the D.C. Circuit's

5    opinion -- the district court based its dangerousness

6    determination based on a finding that Munchel's alleged

7    conduct indicates that he is willing to use force to promote

8    his political ends and that such conduct poses a clear risk

9    to the community.  The precise argument you were just

10   making, Mr. Lallas.

11        And the Circuit rejected that saying, The Court --

12   in making this determination, however, the Court did not

13   explain how it reached that conclusion notwithstanding the

14   countervailing finding that the record contains no evidence

15   indicating that while inside the Capitol the defendants

16   vandalized any property or physically harmed any person and

17   the absence of any record evidence that either of the

18   defendants committed any violence on January 6th.

19        So they basically said, you know, those arguments

20   about dangerousness, they don't fly for the Circuit.  You've

21   got to look at future dangerousness and you have to look at

22   that in specific context, which the Circuit went on to say

23   those defendants had a unique opportunity to obstruct

24   democracy on January 6th because of the Electoral College

25   vote tally taking place that day with the concurrently

1    scheduled rallies and protests; and, you know, they were

2    able to take advantage basically of this large -- and I

3    quote, Large group of people who had gathered at the Capitol

4    in protest that day.  And -- but they go on to say, That day

5    has passed, there is no more mob, so they weren't involved

6    in planning and coordinating the activities.  The Court said

7    they seemingly would pose little threat.

8            So I think that argument, like, look at what

9    happened on January 6th, disrupting the core function of our

10   democracy and the count of the electoral vote -- that's not

11   an argument that the D.C. Circuit appears ready to accept as

12   a consideration in evaluating dangerousness.

13           MR. LALLAS:  Your Honor, could I respond?

14           THE COURT:  Yes.

15           MR. LALLAS:  So I do think, though, that this is

16   different.  The D.C. Circuit in *Munchel* went to great pains

17   to carve out a case just like Mr. Coffee.  The Court's

18   reasoning was limited, and it reiterated this many times to

19   just a class of individuals that didn't assault officers,

20   didn't destroy property, didn't plan or conspire to commit

21   the attack.

22           The Circuit, particularly on pages 18 and 19,

23   noted at least three times because Munchel and Eisenhart did

24   not vandalize property or commit violence -- in our view,

25   those who actually assaulted police officers and broke the

1     windows, et cetera, are in a different category of

2     dangerousness than those who cheered on the violence.

3            Well, I mean, they're not talking about Luke

4     Coffee, but they are referring -- carving out people like

5     Luke Coffee.  He did attack law enforcement.  The Circuit

6     just said, again and again, we're not talking about

7     people -- because Munchel and his codefendant were not such

8     people -- who attacked law enforcement or destroyed

9     property.  So I think if we can find dangerousness --

10           THE COURT:  Yes.  But I think that you are not the

11     first AUSA who has tried to distinguish *Munchel* that way.

12           But I do think that *Munchel* made it clear, you

13     know, that looking at dangerousness is a forward-looking

14     issue, and the specific circumstances of January 6th and how

15     that may have egged on members of the mob in the conduct

16     they were engaged in is an important consideration, and that

17     there's got to be a clear explanation of how there's future

18     dangerousness that I think applies not just to people in the

19     mob but also to people in what you call -- and what the

20     Circuit called this different category of people.

21           And as I have already said, it's -- you know, this

22     is not -- this is not a defendant who was using that crutch

23     to batter, spear, throw at the police.  He was using it to

24     push the police -- clearly illegal, no question about

25     that -- clearly serious conduct that may have contributed to

 1     the breaking of the police line and allowing a mob to go

 2     into the Capitol and terrorize people within the Capitol.

 3              But this defendant didn't go into the Capitol;

 4     there is no evidence of that, am I right, Mr. Lallas?

 5              Mr. Lallas, can you hear?  If you can, could you

 6     wave?

 7              (Technical difficulties addressed.)

 8              MR. LALLAS:  That's right, Your Honor.

 9              THE COURT:  That's right.  All right.

10              Okay.  Didn't -- I mean, to go back to the remorse

11     issue --

12              MR. LALLAS:  I'm sorry, Your Honor.  I responded

13     in the affirmative to that.

14              THE COURT:  Yes, I heard that.  That is right, he

15     did not go into the Capitol.

16              In any event, the defendant gave a whole *Texas*

17     *Monthly* interview where he says that he doesn't want to be

18     forever known as the Capitol riot guy; how do you interpret

19     that statement?  Some remorse, some regret?

20              Mr. Lallas, we're losing you.

21              MR. LALLAS:  Well, correct, regret of being

22     caught.  Regret that the media was reporting on his conduct.

23              THE COURT:  All right.  Okay.

24              So the defendant was at an undisclosed --

25              MR. LALLAS:  I will call in, Your Honor, if Your

1    Honor still can't hear me.

2          THE COURT:  I think you can leave your video on;

3    but if you can call in and make your mic silent because you

4    are cutting in and out.

5          (Technical difficulties addressed.)

6          MR. LALLAS:  Can Your Honor hear me now?

7          THE COURT:  Yes.  That's much better.  Thank you.

8          MR. LALLAS:  I'm sorry for that technical problem.

9          Your Honor, I think that the statements to *Texas*

10   *Monthly* could be interpreted as regret of having been

11   caught; certainly he regrets the media coverage of his

12   conduct, now of his arrest and charges.

13         Being known as the -- I forget exactly how he

14   phrased it, you know, the Capitol attack guy is different

15   from saying, I wish I hadn't done it; he is just regretting

16   that people are finding out about it.

17         THE COURT:  Okay.  Let me -- let me turn to risk

18   of flight because the government is also seeking pretrial

19   detention here because of the defendant's risk of flight,

20   and pointing in particular to the fact that he was at an

21   undisclosed location, some resort, for a while.

22         And I just wanted to drill down on that a little

23   bit because, you know, being at an undisclosed location

24   sounds, you know, like a red flag for risk of flight.  But

25   once we drill down on this a little bit, as defense counsel

1    has pointed out from the detention hearing in the Northern

2    District of Texas, the agent who testified at that hearing

3    said while he was at this resort the FBI agent talked to him

4    multiple times; is that right? -- And that the defendant

5    returned all of his phone calls; is that right?

6              MR. LALLAS:  Well, the first part is right, that

7    the FBI agent was in touch with Mr. Coffee while he was at

8    the resort.

9              With respect to turning the phone off, I am not

10   sure exactly when that happened; but I know it was

11   immediately before his arrest.  I think there was some

12   period his phone might have been off.

13             THE COURT:  Okay.  But -- but it appeared that the

14   FBI was in fairly regular contact with the defendant and, in

15   fact, told the defendant that he wasn't a suspect; is that

16   right?

