# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. No. 21-236 (JDB) |
| FEDERICO GUILLERMO KLEIN, also known as "Freddie Klein," | |
| Defendant. | |

**MEMORANDUM OPINION**

Defendant Federico Guillermo Klein, a former employee at the U.S. State Department, is charged via indictment with three felony and five misdemeanor offenses based on his participation in the events at the United States Capitol on January 6, 2021.  Following his arrest on March 4, 2021, Magistrate Judge Faruqui ordered Klein detained pending trial.  Klein now asks this Court to revoke that order of detention and place him on pretrial release.  The government also requests, over Klein's objection, to continue this matter and exclude time under the Speedy Trial Act for sixty days.

The detention issue here is close, and this Court respects Magistrate Judge Faruqui's thoughtful assessment.  Subsequent guidance from the D.C. Circuit, however, impacts the analysis of whether the government has established, by clear and convincing evidence, that Klein presents an articulable prospective threat to the safety of the community.  Pretrial detention is the exception, not the norm, under the Bail Reform Act, see United States v. Salerno, 481 U.S. 739, 755 (1987), and the government's burden is thus a heavy one.  The Court concludes on the evidence presented that the government has not met its burden.  For the following reasons, then, the Court will order Klein's release from custody pending trial subject to strict conditions.  The Court will also grant a thirty-day continuance and exclude the intervening time under the Speedy Trial Act in the interests

1

of justice.

### **Background**

Klein is a forty-two-year-old resident of Annandale, Virginia who served as a political appointee at the U.S. State Department under President Trump and held a "top secret" security clearance in that role.  Statement of Facts ("SOF") [ECF No. 1-1] at 3.  On January 6, 2021, Klein actively participated in the attempt to gain entry into the Capitol Building through the Lower West Terrace doorway while the U.S. Congress was meeting inside to certify the vote count of the Electoral College for the 2020 presidential election.  Id. at 2, 5–14.  Video footage depicts Klein entering the tunnel from the Lower West Terrace at 2:43 p.m., where a mob of individuals had already gathered to confront the line of police officers protecting the entrance to the Capitol.  Id. at 5.  Klein remained inside the tunnel for approximately thirty-eight minutes—until 3:21 p.m.— when officers were able to expel the first wave of rioters out of the tunnel and back onto the Terrace.  Id. at 10.

While inside the tunnel, Klein repeatedly placed himself at the front of the mob and used force against several officers in an effort to breach the Capitol entrance and maintain the mob's position.  Id. at 5–10.  He ignored several verbal commands by officers to "back up" and "[l]et it go now."  Id. at 6.  And twice he can be heard calling to the crowd behind him: "We need fresh people, we need fresh people."  Id. at 8.  Around 2:55 p.m., Klein bent down to pick up a flagpole, which lay at the foot of the police line, and passed it back to other rioters.  Id. at 6; Rough Tr. of Hr'g (Apr. 9, 2021) ("Hr'g Tr.") 28:22–24.[1]

Sometime between 2:55 p.m. and 3:00 p.m., Klein came into the possession of a plastic riot shield, which had been taken from the police.  SOF at 6.  Body-worn camera ("BWC") footage

---

[1] Citations to the April 9, 2021 hearing transcript are to a rough draft of the transcript.  When finalized, the transcript will be posted to the docket.  Discrepancies between the rough and final transcripts may exist.

from the Metropolitan Police Department ("MPD") captures Klein and another unidentified individual wedging the shield between the doors to the Capitol at approximately 3:00 p.m. in an apparent effort to prevent the officers from closing the doors. Id. at 6–7; Hr'g Tr. 33:17–20. At 3:15 p.m., another BWC video shows Klein pushing the shield into an officer's body in an attempt to break the police line. SOF at 7. A publicly-sourced video posted to YouTube also depicts Klein shoving the shield against an unidentified officer's body and against the shields of two MPD officers.[2] Id. at 9–10.

At around 3:21 p.m., officers successfully drove the rioters, including Klein, out of the tunnel and back onto the Terrace. Id. at 10. But Klein still lingered near the tunnel entrance. Shortly thereafter, police realized that an MPD officer had been dragged into the crowd. Another officer seeking to rescue his fallen colleague asked Klein to move aside, to which Klein responded, "no way." Id. at 13. Moments later, however, Klein is briefly seen helping to shepherd the fallen officer—who by then had begun extricating himself from the crowd—back toward the police line. Id. at 13–14. To the government's knowledge, Klein is not captured on any footage thereafter, though attempts to breach the tunnel entrance persisted until approximately 5:15 p.m. See Gov't's Opp'n to Def.'s Mot. for Review & Revocation of Detention Order & Reply to Def.'s Opp'n to Mot. for Exclusion of Time ("Gov't Br.") [ECF No. 25] at 4–5.

On March 4, 2021, Klein was arrested pursuant to a criminal complaint. Arrest Warrant [ECF No. 6]. He appeared before Magistrate Judge Faruqui the following day and was temporarily detained at the government's request. Min. Entry (Mar. 5, 2021). Judge Faruqui held a detention hearing on March 9, 2021 and ordered that Klein be detained pending trial, finding that the government had shown by clear and convincing evidence that no condition or combination of

---

[2] The total amount of time that Klein spent pressing the riot shield against different officers is not clear, but the government proffered that at least one of these instances lasted approximately sixty seconds. Hr'g Tr. 37:8–10.

conditions of release could reasonably assure the safety of any other person and the community. Min. Entry (Mar. 9, 2021); Order of Detention Pending Trial (Mar. 16, 2021) [ECF No. 11]. Judge Faruqui also excluded the time between March 9, 2021 and March 22, 2021 under the Speedy Trial Act in the interests of justice, despite Klein's objection. Min. Entry (Mar. 9, 2021).

On March 19, 2021, Klein was indicted by a grand jury on eight counts: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Obstruction of an Official Proceeding (Aiding and Abetting), in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). Indictment [ECF No. 12]. The first three counts are felonies; the last five are misdemeanors.