17             MR. LALLAS:  I think there were words to that

18   effect.  I am sure Your Honor can imagine that the FBI might

19   make it harder to apprehend individuals if they are told

20   that they are wanted or if they are told that there is an

21   arrest warrant out for them, particularly an arrest warrant

22   for a very serious offense.

23             THE COURT:  But there wasn't an arrest warrant for

24   him for much of the time he was at the resort; is that

25   right?

 1          MR. LALLAS:  Yes.  I was actually going to just

 2   say that.  At the time that the agent made that statement,

 3   there was not yet an arrest warrant either.

 4          THE COURT:  And then, when the defendant got an

 5   attorney, the defense attorney was in contact with the FBI

 6   multiple times; is that right?

 7          MR. LALLAS:  Yes.

 8          THE COURT:  And when the defendant was told by the

 9   FBI to turn himself in, he did voluntarily surrender --

10          MR. LALLAS:  That's correct.

11          THE COURT:  -- as scheduled; is that right?

12          MR. LALLAS:  That's right, Your Honor.

13          THE COURT:  With no shenanigans.

14          MR. LALLAS:  I don't think there were shenanigans.

15   I don't think it was immediate.  I wasn't involved in those

16   conversations; but there was not any sort of undue delay

17   or -- for the self-surrender, I will say that.

18          THE COURT:  So what is it about that set of

19   circumstances that should give me concern about risk of

20   flight?  I am finding it --

21          MR. LALLAS:  First of all --

22          THE COURT:  I am finding it hard to see.

23          MR. LALLAS:  Well, first of all, he was hiding

24   even when he had not been charged with a crime, when charges

25   were merely hypothetical.

1          They are no longer hypothetical.  He knows we

2     found him.  He knows we charged him, and he faces at least

3     the statutory maximum for a large -- decades in prison.  So

4     he is hiding under much more favorable circumstances for

5     not wanting to flee in that, you know, he could have been

6     one of the Capitol attack subjects whom we haven't

7     identified yet.

8          And, you know, responding to a text message from

9     the FBI, he could have done that from Indonesia; he happened

10    to be doing it from some resort outside of Dallas

11    apparently.  Similarly, his lawyer -- he could have obtained

12    a lawyer to see to this from the Congo, and the lawyer could

13    have been talking to the FBI on his behalf.  So I don't

14    think the fact that he responded to text messages or that he

15    hired a lawyer goes to determine that he was not in hiding

16    or is not a flight risk now.

17         He refused -- when the FBI asked, he refused to

18    say where he was.  When his own mother asked, he said, Don't

19    worry, I am being taken care of, I am hidden; refusing to,

20    yet again, to say where he was.  So, you know, now looking

21    at decades in prison, I think it's a very serious risk he is

22    going to go into hiding yet again.

23         THE COURT:  Well, at the time he was in hiding and

24    not telling his mother for whatever reason where he was, he

25    was not charged, there was no arrest warrant outstanding for

 1    him.  So it's hard to say he was hiding from the law when he

 2    was in constant, fairly regular contact with an FBI agent

 3    and there were no charges against him.  And the time that

 4    would raise a giant red flag warranting detention for risk

 5    of flight was when he did find out he was charged if he

 6    remained hidden, but that's not what happened.  As soon as

 7    he found out that there were charges, he turned himself in

 8    as directed.

 9              MR. LALLAS:  Yes.  That's right, Your Honor.

10              THE COURT:  All right.  Okay.  So let me turn --

11    is there anything else, Mr. Lallas?

12              MR. LALLAS:  No, Your Honor.

13              THE COURT:  All right.

14              Okay.  Let me turn to Mr. Burnham, defense

15    counsel.

16              Mr. Burnham, you have not raised a question about

17    the standard of review.  But in light of the D.C. Circuit's

18    raising of the issue that it is not possibly a *de novo*

19    review, let me just ask you:  Do you think I need to give

20    deference to the Northern District of Texas magistrate

21    judge's determination?

22              MR. BURNHAM:  Yes, Your Honor.

23              And I think -- the hearing was four and a half

24    hours.  And he -- the magistrate judge there heard from the

25    FBI and heard from -- listened to videotapes that the

1    government played and we played.  And I called about six

2    witnesses that testified as to ties to the community, where

3    he was not a flight risk, and he would obey the Court's

4    order and he was not a dangerous person.

5          He even has a sick sister who has Lyme's disease

6    and is really debilitated by it; said that he keeps in touch

7    every day.  And very few people understand the disease

8    because you can't really see any difference in the person

9    but there is a tremendous amount of pain, and that he stays

10   in touch with her more than any other person other than her

11   parents.  So I bring this out it because it shows the mark

12   of the man, the kind of individual we're dealing with, a

13   kind, you know, good person.  You know, his sister came in

14   for him.  He was doing it in a kind, brotherly way, in a

15   loving way.  And I think her testimony is powerful in the

16   sense that she shows so much love and respect for him.  And

17   the other -- we had nine proffered witnesses who were going

18   to testify to proffer he would not be a flight risk or a

19   danger to the community or to anyone else.

20         One of the things is as soon as the FBI agent

21   called Luke Coffee, he testified he called him right back.

22   He testified that -- Mr. Hillman, the FBI agent testified he

23   was not a flight risk -- that he was not a suspect.  And he

24   said, as a matter of fact, it looked like he was trying to

25   stop it from happening.  He told him that.  And I said, now,

1    when you told him that were you telling the truth?  Were you

2    telling the truth?  And he said, yes, I was telling the

3    truth.  And so these two second interviews, the interviews

4    over the video feed, happened right after he talked to FBI

5    Agent Hillman.

6              So -- and I know everybody knows that social media

7    in this world -- in this country has gone off the deep end;

8    people get on and say things.  And like the Court in *Munchel*

9    says, people get on there and, you know, just blow it out

10   so-to-speak -- and said that a lot of this is just bravado;

11   and anything he said I think is just bravado.

12             And then, after January 25th, I called --

13   somewhere, maybe February the 2nd, I had called the FBI

14   agent and asked him if he was -- there was a federal warrant

15   for him; do I need to turn him in?  He said no.  I called

16   approximately seven times trying to make sure.  Mr. Coffee

17   was calling me and making sure that we did what we needed to

18   do if he'd done anything wrong.

19             So it was when he finally called me on the 24th --

20   and I talked to him twice that day -- and he said that -- he

21   wanted to know if Mr. Coffee had changed his cell phone

22   number; I said no.  I called him back, and I finally figured

23   out what he was doing.  He was calling his cell phone from a

24   landline.  I said from a landline you have got to call "1-"

25   and then the "214."  He called him on his cell phone.  So he

1    had not changed the phone.  We cleared that up.

2         And later that evening, he called me and told me

3    he wanted him to turn himself in the following -- he called

4    me at five o'clock on a Thursday; was to turn himself in

5    "tomorrow" morning at 9 a.m., and he did.