Klein was arraigned on the Indictment on March 25, 2021 and entered a plea of not guilty on all counts. Min. Entry (Mar. 25, 2021). That same day, the government filed a motion to continue and exclude time for sixty days under the Speedy Trial Act. Gov't's Mot. to Continue & to Exclude Time Under the Speedy Trial Act ("Continuance Mot.") [ECF No. 15]. Based on defense counsel's stated intention to file a motion to revoke Magistrate Judge Faruqui's detention order, this Court scheduled a hearing for April 9, 2021 and set a combined briefing schedule on Klein's motion to revoke and the government's motion to continue. Min. Entry (Mar. 25, 2021). The Court also entered a written order granting a limited continuance and excluding the time

between March 22, 2021 and April 9, 2021 under the Speedy Trial Act in the interests of justice and in light of Klein's forthcoming motion.  Order (Mar. 26, 2021) [ECF No. 18].

Briefing on the motions concluded on April 7, 2021, and the Court conducted a hearing on April 9 at which the government presented some additional evidence of Klein's conduct at the Capitol.[3]  Both motions are now ripe for decision.

## Discussion

### I.  Defendant's Motion to Revoke Detention Order

Klein has moved to revoke Magistrate Judge Faruqui's detention order, asserting that he is not eligible for pretrial detention based on the offenses charged, that he does not pose a danger to any person or his community if released, and—in the alternative—that any danger he does pose can be mitigated by a combination of conditions.  See Def.'s Mot. for Review & Revocation of Detention Order & Opp'n to Mot. for Exclusion of Time ("Def.'s Br.") [ECF No. 22] at 4–5.  The Court finds that Klein is eligible for pretrial detention because he is charged in Count 3 of the Indictment with a "crime of violence."  See 18 U.S.C. § 3142(f)(1)(A).  However, because there is not clear and convincing evidence that Klein poses a concrete, prospective threat to public safety that cannot be mitigated by pretrial supervision, the Court will order him released on strict conditions pending trial.

### A.  Legal Standard

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "the court having original jurisdiction over the offense."  18 U.S.C.

---

[3] The government presented several minutes of BWC footage and some text messages at the hearing.  Due to technical difficulties, however, the government was not able to present all of the footage that it had intended to show the Court and instead proceeded by proffer to explain what the remaining footage would have depicted.  Because, for the most part, Klein has not contested the accuracy of the government's proffer—only the conclusions to be drawn from it—the Court finds that these technical difficulties did not prejudice the government.  See Hr'g Tr. 69:5–10.

§ 3145(b). Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to <u>de novo</u> review. <u>See</u> <u>United States v. Hunt</u>, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (referencing cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that support this proposition). This Court has adopted this view, <u>see</u> <u>United States v. Louallen</u>, 2019 WL 1003531, at *1 (D.D.C. Feb. 27, 2019) (Bates, J.), and the parties agree that this is the appropriate standard, <u>see</u> Def.'s Br. at 4; Gov't's Br. at 8.

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." <u>United States v. Singleton</u>, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting <u>Salerno</u>, 481 U.S. at 747). Hence, a detention hearing must be held only if a case involves certain enumerated categories of offenses, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, <u>id.</u> § 3142(f)(2)(A)–(B).

If a defendant is eligible for a detention hearing, the BRA provides that the court "shall" order pretrial detention if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." <u>Id.</u> § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" <u>United States v. Vasquez-Benitez</u>, 919 F.3d 546, 550 (D.C. Cir. 2019). Here, the government only contends that Klein's detention is appropriate on the basis of dangerousness.

To assess a defendant's dangerousness, the court must "take into account the available information" concerning four statutory factors: (1) "the nature and circumstances of the offense

charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4). As the D.C. Circuit recently stated in United States v. Munchel, "[t]o justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021) (quoting 18 U.S.C. § 3142(f)). That requires the government to establish that the defendant poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. Id. (quoting Salerno, 481 U.S. at 751); see also id. ("[A] defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."). Furthermore, "[d]etention cannot be based on a finding that defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness . . . [as] otherwise the scope of detention would extend beyond the limits set by Congress." Id. at *7; see also Salerno, 481 U.S. at 746 ("[P]retrial detention under the Bail Reform Act is regulatory, not penal.").

**B. Detention Eligibility Analysis**

At the outset, the parties dispute whether Klein is eligible for pretrial detention based on the offenses charged. As relevant here, the BRA authorizes pretrial detention "in a case that involves . . . a crime of violence" or "any felony that is not otherwise a crime of violence that involves . . . the possession or use of a firearm or destructive device . . . or any other dangerous weapon." 18 U.S.C. § 3142(f)(1)(A), (E).

The government argues that Klein is subject to pretrial detention "because he has been charged with both a crime of violence as well as two additional felonies that were committed using a dangerous weapon." Gov't Br. at 8. Specifically, the government contends that Count 3 of the Indictment—charging Klein with "using a deadly or dangerous weapon, that is, a riot shield," to "forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States," in violation of 18 U.S.C. §§ 111(a)(1) and (b)—qualifies as a "crime of violence." Id. (quoting Indictment at 2). The government also asserts that Counts 1 and 2—charging Klein with civil disorder, in violation of 18 U.S.C. § 231(a)(3), and obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2—qualify as felonies involving the use of a dangerous weapon. Id. Klein disputes this analysis wholesale, arguing that Count 3 is not a "crime of violence" and that the riot shield was not used as a dangerous weapon. See Def.'s Br. at 4.

The Court finds that Klein is eligible for pretrial detention based on Count 3. Under the BRA, a "crime of violence" includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 3156(a)(4)(A). The Supreme Court in Johnson v. United States defined "physical force" as "force capable of causing physical pain or injury to another person." 559 U.S. 133, 140 (2010); see also Def.'s Br. at 9. To determine if a charged offense qualifies as a "crime of violence," a court generally applies a categorical approach, meaning that the court assesses "how the law defines the offense and not . . . how an individual offender might have committed it on a particular occasion," United States v. Moore, 149 F. Supp. 3d 177, 179 (D.D.C. 2016) (quotations omitted); see also Singleton, 182 F.3d at 12. However, if the statute of offense is "divisible"—i.e., defines multiple separate crimes—then the court employs a "modified categorical approach" by looking

at "a limited class of documents," such as the indictment, to "determine what crime, with what elements," the defendant was charged with.  Mathis v. United States, 136 S.Ct. 2243, 2249 (2016) (quoting Shephard v. United States, 544 U.S. 13, 26 (2005)).