6         THE COURT:  So when Mr. Lallas talks about the

7    phone being turned off, Mr. Burnham, you are saying that it

8    was not the phone being turned off, that it was an incorrect

9    call by the FBI agent?

10        MR. BURNHAM:  If that's what he was talking about.

11   Mr. Coffee never turned his phone off.  I was able to talk

12   to him every day or every other day when this case was

13   ongoing.  I didn't know what -- I didn't want them to have

14   to go out and arrest him.  And I wanted him to be able to

15   turn himself in as professionally --

16        THE COURT:  Of course.  That's safer for everybody

17   involved.

18        Let me just ask you.  Your memo says that this

19   defendant should be in a class of his own being one of four

20   nonviolent peacemakers that broke up the violent

21   confrontations between the Capitol police and the rioters.

22   Who were the four other nonviolent peacemakers you are

23   talking about?  What are you talking about there?

24        MR. BURNHAM:  Well, there were some other people

25   there, Your Honor, who were trying to stop it too, I

1    thought.  But, really, primarily -- primarily, I guess,

2    maybe -- you know, primarily Luke Coffee would be in a

3    category by himself because he was down there by himself.

4         One time he had his hat on and he was praying; we

5    have a picture of that.  I think that's figure 4 in the

6    memorandum, where he's got his hat off and his mask, and he

7    is praying.  And later --

8         THE COURT:  Is that the one where he's holding the

9    crutch over his head?

10        MR. BURNHAM:  No, ma'am.

11        When he has the crutch over his head, he said

12   Jesus -- in the name of Jesus, stop.  But the first thing he

13   does with the crutch -- not the crutch -- but he stopped to

14   pray.  And said stop four times, pray nine times.  You can

15   hear it clearly on the video.  So --

16        THE COURT:  And was that a video that the

17   defendant was making himself?

18        MR. BURNHAM:  No.  That's a copy of the video.  It

19   was a YouTube video, and anybody can get access to it.

20        So the FBI -- the Assistant U.S. Attorney

21   introduced that video in the detention hearing, but he

22   didn't play those particular parts.  And then when we went

23   back and played those parts for His Honor -- where he was

24   saying stop four times and pray nine times.  And then we

25   also showed the time when he had his hat -- took his hat off

1    and said pray.

2             THE COURT:  All right.  So he may have said -- he

3    may have said "pray" and "stop," I guess, facing both the

4    mob and the police line.  But there are these photographs of

5    the defendant holding this crutch in a fairly aggressive

6    manner and, as you concede, he made contact with the police

7    line with that crutch which is --

8             MR. BURNHAM:  Yes, Your Honor.

9             THE COURT:  -- sort of a, you know -- which is

10   inexplicable other than to say that he was trying to push

11   back the police line to gain entry to the Capitol Building.

12   So why isn't that sufficient for detention here?

13            MR. BURNHAM:  Well, first of all, Your Honor, he

14   was standing there and he got hit a number of times with

15   police batons.  And there is a tremendous amount of spray,

16   pepper spray -- or whatever type of spray it was.  And he --

17   and then he picked up the crutch and I guess -- he was

18   disoriented; had to be.  I think he put the crutch up just

19   to kind of stop himself -- stop or pushed -- and he fell

20   down.

21            And the next time the government is speaking

22   about, the second -- he calls it -- charge lasted less than

23   about two seconds -- one to two seconds.  So he was there.

24   Hillman testified that the crutch -- there was contact with

25   the officers for about 10 seconds he testified in his

 1    testimony.  And so the FBI agent -- so, I mean, this

 2    happened in seconds.  He was there.  He just -- I think

 3    after he got pepper sprayed and hit -- he got hit numerous

 4    times; and I think he kind of got disoriented and fell down.

 5    And -- but there was no bodily injury; Hillman testified

 6    there was no bodily injury, Your Honor.

 7                THE COURT:  Well, was the defendant -- I don't see

 8    any pictures in the briefing; but was the defendant using

 9    the crutch to push or shove against any of the rioters or

10    just against the police?

11                MR. BURNHAM:  There is no evidence -- there is no

12    evidence here of him pushing against the rioters.

13                THE COURT:  Right.  Just against the police; is

14    that right?

15                MR. BURNHAM:  Yes, Your Honor.

16                THE COURT:  I mean, the defendant actually

17    admitted he was charging the police, right?

18                MR. BURNHAM:  Well, I don't know who he admitted

19    it to or whatever; but I think in the video it appears that

20    he is pushing.  Nobody come forward and said they personally

21    were pushed or anything like that.

22                It appears on the video that he is pushing the

23    officers.  But, you know, one of the things, Judge -- on

24    111(b) it talks about bodily injury which we don't have, and

25    then it talks about dangerous weapon.

1          But on *Munchel* they referred to, when they talked

2     about the taser gun, 40 U.S. Code 5104.  In number (2) they

3     said that the taser -- they agreed, I think, with you that

4     the taser, under (2), is a dangerous weapon.  But I looked

5     up under (a)(2)(A), big A, and -- I had the statute, and it

6     lists -- that statute lists all of the dangerous weapons.

7     And it goes on -- I don't want to read the whole list, but

8     it does not list an aluminum crutch with -- what do you call

9     it? -- the rubber ends on it.

10         But 14 U.S.C. code 5104(a)(2)(B) is the taser we

11    talked about.  In (A) we're talking about a deadly weapon.

12    It's not a deadly weapon, and he didn't use it in a deadly

13    manner.  He didn't strike or spear or throw the thing or try

14    to stab anybody.  It was just waist level and kind of --

15    from the video, it appears to be pushing.  And I guess --

16    you know, I wasn't there.  It's hard to read the video -- or

17    see the video.  You know, if you assume he was pushed up

18    against the officers it was just seconds.  And part of it

19    was just a reflex action of the -- of all the stuff you got.

20    He got a big -- like a hose with this pepper spray stuff

21    coming out.  He got hit a couple of times; in one of the

22    videos it looks like a tree limb.  He falls down and gets

23    back up.  He then -- it looks like he is moving forward and

24    then, all of a sudden -- it was in three seconds -- one to

25    two seconds there may be contact; and the next thing is he

1     retreats.  He retreats from where he was.  He retreats down

2     the stairs away from the Capitol entrance.

3            THE COURT:  And is that when he left the Capitol

4     grounds?

5            MR. BURNHAM:  Yes, ma'am.

6            Later on you can see him.  A few minutes later you

7     can see him.  He has some kind of bottle of something --

8     pouring over his eyes, trying to clear his eyes.

9            Obviously, when he had the crutch in his hand, he

10     probably had a hard time seeing.  I don't know what pepper

11     spray does to your eyes -- if it was pepper spray, bear

12     spray -- or whatever it was, because I have no idea -- I am

13     sure it causes your eyes to have a reaction.  What that

14     reaction is, I can't testify to or even argue about because

15     I don't know.  I know it had to disorient.  Once you get

16     soap in your eyes you get a little turned around.