The first question then is whether 18 U.S.C. § 111 is divisible.  That statute provides:

(a)  In general.—Whoever—

    (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated [as a federal officer] while engaged in or on account of the performance of official duties; or

    (2) forcibly assaults or intimidates any person who formerly served [as a federal officer] on account of the performance of official duties during such person's term of service,

    shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

(b)  Enhanced penalty.—Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon . . . or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111.

At least six circuits have held that 18 U.S.C. § 111 is divisible and "creates three separate offenses."  United States v. Bullock, 970 F.3d 210, 214 (3d Cir. 2020) (collecting cases).  Klein does not cite any contrary precedent or make any real attempt to dispute this point.[4]  Therefore,

---

[4] Klein does argue briefly in a footnote that it is "not clear" that § 111(b) "is its own offense, as opposed to providing for an 'enhanced penalty' as the title of the subjection [sic] provides."  Def.'s Br. at 10 n.8.  Klein posits that if "Congress [had] intended the Bail Reform Act to provide for pretrial detention in cases where penalty enhancements apply, it could have so specified, but it did not," and therefore, "[o]n this basis alone, Mr. Klein should not be subject to pretrial detention.  Id.  Klein offers no authority for this theory and does not attempt to reconcile his argument with any case law on the subject.  The Supreme Court has made clear that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).  Therefore, because the facts underlying a violation of § 111(b)—which raise the statutory maximum from eight to twenty years in prison—must be "submitted to a jury, and proved beyond a reasonable doubt," id., they constitute elements of Klein's offense.  See Mathis, 136 S. Ct. at 2248 (defining the "elements" of an offense as "the things the prosecution

this Court will apply the modified categorical approach. And because Klein was charged with a "violation of § 111(b) [which] requires more violent conduct than a violation of § 111(a)(1) alone," the Court need only "focus on whether § 111(b) is a crime of violence." See Gray v. United States, 980 F.3d 264, 266 (2d Cir. 2020); Indictment at 3–4. The key question then is whether a defendant can be convicted of violating § 111(b) without "the use, attempted use, or threatened use of physical force against the person or property of another." See 18 U.S.C. § 3156(a)(4)(A).

The D.C. Circuit has not yet weighed in, but every circuit to address the issue has answered that question in the negative, concluding that § 111(b) does constitute a "crime of violence." See Gray, 980 F.3d at 265; Bullock, 970 F.3d at 217; United States v. Bates, 960 F.3d 1278, 1287 (11th Cir. 2020); United States v. Kendall, 876 F.3d 1264, 1270 (10th Cir. 2017); United States v. Taylor, 848 F.3d 476, 494 (1st Cir. 2017); United States v. Rafidi, 829 F.3d 437, 445–46 (6th Cir. 2016); United States v. Hernandez-Hernandez, 817 F.3d 207, 217 (5th Cir. 2016).[5] This Court agrees.

As several courts have observed, to violate § 111(b), a defendant "must have committed one of the acts described in § 111(a), i.e., 'forcibly assault[ed], resist[ed], oppose[d], impede[d], intimidate[d], or interfere[d] with' a [federal officer] in specified circumstances;" and "in committing the act," either (1) "'use[d] a deadly or dangerous weapon'" or (2) "'inflict[ed] bodily injury.'" Gray, 980 F.3d at 266 (quoting 18 U.S.C. §§ 111(a)(1), (b)). The Court will consider each scenario.

---

must prove to sustain a conviction" and "what the jury must find beyond a reasonable doubt to convict the defendant" at trial) (quotation omitted). Klein offers this Court no reason to believe that Congress intended to apply a different definition of an offense "element" when analyzing a crime of violence under the BRA, and therefore the Court finds no merit in the distinction between an "enhanced penalty" and separate "offense" that Klein seeks to draw.

[5] Some of these cases addressed the issue in the context of 18 U.S.C. § 924(c)(3), which likewise defines a "crime of violence" to include any offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Others "did so in the context of the substantively similar provisions in the Sentencing Guidelines." Gray, 980 F.3d at 265 n.1. Klein does not argue that either context offers a basis for distinction.

For starters, a "deadly or dangerous weapon" means "any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person." Bullock, 970 F.3d at 215 (quotation omitted). This Court agrees with the weight of authority that "[a] defendant who acts 'forcibly' using a deadly or dangerous weapon under § 111(b) must have used force by making physical contact with the federal [officer], or at least threatened the [officer], with an object that, as used, is capable of causing great bodily harm." Taylor, 848 F.3d at 494; see also Bullock, 970 F.3d at 215; Gray, 980 F.3d at 266–67. This first means of violating § 111(b) therefore "necessarily requires the use or threat of force 'capable of causing physical pain or injury to another.'" Taylor, 848 F.3d at 494 (quoting Johnson, 559 U.S. at 140). The second scenario under § 111(b) is even more straightforward given that a defendant who acts "forcibly" and actually "inflicts bodily injury" by definition uses "force capable of causing . . . injury" to another. See Bullock, 970 F.3d at 216; Gray, 980 F.3d at 267; Taylor, 848 F.3d at 494. Because both acts in § 111(b)—use of a deadly or dangerous weapon and infliction of bodily injury—necessarily entail "the use, attempted use, or threatened use of physical force," §111(b) qualifies as a "crime of violence" that renders Klein eligible for pretrial detention under 18 U.S.C. § 3142(f)(1)(A).

Klein does not offer a compelling reason to question this clear consensus view. Indeed, he devotes a substantial portion of his brief to arguing that § 111(a) is not a crime of violence, Def.'s Br. at 8–10, which as explained above is irrelevant because the statute is divisible, and Klein was charged with the more serious violation of the statute in § 111(b). Furthermore, the primary case on which Klein relies to argue that § 111(b) is not a "crime of violence" is readily distinguishable. Klein states that "[t]he Seventh Circuit's decision in United States v. Bennett, 863 F.3d 679 (7th Cir. 2017), is instructive" because there the court concluded that "Indiana's resisting law enforcement statute"—which is similarly worded to § 111(b)—did not qualify as a "crime of

violence." See Def.'s Br. at 12–14. In its analysis, however, the Seventh Circuit expressly relied on how Indiana courts had defined the terms "inflict[ing] bodily injury or otherwise caus[ing] bodily injury" to uphold convictions under that statute for nonviolent and accidental conduct. See Bennett, 863 F.3d at 681. That latter—and seemingly broader—term "otherwise caus[ing] bodily injury" is not found in § 111(b). And the Court is not aware of, nor has Klein identified, any case suggesting that such conduct has or hypothetically would be criminalized by § 111(b). See United States v. Redrick, 841 F.3d 478, 485 (D.C. Cir. 2016) (cautioning that the categorical approach requires a focus on "realistic probabilities" not "theoretical possibilities" that the statute "would apply . . . to conduct that falls outside the force clause") (quotation omitted). The Court thus sees no reason to depart from the weight of authority concluding that § 111(b) qualifies as a "crime of violence."