17            So he went there -- he was saying he was a

18     peacemaker.  He was a peacemaker saying stop, stop; pray,

19     pray.  He was saying, In the name of Jesus, stop.

20            It shows, number one, Your Honor, his intent when

21     he went there was not to be in any insurrection.  His intent

22     was not to be -- commit any violent act.  I mean, obviously,

23     he was there, and I guess -- you know, you shouldn't go to

24     crowded areas like this, for one thing.

25            THE COURT:  Well, he wasn't just there right,

1    Mr. Burnham, he was at the front of the line; right next to

2    the line of the police officers, wasn't he?

3              MR. BURNHAM:  Yes, Your Honor.  Yes, Your Honor.

4              I mean, he shouldn't have been there.  He

5    shouldn't have been anywhere -- he shouldn't have gone to

6    this thing, in my opinion.  But he -- you know, he is --

7    like *Munchel,* he ought to be in a separate category.

8              You know, like -- take what FBI Hillman said when

9    he first talked to him; it looked like he tried to stop

10   them.  When I asked Hillman at the detention hearing, he

11   said that's what -- I told him, and that was the truth.  And

12   he should be a part in your consideration from these other

13   people who were taking sticks and beating officers or poking

14   them or pulling them out or grabbing them -- or anything.  I

15   think that the evidence will show really that he is in the

16   best-case scenario, Your Honor.  The worst-case scenario for

17   the government is this is a simple assault.

18             THE COURT:  Well, simple assault against a police

19   officer when they're trying to save our democracy in a

20   constitutionally-mandated task for members of Congress;

21   there is nothing simple about that.

22             MR. BURNHAM:  No.  I mean, I am just saying -- he

23   didn't use -- I am not trying to make it -- I am

24   not saying -- I don't mean it that way.  I mean, it's not

25   a -- 111(a) refers to the expression "simple assault," so I

 1   use that terminology in 111(a).  I use that word simple

 2   assault not in a sense that anything he did was simple

 3   there, but --

 4            THE COURT:  So, Mr. Burnham, is this defendant a

 5   QAnon follower?

 6            MR. BURNHAM:  No.  No, ma'am.

 7            Pardon me.  No, Your Honor.

 8            He has lived in Dallas basically all of his life,

 9   and he has had a business there since 2008.  He has his own

10   commercial advertising company and he has employees; and he

11   needs to try to keep the company going.  It's been tough

12   going through COVID.

13            And a number of years ago, he had a very traumatic

14   experience, Your Honor.  He was walking across the street in

15   Los Angeles with his fiancée or girlfriend, a hit-and-run

16   driver hit him and her; killed her.  He was put in the

17   hospital in serious condition.  It's obvious this has had a

18   traumatic effect on him.  They were going someplace, her

19   shoe got stuck in the street, her high heels.  He picked her

20   up to carry her, and he got hit -- and she did and it killed

21   her.  And this happened a number of years ago, so he has

22   been through a very traumatic experience.  And obviously

23   this has been traumatic; he has been in jail now 45 days,

24   and he has never been in trouble with the law before.  And

25   it can be -- you can see from the character witnesses, he

1    has had a lot of good people to speak for him, his family.

2    His dad has agreed to be his third-party custodian.

3          And the judge on pretrial release -- they agreed

4    to pretrial release -- pretrial services, without any

5    electronic monitoring.  But the judge -- after the hearing,

6    the government asked for electronic monitoring and the judge

7    added electronic monitoring.

8          With all of those conditions, I think that that

9    would reasonably assure the safety and his return to Court,

10   Your Honor.

11         And one of the things -- I didn't want to

12   forget -- I went down there at the federal courthouse, the

13   police officer -- FBI Hillman said, We need to search your

14   car.  We need to get a search warrant.  I need to get a

15   judge to get a search warrant to search your car.  He said,

16   I will let you search my car.  He signed the consent to

17   search right there.  He wasn't trying to obstruct.  He told

18   him the key was on the back -- the back -- on the back tire

19   to get in the car.

20         He told him his apartment was -- they were going

21   to execute a search warrant on his apartment at that time.

22   He told him that the door is unlocked; he told him to follow

23   us.  He asked him where the backpack was; and he told him

24   there was cameras in the backpack.  And he told him where

25   the coat was -- what was in the coat.  I don't know about

1    the hat.  I don't know if he ever found the hat.  But he

2    cooperated right there and told him -- he was questioned;

3    told him what he wanted to know.  I just think that's

4    important, his cooperation, and his attitude, the fact that

5    he has no criminal history.

6              THE COURT:  All right.  Thank you, Mr. Burnham.

7              Mr. Lallas, do you want to respond before I issue

8    my ruling?

9              MR. LALLAS:  The only thing I wanted to respond

10   to, Your Honor, is on the QAnon point.

11             When interviewed by an FBI agent, the defendant

12   said that he believes in QAnon.  And, furthermore, in the

13   text messages with his mother there is a reference to the

14   "Q storm."  He admitted on a Conspiracy Castle program on

15   January 5th that he is, quote, part of this Q mission; so it

16   sure sounds like he is a QAnon believer, at least in his own

17   words.  Maybe he is lying to everyone with whom he comes

18   into contact with on that point; but he certainly has said

19   numerous times that he does believe in QAnon.

20             THE COURT:  And what am I supposed to make of

21   that, in terms of assessing dangerousness?

22             MR. LALLAS:  Well, Your Honor, I think it is --

23   part of the concern is that he is someone -- QAnon -- to

24   paraphrase Your Honor -- I know Your Honor deals in facts,

25   not fantasies.

1              THE COURT:  I think I have said that before.

2              MR. LALLAS:  Yes.  I had to paraphrase Your Honor.

3     I know that Your Honor has said that in response to an AUSA

4     commenting that Your Honor must be familiar with the QAnon

5     conspiracy theory.

6              I am not to presuppose any knowledge about it.  I

7     am not an expert on the fantasies; but QAnon theorists think

8     there is a cabal of West Wing pedophiles engaging in the

9     human trafficking of children.  And I think adherents also

10    believe that Donald Trump was in some way going to root out

11    those pedophiles, perhaps even execute them.

12             But the concern here -- it's not so much that he

13    believes in that, but that if he felt as it sounds like he

14    did on the day of the insurrection and the attack on law

15    enforcement -- if he felt like he was there to root out

16    child predators, to do what a higher power, the divine, was

17    telling him to do, and in that instance he, you know, was so

18    compelled -- he was so moved he was ready to die, and he

19    attacked law enforcement in an effort -- as Your Honor said

20    just a few minutes ago -- to disrupt the sacred

21    constitutional duty Congress was inside performing.