Because Klein is eligible for pretrial detention due to the fact that he has been charged under 18 U.S.C. § 111(b) with a "crime of violence," see 18 U.S.C. § 3142(f)(1)(A), the Court need not resolve the parties' dispute over whether Klein is also subject to pretrial detention under 18 U.S.C. § 3142(f)(1)(E) because he has been charged with two felonies that "involve[] . . . the possession or use of a . . . dangerous weapon."[6] Hence, the Court will proceed directly to analyzing the § 3142(g) factors.

---

[6] The Court has some doubts about whether Klein "used" the stolen riot shield as a dangerous weapon. The BRA does not define the term, but at least for purposes of § 111(b), courts have held that a dangerous weapon is any "object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm." See United States v. Chansley, 2021 WL 861079, at *7 (D.D.C. Mar. 8, 2021) (Lamberth, J.) (collecting cases). A plastic riot shield is not an "inherently dangerous" weapon, and therefore the question is whether Klein used it in a way "that is likely to endanger life or inflict great bodily harm." The standard riot shield "is approximately forty-eight inches tall and twenty-four inches wide," see Gov't Br. at 13, and the Court disagrees with defense counsel's suggestion that a riot shield might never qualify as a dangerous weapon, even if swung at an officer's head, Hr'g Tr. 18:18–25, 19:1–11. See, e.g., United States v. Johnson, 324 F.2d 264, 266 (4th Cir. 1963) (finding that metal and plastic chair qualified as a dangerous weapon when "wielded from an upright (overhead) position and brought down upon the victim's head"). But it is a close call whether Klein's efforts to press the shield against officers' bodies and shields were "likely to endanger life or inflict great bodily harm." See Chansley, 2021 WL 861079, at *7.

### C. Section 3142(g) Factors

#### i. Nature and Circumstances of the Offense

The Court first considers "the nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1). Chief Judge Howell has set forth a number of considerations, which this Court finds helpful, to differentiate the severity of the conduct of the hundreds of defendants connected to the events of January 6. See United States v. Chrestman, -- F. Supp. 3d --, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) (Howell, C.J.). These considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses;" (2) "engaged in prior planning before arriving at the Capitol;" (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot;" or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct;" and (6) the nature of "the defendant's words and movements during the riot," including whether he "damaged federal property," "threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot." Id. at *7–8.

Klein is charged with three felony and five misdemeanor offenses. None of the offenses gives rise to a rebuttable presumption of dangerousness under the BRA. But the crimes alleged are serious, and both Counts 2 and 3—which charge Klein with obstructing an official proceeding and assaulting, resisting, or impeding certain officers using a dangerous weapon—carry a statutory maximum of twenty years in prison. See 18 U.S.C. §§ 1512(c), 111(b).

The next few considerations, however, weigh against detention. Any evidence that Klein planned his conduct before arriving at the Capitol is noticeably absent. See Chrestman, 2021 WL 765662, at *8 ("[S]teps taken in anticipation of an attack on Congress speak volumes to both the

gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses."). A former romantic partner of Klein's told the government that Klein had plans to attend the "Stop the Steal" rally outside the White House earlier that day. Gov't Br. at 18 & n.8. But that witness was "not aware that Klein had any plans for violence," id., and the government has proffered no evidence that Klein's prolonged confrontation with law enforcement or even his attempt to breach the Capitol building were premeditated. Furthermore, although the parties vehemently dispute whether Klein used a dangerous weapon during the riot—i.e., the stolen riot shield—there is no suggestion that he brought a weapon with him to the Capitol or carried any items that evinced an "expectation that the need to engage in violence against law enforcement or . . . the Legislative branch, might arise." See Chrestman, 2021 WL 765662, at *8. Indeed, Klein was dressed in ordinary clothing—namely a "green jacket, dark dress pants, [] a blue dress shirt," and a red baseball cap with the "Make America Great Again" ("MAGA") slogan—and not any tactical or military gear. SOF at 2.

There is also no evidence that Klein coordinated with other participants before, during, or after the riot, or assumed any meaningful leadership role during the events of January 6. To be sure, Klein did try to encourage other rioters to hold the mob's position in the tunnel by shouting "We need fresh people, we need fresh people," on two separate occasions. See SOF at 8. Those are, however, the only words of encouragement that he is alleged to have spoken; and viewed in context, those chants—though reprehensible—hardly establish that Klein was a de facto leader of the mob. The first chant, for instance, echoes a similar call for "fresh patriots at the front" made by an adjacent rioter seconds before. See Scenes Captured Inside US Capitol as Crowd Challenges Police, YouTube (Jan. 7, 2021) https://www.youtube.com/watch?v=qc0U755-uiM&t=636s (Mins. 10:29–10:42). And countless other words of incitement can be heard throughout the tunnel

during the time that Klein was inside.[7]

The government does assert that Klein engaged in a coordinated effort when he and another unidentified rioter wedged the riot shield between the Capitol doors to enable a third rioter to push open the closing door.  See Hr'g Tr. 55:13–22.  But this type of ad hoc, spur-of-the-moment collaboration—while troubling—does not generate nearly the same kind of coordination concerns as other cases.  See, e.g., United States v. Pezzola, 2021 WL 1026125, at *9 (Kelly, J.) (ordering pretrial detention for defendant "engaged in planning and coordination with other Proud Boys, including by arranging concealed means of communicating by radio during the riot"); Chrestman, 2021 WL 765662, at *2–3(ordering pretrial detention for defendant who marched with the Proud Boys to the Capitol, urged the crowd to "take" the Capitol, and then "led his [four] co-conspirators in deliberate efforts to prevent Capitol Police from closing the barriers").  Therefore, although Klein occasionally worked in tandem with the mob and contributed to its overall efforts, the Court respectfully disagrees with Magistrate Judge Faruqui that Klein played any real leadership role within the tunnel.