22             And so some of those circumstances, the counting

23    of electoral votes, are unlikely to be repeated, at least

24    for a little less than four more years.  But if he again

25    felt moved from a divine power to assault law enforcement,

1    if he again felt that, you know, children were being abused

2    and trafficked, it seems there is no length to which he

3    wouldn't go, including sacrificing his own life, to stop

4    that conduct; and that's a great concern of future dangerous

5    conduct.

6            MR. BURNHAM:  Your Honor, may I respond?

7            THE COURT:  Yes.

8            MR. BURNHAM:  Well, he said somewhere -- first of

9    all, the conversation with his -- a lot of this -- *Munchel*

10   said a lot of this conversation that is on the internet is

11   social media, bravado and exaggeration, and from viewers'

12   likes, and just kind of [unintelligible].

13           He said one of these conversations on 11 -- from

14   January 17th, he said, I have been part of this for the

15   purpose of trying to understand whether they are making any

16   valid points -- [unintelligible].

17           And so -- and so he -- I don't -- this

18   conversation with his parents, with his mother or

19   somebody -- they got up there saying yup [sic] means yes;

20   and all it meant is what yap [sic] means -- yap, yap, yap --

21   and what it means.  You know, I am tired of talking to you;

22   keep yapping at them.  So I think that they're trying to

23   make something out of nothing.

24           Everybody -- if you start going on -- I am not a

25   social media person; but I know enough to know that people

1    get on there and just run their mouths.  And earlier on when

2    they did the first one, January 5th, the person that ran the

3    so-called media thing said that it was all for

4    entertainment; remember, this is only for entertainment

5    purposes.

6              THE COURT:  Yes.  But, Mr. Burnham, that's not

7    addressing what Mr. Lallas has said.  And I think --

8              Mr. Lallas, you have said that he is not part of a

9    coordinated gang that had a presence on January 6th.  Your

10   papers don't really say much about QAnon raising an issue

11   about his future dangerousness but -- despite your vigorous

12   effort here in reply.

13             But, Mr. Burnham, is defendant's belief in this

14   QAnon theory an issue that raises --

15             MR. BURNHAM:  Judge --

16             THE COURT:  -- concern about what he may do in the

17   future and pose a danger?

18             MR. BURNHAM:  Your Honor, he is not a member of

19   the QAnon and -- I mean, there is no evidence of that.  And

20   the fact that he mentioned it, I mean, that doesn't mean --

21   I don't even if know there is an organization about QAnon.

22             You know, I think it's -- it's just a conspiracy

23   theory.  And it's not like the Proud Boys or one of those

24   other organizations.  It's just a so-called conspiracy

25   theory; and he is not a member of any organization like

1    that.  You know, the judge in Dallas didn't find any

2    evidence of that.

3            I just think that just because he says something

4    on social media doesn't mean he necessarily believes it, you

5    know.  I just -- he didn't say he was a member of the QAnon

6    on social media.

7            THE COURT:  All right.  Okay.

8            Okay.  Mr. Lallas, we sort of interrupted you a

9    little bit because you really haven't pushed this QAnon

10   membership as a reason to find him dangerous in your papers;

11   is that right?

12           MR. LALLAS:  I guess not, Your Honor.

13           THE COURT:  No.  Okay.

14           Is there anything else you want to add before I

15   rule?

16           MR. LALLAS:  No, I don't, Your Honor.  No, Your

17   Honor.  Thank you.

18           THE COURT:  All right.  I am prepared to rule on

19   the government's motion to review the Northern District of

20   Texas magistrate judge's decision to release this defendant,

21   Luke Coffee, pending trial.

22           As to the legal standard, the government may

23   request review of a magistrate judge's order of pretrial

24   release, and the district court must then conduct a review

25   promptly under 18 U.S.C. Section 3145(a).  And to be clear,

1    the Court was prepared to do a very prompt hearing within

2    just several days, if not two days, of the magistrate

3    judge's decision; and it was at the defense's request for an

4    extension of 30 days that we are now meeting today.

5         Recently in *Munchel,* decided on March 26, 2021,

6    the D.C. Circuit declined to decide the standard applicable

7    to the district court's review of a magistrate judge's

8    release order, and whether the magistrate judge's factual

9    findings are entitled to any deference or the magistrate

10   judge's legal findings, for that matter, were subject to any

11   deferential standard.

12        For years, however, this Court has exercised

13   *de novo* review, based on the text, the structure of the Bail

14   Reform Act, and the weight of authority from every other

15   circuit to consider and resolve this critical issue, holding

16   that *de novo* review applies; these decisions are all

17   collected in *U.S. v Chrestman,* this Court's decision, at

18   footnote 5.

19        This Court will apply *de novo* review here.

20        The Bail Reform Act requires release of a

21   defendant prior to trial unless a judicial officer

22   determines, after a hearing, that no condition or

23   combination of conditions will reasonably assure the

24   appearance of the person as required and the safety of any

25   other person and the community.  See 18 U.S.C. Section

1    3142(e)(1).

2              The government bears the burden to establish, by a

3    preponderance of the evidence, that the defendant poses a

4    serious risk of flight or a serious risk of obstruction or

5    attempt to obstruct justice, or to intimidate or threaten a

6    prospective witness and/or to show, by clear and convincing

7    evidence, that no conditions of release will assure the

8    safety of any other person or the community.  See 18 U.S.C.

9    3142(f)(2).

10             In determining whether any conditions of release

11   will reasonably assure the appearance of the person as

12   required and the safety of others, the Court must take into

13   account the available information concerning four factors

14   set out in Section 3142(g) including:

15             The nature and circumstances of the offense

16   charged; the weight of the evidence against the person; the

17   history and characteristics of the person; the nature and

18   seriousness of the danger to any person or the community

19   that would be posed by the person's release.

20             In conducting this review, the Court examines the

21   available information that touches upon these four statutory

22   factors that I just listed.  And I will discuss each of

23   these factors, starting with the nature and circumstances of

24   the offenses charged.

25             The first factor weighs in favor of detention.

1      The defendant has been charged with several

2  serious felony offenses, and it bears reviewing what those

3  charges are.

4      First, he's charged with assaulting, resisting,

5  opposing, impeding, intimidating, or interfering with an

6  officer or employee of the United States or of any agency in

7  any branch of the U.S. government while such officer or

8  employee is engaged in the performance of his official

9  duties, in violation of 18 U.S.C. Section 111(a)(1), with

10  the enhanced penalty under 111(b) for use of a deadly or

11  dangerous weapon; that offense carries up to 20 years'

12  imprisonment.

13      The basis for this charge is the allegation that

14  defendant was not only part of the mob storming onto

15  restricted areas on the Capitol grounds, but used a crutch

16  to shove and jab at police officers holding off the mob from

17  entering the Capitol building.