The government's contention that Klein engaged in "what can only be described as hand-to-hand combat" for "approximately thirty minutes" also overstates what occurred.  See Gov't's Br. at 6.  Klein consistently positioned himself face-to-face with multiple officers and also repeatedly pressed a stolen riot shield against their bodies and shields.  His objective, as far as the Court can tell, however, appeared to be to advance, or at times maintain, the mob's position in the tunnel, and not to inflict injury.  He is not charged with injuring anyone and, unlike with other

---

[7] At the hearing, the government also referenced a video clip of Klein waving his hand in the air while he was standing on the Capitol grounds.  In a text message exchange with a reporter, Klein later described his gesture as motioning for another person "to come here."  See Hr'g Tr. 49:4–8.  Although the government offered this as further evidence of Klein's role in encouraging others to participate in the riot, see id. at 49:19–24, the Court does not find this incriminating without further context.

defendants, the government does not submit that Klein intended to injure officers. Compare Hr'g Tr. 57:12–18 (government conceding that the evidence does not establish Klein intended to injure anyone, only that "there was a disregard of care whether he would injure anyone or not" in his attempt to enter the Capitol), with Gov't's Opp'n to Def.'s Mot. to Reopen Detention Hearing & For Release on Conditions, ECF No. 30 ("Gov't's Opp'n to McCaughey's Release"), United States v. McCaughey, III, 21-CR-040-1, at 11 (D.D.C. Apr. 7, 2021) (government emphasizing defendant's "intent to injure" an officer who he had pinned against a door using a stolen riot shield as grounds for pretrial detention). And during the time period before Klein obtained the riot shield, he made no attempts to "battle" or "fight" the officers with his bare hands or other objects, such as the flagpole he retrieved. That does not mean that Klein could not have caused serious injury— particularly given the chaotic and cramped atmosphere inside the tunnel. But his actions are distinguishable from other detained defendants charged under § 111(b) who clearly sought to incapacitate and injure members of law enforcement by striking them with fists, batons, baseball bats, poles, or other dangerous weapons.[8]

The record is also strikingly silent as to what—other than "we need fresh people" and "no way"—Klein actually said during his time at the Capitol. It is possible that his words are simply

---

[8] See, e.g., Statement of Facts, ECF No. 1-1 & Min. Entry (Apr. 1, 2021), United States v. Webster, 21-CR-208 (D.D.C.) (defendant struck officer with flagpole multiple times, tackled officer, and pinned officer to ground while trying to remove officer's shield and gas mask); Statement of Facts, ECF No. 1-1 & Min. Entry (Apr. 8, 2021), United States v. Sabol, 21-CR-35-1 (D.D.C.) (defendant took officer's baton and dragged officer down steps); Statement of Facts, ECF No. 1-1 & Min. Entry (Apr. 5, 2021), United States v. McKellop, 21-CR-268 (D.D.C.) (defendant pushed officers back with his hands, threw a bottle at another officer, and shoved flagpole into officer's face); Statement of Facts, ECF No. 1-1 & Min. Entry (Mar. 10, 2021), United States v. Stager, 21-CR-35-2 (D.D.C.) (defendant struck officer on the ground with flagpole); Statement of Facts, ECF No. 1-1 & Min. Entry (Mar. 15, 2021), United States v. Foy, 21-CR-108-1 (D.D.C.) (defendant lifted hockey stick above his head and struck an officer lying on the ground multiple times); Statement of Facts, ECF No. 1-1 & Rule 5(c)(3) Docs., ECF No. 6, United States v. Jenkins, 21-CR-245 (D.D.C.) (defendant threw nine items at officers, including three stick-like objects, a wooden dresser drawer, and a flagpole); Aff. in Supp. of Crim. Compl. & Arrest Warrant, ECF No. 1-1 & Min. Entry (Feb. 9, 2021), United States v. Lang, 21-CR-53 (D.D.C.) (defendant swung bat at officers' shields); Statement of Facts, ECF No. 1-1 & Min. Entry (Mar. 9, 2021), United States v. Mellis, 21-CR-206 (D.D.C.) (defendant repeatedly struck or attempted to strike officers' necks between their helmets and body armor).

inaudible given the noise inside the tunnel. But, in contrast to many others present that day, he is never shown verbally threatening any officers or even boasting about his confrontations with law enforcement after the fact.

Nonetheless, Klein did act on the front lines of the mob for a significant time period. He can be seen actively advancing himself to the very front of the tunnel on more than one occasion. And he demonstrated a clear and persistent willingness to use force against law enforcement to attempt to gain entry into the Capitol and to stop the certification of the election.[9] That conduct is deeply troubling and reveals some propensity for violence, as well as a blatant disregard for the law. Furthermore, his suggestion that his conduct is somehow less egregious because he never actually entered the Capitol building is nonsensical because, as the government puts it, that "was not for his lack of trying." See Gov't's Br. at 20; Def.'s Br. at 19.

All told then, the Court finds that the nature and circumstances of the charged offense weigh modestly in favor of detention. Klein's conduct was forceful, relentless, and defiant, but his confrontations with law enforcement were considerably less violent than many others that day, and the record does not establish that he intended to injure others.

### ii.       The Weight of the Evidence

There is strong evidence that Klein attempted to gain entry into the Capitol building on January 6 and employed force against multiple officers. Klein is captured on several cameras inside the Lower West Terrace tunnel, using a riot shield to wedge open the building doors and push back the officers protecting the tunnel entrance. Although Klein has not conceded that the

---

[9] The Court finds completely unconvincing Klein's assertion that he was a "protestor[] caught in the middle of the officers and the mob" who was unable to turn around or retreat. See Reply in Supp. of Def.'s Mot. for Review & Revocation of Detention Order ("Def.'s Reply") [ECF No. 27] at 5. Even if Klein did find himself "trapped" for any limited moment in time, he remained in the tunnel for approximately thirty-eight minutes, and many other individuals exited the tunnel during that time. Thus, Klein failed to retreat despite ample opportunity to do so.

individual depicted on video is him, three separate witnesses—including a former colleague of two years at the State Department and a recent romantic partner—have identified him in the footage. See SOF at 3–4; Gov't Br. at 23. Cell-site location information is consistent with Klein's presence at the Capitol on January 6, see SOF at 4, and he told his former partner "that he had been pepper sprayed and assaulted" that day, see Gov't Br. at 23. He also confirmed in a text message exchange with a reporter that he was caught on video at the Capitol on January 6. Hr'g Tr. 48:15–23.