18      In assessing whether the crutch is a "deadly

19  weapon," the Court adopts the definition multiple circuit

20  courts have applied to Sections 111 and 113; namely, an

21  object is either inherently dangerous or used in a way that

22  is likely to endanger life or inflict great bodily harm.

23  See Judge Lamberth's decision in *U.S. v Chansley* issued on

24  March 8, 2021, and all of the cases that he cites there, for

25  the use of that definition of dangerous -- deadly or

1    dangerous weapon in Section 111.

2            For purposes of this hearing, at this stage, I do

3    find that the government has sufficiently demonstrated that

4    the crutch, though not inherently dangerous, is a dangerous

5    weapon when wielded in the midst of a mob trying to get into

6    the Capitol building to stop the electoral vote count -- to

7    push against the police trying to keep the mob out; the

8    crutch was used in a way that likely could inflict bodily

9    harm and result in people being crushed, hit, or otherwise

10   hurt.

11           Next, the defendant is charged with committing or

12   attempting to commit any act to impede, obstruct, interfere

13   with a law enforcement officer lawfully engaged in the

14   lawful performance of official duties incident to and during

15   the commission of a civil disorder which in any way or

16   degree obstructs, delays, or adversely affects the

17   performance of any federally-protected function, in

18   violation of 18 U.S.C. Section 231(a)(3); that offense

19   carries up to 5 years' imprisonment, and is based on the

20   same conduct of the defendant trying to push against the

21   police that was blocking the entry of the mob to the

22   Capitol.  And ultimately, of course, as we all know now,

23   that mob was able to break the police line and get into the

24   Capitol building.

25           Third, the defendant is charged with obstructing,

1    influencing, or impeding an official proceeding, or

2    attempting to do so, in violation of 18 U.S.C. Section

3    1512(c)(2); a charge that carries up to 20 years'

4    imprisonment based on the same -- on the same behavior.

5            He is also charged with misdemeanors, now that we

6    have that clarified, in 40 U.S.C. Section 5104(e)(2); so I

7    am not going to address the misdemeanor charges in any

8    detail.

9            In its proffer describing the defendant's offense

10   conduct, the government has identified the defendant in

11   multiple pictures and apparently in videos taken outside the

12   Capitol building during the riot on January 6th, 2021.

13           In many of these pictures, the defendant is

14   depicted raising, occasionally, the crutch above his head;

15   using the crutch to push against the line of officers

16   holding off this mob from entering the Capitol and being

17   pushed away, rightly, by law enforcement at a point where

18   the defendant apparently fell on the ground and was pepper

19   sprayed.  And then the defendant is seen going again, using

20   the crutch to push against the police line; and at all times

21   that he was pushing against the police line with the crutch,

22   the defendant appeared to be holding the crutch at his waist

23   or at his chest level to push.  He was not using the crutch

24   in ways that people -- other members of the mob, in cases in

25   front of this Court, have used flagpoles and other

1    equipment, axes, to literally beat the police officers.

2            The defendant's conduct -- even though he didn't

3    use the crutch to beat a police officer, or stab or jab the

4    police officer -- his conduct is very serious. And by

5    actually using the crutch bodily against the police, in

6    contact with the police, it doesn't matter how many seconds;

7    but contact with the police with use of this item is more

8    egregious than more other rioters that had no physical

9    contact with the police and merely followed the crowd onto

10   the Capitol grounds, and some of them even into the Capitol.

11           But notwithstanding the gravity of the defense's

12   charges, the government does not proffer evidence that the

13   defendant actually injured any officer or other person in

14   the mob with the crutch, engaged in any prior planning,

15   coordinated with anyone before, during, or even after the

16   riot to assault the Capitol.

17           The government hasn't proffered that he is a

18   member of one of the gangs who were present to help the mob

19   break into the Capitol on January 6th. There is no evidence

20   he took a leadership role, de facto or otherwise. He didn't

21   even enter the Capitol building with the crutch.

22           By contrast, even in *Munchel*, where the D.C.

23   Circuit thought that *Munchel* had not -- the District Court,

24   in *Munchel,* had not demonstrated dangerousness sufficiently.

25   And in *Munchel*, those defendants had entered into the

1    Capitol building, into the Senate Chamber, with a taser and

2    zip ties looking for members of Congress.

3        Moreover, there is evidence in this case that the

4    defendant, a few minutes before his interaction with law

5    enforcement or contact with law enforcement using the

6    crutch -- he raised his hands and yelled into the crowd,

7    imploring them to stop and pray; and that was something that

8    the government's memo did not discuss at all but defense

9    counsel brought out from the transcript of the hearing

10   before the magistrate judge.

11       The defendant's interactions with the police,

12   particularly the second interaction in which the government

13   alleges that the defendant's use of the crutch was more

14   aggressive is explained, in part or theoretically, by the

15   defense by saying that he was disoriented, having been

16   pepper sprayed and hit in the head by police batons just

17   moments before having dropped to the ground, and was trying

18   to get up when he couldn't see very clearly because of the

19   pepper spray; and that explains part of his use of the

20   crutch in that second, more aggressive -- as the government

21   characterizes it -- use of the crutch in contact with the

22   police line for a few seconds.

23       While the defendant's offense conduct of using a

24   crutch to push against the police line is a factor that

25   weighs in favor of detention, it does not weigh as heavily

1    as it has for some of the defendants facing charges as a

2    result of conduct on January 6th that have come before this

3    Court where I have actually seen direct injuries being

4    caused by the conduct of defendants to police officers and

5    spraying right in the face of police officers of bear spray

6    and pepper gel.

7         As to the weight of the evidence against the

8    defendant, the weight of the evidence is overwhelming.  He

9    was certainly on the Capitol grounds; there are pictures of

10   him, he concedes that.  He bragged about it after

11   January 6th.  He was not where he was supposed to be.  And

12   not only that, he was in front of the mob against the police

13   line trying to push the police line, break the police line

14   so that the mob could get in, and using a crutch to help him

15   do that.

16        Special Agent Hillman testified, I guess in front

17   of the magistrate judge, about a video exhibit that was also

18   shown to the magistrate judge and it was not submitted to

19   this Court.  But this Court has seen the multiple -- almost

20   20 photographs of the defendant pushing against the police

21   line.  And it's -- he actually admitted to this in, you

22   know, sort of, this Conspiracy Castle videos that either he

23   did himself or, certainly, he was talking in those videos.

24        In short, the weight of the evidence is, as I

25   said, overwhelming; it weighs in favor of pretrial detention

1    because the facts here plainly support the charges committed

2    and that have been brought.

3            The history and characteristics of the defendant;

4    I'll start, first, with the fact that he doesn't have a

5    criminal record.  In *Munchel* that was highlighted certainly

6    by Judge Katsas in his dissent, but it was also highlighted

7    by the majority opinion in that the defendants had very

8    little, if any, criminal record.  So that's in his favor.