Klein attempts to cast doubt on the evidence against him by arguing that "the individual [the government] purport[s] to be Mr. Klein is apparently captured wearing two <u>different</u> hats" and other tipsters identified the individual in the footage as "someone <u>other than</u> Mr. Klein." Def.'s Br. at 22. Neither argument is convincing. Klein did lose his original red MAGA hat at some point when he exited the tunnel, but he is soon captured on video placing a different red hat on his head. See SOF at 10–13. "The contention that the defendant's hat switch" then somehow diminishes the government's case against him "not only ignores [that] video evidence, but also disregards" the similarity of Klein's "facial features, build, hairstyle, and clothing," which also serve as a basis to identify him. Gov't Br. at 22–23. Furthermore, the fact that the "FBI received tips during [its] investigation that did not identify Klein" as the individual captured on camera is even less persuasive. The FBI made thorough efforts to follow up on those tips, many of which were vague and none of which could be corroborated. And three separate witnesses—two of whom had extensive and recent interactions with Klein—have confirmed his identity. See SOF at 3–4; Gov't Br. at 23.

In sum, this factor weighs firmly in favor of detention, although it "is the least important." See United States v. Gebro, 948 F.2d 1118, 1121–22 (9th Cir. 1991).

### iii.    History and Characteristics of the Defendant

Klein's history and characteristics are mixed, but tilt slightly in favor of release.  As part of this factor, the Court must consider Klein's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).

Klein is 42 years old and has lived in the Washington, DC area for his entire life.  Def.'s Br. at 23.  He reports to be "a devout catholic and regular parishioner" at a church in Virginia, and has substantial family in the area, including his mother, step-mother, brother, and sister-in-law. Id.  He served "honorably in the Iraq War" as a marine, id. at 24, and spent the past four years as a political appointee in the State Department during the Trump Administration, id.  In that role, he possessed a "Top Secret" security clearance.  SOF at 3.  Klein resigned on January 19, 2021 with the change in administration, at which time he began actively seeking work and occasionally working as a landscaper until the time of his arrest.  Def.'s Br. at 24; Hr'g Tr. 64:19–25, 65:1–5. His criminal history—which as far as the Court can tell, consists of one 1998 arrest for failing to appear, another unspecified arrest presumably associated with that charge, and no prior convictions—is very limited.  See Pretrial Services Report [ECF No. 5].  And he has no known ties to any extremist groups.  These characteristics are all to Klein's credit.

The government nonetheless contends that "this factor weighs substantially in favor of detention" because Klein's conduct on January 6 "demonstrates an utter disregard for the law and the legitimate functions of government."  Gov't Br. at 24.  This contention buttresses the government's view that Klein would not comply with any conditions of release.  See id. at 25.  In light of the D.C. Circuit's recent admonition in Munchel, the Court finds that this argument is best

19

considered in the subsequent section examining whether any condition or combination of conditions would reasonably assure the safety of the community. See Munchel, 2021 WL 1149196, at *7 ("Detention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness."). Still, the Court does agree that Klein's decisions on January 6 show that he is willing to allow "his own personal beliefs [to] override the rule of law" which "reflect[s] poorly on his character." Gov't Br. at 24, 25.

The government also argues that "Klein abdicated his responsibilities to the country and the Constitution" on January 6 by violating his oath of office as a federal employee to "support and defend the Constitution of the United States against all enemies, foreign and domestic." Id. at 24–25 (quoting 5 U.S.C. § 3331). The fact that, as a federal employee, Klein actively participated in an assault on our democracy to thwart the peaceful transfer of power constitutes a substantial and deeply concerning breach of trust. More so, too, because he had been entrusted by this country to handle "top secret" classified information to protect the United States' most sensitive interests. In light of his background, Klein had, as Magistrate Judge Faruqui put it, every "reason to know the acts he committed" on January 6 "were wrong," and yet he took them anyway. Order of Detention Pending Trial at 4. Klein's position as a federal employee thus may render him highly culpable for his conduct on January 6. But it is less clear that his now-former employment at the State Department heightens his "prospective" threat to the community. See Munchel, 2021 WL 1149196, at *4. Klein no longer works for or is affiliated with the federal government, and there is no suggestion that he might misuse previously obtained classified information to the detriment of the United States. Nor, importantly, is he alleged to have any contacts—past or present—with individuals who might wish to take action against this country.

Ultimately, Klein's history—including his ability to obtain a top-level security clearance—

shows his potential to live a law-abiding life. His actions on January 6, of course, stand in direct conflict with that narrative. Klein has not—unlike some other defendants who have been released pending trial for conduct in connection with the events of January 6—exhibited remorse for his actions. See, e.g., United States v. Cua, 2021 WL 918255, at *7–8 (D.D.C. Mar. 10, 2021) (Moss, J.) (weighing defendant's deep remorse and regret in favor of pretrial release). But nor has he made any public statements celebrating his misconduct or suggesting that he would participate in similar actions again. And it is Klein's constitutional right to challenge the allegations against him and hold the government to its burden of proof without incriminating himself at this stage of the proceedings. See United States v. Lawrence, 662 F.3d 551, 562 (D.C. Cir. 2011) ("[A] district court may not pressure a defendant into expressing remorse such that the failure to express remorse is met with punishment."). Hence, despite his very troubling conduct on January 6, the Court finds on balance that Klein's history and characteristics point slightly toward release.

### iv. Nature and Seriousness of the Danger

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(4). "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," as it requires the Court to engage in an "open-ended assessment of the 'seriousness' of the risk to public safety." Cua, 2021 WL 918255, at *5 (quoting United States v. Taylor, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)).