9            He also has close ties to his family and community

10   in Texas.  As defense counsel has pointed out, he has

11   frequent contact with his family and he has very close ties

12   there, including the people who testified at the hearing on

13   his behalf; and he actually is the owner of his own business

14   in Texas with no history of mental illness and very minimal

15   substance abuse history.

16           As already noted, he didn't attempt the assault on

17   the Capitol as a member of an organized gang.  And in his

18   comments and interviews following the attack which the

19   government has quoted from, they certainly don't appear

20   remorseful about his conduct on that day or what that day

21   did to this country's standing in the world, in terms of the

22   embarrassment of a constitutionally-mandated function being

23   disrupted by a mob.

24           But at the same time, despite the fact that he has

25   shown no remorse that I can see -- some regret perhaps that

1    he was caught and highlighted in his role as a member of the

2    mob.  At the same time, those comments that the government

3    has pointed out to the Court appear to be more descriptive

4    of what he was seeing and feeling and doing on January 6th

5    rather than an indication that he plans to go out and find

6    the next mob he can in a political environment to express

7    his political opinions which would pose a danger in the

8    future; so I don't find those comments as particularly

9    probative of his future danger which is what *Munchel* has

10   made clear has to be examined.

11          Importantly, the defendant turned himself in once

12   his lawyer was contacted by the FBI and told that there was

13   an arrest warrant for him.  Certainly, prior to his arrest

14   he said he was in hiding; but to the extent that that shows

15   a risk of flight, this Court is not buying it because at the

16   point where he said that -- there was not even an arrest

17   warrant for the defendant and he stayed, it appears, in

18   fairly constant contact with an FBI agent who talked to him

19   multiple times.  I think the FBI agent said he talked to him

20   about 10 or 12 times; that's a lot of contact with an FBI

21   agent when you are trying to stay in hiding from law

22   enforcement.  The defendant got himself a lawyer who also

23   stayed in close contact with the FBI agent, and turned

24   himself in and provided a fairly cooperative attitude

25   overall, in terms of the subsequent search of his car and

1    his apartment.  So this factor weighs generally and strongly

2    in favor of release.

3              As to the nature and seriousness of the danger to

4    any person in the community posed by the defendant's release

5    in this case, to my mind this weighs in favor of release,

6    particularly based on the D.C. Circuit's instructions in

7    *Munchel*.

8              Based on the government's proffer for this hearing

9    and his conduct on January 6th which was highly unlawful --

10   a clear threat to the operation of the democratic process --

11   because his actions appeared, intended, and certainly

12   contributed to breaking down the police line protecting the

13   Capitol against hundreds of rioters who did ultimately

14   successfully obtain entry to the Capitol Building and

15   terrorized members of Congress, staff, and media who were

16   inside that building; but this conduct alone, particularly

17   in the wake of *Munchel* -- the D.C. Circuit's instruction in

18   *Munchel* -- is insufficient to show dangerousness without a

19   showing of an identified and articulable threat to the

20   community outside the context of January 6th.

21             The D.C. Circuit in *Munchel* made it very clear

22   that showing that a person who was dangerous on January 6th

23   is not enough for pretrial detention.

24             Instead, and I quote, the circuit said, The threat

25   must also be considered in context where -- the Court said,

1    quote, "The specific circumstances that made it possible on

2    January 6" for defendant "to threaten the peaceful transfer

3    of power" because of the "large group of people who had

4    gathered at the Capitol in protest that day," -- "the

5    presence of the group was critical to defendant's ability to

6    obstruct the vote and to cause danger to the community."

7            The Circuit went on to say, "without it" --

8    meaning the mob -- the *Munchel* defendants who carried a

9    taser and zip ties in the Senate Chamber "seemingly would

10   have posed little threat."

11           The D.C. Circuit went on to say that, quote, "Now

12   that the specific circumstances of January 6 have passed,"

13   the Court is required to explain how the defendant is

14   capable of posing a danger in the future after consideration

15   of "the nature of the threat identified and the resources

16   and capabilities of the defendant"; and that was the reason

17   the D.C. Circuit remanded *Munchel* to Judge Lamberth to

18   provide that explanation; but before Judge Lamberth had the

19   opportunity to provide such an explanation, the government

20   in that case agreed to pretrial release.

21           In every one of the cases arising out of the

22   January 6th assault on the Capitol now, the Court must

23   explain whether and how -- now that the specific

24   circumstances of January 6th have passed -- to quote the

25   D.C. Circuit -- and the mob is gone, the defendant still

1    could pose a danger to the community.

2            And it is important to note, as I have already

3    pointed out to Mr. Lallas, that the D.C. Circuit determined

4    that the District Court inappropriately based its

5    dangerousness determination on a finding that Munchel's

6    alleged conduct indicates that he is willing to use force to

7    promote his political ends, and that such conduct poses a

8    clear risk to the community, when the record contains no

9    evidence indicating that while inside the Capitol the

10   defendants vandalized any property or physically harmed any

11   person.

12           Now, the Circuit did say that those who actually

13   assaulted police officers; broke through windows, doors, and

14   barricades; and those who aided, conspired with, planned, or

15   coordinated such actions; are in a different category of

16   dangerousness than those who cheered on the violence or

17   entered the Capitol after others cleared the way.

18           Nonetheless, even with this different category of

19   January 6 defendants, the district courts must still proffer

20   an explanation of how a defendant would be capable of acting

21   in a dangerous way now that the specific circumstances of

22   January 6 have passed.

23           In this case, the defendant apparently spent part

24   of his time on the Capitol grounds on January 6th facing the

25   mob and telling the mob to stop and pray.  At some point, of

1    course, he got in front of the mob and pushed a crutch

2    against the police line.  But, as I have said before, he

3    didn't use that crutch like a spear; he didn't beat the

4    crutch against the police officers' heads or shoulders or

5    any parts of their bodies.  He didn't cause any injury to

6    the officers with the crutch; he used it to push.  These

7    considerations undercut the clear and convincing evidence

8    the government is required to show that he is a danger in

9    the future.

10        The defendant also presents no indication or

11   intention to engage in any kind of similar conduct in the

12   future.  It's not clear that he has the means to do so since

13   he is not associated with any gang that would encourage him

14   or provide him with the means to do so now -- as the

15   D.C. Circuit has highlighted in *Munchel* -- that January 6th

16   has passed.  Therefore, I conclude that the government has

17   not shown by clear and convincing evidence that this

18   defendant presents a future danger warranting pretrial

19   detention.