As stated above, Klein's conduct on January 6 showed an obvious disregard for the safety of others and for the country. The government has shown by clear and convincing evidence that he employed persistent force against multiple officers, repeatedly pressing a stolen riot shield against them to gain entry into the Capitol building and stop the certification of the election. And

the government has likewise established that he chose to position himself at the front lines of the mob for over half an hour, without once appearing to reconsider the propriety or ramifications of his conduct even as officers commanded him to stop.  There is no evidence, however, that he injured an officer or anyone else, or that he destroyed any federal property—or that he sought to do either.  He also has not, to the government's knowledge, ever verbally threatened others or advocated political violence either before or after January 6.  Indeed, Klein's life otherwise has been lawful, and the nearly two months he spent outside of jail between January 6 and his arrest on March 4, when the continued threat to our democracy loomed particularly large, apparently proceeded without incident.

The degree to which Klein's behavior on January 6 appears, at least on paper, to be an aberration in his life makes his dangerousness challenging to assess.  So, too, does his lack of planning.  The D.C. Circuit recently remarked that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."  Munchel, 2021 WL 1149196, at *8.  Klein's actions may place in him in the former category, but just barely—his conduct does not approach the high end of the spectrum of violence that occurred and was threatened that day.

The government seeks to analogize Klein's behavior to that of another rioter alleged to have pressed a stolen riot shield against an officer in the tunnel.  But that defendant, after "strik[ing] multiple officers with [a] stolen riot shield," is allegedly depicted on video using the shield to pin an officer against a door for over ten seconds as the officer screams for help, his mouth dripping blood.  See Gov't's Opp'n to McCaughey's Release, McCaughey, III, at 3–5. During that incident, that defendant also says to the officer, "come on man, you are going to get

squished just go home." Id. at 3. That type of force is of a different magnitude than Klein's. Furthermore, the government decided not to appeal the release of a codefendant in that same case, who is alleged to have used a stolen riot shield in the tunnel "to push against the line of officers" and to have tried to take an officer's baton. See Aff. in Supp. of Crim. Compl. & Arrest Warrant, ECF No. 1-1, United States v. Stevens, 21-CR-040-2, at 8–9, (D.D.C. Feb. 3, 2021); Hr'g Tr. 45:10–11. And the government is not aware of any other individual—besides McCaughey—who, like Klein, was on the front line of the mob in the tunnel and is still detained pending trial. See Hr'g Tr. 45:22–25, 46:1–10.

Of course, any determination of dangerousness must rest on the specific circumstances of each defendant. See Munchel, 2021 WL 1149196, at *7 ("[W]hether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant."). But where so much of the proffered justification for Klein's detention relies on the type of force he employed, the Court sees some relevance in the fact that several defendants who also face charges under §111(b) for assaulting officers and did not engage in planning activities were released without objection from the government. See Statement of Facts (Jan. 7, 2021), ECF No. 1-1 & Min. Entry (Jan. 8, 2021), United States v. Leffingwell, 21-CR-5 (D.D.C.) (defendant repeatedly punched officer with closed fist in attempt to push past wall of officers); Statement of Facts (Jan. 18, 2021), ECF No. 1-1 & Min. Entry (Jan. 19, 2021), United States v. Gossjankowski, 21-CR-123 (D.D.C.) (defendant activated taser within tunnel multiple times as he pushed towards the police line); Statement of Facts (Feb. 9, 2021), ECF No. 1-1 & Min. Entry (Feb. 17, 2021), United States v. Blair, No. 21-CR-186 (D.D.C.) (defendant struck an officer in the chest with a

lacrosse stick).[10]  To be sure, these cases do not entail the same duration of force employed by Klein, but, on the other hand, they do appear to involve actions intended to injure or incapacitate officers.

The broad divisions drawn in Munchel offer some parameters for differentiating among participants at the January 6 events.  But ultimately the D.C. Circuit's primary holding there is that a finding of dangerousness must be predicated on a concrete determination that the defendant poses a continued, "identified and articulable threat to the community" or to another person.  Munchel, 2021 WL 1149196, at *4 (quoting Salerno, 481 U.S. at 751).  As part of that analysis, the D.C. Circuit advised the district court to consider "the specific circumstances that made it possible, on January 6, for [the defendant] to threaten the peaceful transfer of power."  Id. at *8.  In this respect, this Court finds that "the presence of the group" somewhat impacted Klein's "ability to obstruct the vote and to cause danger to the community."  Id.  His most forceful conduct was directed to advancing and maintaining the mob's position in the tunnel, not toward inflicting injury, and outside that context, the nature of his actions and the force that he employed would not have had the same effect.

Although the government emphasizes Klein's "choice to use violence as a means to his ends" as evidence that he "poses a threat regardless of the unique circumstances of January 6, 2021," see Gov't's Br. at 27, it does not articulate any concrete "end[]" or "threat," now that "the transition [of power] has come and gone."  See Munchel, 2021 WL 1149196, at *10 (Katsas, J., concurring in part and dissenting in part); see id. at *8 (Wilkins, J.) (explaining that defendants'

---

[10]  Other defendants in this category have also been ordered released without further appeal thus far from the government.  See, e.g., Statement of Facts (Jan. 13, 2021), ECF No. 1-1 & Min. Entry (Mar. 2, 2021), United States v. Sanford, 21-CR-86 (D.D.C.) (defendant hurled a fire extinguisher that struck one officer and ricocheted off two other officers' helmets); Statement of Facts (Feb. 16, 2021), ECF No. 1-1 & Min. Entry (Apr. 9, 2021), United States v. Coffee, 21-MJ-236 (D.D.C.) (defendant pushed a crutch into an officer's body at the archway to the tunnel and then charged at several officers in the tunnel with the crutch).

purported "danger to 'act against Congress'" required additional justification). Indeed, while security threats around the Capitol are always present, the specific concerns in the wake of the January 6 events over future protests and violent attacks on the government—on January 20, March 4, and otherwise—have dissipated to some degree now three months later, even though troops and defenses remain present. See id. As the majority emphasized in Munchel, the threat to public safety must be continuing and prospective. Id. at *4.

Therefore, although it is a close call, the Court ultimately does not find that Klein poses a substantial prospective threat to the community or any other person. He does not pose no continuing danger, as he contends, given his demonstrated willingness to use force to advance his personal beliefs over legitimate government objectives. But what future risk he does present can be mitigated with supervision and other strict conditions on his release.