20        So upon consideration of the proffered evidence,

21   the factors set forth in 18 U.S.C. Section 3142(g), the

22   Court finds that overall the statutory factors weigh in

23   favor of release, and the government has not met its burden

24   of establishing that no condition or combination of

25   conditions will reasonably assure the appearance of this

1    defendant as required, and the safety of any other person

2    and the community.

3            The magistrate judge's pretrial detention ruling

4    is, therefore, affirmed.

5            The government's motion for pretrial detention is

6    denied.

7            The defendant will be released subject to the same

8    conditions previously imposed by the magistrate judge.

9            He will be released to the custody of his father,

10   Russell Coffee.  He must report to pretrial services by

11   phone today if possible and, thereafter, report to pretrial

12   services weekly by phone.

13           He must verify his address with pretrial services.

14   He must surrender his passport if he hasn't already.

15   Apparently, there was a fraudulent passport found in his

16   home; he must not obtain another passport or any other

17   international travel document.  His travel is restricted to

18   the Northern District of Texas; and I will rely on

19   Mr. Burnham to tell him what those parameters are.

20           The defendant may come into the District of

21   Columbia only for court purposes.  The defendant must avoid

22   all contact, directly or indirectly, with any person who is

23   or may be a victim or a witness in the investigation or

24   prosecution.

25           He must not possess a firearm, destructive device,

1    or any other weapon.  He must not use or unlawfully possess

2    a narcotic drug or any other controlled substance, as

3    defined in 21 U.S.C. Section 802, unless prescribed by a

4    licensed medical practitioner.

5            He will be placed on home detention; restricted to

6    his residence at all times, except for employment,

7    education, religious services, medical, substance abuse or

8    mental health treatment, attorney visits or court

9    appearances, court-ordered obligations, or other approved

10   activities by the pretrial services office.

11           He must submit to location monitoring, as directed

12   by the pretrial services office or supervising officer, and

13   comply with all program requirements and instructions

14   provided, and must pay all or part of the cost of the

15   program based on his ability to pay.

16           He must report to pretrial services by phone any

17   contact he has with law enforcement as soon as possible

18   after such contact including arrests, questioning, and

19   traffic stops.  And he must also report as soon as possible

20   to pretrial services any change of address, telephone, or

21   employment status; although he is going to be residing, as

22   required by the magistrate judge, in Texas with his father

23   Russell Coffee.

24           The Court is to be notified of any violations of

25   this order.

1          Mr. Coffee, I need to remind you that your

2    presence is required in court when you are notified that

3    your case has been assigned to a judge.  So you will be

4    advised when next to appear.  You have to keep in close

5    touch with your counsel to know when that will occur.

6          I am required to caution you about your conduct

7    during your release pending trial and certain penalties that

8    could apply to you.

9          First, failing to appear in court as required is a

10    crime to which you can be sentenced to imprisonment.

11          If you violate any condition of release, a warrant

12    for your arrest may be issued and you may be jailed until

13    trial and also prosecuted for contempt of Court.

14          Committing a crime while on release may lead to

15    more severe punishment than you would receive for committing

16    the same crime at any other time.

17          And it is a crime to try to influence a juror, to

18    threaten or attempt to bribe a witness or any other person

19    who may have information about this case, to retaliate

20    against anyone for providing information about the case, or

21    to otherwise obstruct the administration of justice.

22          Do you understand that, Mr. Coffee?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  All right.  Is there anything further

25    today from the defense?

```
 1            MR. BURNHAM:  Your Honor, may I say something?

 2            You said to stay in the Northern District of

 3    Texas.  He is living with his father outside of Dallas

 4    County, in Anderson County, which happens to be in the

 5    Eastern District of Texas, so it's an adjacent county.  Just

 6    so the Court would know that his -- he is not going to be

 7    living in the Northern District.

 8            THE COURT:  Okay.  Well, then -- I know Texas is a

 9    big state, so I may just be expanding this; but he will be

10    restricted to the Northern and Eastern Districts of Texas.

11            MR. BURNHAM:  Thank you, Your Honor.

12            THE COURT:  That may be more mileage than the

13    entire District of Columbia, but there you go.

14            MR. BURNHAM:  Thank you, Your Honor.

15            THE COURT:  Mr. Lallas, anything further from you?

16            MR. SIDBURY:  Your Honor.

17            THE COURT:  Mr. Lallas, anything further from you?

18            MR. LALLAS:  No, Your Honor.  Thank you.

19            THE COURT:  Okay.  Pretrial services.  Yes?

20            MR. SIDBURY:  Yes, Your Honor.

21            With that being said, we would have to determine

22    which district he will be supervised in.  So the Northern

23    District -- since he's staying with his father, the Northern

24    District will be the supervising jurisdiction for his

25    release conditions.
```

1          THE COURT:  The Northern -- the Northern District

2   of Texas will be the supervising jurisdiction.  Will that be

3   very complicated if he's living in the Eastern District of

4   Texas?

5          MR. SIDBURY:  I will ask, Your Honor.  I do not

6   know that at this time.

7          THE COURT:  I'm sorry.  I couldn't hear you.

8          MR. SIDBURY:  I don't know if that will be

9   difficult or not, Your Honor, but I will ask when I reach

10   out to the Northern District of Texas.

11          THE COURT:  All right.  Whichever district finds

12   it most convenient, Eastern or Northern District of Texas.

13          Mr. Burnham.

14          MR. BURNHAM:  It might be easier, Your Honor,

15   since we had the detention hearing in Dallas, in the

16   Northern District, and pretrial services did everything

17   there.  He works in Dallas, so that might be easier -- to

18   just leave it in the Northern District, but that's up to

19   probation.

20          THE COURT:  Right.  Okay.  I mean, I do think that

21   it was the Northern District of Texas pretrial services

22   office that did the original pretrial services report, so I

23   had thought that they would be the ones to do the

24   supervision.

25          All right.  If there is nothing further, you are

1    all excused.

2              MR. BURNHAM:  Thank you, Your Honor.

3              THE DEFENDANT:  Thank you, Your Honor.

4              MR. LALLAS:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              (Whereupon, the proceeding concludes, 3:57 p.m.)

7                        *  *  *  *  *

8                          **CERTIFICATE**

9              I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
10   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
11   ability.

12
               PLEASE NOTE:  This hearing was held via
13   videoconference and telephonically in compliance with the
     COVID-19 pandemic stay-safer-at-home recommendations and is
14   therefore subject to the limitations associated with the use
     of technology, including but not limited to telephone signal
15   interference, static, signal interruptions, and other
     restrictions and limitations associated with remote court
16   reporting via telephone, speakerphone, and/or
     videoconferencing capabilities.

17

18             This certificate shall be considered null and void
     if the transcript is disassembled in any manner by any party
19   without authorization of the signatory below.

20
          Dated this 15th day of April, 2021.
21
          /s/ Elizabeth Saint-Loth, RPR, FCRR
22        Official Court Reporter

23

24

25