Klein will, among other things, be restricted to his home—where he is not alleged to have engaged in any unlawful or even threatening conduct before—except for employment, education, religious services, medical treatment, attorney visits, court-ordered obligations, and other pre-approved activities. Cf. Chrestman, 2021 WL 765662, at *16 (rejecting feasibility of home detention where defendant had engaged in planning at his home, harbored weapons there, and destroyed evidence of his involvement in the January 6 events); Pezzola, 2021 WL 1026125, at *9 (similar). He will be prohibited from entering the Capitol grounds, attending any type of political protest, contacting other participants in the events of January 6, and possessing firearms or other weapons. And his compliance with these conditions will be ensured through GPS monitoring.

The government disagrees that Klein can be trusted to follow any court orders in light of his refusal to obey officers' commands at the Capitol and his brazen disrespect for the rule of law in full view of law enforcement. See Gov't's Br. at 24–25. Although certainly relevant to the

25

Court's analysis, those facts are not dispositive because the same rationale applies to virtually every rioter within the tunnel and many other individuals who contributed to the threat at the Capitol that day.  And weighed against Klein's lack of past criminal history, lack of efforts to obstruct the FBI's investigation, and law-abiding behavior for the period leading up to his arrest, there is not "clear and convincing evidence" that Klein would violate this Court's orders upon release.  See 18 U.S.C. § 3142(f); see also Munchel, 2021 WL 1149196, at *7 ("'[T]he law requires reasonable assurance, but does not demand absolute certainty' that a defendant will comply with release conditions because a stricter regime 'would be only a disguised way of compelling commitment in advance of judgment.'") (quoting United States v. Alston, 420 F.2d 176, 178 (D.C. Cir. 1969)).

This decision is not an easy one, but, in the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, this Court must apply "the default rule favoring liberty."  See Cua, 2021 WL 918255, at *8; see also Salerno, 481 U.S. at 755 ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").  Hence, the Court will order Klein released pending trial, subject to the conditions set forth in Attachment A of the accompanying Order issued on this date.

## II.    Government's Motion to Continue and Exclude Time Under the Speedy Trial Act

The Court's decision to release Klein pending trial substantially alters the parameters of the parties' dispute regarding the government's request to exclude time under the Speedy Trial Act.  The government had moved for a sixty-day continuance and exclusion of time based on the complexity associated with prosecuting the offenses related to the January 6 events and the need for adequate time to prepare.  Continuance Mot. at 6.  Klein objected to this request primarily, though not exclusively, on the ground that "the combination of insisting" on Klein's indefinite

"pretrial detention while not being able [to] afford Mr. Klein a speedy trial constitutes a violation of his due process rights."  Def.'s Br. at 28.  Those concerns have dissipated given that Klein will no longer be detained.[11]

Nonetheless, the Court must still examine the propriety of continuing this matter and excluding time under the Speedy Trial Act.  Klein takes issue with the fact that he has not received discovery and that the government "does not now know when it will be prepared for trial."  Def.'s Reply at 11 (emphasis omitted); see also Def.'s Br. at 29.  Since the time of Klein's initial filing, however, the Court understands that the government has produced "all of the BWC . . . upon which the government has based its case [against Mr. Klein] to date," see Def.'s Reply at 5, and anticipates providing by April 19 all other "specific materials that the government relied on in charging Mr. Klein, as well as related materials such as the data extraction from his cell phone and the search of his vehicle," see Gov't's Br. at 29.  Those steps demonstrate substantial forward progress and satisfy this Court that a further continuance is appropriate.  However, in light of Klein's concerns about the discovery delays, the Court will continue this proceeding for only thirty days to further monitor what progress has been made and ensure that the interests of justice remain served.

In its prior Order addressing speedy trial issues in this case, the Court detailed the complexity associated with discovery and now incorporates those findings here.  See Order (Mar. 26, 2021) at 1–2.  The Court again finds that due to the number of individuals currently charged

---

[11] The Court does not disagree that the speedy trial analysis would be quite different were Klein to remain detained pretrial.  But Klein's specific due process argument is not persuasive.  In Salerno, the Supreme Court held that the BRA, which permits pretrial detention in certain "carefully limited exception[s]," facially comports with due process because it serves a regulatory purpose, and is not punitive in nature.  481 U.S. at 748, 755.  The Supreme Court, however, expressed "no view as to the point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal."  Id. at 747 n.4.  Even so, the five weeks that Klein has spent in pretrial detention does not remotely approach that threshold.  See Sharps v. United States, 2021 WL 922468, at *11 n.89 (D.C. Mar. 11, 2021) (collecting cases holding that twenty to fifty-two months of pretrial detention did not violate due process).

in connection with the events of January 6, the scope of the ongoing investigation, the volume and nature of potentially discoverable materials, and the reasonable time necessary for effective preparation by all parties taking into account the exercise of due diligence, the failure to grant a continuance in this proceeding would likely make a continuation of this proceeding impossible, or result in a miscarriage of justice. For the same reasons, it is unreasonable to expect adequate preparation for pretrial proceedings or trial itself within the time limits established by the Speedy Trial Act.

Hence, under 18 U.S.C. §§ 3161(h)(7)(B)(i) and (ii), the ends of justice served by granting a thirty-day continuance from April 9, 2021 to May 10, 2021 outweigh the best interest of the public and the defendant in a speedy trial. The time between April 9, 2021 and the date of this Order is likewise excluded from the speedy trial computation under 18 U.S.C. § 3161(h)(1)(H).[12]

### Conclusion

For the reasons explained above, the Court will grant defendant's motion to revoke his detention and order that he be released on conditions, as set forth in Attachment A of the accompanying Order issued on this date. The Court will also continue this matter for thirty days— until a status conference now set for May 10, 2021 at 10:00 a.m.—and exclude the intervening time in the interests of justice under the Speedy Trial Act.

/s/
JOHN D. BATES
United States District Judge

Dated: April 12, 2021

---

[12] Moreover, as Klein recognizes, in light of the "exigent circumstances created by the COVID-19 pandemic," Chief Judge Howell has entered a District-wide Standing Order excluding time through August 31, 2021 under 18 U.S.C. § 3161(h)(7)(B)(i) in all criminal cases "that cannot be tried consistent with [] health and safety protocols and limitations." See Standing Order No. 21-10 (BAH) (Mar. 5, 2021); Def.'s Br. at 31 n.12.